**LEVI & KORSINSKY, LLP**
Adam M. Apton (316506)
Adam C. McCall (302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel : 415-373-1671
Fax : 415-484-1294
Email: aapton@zlk.com
       amccall@zlk.com

*Attorneys for Plaintiffs and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISSA M. ROBERTS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BLOOM ENERGY CORPORATION, KR SRIDHAR, RANDY FURR, L. JOHN DOERR, SCOTT SANDELL, EDDY ZERVIGON, COLIN L. POWELL, PETER TETI, MARY K. BUSH, KELLY A. AYOTTE, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, KEYBANC CAPITAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH IN CORPORA TED, ROBERT W. BAIRD & CO., INCORPORATED, COWEN AND COMPANY, LLC, HSBC SECURITIES (USA) INC., OPPENHEIMER & CO. INC., and RAYMOND JAMES & ASSOCIATES, INC.,<br><br>Defendants. | Case No. 3:19-cv-02935-WHO<br><br><u>CLASS ACTION</u><br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>DEMAND FOR JURY TRIAL</u> |

Lead Plaintiff James Everett Hunt ("Hunt") and additional plaintiff Juan Rodriguez ("Rodriguez") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Bloom Energy Corporation ("Bloom Energy") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Bloom Energy's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the company; (d) interviews with former employees; and (e) information readily obtainable on the Internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of Bloom Energy common stock: (i) in Bloom Energy's initial public offering on July 25, 2018 (the "IPO"); and/or (ii) on the public market between July 25, 2018 and September 16, 2019, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against Bloom Energy and certain of its top officials.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Bloom Energy has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

4.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

5.      Plaintiff Hunt is a former stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.   Hunt previously filed his certification evidencing his transactions in Bloom Energy's common stock with the Court in connection with his motion for appointment as Lead Plaintiff.  An updated certification and list of transactions is filed along with this Complaint as "Exhibit A" is incorporated herein by reference.

6.      Plaintiff Rodriguez is a former stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.   Rodriguez's transactions and certifications are filed along with this Complaint as "Exhibit B" and is incorporated herein by reference.

7.      Defendant Bloom Energy is a Delaware corporation with principal executive offices located at 4353 North First Street, San Jose, California.  Bloom Energy is traded on the New York Stock Exchange under the ticker symbol "BE".

8.      Defendant KR Sridhar ("Sridhar") is Bloom Energy's Founder and has been a director since January 2001. Sridhar has also been Chief Executive Officer and Chairman of the Board of Directors since April 2002, and has acted as President since at least July 2011. Defendant Sridhar reviewed and signed the Registration Statement.

9.      Defendant Randy Furr ("Furr") has been Bloom Energy's Chief Financial Officer since April 2015, and has been the Executive Vice President since at least March 2016. Defendant Furr reviewed and signed the Registration Statement.

10.      Defendant L. John Doerr ("Doerr") has been Bloom Energy's Lead Independent Director since July 2018, and has been a director since May 2002. Defendant Doerr reviewed and signed the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Registration Statement.

11.     Defendant Scott Sandell ("Sandell") has been a director of Bloom Energy since August 2003. Defendant Sandell reviewed and signed the Registration Statement.

12.     Defendant Eddy Zervigon ("Zervigon") has been a director of Bloom Energy since October 2007. Defendant Zervigon reviewed and signed the Registration Statement.

13.     Defendant Colin L. Powell ("Powell") has been a director of Bloom Energy since January 2009. Defendant Powell reviewed and signed the Registration Statement.

14.     Defendant Peter Teti ("Teti") has been a director of Bloom Energy since November 2015. Defendant Teti reviewed and signed the Registration Statement.

15.     Defendant Mary K. Bush ("Bush") has been a director of Bloom Energy since January 2017. Defendant Bush reviewed and signed the Registration Statement.

16.     Defendant Kelly A. Ayotte ("Ayotte") has been a director of Bloom Energy since November 2017. Defendant Ayotte reviewed and signed the Registration Statement.

17.     Defendant J.P. Morgan Securities LLC ("JP Morgan") is a Delaware limited liability company with principal executive offices located at 383 Madison Avenue, New York, New York. Defendant JP Morgan entered into an underwriting agreement with the company in connection with the IPO. Defendant JP Morgan also acted as a co-joint, book-running manager of the IPO and as co-representative of the underwriters.

18.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York. Defendant Morgan Stanley entered into an underwriting agreement with the company in connection with the IPO. Defendant Morgan Stanley also acted as a conjoint, book-running manager of the IPO and as co-representative of the underwriters in the IPO.

19.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company with principal executive offices located at 11 Madison Avenue, New York, New York. Defendant Credit Suisse entered into an underwriting agreement with the company in connection with the IPO.

20.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is an Ohio corporation with

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

principal executive offices located at 127 Public Square, Cleveland, Ohio. Defendant KeyBanc entered into an underwriting agreement with the company in connection with the IPO.

21.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation with principal executive offices located at 4 World Financial Center, North Tower, New York, New York. Defendant Merrill Lynch entered into an underwriting agreement with the company in connection with the IPO.

22.     Defendant Robert W. Baird & Co. Incorporated ("Baird") is a Wisconsin corporation with principal executive offices located at 777 E Wisconsin Avenue, Milwaukee, Wisconsin. Defendant Baird entered into an underwriting agreement with the company in connection with the IPO.

23.     Defendant Cowen and Company, LLC ("Cowen") is a Delaware limited liability company with principal executive offices located at 599 Lexington Avenue, 20th Floor, New York, New York. Defendant Cowen entered into an underwriting agreement with the company in connection with the IPO.

24.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a Delaware corporation with principal executive offices located at 452 Fifth Avenue, New York, New York. Defendant HSBC entered into an underwriting agreement with the company in connection with the IPO.

25.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a New York corporation with principal executive offices located at 85 Broad Street, New York, New York. Defendant Oppenheimer entered into an underwriting agreement with the company in connection with the IPO.

26.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a Florida corporation with principal executive offices located at 880 Carillon Parkway, Saint Petersburg, Florida. Defendant Raymond James entered into an underwriting agreement with the company in connection with the IPO.

*      *      *

27.     "Underwriter Defendants" refers to Defendants JP Morgan, Morgan Stanley, Credit Suisse, KeyBanc, Merrill Lynch, Baird, Cowen, HSBC, Oppenheimer, and Raymond James.

28.     "Section 11 Defendants" refers to Defendants Bloom Energy, Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, Ayotte, and the Underwriter Defendants.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

29.     "Section 15 Defendants" refers to Defendants Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, and Ayotte.

30.     "Section 10(b) Defendants" refers to Defendants Bloom Energy, Sridhar, and Furr.

31.     "Section 20(a) Defendants" refers to Defendants Sridhar and Furr.

## BACKGROUND ALLEGATIONS

32.     Bloom Energy refers to its core product as a "Bloom Energy Server." According to Bloom Energy, its Servers are a stationary power generation platform that convert standard low-pressure natural gas or biogas into electricity through an electrochemical process. In other words, Bloom Energy's Servers convert gas into electric.

33.     Bloom Energy primarily recognizes revenue from (*i*) selling Servers to customers and (*ii*) providing maintenance services to its customers under warranty and maintenance agreements, or MSAs.

34.     When Bloom Energy sells a Server, the company recognizes revenue only after the Server is installed and producing power. Bloom Energy refers to this as an "acceptance."

35.     Bloom Energy identified "acceptances" as one of its "key operating metrics" that investors could use to track the progress of the company and gain "useful insight into the operational trajectory, cash generation, and cost profile of the business."

36.     When Bloom Energy sells, leases, or finances a Server to a customer, the Server generally comes with a one-year warranty as well as the option to purchase an extended MSA. The yearly cost of the MSA is predetermined at the time of purchase and MSAs may be renewed annually for a period of up to 25 years. According to Bloom Energy, the company's customers have "almost always" exercised their option to renew the MSAs with "virtually no customers hav[ing] selected to cancel [them]."

37.     Bloom Energy's MSAs contain guarantees for its Servers. Pursuant to these guarantees, Bloom Energy is liable for repairing and/or replacing its Servers when output or efficiency falls below certain thresholds. Bloom Energy prices these contracts, and estimates reserves in relation thereto, based on estimates of the life of the Servers and their components, including the internal fuel cells.

## THE SECURITIES ACT CLAIMS

38.     These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k

and 77o, are based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of the Section 11 Defendants' investigation of the true facts underlying the alleged misstatements and omissions.

39.     These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained elsewhere in this Complaint that allege fraud or scienter. These Securities Act claims are not based on any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance on fraud allegations for the purpose of these claims.

40.     After more than 15 years as a private company, Bloom Energy decided to go public. On June 12, 2018, the company filed a draft registration statement with the SEC on Form S-1 registering shares for the IPO. Bloom Energy amended this registration statement on July 9, 2018, July 19, 2018, July 20, 2018, and July 24, 2018. On July 26, 2018, Bloom Energy filed its final prospectus for the IPO. Bloom Energy's initial registration statement, subsequent amendments, and final prospectus are collectively referred to herein as the "Registration Statement."

41.     The Registration Statement registered over 20.7 million Bloom Energy shares for sale. These shares were sold in the IPO at $15 per share and began trading on July 25, 2018. Bloom Energy received proceeds of $284.3 million, net of underwriting discounts, commissions, and estimated offering costs.

42.     Bloom Energy's Registration Statement contained untrue statements of material fact and omitted to state other material facts required to be stated in order to make statements therein not misleading. The omissions and misrepresentations within the Registration Statement related to: (*i*) uncertainties arising from "construction delays" that impacted Bloom Energy's "acceptances" and, in turn, revenue; and (*ii*) Bloom Energy's estimated repair and replacement liabilities, including expenses under its MSAs.

A.     **Construction Delays**

43.     Bloom Energy's Registration Statement described certain "risks" related to Bloom Energy, including that the company was dependent on construction schedules that may be delayed. In particular, the Registration Statement stated:

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations.***

Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.

*      *      *

The timing of delivery and installations of our products have a significant impact on the timing of the recognition of product revenue. ***Many factors can cause a lag between the time that a customer signs a purchase order and our recognition of product revenue. These factors include . . . customer facility construction schedules***.

44.     In violation of Section 11 of the Securities Act, the statements identified in emphasis above in Paragraph 43 did not disclose that Bloom Energy was, at the time of the Registration Statement, already facing significant construction delays that were interfering with its installations and "acceptances." In fact, the construction delays existing at the time of the Registration Statement were so substantial that they prevented Bloom Energy from meeting even the low end of its publicly-stated guidance for "acceptances" for the third quarter of 2018 (i.e., the quarter in which the IPO occurred).

45.     According to CW1 who was a senior program manager for Bloom Energy from June 2016 to February 2018, construction delays were a constant issue at Bloom Energy. CW1 indicated that during his[1] tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

46.     CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left the company in February 2018.

47.     CW1 also indicated that upper management, all the way up to the company's CEO KR Sridhar typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

48.     CW was in a position to know about the construction delays because he was responsible

---

[1] The CW is referred to in the masculine to help protect his identity.

for overseeing sales from development to acceptance, providing technical help during installation and sales, overseeing construction contracts, and ensuring that the construction and installation met all government requirements.

49. On November 5, 2018, Bloom Energy disclosed its operating results for the third quarter of fiscal 2018. The company reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that the company's low rate of "acceptances" was "a result of construction delays." Accordingly, at the time of the IPO, Bloom Energy was experiencing significant "construction delays" that the company did not disclose in the Registration Statement.

50. Market analysts from large banks focused on this point. On November 6, 2018, Cowen released an analyst report titled "Growing Pains" and noted that "3Q results were largely impacted by lower than expected acceptances as a result of construction timing delays." Similarly, Credit Suisse published a report titled "Bloom Wilts a Bit on Project Delays." Credit Suisse stated, "Bottom line – near-term challenges due to construction delays." The fact that market analysts focused on the "construction delay" news confirms that it was material to investors and, for that reason, should have been disclosed in the Registration Statement.

51. The Section 11 Defendants also violated Section 11 of the Securities Act in so far as they failed to comply with Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. Item 303 requires disclosure of any known events or uncertainties that, at the time of the IPO, had caused, or were reasonably likely to cause, a materially negative impact on Bloom Energy.

52. Bloom Energy's "construction delays" constituted an "uncertainty" under Item 303 that required disclosure in the Registration Statement. As previously alleged, the "construction delays" existed prior to and during the IPO. Moreover, given that the "construction delays" delayed installation of Bloom Energy's Servers and that Bloom Energy only recognized revenue after installation (*i.e.*, upon "acceptance"), the delays had, or Bloom Energy reasonably expected the delays to have, a material unfavorable impact on its revenues and/or income. This is especially so considering the fact that Bloom Energy knew that many of its customers would not allow construction to proceed during the fourth quarter due to "blackouts," as described by Furr during the November 5, 2018 investor conference call.

1    Accordingly, unless Servers were installed timely in the third quarter, installations would likely be

2    delayed until the first quarter of fiscal 2019 and, as a result, delaying revenue recognition substantially.

3         **B.    Expenses and Contingencies**

4         53.    When Bloom Energy sells, leases, or finances one of its Servers, it includes a one-year

5    warranty and service guarantee with the purchase price. After the initial one-year warranty period ends,

6    Bloom Energy's customers enter into MSAs with Bloom Energy, under which Bloom Energy

7    purportedly receives annual service payments from the customer. In the Registration Statement, Bloom

8    Energy provided investors with its expected revenue from these MSAs over the life of the contract (*i.e.*,

9    typically lasting from 10 to 21 years and lasting as long as 25 years). As of March 31, 2018, the amount

10   of this revenue totaled more than $450 million, according to the Registration Statement.

11        54.    Bloom Energy's MSAs also create expenses for the company, however. Under the terms

12   of the agreements, Bloom Energy is required to service, repair and replace the Servers when output or

13   efficiency falls below certain thresholds. Bloom Energy is responsible for two types of replacements:

14   its fuel cell servers (the system itself) and the individual fuel cells that go inside the Servers. The

15   expenses and/or contingencies associated with these repairs are more than $2 billion. However, the

16   Registration Statement did not disclose this material fact to investors.

17        55.    The Section 11 Defendants violated Section 11 of the Securities Act by failing to disclose

18   the estimated $2 billion in MSA liabilities. Not only was this information material (and therefore

19   deserving of disclosure in its own right), but Bloom Energy was required to disclose this information

20   under both Item 303 of Regulation S-K as an "off-balance sheet arrangement" and Accounting Standards

21   Codification ("ASC") 450 as a "contingent liability." Importantly, financial statements are presumed to

22   be in violation of the Securities Act if they do not comply with Regulation S-K or GAAP (including the

23   ASC).

24        56.    Item 303 of Regulation S-K required Bloom Energy to disclose "off-balance sheet

25   arrangements," including "the nature and amounts of any other obligations or liabilities (including

26   contingent obligations or liabilities) of the registrant arising from such arrangements that are or are

27   reasonably likely to become material and the triggering events or circumstances that could cause them

28   to arise." 17 CFR § 229.303(a)(4).

57.     Similarly, ASC 450, the authoritative accounting standard under GAAP concerning loss contingencies, required Bloom Energy to accrue for a loss when that loss is both probable and reasonably estimable. ASC 450-20-25-2.

58.     Bloom Energy was required to disclose its liabilities and/or contingencies under both Item 303 and ASC 450. As the loss under the MSAs was probable and reasonably estimable, Bloom Energy should have accounted for the contingent liabilities and disclosed the amount to investors. Bloom Energy admits that "virtually no customers have elected to cancel their maintenance agreements." Additionally, as Bloom Energy knew the estimated life of its Servers were less than the life of the MSAs, liabilities were probable.

59.     In fact, Bloom Energy had already been required to replace Servers and fuel cells under the MSAs. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the MSAs and therefore knew it was likely they would have to replace the remaining early generation systems and the cost to do so. In 2015, Bloom Energy implemented a fleet decommissioning program for its early generation Servers. This resulted in "a significant adjustment to revenue in the quarter ended December 31, 2015."

60.     Bloom Energy admitted that it would have to continue to replace these systems. The Registration Statement stated, in pertinent part, that "[a]s of March 31, 2018, we had a total of 58.5 megawatts in total deployed early generation servers, including our first and second generation servers, out of our total installed base of 312 megawatts. . . . [W]e expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers."

61.     Included in 58.5 megawatts were 30 megawatts of early generation Servers in Delaware that needed immediate replacement within the year. The proximity of the replacement to the IPO shows that at the time of the IPO this replacement, along with the remaining 28.5 megawatts was probable.

62.     The amount of these liabilities and/or contingencies were also reasonably estimable. First, as Bloom Energy was able to estimate the amount of revenue to be received from the MSAs, the company was also able to estimate the liabilities. Second, as Bloom Energy had already been required

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to replace some of the earlier generation systems in 2015, Bloom Energy had historical data upon which they were able to reasonably estimate the costs of replacing other Servers going forward. Third, Bloom Energy knew the estimated life of both its Servers and fuel cells and, therefore, could have calculated when they would need to be replaced.

63.     Further proof that these liabilities and/or contingencies were estimable comes from the fact that a third-party market analyst, Hindenburg Research, calculated them in a report dated September 17, 2019. As explained in the report, Bloom Energy had "an estimated $2.2 billion in undisclosed servicing liabilities that the market has missed." Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

64.     Bloom Energy possessed all of this information and, therefore, was able to perform the required calculations and make the appropriate material disclosures.

65.     Bloom Energy's undisclosed $2 billion in servicing liabilities was material information that should have been disclosed in the Registration Statement. Indeed, when Hindenburg published its report, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at close on September 17, 2019, a drop of 21% on unusually high trading volume.

*          *          *

66.     With proper due diligence, the Section 11 Defendants would have been able to discover the aforementioned errors with regard to Bloom Energy's construction delays, and omissions relating the contingent liabilities arising out of the MSAs, and either prevented them from occurring or corrected the Registration Statement so as not to omit material facts relating thereto. But for the Section 11 Defendants' failure to exercise proper and reasonable care in ensuring the accuracy and truthfulness of the Registration Statement, Plaintiffs and other investors would not have been injured. As a direct result of the above misrepresentations Bloom Energy's stock price has declined from its IPO price of $15 per share of common stock, to under $3 per share of common stock at the time of this filing.

## COUNT I

### Violation of Section 11 of the Securities Act

### against the Section 11 Defendants

67.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

68.    This Cause of Action is brought pursuant to Section 11 of the Securities Act against all Section 11 Defendants.

69.    Notwithstanding anything to the contrary alleged herein, for the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

70.    The Registration Statement contained untrue statements of material facts and/or omitted to state other facts necessary in order to make the statements made not misleading.

71.    Defendant Bloom Energy is the registrant and issuer of the stock sold in the IPO. As issuer of the stock, the company is strictly liable to Plaintiffs and the Class for the actionable statements in the Registration Statement.

72.    Defendants Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, and Ayotte signed the Registration Statement and, therefore, are strictly liable to Plaintiffs and the Class for the actionable statements in the Registration Statement.

73.    The Underwriter Defendants are investment banking houses that specialize, inter alia, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees collectively. The Underwriter Defendants arranged road shows prior to the IPO during which they, and representatives from Bloom Energy, met with potential investors and presented highly favorable information about the company, its operations, and its financial prospects.

74.    The Underwriter Defendants assisted Bloom Energy and the Section 15 Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business, operations, financials, and accounting of Bloom Energy, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual

access to internal, confidential, current corporate information concerning Bloom Energy's most up-to-date operational and financial results and prospects.

75.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other Class members.

76.     The Underwriter Defendants are strictly liable to Plaintiffs and the Class for the actionable statements in the Registration Statement.

77.     The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

78.     None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

79.     By reason of the conduct alleged herein, each Section 11 Defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

80.     Plaintiffs acquired shares of Bloom Energy common stock pursuant to the Registration Statement.

81.     Plaintiffs and the Class have sustained damages.

82.     By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 of the Securities Act from all of the Section 11 Defendants, and each of them, jointly and severally.

## COUNT II

### Violation of Section 15 of the Securities Act

### against the Section 15 Defendants

83.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

84.     This Cause of Action is brought pursuant to Section 15 of the Securities Act against the Section 15 Defendants. Notwithstanding anything to the contrary, for the purposes of this claim, Plaintiffs expressly exclude and disclaims any allegation that could be construed as alleging or sounding

in fraud or intentional or reckless misconduct.

85.     The Section 15 Defendants were controlling persons of Bloom Energy by virtue of their positions as directors or senior officers of Bloom Energy.

86.     The Section 15 Defendants were senior officers and/or directors of Bloom Energy.

87.     Each of the Section 15 Defendants was involved in the day-to-day operations of Bloom Energy at the highest levels.

88.     Each of the Section 15 Defendants was privy to confidential proprietary information concerning Bloom Energy and its business and operations.

89.     Due to their positions of control and authority, the Section 15 Defendants were able to, and did, control the contents of the Registration Statement that contained untrue statements and/or omissions of material fact.

90.     Bloom Energy's conduct, as alleged herein, constitutes a violation of Section 11 of the Securities Act.

91.     The Section 15 Defendants are liable to Plaintiffs and the other Class members, jointly and severally with and to the same extent as Bloom Energy, for violations under Section 15 of the Securities Act.

92.     As a direct and proximate result of said wrongful conduct, Plaintiffs and the other Class members suffered damages.

### THE EXCHANGE ACT CLAIMS

93.     Separate and apart from the Securities Act claims, Plaintiffs' Exchange Act claims seek to hold the Section 10(b) Defendants and Section 20(a) Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements for the purpose of inducing investors to purchase Bloom Energy's common stock and/or perpetrating a fraudulent scheme or device upon Plaintiffs and other Class members.

94.     Unlike Plaintiffs' Securities Act claims, Plaintiffs' claims under the Exchange Act sound in fraud.  Defendants' deception began with Bloom Energy's IPO. In order to generate interest in the IPO and gain financially, the Section 10(b) Defendants, unbeknownst to the public, made material misrepresentations and/or omissions to artificially inflate Bloom Energy's stock.  The Section 10(b)

Defendants misrepresented Bloom Energy's consolidated financials, specifically contingent liabilities, and did not tell investors of the construction delays that were materially impacting revenue at the time of the IPO.

95.     The Section 10(b) Defendants flouted their disclosure obligations and intentionally misled investors so as to benefit financially for their own personal gain.  The concrete personal benefits enjoyed by the Section 10(b) Defendants, along with the clear allegations of actual knowledge of wrongdoing, gives rise to a strong, cogent and compelling inference of scienter.

A.     **Defendants' Materially False and Misleading Statements**

*July 26, 2018 – Registration Statement*

96.     Bloom Energy's Registration Statement was materially false and misleading as it hid from investors that Bloom Energy was already experiencing significant construction delays that were materially impacting revenue for the current third quarter, and failed to disclose its contingent liabilities.

97.     Bloom Energy's Registration Statement described certain "risks" related to Bloom Energy, including that the company was dependent on construction schedules that may be delayed. In particular, the Registration Statement stated:

> ***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations.***
>
> Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.
>
> \*     \*     \*
>
> The timing of delivery and installations of our products have a significant impact on the timing of the recognition of product revenue. ***Many factors can cause a lag between the time that a customer signs a purchase order and our recognition of product revenue. These factors include . . . customer facility construction schedules***.

98.     In violation of Section 10 of the Exchange Act, the statements identified in emphasis above in Paragraph 97 concealed that Bloom Energy was, at the time of the Registration Statement, already facing significant construction delays that were interfering with its installations and "acceptances." In fact, the construction delays existing at the time of the Registration Statement were so substantial that they prevented Bloom Energy from meeting even the low end of its publicly-stated

guidance for "acceptances."

99.    The Section 10(b) Defendants also violated Section 10(b) of the Exchange Act in so far as they failed to comply with Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. Item 303 requires disclosure of any known events or uncertainties that, at the time of the IPO, had caused, or were reasonably likely to cause, a materially negative impact on Bloom Energy.

100.    Bloom Energy's "construction delays" constituted an "uncertainty" under Item 303 that required disclosure in the Registration Statement. The "construction delays" existed prior to and during the IPO.

101.    CW1 corroborates that construction delays were a constant issue at Bloom Energy. CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left the company in February 2018.

102.    CW1 indicated that during his tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

103.    CW1 also indicated that upper management, all the way up to the company's CEO KR Sridhar typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

104.    This is further corroborated by the fact that Furr conceded that the company's low rate of "acceptances" in Q3 was "a result of construction delays." The effect of the construction delay was amplified given the customer Q4 "blackout" dates. This resulted in many Server delays by customers to 2019.

105.    Given that the "construction delays" delayed installation of Bloom Energy's Servers and that Bloom Energy only recognized revenue after installation (i.e., upon "acceptance"), the Section 10(b) Defendants knew that the delays were causing a material unfavorable impact on its revenues and/or income. This is especially so considering the fact that Bloom Energy knew that many of its customers would not allow construction to proceed during the fourth quarter due to "blackouts," as described by

Furr during the November 5, 2018 investor conference call. Accordingly, unless Servers were installed timely in the third quarter, installations would likely be delayed until the first quarter of fiscal 2019 and, as a result, delaying revenue recognition substantially.

106.    Therefore, Bloom Energy made materially false and misleading statements or omissions relating to the construction delays in its Registration Statement.

107.    Bloom Energy also materially misrepresented its contingent liabilities that it would incur from the MSAs. The expenses and/or contingencies associated with these repairs under the MSAs amounted to more than $2 billion, including $130 million to replace servers in Delaware, the company's largest single project, within the year. However, the Registration Statement did not disclose this material fact to investors.

108.    The Section 10(b) Defendants violated Section 10(b) of the Exchange Act by failing to disclose this information. Not only was this information material (and therefore deserving of disclosure in its own right), but Bloom Energy was required to disclose this information under both Item 303 of Regulation S-K as an "off-balance sheet arrangement" and Accounting Standards Codification ("ASC") 450 as a "contingent liability." Importantly, financial statements are presumed to be in violation of the Exchange Act if they do not comply with Regulation S-K or GAAP (including the ASC).

109.    Item 303 of Regulation S-K required Bloom Energy to disclose "off-balance sheet arrangements," including "the nature and amounts of any other obligations or liabilities (including contingent obligations or liabilities) of the registrant arising from such arrangements that are or are reasonably likely to become material and the triggering events or circumstances that could cause them to arise." 17 CFR § 229.303(a)(4).

110.    Similarly, ASC 450, the authoritative accounting standard under GAAP concerning loss contingencies, required Bloom Energy to accrue for a loss when that loss is both probable and reasonably estimable. ASC 450-20-25-2.

111.    Therefore, Bloom Energy was required to disclose its liabilities and/or contingencies under both Item 303 and ASC 450. As the loss under the MSAs was probable and reasonably estimable, Bloom Energy should have accounted for the contingent liabilities and disclosed the amount to investors. Bloom Energy admits that "virtually no customers have elected to cancel their maintenance

agreements." Additionally, as the Section 10(b) Defendants knew the estimated life of its Servers were less than the life of the MSAs, liabilities were probable.

112.    In fact, Bloom Energy had already been required to replace Servers and fuel cells under the MSAs. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the MSAs and therefore knew it was likely they would have to replace the remaining early generation systems and the cost to do so. In 2015, Bloom Energy implemented a fleet decommissioning program for its early generation Servers. This resulted in "a significant adjustment to revenue in the quarter ended December 31, 2015."

113.    Bloom Energy admitted that it would have to continue to replace these systems. The Registration Statement stated, in pertinent part, that "[a]s of March 31, 2018, we had a total of 58.5 megawatts in total deployed early generation servers, including our first and second generation servers, out of our total installed base of 312 megawatts. . . . [W]e expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers."

114.    Included in 58.5 megawatts were 30 megawatts of early generation Servers in Delaware that needed immediate replacement within the year. In November of 2018, Bloom Energy filed a request for permit to replace the Servers in Delaware but failed to disclose that Bloom Energy would be liable for the costs under the MSA or the amount of the related liabilities. On June and August 2019, the Section 10(b) Defendants disclosed that Bloom Energy was replacing the Servers under the MSAs and that this would result in approximately $130 million in costs. The proximity of this replacement to the IPO shows that at the time of the IPO this replacement, along with the remaining 40.5 megawatts was probable.

115.    The amount of these liabilities and/or contingencies were also reasonably estimable. First, as Bloom Energy was able to estimate the amount of revenue to be received from the MSAs, the company was also able to estimate the liabilities. Second, as Bloom Energy had already been required to replace some of the earlier generation systems in 2015, Bloom Energy had historical data upon which they were able to reasonably estimate the costs of replacing other Servers going forward. Third, the

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Section 10(b) Defendants knew the estimated life of both its Servers and fuel cells and, therefore, could have calculated when they would need to be replaced.

116. Further proof that these liabilities and/or contingencies were estimable comes from the fact that a third-party market analyst, Hindenburg Research, calculated them in a report dated September 17, 2019. As explained in the report, Bloom Energy had "an estimated $2.2 billion in undisclosed servicing liabilities that the market has missed." Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

117. Bloom Energy possessed all of this information and, therefore, was able to perform the required calculations and make the appropriate material disclosures.

118. Bloom Energy's undisclosed $2 billion in servicing liabilities was material information that should have been disclosed in the Registration Statement.

119. Therefore, the Registration materially misled investors as to its contingent liabilities from the MSAs.

### *August 7, 2018 – Q2 2018 Results*

120. On August 7, 2018, Defendants released a "Letter to Shareholders" announcing Bloom Energy's fiscal Q2 2018 highlights and providing additional financial information. The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the SEC on August 9, 2018.

121. Bloom Energy's financials in the letter were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the amount of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

122. This information was material and should have been disclosed under Item 303 and ASC 450.

### *September 7, 2018 – Form 10-Q for Q2 2018*

123. On September 7, 2018, after market-trading hours, Defendants filed with the SEC their

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Form 10-Q for fiscal Q2 2018, ending June 30, 2018. The Form 10-Q was signed by Sridhar and Furr.

124.    In the Q2 2018 Form 10-Q, Bloom Energy warned investors about possible construction delays despite these delays already being underway and affecting acceptances. In pertinent part, the Q2 2018 Form 10-Q states:

> ***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations***.
>
> Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.
>
>           *          *          *
>
> In addition to the other risks described in this "Risk Factors" section, the following factors could also cause our financial condition and results of operations to fluctuate on a quarterly basis . . . the timing of installations, which may depend on many factors such as . . . customer facility construction schedules.

125.    These statements were misleading because the disclosed risks had already come to fruition, as Bloom Energy was facing significant construction delays that would prevent it from reaching even the low end of its publicly stated guidance for acceptances.

126.    Bloom Energy's financials in the Q2 2018 Form 10-Q were also materially false and misleading as they failed to account for contingent liabilities arising under the MSAs. In pertinent part, the Q2 2018 Form 10-Q indicated that "the aggregate amount of extended warranty services payments we expect to receive over the remaining term of the Power Purchase Agreement Projects was $447.2 million as of June 30, 2018." However, Bloom Energy omitted the amount of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

127.    Further, while Bloom Energy discusses the warranty costs under the "*Contingencies*" section of the Q2 2018 Form 10-Q, but omits the amount of contingent liabilities for the MSAs. As the amount of contingent liabilities for the MSAs were probable and reasonably estimable under ASC 450, they should have been disclosed and accounted for properly.

128.    Although Bloom Energy expected customers to continue to renew the MSAs and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower

output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been disclosed under Item 303 and ASC 450.

129.    The Q2 2018 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to the Sarbanes-Oxley Act ("SOX"). These certifications indicated that Sridhar and Furr had both reviewed the Q2 2018 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2018 Form 10-Q, Exs. 31.1 & 31.2.)

130.    Given the false and misleading nature of the statements in the Q2 2018 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors. By omitting these liabilities the Section 10(b) Defendants misled investors to believe that Bloom Energy's financials were stronger than they appeared. These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they known that the Q2 2018 Form 10-Q contained material misrepresentations and/or omissions.

### B.    The Truth about Bloom Energy's Construction Delays Emerges While Defendants Continue to Mislead Investors about Bloom Energy's Contingent Liabilities

#### *November 5, 2018 – Q3 2018 Results*

131.    On November 5, 2018, Bloom Energy disclosed its operating results for the third quarter of fiscal 2018. The company reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that the company's low rate of "acceptances" was "a result of construction delays." The effect of the construction delay was amplified given the customer Q4 "blackout" dates. This resulted in many Server delays by customers to 2019.

132.    Market analysts from large banks focused on this point. On November 6, 2018, Cowen released an analyst report titled "Growing Pains" and noted that "3Q results were largely impacted by

lower than expected acceptances as a result of construction timing delays. While we don't expect the bulk of these projects to commence in 4Q given construction blackout periods during holiday season, we believe the projects will be pushed out into 1H19."

133.    Similarly, Credit Suisse published a report titled "Bloom Wilts a Bit on Project Delays." Credit Suisse stated, "Bottom line – near-term challenges due to construction delays" and noted that "Long term GM% on target, but below our expectations for 4Q and 2019 . . . ."

134.    J.P. Morgan also concentrated on the construction delays, stating in a report titled "Solid Demand but Delayed Deployment Weighs on 3Q Results and Guidance", that "BE reported 3Q EBITDA slightly ahead of consensus on lower than expected Acceptances. 4Q guidance was lower than expected owing to project timing, in large part specific to one single-site 5MW deployment."

135.    In response to the above news, the price of Bloom Energy stock plummeted from $23.01 at close on November 5, 2018, to $17.25 at close on November 6, 2018, a decline of 25% on unusually heavy trading volume.

136.    Bloom Energy continued to mislead investors relating to their liabilities under the MSAs.

137.    In its letter, financials and on the conference call, the Section 10(b) Defendants failed to disclose that it knew Bloom Energy was expecting $2 billion in liabilities under the MSAs.

138.    Despite the call being November 5, 2018, on November 11, 2018, just two days later, Bloom Energy quietly filed a construction permit request in Delaware for the replacements. While Bloom Energy omitted the amount of the liabilities to replace the Delaware servers until August 2019, the replacement costs ultimately costed Bloom Energy $130 million, according to market analysts. Bloom Energy failed to disclose this liability to investors.

139.    This information was material and should have been disclosed to investors particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability. Therefore, the omission of this liability was materially false and misleading.

*November 13, 2018 – Form 10-Q for Q3 2018*

140.    On November 13, 2018, after market-trading hours, Defendants filed with the SEC their Form 10-Q for fiscal Q3 2018, ending September 30, 2018. The Form 10-Q was signed by Sridhar and Furr.

141.    Bloom Energy's financials in the Q3 2018 Form 10-Q were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs. In pertinent part, the Q3 2018 Form 10-Q indicated that "[t]he aggregate amount of extended warranty services payments we expect to receive over the remaining term of the Power Purchase Agreement Projects $439.0 million as of September 30, 2018." However, Bloom Energy omitted $2 billion of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

142.    While Bloom Energy discussed the warranty costs under the "*Contingencies*" section of the Q3 2018 Form 10-Q, Bloom Energy omitted the amount of contingent liabilities required to be disclosed under Item 303 and ASC 450.

143.    As the amount of contingent liabilities for the MSAs were probable and reasonably estimable under ASC 450, they should have been disclosed and accounted for properly.

144.    Although Bloom Energy expected customers to continue to renew the MSAs and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount ($2 billion) and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been disclosed under Item 303 and ASC 450.

145.    These liabilities were material and should have been disclosed to investors under Item 303 and ASC 450, particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability. Therefore, the omission of these liabilities were materially false and misleading.

146.    The Q3 2018 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q3 2018 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q3 2018 Form 10-Q, Exs. 31.1 & 31.2.)

   147.   Given the false and misleading nature of the statements in the Q3 2018 Form 10-Q

described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors. By omitting these liabilities the Section 10(b) Defendants misled investors to believe that Bloom Energy's financials were stronger than they appeared. These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they known that the Q3 2018 Form 10-Q contained material misrepresentations and/or omissions.

### *February 5, 2019 – Financial Results*

148.   On February 5, 2019, Defendants released a "Letter to Shareholders" announcing Bloom Energy's fiscal 2018 highlights and providing additional financial information. The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the SEC on February 6, 2019.

149.   Bloom Energy's financials in the letter were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the $2.0 billion in undisclosed contingent liabilities that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

150.   This information was material and should have been disclosed under Item 303 and ASC 450.

### *March 21, 2019 – Form 10-K for Fiscal Year 2018*

151.   On March 21, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC their Fiscal Year 2018 Form 10-K, for the year ending December 31, 2018. The Form 10-K was signed in part by Sridhar and Furr.

152.   Bloom Energy's financials in the 2018 Form 10-K were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs.

153.   While Bloom Energy discussed the warranty costs under the "*Contingencies*" section of the 2018 Form 10-K, Bloom Energy omitted the amount of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303. These liabilities were material and

the omission of them materially misled investors.

154.    Bloom Energy knew that its customers would continue to renew the MSAs and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate if our customers continue to renew their maintenance service agreements in respect of those servers".

155.    As the amount of contingent liabilities ($2 billion) for the MSAs were probable and reasonably estimable, they should have been disclosed and accounted for under Item 303 and ASC 450. Therefore, the Section 10(b) Defendants materially misled investors to the actual amount of contingent liabilities from Bloom Energy's MSAs.

156.    This information was material and should have been disclosed to investors particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability.

157.    The 2018 Form 10-K was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the 2018 Form 10-K and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2018 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(2018 Form 10-K, Exs. 31.1 & 31.2.)

158.    Given the false and misleading nature of the statements in the 2018 Form 10-K described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-K omitted the contingent liabilities that should have been disclosed to investors. By omitting these liabilities the Section 10(b) Defendants misled investors to believe that Bloom Energy's financials were stronger than they appeared. These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they known that the 2018 Form 10-K contained material misrepresentations and/or omissions.

### *May 6, 2019 – Financial Results*

159.    On May 6, 2019, Defendants released a "Letter to Shareholders" announcing Bloom Energy's Q1 fiscal 2019 highlights and providing additional financial information. The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the SEC on May 9, 2019.

160.     Bloom Energy's financials in the letter were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the $2.0 billion in undisclosed contingent liabilities that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

161.     This information was material and should have been disclosed under Item 303 and ASC 450.

### *May 14, 2019 – Form 10-Q for Q1 2019*

162.     On May 14, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC their Form 10-Q for fiscal Q1 2019, ending March 31, 2019. The Form 10-Q was signed by Sridhar and Furr.

163.     Bloom Energy's financials in the Q1 2019 Form 10-Q were materially false and misleading as they failed to account for contingent liabilities arising under the MSAs.

164.     While Bloom Energy discussed the warranty costs under the "*Contingencies*" section of the Q3 2018 Form 10-Q, Bloom Energy omitted the amount of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

165.     As the amount of contingent liabilities for the MSAs were probable and reasonably estimable under ASC 450, they should have been disclosed and accounted for properly.

166.     Although Bloom Energy expected customers to continue to renew the MSAs and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount ($2 billion) and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been disclosed under Item 303 and ASC 450.

167.     This information was material and should have been disclosed to investors particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

168.    The Q1 2019 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q1 2019 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended March 31, 2019 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q1 2019 Form 10-Q, Exs. 31.1 & 31.2.)

169.    Given the false and misleading nature of the statements in the Q1 2019 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors. By omitting these liabilities the Section 10(b) Defendants misled investors to believe that Bloom Energy's financials were stronger than they appeared.  These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they known that the Q1 2019 Form 10-Q contained material misrepresentations and/or omissions.

    **C.**    **The Truth about Bloom Energy's Liabilities Begins to Emerge**

    *June 21, 2019 – Press Release to Upgrade Delaware Fuel Cell Project*

170.    On June 21, 2019, Bloom Energy announced that it "will deploy the latest generation of its Bloom Energy Servers at an existing 30 megawatt (MW) fuel cell project located on two sites in New Castle and Newark, Delaware."

171.    Bloom Energy also announced that they would be using funds invested by Southern Power to do so, and that "[t]he fuel cell project was previously owned by Bloom Energy and a tax equity investor. As part of the transaction to upgrade the project, Southern Power will become the majority co-owner with Bloom Energy."

172.    This was evidence that Bloom Energy was subject to significant repair liabilities and costs under the MSAs. Additionally, investors began to realize that Bloom Energy's public statements

were not entirely true because these costs should have been disclosed in the IPO and prior filings. It further created the suspicion that additional liabilities under the MSA were just around the corner.

173.    The June 21, 2019 press release confirmed a previous article published by Axios in November 2018 that noted that Bloom Energy had approximately $100-150 million in undisclosed contingent liabilities arising from the replacement of the Delaware servers alone.

174.    While the June 21, 2019 press release was Bloom Energy's first public mention of the Delaware replacement, this confirmed the Axios article's concerns. However, the June 21, 2019 press release failed to disclose the amount of liabilities it would incur from the Delaware replacements, and that Bloom Energy still had approximately $2 billion in undisclosed contingent liabilities arising from the MSAs.

175.    Therefore, this information only partially revealed to the market that Bloom Energy was required to replace a number of servers in Delaware and would face additional undisclosed liabilities.

176.    As a result of this news, Bloom Energy's stock dropped from $12.37 at open on June 21, 2019, to close at $11.56 at close on June 22, 2019, a drop of 6.5%.

*August 12, 2019 - Q2 2019 Letter to Shareholders and Earnings Call*

177.    On August 12, 2019, after hours, Defendants announced in a "Letter to Shareholders" filed with the SEC, Q2 Fiscal 2019 results ending June 30, 2019. Defendants also held a Conference Call and issued slides included "Supplemental Financial Information" to discuss Bloom Energy's financial results.

178.    In the letter, Bloom Energy disclosed to investors that revenue was down 3.8% sequentially due, in part, "from the PPA II upgrade" where they replaced the Delaware servers. Additionally, Bloom Energy disclosed a onetime $5.9 million charge associated with the Delaware upgrade. Finally, Bloom Energy disclosed a write-off of PPA II decommissioned assets (the Delaware assets) of $25,613,000, and "payments to redeemable noncontrolling interests related to the PPA II [Delaware] decommissioning" of $18,690,000 for the three months ending June 30, 2019. On the conference call Furr again revealed that the decrease in sequential revenue was due, in part, "from the PPA II [Delaware] upgrade."

179.    This revealed to the market the extent of liabilities from the Delaware replacement

project, and partially revealed to the market that Bloom Energy had hidden contingent liabilities from investors relating to the replacement of its servers.

180.   As a result of this news, Bloom Energy's stock price dropped from $8.00 at close on August 12, 2019, to $4.60 at close on August 13, 2019 the following trading day, a decrease of 42.5% on unusually heavy trading volume.

181.   Bloom Energy's financials in the letter were also materially false and misleading as they failed to account for the remaining $2.0 billion in undisclosed contingent liabilities arising under the MSAs. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the amount of contingent liabilities. This information was material and should have been disclosed to investors.

*August 13, 2019 – Form 10-Q for Q2 2019*

182.   On August 13, 2019, after market-trading hours, Defendants filed with the SEC their Form 10-Q for fiscal Q2 2019, ending June 30, 2019. The Form 10-Q was signed by Sridhar and Furr.

183.   The Q2 2019 Form 10-Q revealed that Bloom Energy incurred expenses in the amount of $130 million from the decommissioning of old Servers in Delaware:

> The PPA II Project occurs in two phases, phase 1 where initially SPDS had its purchased interest in 9.7 megawatts of Energy Servers installed during June 2019, and its remaining phase 2 purchased interest in 8.0 megawatts of Energy Servers to be installed which is expected to occur during the remainder of 2019. As of June 30, 2019, we have sold 9.7 megawatts of our current generation Energy Servers for $87.8 million to DSGP subsequent to its deconsolidation, which is included in product revenue, and recognized installation services of $3.9 million which is included in installation revenue, in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Concurrently, we had repurchased and written-off 10.0 megawatts of our earlier generation energy serves [sic] for $25.6 million and had installed the 9.7 megawatts of servers at a cost of goods sold of $26.3 million, which is included in cost of product revenue in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. In anticipation of replacing the remaining installed 9.0 megawatts of Energy Servers during 2019 under phase 2 which reduced their previously expected useful lives, we recognized charges related to the decommissioning of PPA II Energy Servers of $8.1 million, which is included in cost of electricity revenue in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Additionally, in paying-off the outstanding debt and interest of PPA II amounting to $77.7 million, we incurred a debt payoff make-whole penalty of $5.9 million, which is included in general and administrative expense in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Finally, we had PPA II debt issuance costs written-off of $1.0 million and additional interest expense incurred for PPA 2 debt payoff

of $0.1 million, which is included in interest expense in our condensed consolidated statements of operations for the three and six months ended June 30, 2019.

184.    This reiterated the substantial costs to Bloom Energy in replacing servers under the MSAs that were disclosed on August 12, 2019.

185.    The Q2 2019 Form 10-Q was also materially false and misleading as Bloom Energy's financials failed to account for the remaining contingent liabilities arising under the MSAs. While Bloom Energy discussed the warranty costs under the "*Contingencies*" section of the Q2 2019 Form 10-Q, Bloom Energy omitted the amount of contingent liabilities that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

186.    As the amount of contingent liabilities for the MSAs were probable and reasonably estimable under ASC 450, they should have been disclosed and accounted for properly.

187.    Although Bloom Energy expected customers to continue to renew the MSAs and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been disclosed under Item 303 and ASC 450.

188.    The Q2 2019 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q2 2019 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended March 31, 2019 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the**

**financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2019 Form 10-Q, Exs. 31.1 & 31.2.)

     189.    Given the false and misleading nature of the statements in the Q2 2019 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading.

Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors. By omitting these liabilities the Section 10(b) Defendants misled investors to believe that Bloom Energy's financials were stronger than they appeared.   These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they known that the Q2 2019 Form 10-Q contained material misrepresentations and/or omissions.

### September 17, 2019 – Hindenburg Research Report

190.    On September 17, 2019, prior to the market opening, Hindenburg Research published a report revealing to the market the extent of Defendants' undisclosed contingent liabilities. Hindenburg reported in pertinent part that it "uncovered an estimated $2.2 billion in undisclosed servicing liabilities that the market has missed, even in its most recent re-valuation of Bloom [Energy] shares." According to Hindenburg, "Bloom[ Energy]'s tricky accounting allows it to mask servicing costs and shift write-downs to other periods, thereby avoiding recognizing major recent additional losses."

191.    These liabilities related to the performance guarantees in the MSAs, and Bloom Energy's responsibility to replace its fuel cell servers (the system itself) and the individual fuel cells that go inside the servers.

192.    Hindenburg reported that "Bloom's fuel cells and systems degrade significantly faster than expectations, yet the company barely records any liability for these issues."  Hindenburg discloses that this is because Bloom Energy does not recognize future expenses until the customer renews its MSA each year. However, while customers have the right to renew each year, "virtually no customers have elected to cancel their maintenance agreements" and Bloom Energy admits that they "expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level."

193.    Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

194.    Using these factors, and data from Bloom Energy's public filings, Hindenburg concluded

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

that the liabilities for fuel cell replacement alone was $1.8 billion, and server replacement liabilities were $1.4 billion, which, after off-setting the service liabilities with service revenue, resulted in over $2 billion in service liabilities from the MSAs.

195.    Accordingly, the report fully disclosed to the market that Bloom Energy "only books the next year of servicing liabilities, rather than accounting for the liabilities across the full 10-25 years of the contract" and that Bloom Energy hid up to $2 billion in contingent liabilities.

196.    On this news, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at close on September 17, 2019, a drop of 21% on unusually high trading volume.

### D.    Defendants' Acted With Scienter

197.    For the purposes of Plaintiffs' claims under the Exchange Act only, Plaintiffs allege that the above material misrepresentations and omissions were made by the Section 10(b) Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a) personal financial gain; and (b) inflating market demand for Bloom Energy shares in the IPO.

198.    The Section 10(b) Defendants were aware of the construction delays at the time they made material misrepresentations and were aware that Bloom Energy was not accounting for its contingent liabilities.  The Section 10(b) Defendants provided investors with material information concerning Bloom Energy's financials while at the same time knowing that it would have to continue to take losses relating to its MSAs.

*The Section 10(b) Defendants Acted with Actual Knowledge or Were Deliberately Reckless*

199.    At all times, the Section 10(b) Defendants knew that they had undisclosed contingent liabilities because their early generation systems and fuel cells would need to be replaced under the MSAs. Bloom Energy admitted this in their filings with the SEC.

200.    For example, Bloom Energy admits that "virtually no customers have elected to cancel their maintenance agreements," and that "as we expect our customers to renew their maintenance service agreements each year, the total liability over time may be more than the accrual." As the Section 10(b) Defendants knew the estimated life of its servers were less than the life of the contracts, the Section 10(b) Defendants knew that the liabilities were probable.

201.    Additionally, Bloom Energy had already been required to replace servers and fuel cells

under the MSAs. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the MSAs and therefore knew it was likely they would have to replace the remaining early generation systems and knew the costs to do so. In fiscal year 2015, the Section 10(b) Defendants implemented a fleet decommissioning program for its early generation servers. This resulted in "a significant adjustment to revenue in the quarter ended December 31, 2015."

202.    Similarly, Defendants admit that they would have to continue to replace these systems. The Registration Statement and later filings stated in pertinent part, "*we expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers.*"

203.    As "virtually no customers have elected to cancel their maintenance agreements" and Bloom Energy "anticipates that almost all of its customers will continue to renew their maintenance services agreement each year," the fact that the maintenance costs would exceed the proceeds was probable.

204.    Additionally, the proximity of the Delaware replacements shows that the Section 10(b) Defendants knew they would need to replace additional fuel cells and servers and therefore had undisclosed contingent liabilities. On June 21, 2019, less than a year after the IPO, Defendants disclosed it was commencing a project to "decommission" 30 megawatts worth of servers in Delaware. The servers were only about 7 years old, yet the company was required to replace all of them. The proximity to the IPO shows that at the time of the IPO this replacement was probable and reasonably estimable.

205.    Despite the fact that Bloom Energy could reasonably estimate the contingent liabilities under the MSAs, and the fact that the liabilities were probably, the Section 10(b) Defendants refused to disclose this material information to the public. Indeed, the Section 10(b) Defendants went out of their way to hide this information from the public, redacting pertinent information in correspondence with the SEC that would have let investors know the extent of contingent liabilities Bloom Energy was subject to.

206.    Accordingly, the Section 10(b) Defendants had actual knowledge or were deliberately

reckless in not complying with ASC 450 and Item 303.

207.    The Section 10(b) Defendants similarly acted with actual knowledge or deliberate recklessness when it hid from investors the fact that Bloom Energy was facing significant construction delays at the time of the IPO.

208.    The Section 10(b) Defendants' knowledge about the construction delays at the time of the Registration Statement is evident by the fact that the construction delays were currently on-going at the time of the IPO. This is apparent because the third quarter was already well underway on July 25, 2018, the date of the IPO, and had been since at least June 2016 according to CW1.

209.    CW1 corroborates that construction delays were a constant issue at Bloom Energy. CW1 indicated that during his tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

210.    CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left the company in February 2018.

211.    CW1 also indicated that upper management, all the way up to the company's CEO KR Sridhar typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

212.    The fact that the construction delays were a constant issue and that these delays were reported immediately all the way up to Defendants Sridhar shows that Sridhar knew of these problems at the time of the IPO, but intentionally misled investors.

213.    Accordingly, the Section 10(b) Defendants acted with deliberate recklessness or actual knowledge when warning of risks that were already underway.

### The Section 10(b) Defendants Were Financially Motivated to Commit Fraud

214.    The Section 10(b) Defendants' motivation behind the misrepresentations and omissions in the Registration Statement and throughout the Class Period stems from their desire to profit financially, their need for financing via the IPO, and the risk that Bloom Energy would be unable to pay

the Section 10(b) Defendants their annual employee and director compensation.

215. On March 26, 2019, Bloom Energy filed with the SEC its DEF 14A proxy statement that disclosed Defendants Sridhar's and Furr's compensation in 2018, and bonuses for taking Bloom Energy public. According to the DEF 14A, "[i]n 2018, Defendant Sridhar was awarded a cash and equity bonus to be payable or become vested upon the achievement of certain corporate initiatives, *specifically the consummation of the IPO and related subsequent milestones*. Mr. Sridhar received $2,000,000 of the $3,000,000 cash bonus opportunity in 2018 as a result of having completed two of the milestones and remains eligible to receive the remaining $1,000,000 of this cash bonus program in 2019. In addition, *Mr. Sridhar received an equity bonus of RSUs*."

216. Bloom Energy refers investors to the "the 'Bonus' and 'Stock Awards' columns in the 2018 Summary Compensation Table for the amount of bonuses paid to [Defendant] Sridhar." According to the Compensation Table, as a direct result of taking Bloom Energy public, Sridhar received $44,259,315 in vested RSUs, along with a $2 million cash bonus.

217. Sridhar received an annual salary of $524,039 in 2017 and $607,500 in 2018. Accordingly, Sridhar's bonus to take Bloom Energy public was *7,285%* higher than his 2018 yearly salary. This is money that Sridhar would not have been awarded had Bloom Energy not gone public.

218. Defendant Furr similarly profited from the IPO. While Bloom Energy does not disclose Furr's compensation from 2017, and therefore his 2017 salary is unknown, Furr's salary for 2018 was $407,154. In connection with the IPO, Furr was granted $11,276,283 in vested RSUs. This is *2,769%* higher than his 2018 yearly salary.

219. At the time of these bonuses, Bloom Energy operated at a net loss of $281,265,000 for fiscal year 2017, and $259,952,000 for fiscal year 2018. Accordingly, the amount of the bonuses for taking a company that was pre-profit public was material and unreasonable. Thus, the Section 10(b) Defendants were motivated to consummate a public offering.

220. Additionally, the Section 10(b) Defendants desperately needed additional funding with $379.2 million in debt is coming due by the end of 2020, with significant 2021 maturities thereafter. Bloom Energy currently had $308 million in cash on hand (as of June 30, 2019), down from $325.1 million in December 2018. Bloom Energy currently has $701.3 million in total debt, with $431.7 million

of that total listed as recourse debt.

221.   Of Bloom Energy's $431.7 million in recourse debt, $296.2 million represents convertible notes due in December 2020.  These notes present a problem for the company, as the conversion price is now far out of the money, at $11.25 per share of common stock (Bloom Energy currently trades below $3 per share of common stock). This likely means that, upon maturity, Bloom will have to pay cash, unless it can refinance.

222.   Bloom Energy was also incentivized to artificially inflate the stock price at the IPO due to notes that were convertible at the option of the holder at the time of the IPO. Specifically, 25,812,404 shares of Bloom Energy Class B common stock were issuable upon the conversion of Bloom Energy's outstanding 6.0% notes due 2020 (6% Notes). This was set to convert at a price of 75% of the IPO price of $15 per share.

223.   Additionally, 865,060 shares of Bloom Energy's Class B common stock were issuable upon the conversion of Bloom Energy's outstanding Constellation Note, which was convertible, at the option of the holder, prior to the completion of IPO, into shares of Series G convertible preferred stock or, following the completion of the IPO, into shares of Class B common stock. Further, approximately 800,000 shares of Bloom Energy's Class B common stock was issuable upon the conversion of accrued interest payable on its 6% Notes, 8% Notes and Constellation Note after March 31, 2018.

224.   Once the IPO was completed, $221.6 million of principal and accrued interest of outstanding 8% Notes automatically converted into additional paid-in capital, the conversion of which included all the related-party noteholders. The 8% Notes converted to shares of Series G convertible preferred stock and, concurrently, each such share of Series G convertible preferred stock converted automatically into one share of Class B common stock. Upon the IPO, conversions of 5,734,440 shares of Class B common stock were issued and the 8% Notes were retired.

225.   Total, this resulted in 33,211,904 in Bloom Energy stock, worth $412,161,960 at $15 per share, to satisfy debt obligations alone.

226.   Had Bloom Energy's share price not been inflated, Bloom Energy would not have been able to satisfy its debt obligations at the number of shares that it did.

227.   As Bloom Energy preferred to convert the debt to Bloom Energy equity rather than pay

cash, Bloom Energy was motivated to artificially inflate Bloom Energy's stock price by rebooking replacement servers and fuel cells, hiding construction delays, and omitting the amount of contingent liabilities that should have been in its financials. Therefore, the Section 10(b) Defendants' motivation for committing fraud is indicative of scienter.

### *The SOX Certifications*

228.   The Section 10(b) Defendants also repeatedly represented to investors that Bloom Energy's financials were adequate and that Sridhar and Furr were complying with their obligations under SOX. The Section 10(b) Defendants made these representations notwithstanding the fact that they knew that Bloom Energy was not properly accounting for their contingent liabilities.

229.   For example, the Section 10(b) Defendants represented that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report."   The fact that the Section 10(b) Defendants reviewed its financial reporting is highly indicative that the Section 10(b) Defendants reviewed ASC 450 but purposely ignored it. Accordingly, the fact that the Section 10(b) Defendants regularly reviewed Bloom Energy's financials and the disclosure requirements show that Defendants acted with scienter.

230.   In addition, the core-function of the CEO and CFO is to monitor and ensure adequate financials of a company.  Bloom Energy stated that Furr was qualified to serve as CFO due to his "30+ years of experience in the technology sector" and disclosed that Furr "is an experienced financial and operations executive." Furr also "holds a Bachelor of Business Administration degree from the University of Oklahoma and is a certified public accountant." Accordingly, Furr was familiar with the accounting standards, including ASC 450, and knew that Bloom Energy was required to disclose its contingent liabilities under ASC 450.

231.   This is further evidence that the Section 10(b) knew or were deliberately reckless by failing to properly account for the contingent liabilities.

### *Change in Risk Warnings*

232.   Further evidence that Bloom Energy knew about the fraud was the risk warning added to Bloom Energy's Fiscal Year 2018 Form 10-K. Prior to the March 22, 2019 Form 10-K Bloom Energy

hid the fact that they were not accounting for their future expenses for the MSAs under GAAP. However, starting in the 2018 Form 10-K, Bloom Energy made the conscious decision to inform investors that they only accounted for its service liabilities yearly when the service contracts were renewed. This shows that the Section 10(b) Defendants knew of the service liabilities but hid them from investors.

233.    The Section 10(b) Defendants' knowledge of the accounting rules is highly indicative of the fact that they acted with scienter when making the false and misleading statements.

<em>Corporate Scienter</em>

234.    Bloom Energy is also liable for the acts of the Section 20(a) Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

235.    Similarly, the scienter of the Section 20(a) Defendants and other employees and agents of Bloom Energy is imputed to Bloom Energy under *respondeat superior* and common law agency principles.

**E.    Loss Causation and Economic Loss**

236.    The Section 10(b) Defendants' materially misleading statements and omissions during the Class Period resulted in Plaintiffs and the other Class members purchasing Bloom Energy's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and the other Class members.

237.    As alleged herein:

   a.    The market for Bloom Energy's stock was open, well-developed and efficient at all relevant times;

   b.    The Section 10(b) Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of Bloom Energy and its prospects, thus causing Bloom Energy's shares to be overvalued and the market price of Bloom Energy's shares to be artificially inflated during the Class Period;

   c.    The Section 10(b) Defendants created an unrealistically positive assessment of Bloom Energy and its prospects by, in part, concealing risks associated with

exposure arising from Bloom Energy's construction delays, and contingent liabilities;

d.     Plaintiffs and the other Class members purchased or otherwise acquired Bloom Energy stock relying upon the integrity of the market price for Bloom Energy shares and market information relating to Bloom Energy;

e.     The risks associated with exposure arising from Bloom Energy's construction delays and contingent liabilities began to materialize and, in turn, investors began to discover that the Section 10(b) Defendants' public statements were materially misleading; and

f.     Upon discovery of Defendants' materially misleading statements and/or material omissions, Bloom Energy's share price suffered severe devaluation.

238.   The Section 10(b) Defendants' disclosures and/or events on the below dates resulted in damages to investors caused by misrepresentations and omissions in public statements. In each instance, the disclosure revealed material information related to the false statements.

239.   **November 5, 2018**. On November 5, 2018, Bloom Energy disclosed its operating results for the third quarter of fiscal 2018. The company reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that the company's low rate of "acceptances" was "a result of construction delays." Accordingly, this announcement revealed to the market that Bloom Energy had been experiencing construction delays that affected its Q3 acceptances and would also affect Q4 acceptances. In response to the above news, the price of Bloom Energy stock plummeted from $23.01 at close on November 5, 2018, to $17.25 at close on November 6, 2018, a decline of 25% on unusually heavy trading volume.

240.   **June 21, 2019.** On June 21, 2019, Bloom Energy announced that it "will deploy the latest generation of its Bloom Energy Servers at an existing 30 megawatt (MW) fuel cell project located on two sites in New Castle and Newark, Delaware." This was confirmation of a previous article that noted that Bloom Energy had approximately $100-150 million in undisclosed contingent liabilities arising from the replacement of the Delaware servicers. While this press release was Bloom Energy's first

1   public mention of the Delaware replacement, this confirmed the previous articles concerns. Therefore,

2   this information partially revealed to the market that Bloom Energy was required to replace a number

3   of servers in Delaware and would face additional undisclosed liabilities. As a result of this news, Bloom

4   Energy's stock dropped from $12.37 at open on June 21, 2019, to close at $11.56 at close on June 22,

5   2019, a drop of 6.5%.

6       241.   **August 12, 2019**. On August 12, 2019, after hours, Defendants announced in a "Letter

7   to Shareholders" filed with the SEC, Q2 Fiscal 2019 results ending June 30, 2019. Defendants also held

8   a Conference Call and issued slides included "Supplemental Financial Information" to discuss Bloom

9   Energy's financial results. In the letter, Bloom Energy disclosed to investors that revenue was down

10  3.8% sequentially due, in part, "from the PPA II upgrade" where they replaced the Delaware servers.

11  Additionally, Bloom Energy disclosed a onetime $5.9 million charge associated with the Delaware

12  upgrade. Finally, Bloom Energy disclosed a write-off of PPA II decommissioned assets (the Delaware

13  assets) of $25,613,000, and "payments to redeemable noncontrolling interests related to the PPA II

14  [Delaware] decommissioning" of $18,690,000 for the three months ending June 30, 2019. On the

15  conference call Furr again revealed that the decrease in sequential revenue was due, in part, "from the

16  PPA II [Delaware] upgrade." This revealed to the market the extent of liabilities from the Delaware

17  replacement project, and partially revealed to the market that Bloom Energy had hidden contingent

18  liabilities from investors relating to the replacement of its servers. As a result of this news, Bloom

19  Energy's stock price dropped from $8.00 at close on August 12, 2019, to $4.60 at close on August 13,

20  2019 the following trading day, a decrease of 42.5% on unusually heavy trading volume.

21      242.   **September 17, 2019.**  On September 17, 2019, prior to the market opening, Hindenburg

22  Research published a report revealing to the market the extent of Defendants' undisclosed contingent

23  liabilities. Hindenburg reported in pertinent part that it "uncovered an estimated $2.2 billion in undisclosed

24  servicing liabilities that the market has missed, even in its most recent re-valuation of Bloom [Energy]

25  shares." According to Hindenburg, "Bloom[ Energy]'s tricky accounting allows it to mask servicing costs

26  and shift write-downs to other periods, thereby avoiding recognizing major recent additional losses." These

27  liabilities related to the performance guarantees in the MSAs, and Bloom Energy's responsibility to replace

28  its fuel cell servers (the system itself) and the individual fuel cells that go inside the servers. Accordingly,

this report fully disclosed to the market that Bloom Energy "only books the next year of servicing liabilities, rather than accounting for the liabilities across the full 10-25 years of the contract" and that Bloom Energy hid up to $2 billion in contingent liabilities. On this news, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at close on September 17, 2019, a drop of 21% on unusually high trading volume.

243.    The Section 10(b) Defendants failed to disclose to investors material information concerning its contingent liabilities and accounting practices. As the Class Period progressed, investors became increasingly aware of these risks that were previously undisclosed to them by the Section 10(b) Defendants. As the risks surrounding Defendants' conduct materialized during the Class Period, Bloom Energy's stock price substantially decreased.  Each decline in Bloom Energy's stock price is evidence that the risks concealed by the Section 10(b) Defendants gradually materialized.  The total decline in Bloom Energy's stock price is attributable to the Section 10(b) Defendants' fraudulent and/or deliberately reckless conduct pursuant to the materialization-of-the-risk doctrine.

F.    **Presumption of Reliance: Fraud-On-The-Market**

244.    At all relevant times, the market for Bloom Energy's common stock was an efficient market for the following reasons, among others:

a.  Bloom Energy common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

b.  Bloom Energy communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.  Bloom Energy was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.  unexpected material news about Bloom Energy was reflected in and incorporated into Bloom Energy's stock price during the Class Period.

245.    As a result of the foregoing, the market for Bloom Energy common stock promptly digested current information regarding Bloom Energy from all publicly available sources and reflected such information in Bloom Energy's stock price. Under these circumstances, all purchasers of Bloom Energy's common stock during the Class Period suffered similar injury through their purchase of Bloom Energy's common stock at artificially inflated prices, and a presumption of reliance applies.

246.    Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### G.    Presumption of Reliance: Fraud Created the Market

247.    In the alternative, Bloom Energy's common stock should not have been introduced into the market at the time of the IPO because it was objectively unmarketable. Contrary to the information represented in Bloom Energy's Registration Statement, Bloom Energy was actual liable for over $2 billion in liabilities and was already experiencing construction delays.  Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance because they relied on the integrity of the market rather than on individual fraudulent disclosures.

### H.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

248.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

249.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward-looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

250.    Defendants are also liable for any false or misleading "forward-looking statements"

pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Bloom Energy who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## COUNT III

### Violation of Section 10((b) and SEC Rule 10b-5(b)

### against the Section 10(b) Defendants

251.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

252.   This Count is asserted against the Section 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

253.   During the Class Period, the Section 10(b) Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bloom Energy's common stock; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Bloom Energy's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

254.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Section 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Bloom Energy's common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Bloom Energy's finances, accounting, and business prospects.

255.    By virtue of their positions at Bloom Energy, the Section 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other Class members, or, in the alternative, the Section 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Section 10(b) Defendants.  Said acts and omissions of the Section 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each Section 10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

256.    Information showing that the Section 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Section 10(b) Defendants' knowledge and control.  As the senior managers and/or directors of Bloom Energy, the Section 10(b) Defendants had knowledge of the details of Bloom Energy's internal affairs.

257.    The Section 10(b) Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Section 10(b) Defendants were able to and did, directly or indirectly, control the content of the statements of Bloom Energy. As officers and/or directors of a publicly-held company, the Section 10(b) Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Bloom Energy's business operations, accounting, and finances.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Bloom Energy's common stock was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Bloom

Energy's business, accounting, and financial condition which were concealed by the Section 10(b) Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Bloom Energy's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and upon the statements disseminated by the Section 10(b) Defendants, and were damaged thereby.

258.    During the Class Period, Bloom Energy's common stock was traded on an active and efficient market.  Plaintiffs and the other Class members, relying on the materially false and misleading statements described herein, which the Section 10(b) Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Bloom Energy's common stock at prices artificially inflated by the Section 10(b) Defendants' wrongful conduct.  Had Plaintiffs and the other Class members known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Bloom Energy's common stock was substantially lower than the prices paid by Plaintiffs and the other Class members. The market price of Bloom Energy's common stock declined sharply upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

259.    By reason of the conduct alleged herein, the Section 10(b) Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

260.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of Bloom Energy's common stock during the Class Period, upon the disclosure that Bloom Energy had been disseminating false and/or misleading statements and information to the investing public.

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT IV

### Violation of Section 20((a) of the Exchange Act

### against the Section 20(a) Defendants

261.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

262.    During the Class Period, the Section 20(a) Defendants participated in the operation and management of Bloom Energy, and conducted and participated, directly and indirectly, in the conduct of Bloom Energy's business affairs.  Because of their senior positions, they knew the adverse non-public information about Bloom Energy's misstatement of construction delays, and contingent liabilities.

263.    As officers and/or directors of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Bloom Energy's financial condition and results of operations, and to correct promptly any public statements issued by Bloom Energy which had become materially false or misleading.

264.    Because of their positions of control and authority as senior officers, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Bloom Energy disseminated in the marketplace during the Class Period concerning Bloom Energy's operations.  Throughout the Class Period, the Section 20(a) Defendants exercised their power and authority to cause Bloom Energy to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were "controlling persons" of Bloom Energy within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bloom Energy's common stock.

265.    Each of the Section 20(a) Defendants, therefore, acted as a controlling person of Bloom Energy.  By reason of their senior management positions and/or being directors of Bloom Energy, each of the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Bloom Energy to engage in the unlawful acts and conduct complained of herein. Each of the Section 20(a) Defendants exercised control over the general operations of Bloom Energy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

266.   By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Bloom Energy.

## CLASS ACTION ALLEGATIONS

267.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired shares of Bloom Energy common stock: (i) in Bloom Energy's IPO; and/or (ii) on the public market between July 25, 2018 and September 16, 2019, inclusive, and who were damaged upon revelation of the truth. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

268.   The Class members are so numerous that joinder of all members is impracticable. Bloom Energy's stock is actively traded on the New York Stock Exchange under the ticker symbol "BE" and millions of shares were sold in the IPO.

269.   As of August 5, 2019, there were 69,993,919 shares of Bloom Energy Class A common stock outstanding, and 46,347,002 shares of Bloom Energy Class B common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if not millions of members in the proposed Class.

270.   Record owners and other Class members may be identified from records maintained by Bloom Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

271.   Plaintiffs' claims are typical of the claims of the Class members, as all Class members are similarly affected by defendants' conduct in violation of federal securities law that is complained of herein.

272.   Plaintiffs will fairly and adequately protect the interests of the Class members and have

1   retained counsel competent and experienced in class and securities litigation.

2   273.   Common questions of law and fact exist as to all Class members and predominate over

3   any questions solely affecting individual Class members. Among the questions of law and fact common

4   to the Class are:

5   (a)  whether the federal securities laws were violated by Defendants' acts as alleged

6   herein;

7   (b)  whether statements made by Defendants to the investing public during the Class

8   Period misrepresented material facts about the business operations, financials, and

9   accounting of Bloom Energy;

10  (c)  whether Defendants caused Bloom Energy to issue false and misleading statements

11  during the Class Period;

12  (d)  whether Defendants acted knowingly or recklessly in issuing false and misleading

13  statements and financial statements;

14  (e)  whether the prices of Bloom Energy's common stock during the Class Period were

15  artificially inflated because of Defendants' conduct complained of herein; and

16  (f)  whether the Class members have sustained damages and, if so, what is the proper

17  measure of damages.

18  274.   A class action is superior to all other available methods for the fair and efficient

19  adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the

20  damages suffered by individual Class members may be relatively small, the expense and burden of

21  individual litigation make it impossible for Class members to individually redress the wrongs done to

22  them. There will be no difficulty in the management of this action as a class action.

23  **PRAYER FOR RELIEF**

24  WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

25  A.   Determining that the instant action may be maintained as a class action under Rule 23 of

26  the Federal Rules of Civil Procedure, and certifying Plaintiffs as the class representatives;

27  B.   Awarding compensatory damages in favor of Plaintiffs and the other Class members

28  against all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 4, 2019              Respectfully submitted,

                                     **LEVI & KORSINSKY, LLP**

                                     _/s/ Adam M. Apton_
                                     Adam M. Apton (SBN 316506)
                                     Adam C. McCall (SBN 302130)
                                     388 Market Street, Suite 1300
                                     San Francisco, CA 94111
                                     Telephone: (415) 291-2420
                                     Facsimile: (415) 484-1294
                                     Email: aapton@zlk.com
                                     Email: amccall@zlk.com

                                     -and-

                                     Nicholas I. Porritt
                                     **LEVI & KORSINSKY, LLP**
                                     1101 30th Street N.W., Suite 115
                                     Washington, D.C. 20007
                                     Tel:     (202) 524-4290
                                     Fax:     (202) 333-2121
                                     Email: nporritt@zlk.com
                                     (to be _admitted pro hac vice_)

                                     _Attorneys for Plaintiffs and the Class_

AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS