**LEVI & KORSINSKY, LLP**
Adam M. Apton (316506)
Adam C. McCall (302130)
388 Market Street, Suite 1300
San Francisco, CA 94111
Tel : 415-373-1671
Email: aapton@zlk.com
        amccall@zlk.com

*Lead Counsel for Plaintiffs and the Class*

[Additional counsel on signature block]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELISSA M. ROBERTS, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BLOOM ENERGY CORPORATION, KR SRIDHAR, RANDY FURR, L. JOHN DOERR, SCOTT SANDELL, EDDY ZERVIGON, COLIN L. POWELL, PETER TETI, MARY K. BUSH, KELLY A. AYOTTE, J.P. MORGAN SECURITIES LLC, MORGAN STANLEY & CO. LLC, CREDIT SUISSE SECURITIES (USA) LLC, KEYBANC CAPITAL MARKETS INC., MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, ROBERT W. BAIRD & CO., INCORPORATED, COWEN AND COMPANY, LLC, HSBC SECURITIES (USA) INC., OPPENHEIMER & CO. INC., RAYMOND JAMES & ASSOCIATES, INC., and PRICEWATERHOUSECOOPERS LLP <br><br> Defendants. | Case No. 4:19-cv-02935-HSG <br><br> <ins>CLASS ACTION</ins> <br><br> **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <ins>DEMAND FOR JURY TRIAL</ins> |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

SUMMARY OF THE ACTION .................................................................1

JURISDICTION AND VENUE ...............................................................2

THE PARTIES ........................................................................................3

BACKGROUND ALLEGATIONS ..........................................................7

THE SECURITIES ACT CLAIMS .........................................................8

    A.      Construction Delays .........................................................9

    B.      Expenses and Contingencies ...........................................11

    C.      Bloom Energy's Fuel Cell Life .......................................15

    D.      Revenue Recognition ......................................................17

    E.      Restatement ....................................................................18

    F.      Weaknesses in Internal Controls ....................................22

    G.      Efficiency and Pollution Claims .....................................23

COUNT I ...............................................................................................26

COUNT II ..............................................................................................28

THE EXCHANGE ACT CLAIMS .........................................................29

    A.      Defendants' Materially False and Misleading Statements.................................30

             July 26, 2018 – Registration Statement ..........................30

             August 7, 2018 – Q2 2018 Letter to Shareholders............................45

             September 7, 2018 – Q2 2018 Form 10-Q........................48

    B.      The Truth about Bloom Energy's Construction Delays Emerges While Defendants Continue to Mislead Investors about Bloom Energy's Contingent Liabilities ...............................................52

             November 5, 2018 – Q3 2018 Letter to Shareholders .......................52

             November 5, 2018 – Q3 2018 Earnings Call ...................56

             November 13, 2018 – Q3 2018 Form 10-Q .....................59

             February 5, 2019 – Q4 2018 Letter to Shareholders.................63

             February 5, 2019 – Q4 2018 Earnings Call ....................64

             March 21, 2019 – Fiscal Year 2018 Form 10-K ..............66

             May 6, 2019 – Q1 2019 Letter to Shareholders.................72

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

May 6, 2019 – Q1 2019 Earnings Call .......................................74

May 14, 2019 – Q1 2019 Form 10-Q ........................................76

May 14, 2019 – Conference Presentation ..................................81

June 19, 2019 – Conference Presentation .................................83

C.   The Truth about Bloom Energy's Liabilities Begins to Emerge ......................84

June 21, 2019 – Press Release to Upgrade Delaware Fuel Cell Project ............84

August 12, 2019 - Q2 2019 Letter to Shareholders and Earnings Call .............85

August 12, 2019 – Q2 2019 Earnings Call .................................87

August 13, 2019 – Q2 2019 Form 10-Q ...................................88

D.   The Truth about Bloom Energy's Pollutants Begins to Emerge......................93

September 17, 2019 – Hindenburg Research Report.................................93

November 7, 2019 – Q3 2019 Letter to Shareholders ........................96

November 7, 2019 – Q3 2019 Earnings Call.................................98

November 14, 2019 – Q3 2019 Form 10-Q...............................99

E.   The Truth about Bloom Energy's False Financial Statements Begins to Emerge ..................................................................104

February 12, 2020 – Form 8-K ..............................................104

F.   Post Class Period Statements ..............................................107

February 24, 2020 – Senate Letter..........................................107

March 16, 2020 – Q4 2019 Letter to Shareholders & Form NT 10-K ............108

March 31, 2020 – Fiscal Year 2019 Form 10-K...............................108

G.   Defendants' Acted with Scienter ............................................112

The Section 10(b) Defendants Acted with Actual Knowledge or Were Deliberately Reckless..........................................................112

The Section 10(b) Defendants Were Financially Motivated to Commit Fraud116

Insider Stock Sales .......................................................118

The Accounting Violations Are Indicative of Scienter....................................119

The SOX Certifications.....................................................123

Change in Risk Warnings ..................................................124

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Corporate Scienter .................................................................................124

H. Loss Causation and Economic Loss ...............................................124

I. Presumption of Reliance: Fraud-On-The-Market ...........................128

J. Presumption of Reliance: Fraud Created the Market ......................129

K. No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine ......130

COUNT III .............................................................................................................130

COUNT IV .............................................................................................................133

CLASS ACTION ALLEGATIONS ......................................................................134

PRAYER FOR RELIEF ........................................................................................136

JURY DEMAND ....................................................................................................136

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff James Everett Hunt ("Hunt") and additional plaintiffs Juan Rodriguez ("Rodriguez"), Kurt Voutaz ("Voutaz"), Scott Kline ("Kline"), Joel White ("White"), Andrew Austin ("Austin"), and Ryan Fishman ("Fishman") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, allege the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Bloom Energy Corporation ("Bloom Energy") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Bloom Energy's public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning Bloom Energy; (d) interviews with former employees; and (e) information readily obtainable on the Internet.

Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## SUMMARY OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired shares of Bloom Energy common stock: (i) in Bloom Energy's initial public offering on July 25, 2018 (the "IPO"); and/or (ii) on the public market between July 25, 2018 and February 12, 2020, inclusive (the "Class Period"), seeking to recover damages for violations of the federal securities laws under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against Bloom Energy and certain of its top officials.

2.     Bloom Energy designs, manufactures, sells and, in certain cases, installs solid-oxide fuel cell systems that convert gas into electric power ("Energy Servers") for on-site power generation. After more than 15 years as a private company, Bloom Energy decided to go public. Its Registration Statement registered over 20.7 million Bloom Energy shares for sale. These shares were sold in the IPO at $15 per share and began trading on July 25, 2018. Bloom Energy received proceeds of $284.3 million, net of underwriting discounts, commissions, and estimated offering costs.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

3.      Bloom Energy's core service is manufacturing and leasing Energy Servers. From the moment the Defendants decided to take Bloom Energy public, the Defendants have made materially false and misleading statements to the public that artificially inflated its stock price. Bloom Energy did this by i) misleading investors as to construction delays that were plaguing its business; ii) improperly accounting for loss contingencies relating to its Energy Servers; iii) misrepresenting the life cycle of its fuel cells; iv) improperly accounting of revenue; v) failing to review weaknesses in its internal controls; and v) misrepresenting the efficiency and pollution output of its Energy Servers.      These misrepresentations allowed Bloom Energy to report decreased liabilities and increased revenue in its financial statements contained in its Registration Statement and published thereafter. This enabled Defendants to take Bloom Energy public at a higher price due to greater interest in its IPO, and to continue to inflate its stock price until the truth became known through revelations of third parties and ultimately Defendants' admission on February 12, 2020, that Bloom Energy's financial statements dating back to 2016 were misstated. More specifically, Defendants disclosed, in part, Bloom Energy's previously issued financial statements: (a) overstated net revenue by $165 million to $180 million; (b) understated operating loss by $20 million to $35 million; and, (c) understated net loss by $55 million to $75 million.  As a result, Bloom Energy restated its financial statements as of and for the year ended December 31, 2017 and 2018 and its quarterly financial information for the quarters ended March 31, 2018 and 2019, June 30, 2018 and 2019, September 30, 2018 and 2019, and December 31, 2018. and its selected financial data for the year ended December 31, 2016 in connection with the filing of its Form 10-K for the year ended December 31, 2019.

4.      Class members were materially harmed from Bloom Energy's false and misleading statements. As a direct result of Defendants' materially false and misleading statements, Bloom Energy's stock price has declined from its IPO price of $15 per share of common stock, to a 52-week low of $2.44 per share of common stock. Plaintiffs bring this action to recover these losses for the class members.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Act (15 U.S.C. § 78aa).

6.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as Bloom Energy has its principal executive offices located in this District and a significant portion of its business, actions, and the subsequent damages, took place within this District.

7.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## THE PARTIES

8.    Plaintiff Hunt is a former stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.   Hunt previously filed his certification evidencing his transactions in Bloom Energy's common stock with the Court in connection with his motion for appointment as Lead Plaintiff.  An updated certification and list of transactions is filed along with this Complaint as "Exhibit A" is incorporated herein by reference.

9.    Plaintiff Rodriguez is a former stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations. Rodriguez's transactions and certifications are filed along with this Complaint as "Exhibit B" and is incorporated herein by reference.

10.    Plaintiff Voutaz is a former stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations. Voutaz's transactions and certifications are filed along with this Complaint as "Exhibit C" and is incorporated herein by reference.

11.    Plaintiff Kline is a current stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.  Kline's transactions and certifications are filed along with this Complaint as "Exhibit D" and is incorporated herein by reference.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

12.     Plaintiff White is a current stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.  White's transactions and certifications are filed along with this Complaint as "Exhibit E" and is incorporated herein by reference.

13.     Plaintiff Austin is a current stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.  Austin's transactions and certifications are filed along with this Complaint as "Exhibit F" and is incorporated herein by reference.

14.     Plaintiff Fishman is a current stockholder of Bloom Energy who acquired Bloom Energy common stock at artificially inflated prices pursuant and/or traceable to the Registration Statement and was damaged upon the revelation of Defendants' misrepresentations.  Fishman's transactions and certifications are filed along with this Complaint as "Exhibit G" and is incorporated herein by reference.

15.     Defendant Bloom Energy is a Delaware corporation with principal executive offices located at 4353 North First Street, San Jose, California.  Bloom Energy is traded on the New York Stock Exchange under the ticker symbol "BE".

16.     Defendant KR Sridhar ("Sridhar") is Bloom Energy's Founder and has been a director since January 2001. Sridhar has also been Chief Executive Officer and Chairman of the Board of Directors since April 2002, and has acted as President since at least July 2011. Defendant Sridhar reviewed and signed the Registration Statement. Defendant Sridhar also reviewed and certified Bloom Energy's financial statements issued during the Class Period and made statements in letters to shareholders, press releases and earnings conference calls identified below.

17.     Defendant Randy Furr ("Furr") has been Bloom Energy's Chief Financial Officer since April 2015, and has been the Executive Vice President since at least March 2016. Defendant Furr reviewed and signed the Registration Statement. Defendant Furr also reviewed and certified Bloom Energy's financial statements issued during the Class Period and made statements in letters to shareholders, press releases and earnings conference calls identified below.

18.     Defendant L. John Doerr ("Doerr") has been Bloom Energy's Lead Independent Director since July 2018, and has been a director since May 2002. Defendant Doerr reviewed and signed the

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Registration Statement.

19.     Defendant Scott Sandell ("Sandell") has been a director of Bloom Energy since August 2003. Defendant Sandell reviewed and signed the Registration Statement.

20.     Defendant Eddy Zervigon ("Zervigon") has been a director of Bloom Energy since October 2007. Defendant Zervigon reviewed and signed the Registration Statement.

21.     Defendant Colin L. Powell ("Powell") has been a director of Bloom Energy since January 2009. Defendant Powell reviewed and signed the Registration Statement.

22.     Defendant Peter Teti ("Teti") has been a director of Bloom Energy since November 2015. Defendant Teti reviewed and signed the Registration Statement.

23.     Defendant Mary K. Bush ("Bush") has been a director of Bloom Energy since January 2017. Defendant Bush reviewed and signed the Registration Statement.

24.     Defendant Kelly A. Ayotte ("Ayotte") has been a director of Bloom Energy since November 2017. Defendant Ayotte reviewed and signed the Registration Statement.

25.     Defendant J.P. Morgan Securities LLC ("JP Morgan") is a Delaware limited liability company with principal executive offices located at 383 Madison Avenue, New York, New York. Defendant JP Morgan entered into an underwriting agreement with Bloom Energy in connection with the IPO. Defendant JP Morgan also acted as a co-joint, book-running manager of the IPO and as co-representative of the underwriters.

26.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company with principal executive offices located at 1585 Broadway, New York, New York. Defendant Morgan Stanley entered into an underwriting agreement with Bloom Energy in connection with the IPO. Defendant Morgan Stanley also acted as a conjoint, book-running manager of the IPO and as co-representative of the underwriters in the IPO.

27.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a Delaware limited liability company with principal executive offices located at 11 Madison Avenue, New York, New York. Defendant Credit Suisse entered into an underwriting agreement with Bloom Energy in connection with the IPO.

28.     Defendant KeyBanc Capital Markets Inc. ("KeyBanc") is an Ohio corporation with

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

principal executive offices located at 127 Public Square, Cleveland, Ohio.  Defendant KeyBanc entered into an underwriting agreement with Bloom Energy in connection with the IPO.

29.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a Delaware corporation with principal executive offices located at 4 World Financial Center, North Tower, New York, New York. Defendant Merrill Lynch entered into an underwriting agreement with Bloom Energy in connection with the IPO.

30.     Defendant Robert W. Baird & Co. Incorporated ("Baird") is a Wisconsin corporation with principal executive offices located at 777 E Wisconsin Avenue, Milwaukee, Wisconsin. Defendant Baird entered into an underwriting agreement with Bloom Energy in connection with the IPO.

31.     Defendant Cowen and Company, LLC ("Cowen") is a Delaware limited liability company with principal executive offices located at 599 Lexington Avenue, 20th Floor, New York, New York. Defendant Cowen entered into an underwriting agreement with Bloom Energy in connection with the IPO.

32.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a Delaware corporation with principal executive offices located at 452 Fifth Avenue, New York, New York. Defendant HSBC entered into an underwriting agreement with Bloom Energy in connection with the IPO.

33.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") is a New York corporation with principal executive offices located at 85 Broad Street, New York, New York. Defendant Oppenheimer entered into an underwriting agreement with Bloom Energy in connection with the IPO.

34.     Defendant Raymond James & Associates, Inc. ("Raymond James") is a Florida corporation with principal executive offices located at 880 Carillon Parkway, Saint Petersburg, Florida. Defendant Raymond James entered into an underwriting agreement with Bloom Energy in connection with the IPO.

35.     Defendant PricewaterhouseCoopers LLP ("PwC") is the U.S. member firm of PricewaterhouseCoopers International Limited and is has its principal executive office at 300 Madison Avenue New York, New York, 10017 with offices in San Jose, California. Defendant PwC has served as Bloom Energy's auditor out of its San Jose office since 2009 and reviewed Bloom Energy's financial statements in connection with the IPO.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*      *      *

36.     "Underwriter Defendants" refers to Defendants JP Morgan, Morgan Stanley, Credit Suisse, KeyBanc, Merrill Lynch, Baird, Cowen, HSBC, Oppenheimer, and Raymond James.

37.     "Section 11 Defendants" refers to Defendants Bloom Energy, Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, Ayotte, the Underwriter Defendants, and PwC.

38.     "Section 15 Defendants" refers to Defendants Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, and Ayotte.

39.     "Section 10(b) Defendants" refers to Defendants Bloom Energy, Sridhar, and Furr.

40.     "Section 20(a) Defendants" refers to Defendants Sridhar and Furr.

## BACKGROUND ALLEGATIONS

41.     Bloom Energy designs, manufactures, sells and, in certain cases, installs solid-oxide fuel cell systems which it refers to as a "Bloom Energy Server", (hereinafter "Energy Server") for on-site power generation. According to Bloom Energy, its Energy Servers are a stationary power generation platform that convert standard low-pressure natural gas or biogas into electricity through an electrochemical process. In other words, the Energy Servers convert gas into electric.

42.     Bloom Energy states that it primarily recognizes revenue from (i) the sale and installation of its Energy Servers both to direct and to lease customers, (ii) by providing services under its operations and maintenance services contracts (referred to by Defendants as "Maintenance Service Agreements") and (iii) by selling electricity to customers under power purchase agreements.

43.     Bloom Energy offers its customers several ways to finance their purchase of an Energy Server.  Customers may choose to purchase the Energy Servers outright.  Customers may also lease the Energy Servers through one of Bloom Energy's financing partners via its Managed Services program or agreements or as a traditional lease.  Finally, customers may purchase electricity through the Bloom Energy's Power Purchase Agreement Programs.

44.     All of Bloom Energy's product revenue is generated from the sale of its Energy Servers to direct purchase, third-party PPAs, traditional lease and managed services customers. Bloom Energy represented that it generally recognized product revenue from contracts with customers for the sales of its Energy Servers once they achieved "acceptance"; that is, generally, upfront when the system has

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

been installed and is running at full power as defined in each contract.

45.     Bloom Energy identified "acceptances" as one of its "key operating metrics" that investors could use to track the progress of its business and gain "useful insight into the operational trajectory, cash generation, and cost profile of the business."

46.     When Bloom Energy sells, leases, or finances an Energy Server to a customer, the Energy Server generally comes with a one-year warranty and performance guarantee as well as the option to purchase an extended Maintenance Service Agreement. The yearly cost of the Maintenance Service Agreement is predetermined at the time of purchase and Maintenance Service Agreements may be renewed annually for a period of up to 25 years. According to Bloom Energy, its customers have "almost always" exercised their option to renew the Maintenance Service Agreements with "virtually no customers hav[ing] selected to cancel [them]" and that it "anticipate[d]  that almost all of our customers will continue to renew their operations and maintenance services agreements each year."

47.     Bloom Energy's Maintenance Service Agreements contain guarantees for its Energy Servers. Pursuant to these guarantees, Bloom Energy is liable for repairing and/or replacing its Energy Servers when output or efficiency falls below certain thresholds. Bloom Energy prices these contracts, and estimates reserves in relation thereto, based on estimates of the life of the Energy Servers and their components, including the internal fuel cells.

## THE SECURITIES ACT CLAIMS

48.     These claims, brought under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, are based solely on allegations of negligence, strict liability and/or the absence of any affirmative defense based on the reasonableness of the Section 11 Defendants' investigation of the true facts underlying the alleged misstatements and omissions.

49.     These Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained elsewhere in this Complaint that allege fraud or scienter. These Securities Act claims are not based on any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct, and Plaintiffs specifically disclaim any reference to or reliance on fraud allegations for the purpose of these claims.

50.     After more than 15 years as a private company, Bloom Energy decided to go public. On

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

June 12, 2018, it filed a draft registration statement with the SEC on Form S-1 registering shares for the IPO. Bloom Energy amended this registration statement on July 9, 2018, July 19, 2018, July 20, 2018, and July 24, 2018. On July 26, 2018, Bloom Energy filed its final prospectus for the IPO. Bloom Energy's initial registration statement, subsequent amendments, and final prospectus are collectively referred to herein as the "Registration Statement."

51.     The Registration Statement registered over 20.7 million Bloom Energy shares for sale. These shares were sold in the IPO at $15 per share and began trading on July 25, 2018. Bloom Energy received proceeds of $284.3 million, net of underwriting discounts, commissions, and estimated offering costs.

52.     Bloom Energy's Registration Statement contained untrue statements of material fact, omitted to state a material fact required to be stated therein, and omitted to state material facts necessary to make statements therein not misleading. The omissions and misrepresentations within the Registration Statement related to i) construction delays that were plaguing Bloom Energy; ii) improper accounting for loss contingencies relating to the Energy Servers; iii) the life cycle of its fuel cells; iv) improper accounting of Bloom Energy's revenue; v) weaknesses in Bloom Energy's internal controls; and v) the efficiency and pollution output of the Energy Servers.

### A. **Construction Delays**

53.     Bloom Energy's Registration Statement described certain "risks" related to Bloom Energy, including that it was dependent on construction schedules that may be delayed. In particular, the Registration Statement stated:

> ***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations.***
>
> Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.
>
>                         \*         \*         \*
>
> The timing of delivery and installations of our products have a significant impact on the timing of the recognition of product revenue. ***Many factors can cause a lag between the time that a customer signs a purchase order and our recognition of product revenue. These factors include . . . customer facility construction schedules***.

9                                    Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

54.     In violation of the Securities Act, the statements identified in emphasis above in Paragraph 54 did not disclose that Bloom Energy was, at the time of the Registration Statement, already facing significant construction delays that were interfering with its installations and "acceptances." In fact, the construction delays existing at the time of the Registration Statement were so substantial that they prevented Bloom Energy from meeting even the low end of its publicly-stated guidance for "acceptances" for the three months ended September 30, 2018 (i.e., the quarter in which the IPO occurred).

55.     According to CW1 who was a senior program manager for Bloom Energy from June 2016 to February 2018, construction delays were a constant issue at Bloom Energy. CW1 indicated that during his tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

56.     CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left in February 2018.

57.     CW1 also indicated that upper management, all the way up to Sridhar, typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

58.     CW1 was in a position to know about the construction delays because he was responsible for overseeing sales from development to acceptance, providing technical help during installation and sales, overseeing construction contracts, and ensuring that the construction and installation met all government requirements.

59.     On November 5, 2018, Bloom Energy disclosed its operating results for the three months ended September 30, 2018. It reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that Bloom Energy's low rate of "acceptances" was "a result of construction delays." Accordingly, at the time of the IPO during this quarter, Bloom Energy was experiencing significant

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

"construction delays" that it did not disclose in the Registration Statement.

60.    Market analysts from large banks focused on this point. On November 6, 2018, Cowen released an analyst report titled "Growing Pains" and noted that "3Q results were largely impacted by lower than expected acceptances as a result of construction timing delays." Similarly, Credit Suisse published a report titled "Bloom Wilts a Bit on Project Delays." Credit Suisse stated, "Bottom line – near-term challenges due to construction delays." The fact that market analysts focused on the "construction delay" news confirms that it was material to investors and, for that reason, should have been disclosed in the Registration Statement.

61.    The Section 11 Defendants also violated the Securities Act in so far as the Registration Statement failed to comply with Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. Item 303 requires the identification and disclosure of known trends, events, demands, commitments and uncertainties that had or were reasonably likely to have a material effect on Bloom Energy's operating performance..

62.    Bloom Energy's "construction delays" constituted an "uncertainty" under Item 303 that required disclosure in the Registration Statement. As previously alleged, the "construction delays" existed prior to and during the IPO. Moreover, given that the "construction delays" delayed installation of the Energy Servers and that Bloom Energy only recognized revenue after installation (*i.e.*, upon "acceptance"), the delays had, or Bloom Energy reasonably expected the delays to have, a material unfavorable impact on its revenues and/or income. This is especially so considering the fact that Bloom Energy knew that many of its customers would not allow construction to proceed during the fourth quarter due to "blackouts," as described by Furr during the November 5, 2018 investor conference call. Accordingly, unless Energy Servers were installed timely in the third quarter, installations would likely be delayed until the first quarter of fiscal 2019 and, as a result, delaying revenue recognition substantially.

### B.    <u>Expenses and Contingencies</u>

63.    Bloom Energy also materially misrepresented its contingent liabilities that it would incur from its Maintenance Service Agreements. When Bloom Energy sells, leases, or finances one of its Energy Servers, it includes a one-year warranty and performance guarantee with the purchase price.

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

After the initial one-year warranty period ends, Bloom Energy's customers enter into Maintenance Service Agreements with Bloom Energy to extend the initial warranty and performance guarantees, under which Bloom Energy purportedly receives annual service payments from the customer. The life of the Maintenance Service Agreement contract typically lasts from 10 to 21 years and can last as long as 25 years.

64. The Maintenance Service Agreements also create expenses for Bloom Energy, however. Under the terms of the agreements, Bloom Energy is required to service, repair and replace the Energy Servers when output or efficiency falls below certain thresholds. Bloom Energy is responsible for two types of replacements: its fuel cell servers (the system itself) and the individual fuel cells that go inside the Energy Servers. The expenses and/or contingencies associated with these repairs as of March 31, 2018 were approximately $2.9 billionand exceeded its future service revenues by approximately $1.7 billion. However, Bloom Energy failed to recognize (i.e., book) the $1.7 billion net loss in its March 31, 2018 financial statements or disclose this material liability to investors in its Registration Statement.

65. The Section 11 Defendants violated the Securities Act by failing to disclose the estimated $2.9 billion in Maintenance Service Agreement liabilities. Not only was this information material (and therefore deserving of disclosure in its own right), but Bloom Energy was required to disclose this information under both Item 303 of Regulation S-K and Generally Accepted Accounting Principles ("GAAP") related to accounting for loss contingencies and product warranty liabilities. ASC 450-20-50 and ASC 460-10-50. Importantly, registration statements are presumed to be in violation of the Securities Act if they do not comply with Regulation S-K or GAAP.

66. Item 303 of Regulation S-K required Bloom Energy to "identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way." 17 CFR § 229.303(a)(1). The disclosures of the Maintenance Service Agreement liabilities were false and misleading as they failed to adequately convey the magnitude of these liabilities and the material negative impact they would have on Bloom Energy's liquidity.

67. A basic premise in GAAP is that "an estimated loss from a loss contingency shall be accrued by a charge to income if" a loss is both probable and "the amount of loss can be reasonably

estimated." ASC 450-20-25-2. More specifically, with respect to extended warranty or product maintenance contracts, such as Bloom Energy's Maintenance Service Agreements, GAAP requires a loss to be recognized "if the sum of expected costs of providing services under the contracts and unamortized acquisition costs exceeds related unearned revenue. Extended warranty or product maintenance contracts shall be grouped in a consistent manner to determine if a loss exists. A loss shall be recognized first by charging any unamortized acquisition costs to expense. If the loss is greater than the unamortized acquisition costs, a liability shall be recognized for the excess." ASC 460-10-25-8 and ASC 605-20-25-6.

68. After the initial one-year warranty period, Bloom Energy's warranty and guarantee could be "renewed annually at the customer's option as an operations and maintenance services agreement at predetermined prices for a period of up to 20 years." Bloom Energy admits that "[h]istorically, [its] customers have almost always exercised their option to renew under these operations and maintenance services agreements" and "virtually no customers have elected to cancel their maintenance agreements." Therefore, Bloom Energy was able to estimate the amount of revenue to be received from the Maintenance Service Agreements.

69. Additionally, Bloom Energy knew the estimated life of its Energy Servers and fuel cells were less than the life of the Maintenance Service Agreements. In fact, Bloom Energy had already been required to replace Energy Servers and fuel cells under the Maintenance Service Agreements. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the Maintenance Service Agreements and therefore knew it was likely they would have to replace the remaining early generation systems and the cost to do so. In 2015, Bloom Energy implemented a fleet decommissioning program for its early generation Energy Servers. This resulted in "a significant adjustment to revenue in the quarter ended December 31, 2015."

70. Bloom Energy admitted that it would have to continue to replace these systems. The Registration Statement stated, in pertinent part, that "[a]s of March 31, 2018, we had a total of 58.5 megawatts in total deployed early generation servers, including our first and second generation servers, out of our total installed base of 312 megawatts. . . . [W]e expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the

maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers."

71. Included in 58.5 megawatts were 30 megawatts of early generation Energy Servers in Delaware that needed immediate replacement within the year. As Bloom Energy had already been required to replace some of the earlier generation systems in 2015, Bloom Energy had historical data upon which they were able to reasonably estimate the costs of replacing other Energy Servers going forward.

72. Further proof that these liabilities and/or contingencies were estimable comes from the fact that a third-party market analyst, Hindenburg Research, using its specialized industry knowledge, calculated them as of June 30, 2019 in a report dated September 17, 2019. As explained in the report, Bloom Energy had "an estimated [net] $2.2 billion in undisclosed servicing liabilities that the market has missed." Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

73. Bloom Energy possessed all of the information possessed by Hindenburg and, therefore, was able to perform the required calculations, recognize the required loss on the Maintenance Service Agreements in its financial statements, and make the appropriate material disclosures. Bloom Energy admitted that it stopped following the appropriate GAAP in accounting for its Maintenance Service Agreements prior to filing its Registration Statement:

> Prior to fiscal year 2014, certain MSAs with direct customers were accounted for as separately-priced warranty contracts under ASC 605-20-25 Separately Priced Extended Warranty and Product Maintenance Contracts (formerly FTB 90-1), in which we recorded an accrual for any expected costs that exceed the contracted revenues for that one-year service renewal arrangement, and is included as a component of the accrued warranty liability. The related liability was $15.8 million, $9.2 million and $8.5 million as of December 31, 2016 and 2017, and as of March 31, 2018, respectively.

74. Bloom Energy's undisclosed $2 billion in servicing liabilities was material information that should have been disclosed in the Registration Statement. Indeed, when Hindenburg published its report, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at

close on September 17, 2019, a drop of 21% on unusually high trading volume.

C.  **Bloom Energy's Fuel Cell Life**

75.     In its Registration Statement, Bloom Energy also misrepresented the life of its fuel cells, stating that fuel cells installed in 2017 and onward will have a lifespan of over five years:

> Therefore, we experienced losses, particularly during the period between 2013 and 2016, which represented the investment we were willing to make in order to execute our strategy to become the market leader in distributed energy generation. To date, we have seen progress in service financial performance driven by two primary events:
>
> - "time to stack replacement" primarily driven by our fuel cell stack lives—in the early years, replacement was typically 12 to 18 months. Over the years we have made steady improvements in our fuel cell lives, and from 2017 onwards we expect to average over five years between replacements; and
>
> - the cost to refurbish (which include our fuel cells) is coming down. Since 2014, we have driven this cost down by approximately 40%.
>
> At today's pricing, we believe we can break-even in our service business provided the time between stack replacements across all of our fleet is five years or better. Longer term, like many companies with an operation and maintenance business, our strategy is to make our service business a profitable part of our overall business, with predictable annual recurring revenue.

76.     These statements were materially false and misleading. In its September 17, 2019 report, Hindenburg discovered and informed investors that Bloom Energy's fuel cells averaged around three years. Hindenburg stated in pertinent part:

> We have tracked data on Bloom projects installed since 2017 through state utility records in New York and California. There were 35 projects in all. After aggregating this data, we found that even Bloom's newest fuel cells will degrade below replacement thresholds in under 3 years, significantly below the company's "expectations". We present this data later in the report.
>
> Our findings were corroborated by multiple experts in the field who were highly skeptical of Bloom's claim that solid oxide fuel cells could last 5 years or longer in the field.
>
> We asked one professional fuel cell technician, with 19 years of experience, whether he believed the company's claims to be able to run solid oxide fuel cells for 5 years. He responded with a curt "no". When asked if the same fuel cells could operate for three years, he replied:
>
> "Do I believe claims of 3 years before service is needed? No. I would be highly skeptical."
>
> Another expert we contacted, with 14 years of experience working in Fuel Cells and Fuel

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Cell Performance Analysis, who also has a B.S., M.S., and a PhD in Chemical Engineering, also warned about temperature and durability preventing Bloom's cells from running for 5 years:

"They are using the high temperature materials, I think. So, there is advantages and disadvantages. The disadvantage is that degradation is probably high. I doubt they have 5 years life. They may have 1 or 2 max. They cannot achieve 5 years. Or maybe if they have to replace part of the stack, they can achieve 5 years. In general, it's really hard for SOFCs to run 5 years."

*       *       *

Keep in mind that Bloom guarantees both the output (total electricity produced) and the efficiency (how much fuel is used to generate the electricity) of its servers:

"…we typically provide an Output Guaranty of 95% measured annually and an Efficiency Guaranty of 52% measured cumulatively" [Prospectus pg. 75]

Bloom also provides tighter 80% quarterly output guarantees or 45% monthly efficiency guarantees on some of its projects. [Prospectus pg. 88 and 89]

Efficiency and output decline together: As the systems become less efficient, they produce less electricity, making efficiency degradation key to when fuel cells need to be replaced.

As we have seen from older Bloom project data in California and New York, fuel cell replacements were typically done in the 48%-50% efficiency range.

This chart, based on data from California and New York, shows how rapidly Bloom's newer post-2016 installed servers are declining by month, on average. It also shows how the trend continues:



(Source: New York & California Utility Data & Author Analysis)

After only 25 months, Bloom's newer fuel cell installations had deteriorated from a

16

median starting efficiency of 58.3% down to 51.0%, a decline that puts them on pace to breach the 48% threshold with 34 months (less than three years).[1]

The chart also shows that 45% efficiency (which serves as a 'bare minimum' on some projects) will be breached after only 42 months, or 3.5 years.[2]

77.     By making materially false and misleading statements about the life of its fuel cells, Bloom Energy was able to ignore the loss contingencies attributable to the Maintenance Service Agreement. The Hindenburg report revealed that despite Bloom Energy's representations that its fuel cells would last over five years, in reality, Bloom Energy routinely replaced its fuel cells after just three years. Accordingly, Bloom Energy's representations in the Registration Statement that it expected the useful life of its fuel cells to exceed five years were materially false and misleading.

### D.     Revenue Recognition

78.     Bloom Energy's Registration Statement disclosed that "[i]n May 2014, the [Financial Accounting Standards Board ("FASB")] issued guidance which will replace numerous requirements in GAAP, including industry-specific requirements, and provide companies with a single revenue recognition model for recognizing revenue from contracts with customers. The core principle of the new standard is that a company should recognize revenue to show the transfer of promised goods or services to customers in an amount that reflects the consideration to which the company expects to be entitled in exchange for those goods or services." However, Bloom Energy made a false and self-serving claim that "[i]n August 2015, the FASB deferred the effective date [of the new revenue recognition standard] by one year to December 15, 2018 for annual reporting periods beginning after that date." Although, in August 2015, the FASB deferred the effective date of the new revenue recognition standard by one year, the new effective date for public entities was for annual reporting periods beginning after December 15, 2017 (i.e., calendar year 2018), including interim periods within that reporting period. ASU 2014-09 and ASU 2015-14.

---

[1] We used the median starting point in month 1 because there were outliers in the first month that would have skewed the results significantly downward, likely because systems needed to get fully up and running. We used average thereafter.

[2] Bloom states that its servers degrade linearly over time, thus we extrapolate using straight-line degradation. Per Bloom's filings: "the efficiency of the Energy Server decreases very gradually from the beginning of life efficiency toward the end of life efficiency. This decrease is very nearly linear in nature (i.e., a straight-line slope)." (Pg. 31)

79.     The new revenue recognition standard (ASC 606) was a highly significant change to the accounting standards and its adoption would have had a significant impact on Bloom Energy's unaudited March 31, 2018 financial statements included in its Registration Statement. Unlike every other calendar-year GAAP compliant publicly-traded entity, Bloom Energy failed to adopt the new revenue recognition standard on January 1, 2018. Consequently, its unaudited March 31, 2018 financial statements, and the financial information derived from these financial statements, included in the Registration Statement were not prepared in accordance with GAAP. Importantly, registration statements are presumed to be in violation of the Securities Act if they contain financial statements which do not comply with GAAP.

80.     Bloom Energy improperly delayed adopting the new revenue recognition guidance until the fourth quarter 2019, the same quarter during which PwC identified an issue with its accounting for managed services agreements which led to the restatement of Bloom Energy's financial statements dating back to 2016.

**E.     Restatement**

81.     Bloom Energy also misrepresented its financial statements in its Registration Statement. In addition to a direct purchase option, Bloom Energy offered its customers several leasing or pay-as-you-go programs, including a "sale-leaseback sublease" arrangement, which it referred to as Managed Services ("MS"). Under its MS program, Bloom Energy sells its Energy Servers to a financing partner (e.g., a bank) and then leases them back. Bloom Energy then subleases these Energy Servers to a customer pursuant to service agreement which encompasses an operating lease. Thus, Bloom Energy acts as both a "lessee" and a "lessor." The service agreements required customers to pay "a monthly equipment fee calculated based on the size of the installation, which covers the amount of [Bloom Energy's] lease payment [to the financing partner], and a service payment based on the monthly output of electric power produced by the energy server."

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

82.      Bloom Energy recognized a portion of revenue from sales of the Energy Servers upfront and deferred the rest over the duration of the contract. Performance-based payments from customers were recognized as revenue over the duration of the contract. Bloom Energy included the following diagram in its Registration Statement to illustrate its MS program:



83.      A lessee (i.e., the entity leasing equipment) can only classify its leases as either operating or capital.  "The objective of the lease classification criteria … derives from the concept that a lease that transfers substantially all of the benefits and risks incident to the ownership of property [to the lessee] should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee and as a sale or financing by the lessor [i.e., a capital lease]. All other leases should be accounted for as operating leases." ASC 840-10-10-1.

84.      GAAP provides very clear bright line provisions for when a lease should be classified as a capital lease. If, at its inception, a lease meets any of the following four criteria, it is classified as a capital lease by the lessee:

    a.   Ownership is transferred to the lessee by the end of the lease term.

    b.   The lease contains a bargain purchase option.

    c.   The lease term is at least 75% of the property's estimated remaining economic life.

    d.   The present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the lessor at the inception date. ASC 840-10-25-1.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

If none of the above criteria are met, a lessee should classify its lease as an operating lease. ASC 840-10-25-29 – 30.

85.     Proper lease classification is extremely important as it not only determines how a lessee accounts for the lease itself, but also how a seller-lessee (such as Bloom Energy) accounts for a sale-leaseback transaction (such as Bloom Energy's MS transactions).

86.     ASC 840, the authoritative accounting standard under GAAP concerning accounting for leases, states that "[i]f the seller-lessee retains, through a leaseback, substantially all of the benefits and risks incident to the ownership of the property sold, the sale-leaseback transaction is merely a financing. The seller-lessee shall not recognize any profit on the sale of an asset if the substance of the sale-leaseback transaction is merely a financing. Accordingly, this Subtopic does not permit any profit to be recognized on a sale if a related leaseback of the entire property sold meets one of the criteria in paragraph 840-10-25-1 for classification as a capital lease." ASC 840-40-25-4. In other words, ASC 840 recognizes a "sale" to be an essential component of a "sale-leaseback" transaction, which only occurs when "the customer has taken title **and** assumed the risks and rewards of ownership of the products." ASC 605-10-S99 and ASC 840-40-S99. Thus, no gain should be recognized on a failed sale-leaseback transaction because, in substance, the seller-lessee never parted with the asset. Any funds obtained by the seller in a failed sale-leaseback transaction should be recorded as a financing obligation (akin to a loan).

87.     Under an operating lease, the leased asset is not recognized on lessee's books and lease payments are recorded as an expense by the lessee and income by lessor. ASC 840-20-25. On the other hand, a capital lease is recorded on lessee's balance sheet by recognizing an asset and a corresponding liability (i.e., financing obligation). ASC 840-30-25-1 and ASC 840-30-30-1 – 3. The leased asset is "amortized in a manner consistent with the lessee's normal depreciation policy" for owned assets, and lease payments are "allocated by the lessee between a reduction of the obligation and interest expense to produce a constant periodic rate of interest on the remaining balance of the obligation (the interest method)." ASC 840-30-35-1 and ASC 840-30-35-6. Assets and obligations recorded under a capital lease should be separately identified in lessee's financial statements. ASC 840-30-45-1 – 2.

88.     Capital leases are generally less desirable than operating leases because, as stated above,

capital leases require a lessee to record the asset and a corresponding liability on its books, which can affect the company's balance sheet ratios and thus, change the way investors and creditors perceive the company's overall financial health. Also, capital leases saddle a lessee's income statement with interest and depreciation expenses. Moreover, in the case of Bloom Energy, capital leases would render the company's MS transactions as failed sale-leaseback transactions, requiring them to be treated as financing transactions and precluding revenue recognition from such "sales" to financing partners altogether.

89.     Seeking to recognize revenue from its "sales" of Energy Servers to financing partners upfront, Bloom Energy improperly accounted for its MS program leases as operating leases, even though they clearly met the aforementioned GAAP criteria to be classified as capital leases. The length of Bloom Energy's MS leases was 6 - 10 years, well in excess of the 75% of the Energy Servers' actual useful life. Moreover, in its restatement, Bloom Energy acknowledged that "the terms of our Managed Services Agreements and similar arrangements, including the events of default provisions," did not "satisfy[y] the requirements for sales under the revenue accounting standards." In its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, no profit should have been recognized on sales to financing partners and "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

90.     The portion of revenue in 2016, 2017, and the three months ended March 31, 2018 attributable to the MS transactions was 4%, 8%, and 4%, respectively. The chart below shows the impact of Bloom Energy's restatement, primarily due to improper accounting for MS transactions, on its December 31, 2017 and March 31, 2018 financial statements included in the Registration Statement:

| ($ in thousands except per share data) | FY 2017 Reported | FY 2017 Actual | Percent Misstated | Three Months Ended 3/31/18 Reported | Three Months Ended 3/31/18 Actual | Percent Misstated |
|---|---|---|---|---|---|---|
| Total revenue | $375,996 | $365,623 | (2.8%) | $169,361 | $168,582 | (0.5%) |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Net loss | ($281,265) | ($295,028) | **4.7%** | ($22,348) | ($26,223) | **14.8%** |
|---|---|---|---|---|---|---|
| Net loss attributable to common stockholders | ($262,599) | ($276,362) | **5.0%** | ($17,716) | ($21,591) | **17.9%** |
| Net loss per share attributable to common stockholders | ($25.62) | ($26.97) | **5.0%** | ($1.70) | ($2.08) | **18.3%** |

91.     The Section 11 Defendants violated the Securities Act by failing to account for its MS transactions in accordance with GAAP in Bloom Energy's financial statements included in the Registration Statement. Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. Importantly, registration statements are presumed to be in violation of the Securities Act if they contain financial statements which do not comply with GAAP.

92.     Accordingly, Bloom Energy's Registration Statement was materially false because Bloom Energy falsely reported its financial statements, artificially inflated its revenue, decreased its net loss, and decreased its net loss attributable to common shareholders by improperly accounting for its MS program leases.

93.     The errors in Bloom Energy's financial statements were also material as a reasonable investor would consider the correct revenue and net loss information  to be important before purchasing or otherwise acquiring Bloom Energy securities, especially when the net loss was 14% more than what was previously reported.

F.     **Weaknesses in Internal Controls**

94.     In connection with its financial statements, Bloom Energy represented in its Registration Statement that there were no "material weaknesses in internal control over financial reporting at December 31, 2017". This was false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

95.     Accordingly, Bloom Energy's representations relating to its internal controls over

financial reporting were materially false and misleading.

G. **Efficiency and Pollution Claims**

96.     In its Registration Statement, Bloom Energy misrepresented that it owned superior technology involving the efficiency of converting fuel to electricity.  Efficiency is defined as the percentage of the energy in the fuel that is converted to electricity. The higher the efficiency, the less fuel used to generate a given unit of electric power output, resulting in lower fuel costs. However, Bloom Energy's claims were materially false and misleading as actuarial analysis of the efficiency of the Bloom Energy's solid oxide fuel cell technology shows that the fuel efficiency of electric generation using the Energy Servers is substantially inferior to what Bloom Energy publicly represented.

97.     In pertinent part, Bloom Energy represented the following about the efficiency of its Energy Servers:

> We have continuously innovated and evolved our technology over time. The latest generation Energy Server delivers five times the energy output of the first generation in a constant footprint. Similarly, we have also improved the beginning-of-life electrical efficiency (the rate at which fuel is converted into electricity) of our Energy Servers from 45% to 65% today, representing the highest delivered power efficiency of any commercially available power solution. In addition, we have expanded the range of available accessories which extend the capability and functionality of our Energy Servers to meet additional customer requirements, such as an uninterruptable power capability. Our team has decades of experience in the various specialized disciplines and systems engineering concepts unique to this technology. We had 209 issued patents in the United States and 90 issued patents internationally as of March 31, 2018.
>
> *                *                *
>
> *Continual increases in electrical efficiency.* Efficiency is defined as the percentage of the energy in the fuel that is converted to electricity. The higher the efficiency, the less fuel used to generate a given unit of electric power output, resulting in lower fuel costs. Today, our Energy Servers are significantly more efficient than the average of the U.S. grid. The latest generation of our Energy Servers, which began shipping in 2015, is capable of beginning-of-life (BOL) efficiencies of 65%, and we expect to further improve the efficiency in succeeding generations. While the Bloom Energy Server is capable of operating at peak efficiency, typically efficiency of the latest generation of Energy Servers can range from 53% to 65% over the project term depending on environmental conditions and the age of the power modules. We have the flexibility to maintain efficiency at specific levels to comply with customer sustainability, regulatory compliance, or other requirements by managing the replacement cycle of the power modules in the Energy Server.
>
> *                *                *
>
> While solid oxide fuel cell technology offered the best prospects for base load power generation, the challenges associated with fundamental and applied materials and packaging served as a roadblock to commercializing this technology. Bloom has

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

overcome these roadblocks, and our advanced solid oxide fuel cell technology enables both low cost and very high levels of reliability, paving the way for broad commercial application. Compared with legacy fuel cell alternatives, Bloom Energy Servers feature significant advantages:

- *Highest electrical efficiency.* The latest generation of our Energy Servers has greater than 65% BOL electrical efficiency, approximately 40% to 60% higher than that of legacy fuel cells, improving both cost and reducing harmful emissions.

98.     While Bloom Energy indicated efficiencies of 65% in its Registration Statement, a study conducted by the University of Delaware (Wei-Ming Chen, *Energy, Economic, and Social Impacts of a Clean Energy-related Economic Policy: Fuel Cells Deployment in Delaware*, Center for Applied Demography and Survey Research, University of Delaware, 2019) shows that the **actual operating efficiency** of Bloom Energy's solid oxide fuel cells demonstrated an operating at an actuarial efficiency of **approximately 45%** which is substantially below the 65% efficiency claimed by Bloom Energy. The actual level of the Energy Servers efficiency is comparable to that of a natural gas turbine or just slightly better than a natural gas internal combustion generator which generates electric power at approximately 42% efficiency.

99.     Similarly, Bloom Energy misrepresented to investors the impact of its technology on pollutants. In pertinent part Bloom Energy stated in its Registration Statement the following:

The Bloom Energy Server converts standard low-pressure natural gas or biogas into electricity through an electrochemical process without combustion, resulting in very high conversion efficiencies and *lower harmful emissions than conventional fossil fuel generation*.

                                    *       *       *

Our Energy Servers address these requirements and operate on-site at very high efficiencies using natural gas or biogas, *offering significant emissions reductions*, and, unlike prevalent renewable technologies such as wind and solar, provide a viable alternative to the constant base load electricity generated by a central power plant.

                                    *       *       *

*Sustainability.* Bloom Energy Servers provide clean power and because they are fuel-flexible, customers can choose the fuel source that best fits their needs based on availability, cost and carbon footprint. ***Bloom Energy Servers deployed since 2012 running on natural gas produce nearly 60% less carbon emissions compared to the average of U.S. combustion power generation***. Bloom Energy Servers can also utilize renewable biogas to generate carbon-neutral electricity. As of March 31, 2018, approximately 9% of our deployed fleet of Energy Servers, by megawatts deployed, utilized biogas. In both cases, ***our Energy Servers emit virtually no criteria air pollutants, including NOx or SOx***. Bloom Energy Servers also use virtually no water in normal operation. By comparison, to produce one megawatt per hour for a year, thermoelectric power generation for the U.S. grid withdraws approximately 156 million

gallons of water more than Bloom Energy Servers.

100.    These representations were false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838,. a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. As set forth in a Court order dated January 9, 2020, at pages 8, 14 and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

101.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants."

102.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *          *          *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data **show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)**.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, **probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old**.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a

substantial fine (e.g., $100,000) for every day that CO2 emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.

Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

103.    Accordingly, the above representations about the Energy Server's efficiency and pollution were materially false and misleading.

*       *       *

104.    With proper due diligence, the Section 11 Defendants would have been able to discover the aforementioned errors with regard to Bloom Energy's construction delays, omissions relating the contingent liabilities arising out of the Maintenance Service Agreements, its accounting for leases, the carbon output, and the useful life of the Bloom boxes and either prevented them from occurring or corrected the Registration Statement so as not to omit material facts relating thereto. But for the Section 11 Defendants' failure to exercise proper and reasonable care in ensuring the accuracy and truthfulness of the Registration Statement, Plaintiffs and other investors would not have been injured. Following the IPO pursuant to the materially misleading Registration Statement, Bloom Energy's stock price has declined from its IPO price of $15 per share of common stock, to a 52 week low of $2.44 per share of common stock.

## COUNT I

### Violation of Section 11 of the Securities Act

### against the Section 11 Defendants

105.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

106.    This Cause of Action is brought pursuant to Section 11 of the Securities Act against all Section 11 Defendants.

107.    Notwithstanding anything to the contrary alleged herein, for the purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

108.    The Registration Statement contained untrue statements of material facts, omitted to state material facts required to be stated therein, and omitted to state material facts necessary to make statements therein not misleading.

109.    Defendant Bloom Energy is the registrant and issuer of the stock sold in the IPO. As issuer of the stock, Bloom Energy is strictly liable to Plaintiffs and the Class for the actionable statements and omissions in the Registration Statement.

110.    Defendants Sridhar, Furr, Doerr, Sandell, Zervigon, Powell, Teti, Bush, and Ayotte signed the Registration Statement and, therefore, are strictly liable to Plaintiffs and the Class for the actionable statements and omissions in the Registration Statement.

111.    The Underwriter Defendants are investment banking houses that specialize, inter alia, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared substantial fees collectively. The Underwriter Defendants arranged road shows prior to the IPO during which they, and representatives from Bloom Energy, met with potential investors and presented highly favorable information about Bloom Energy, its operations, and its financial prospects.

112.    The Underwriter Defendants assisted Bloom Energy and the Section 15 Defendants in planning the IPO and purportedly conducted an adequate and reasonable investigation into the business, operations, financial statements, and accounting of Bloom Energy, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Bloom Energy's most up-to-date operational and financial results and prospects.

113.    The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiffs and the other Class members.

114.    The Underwriter Defendants are strictly liable to Plaintiffs and the Class for the actionable statements and omissions in the Registration Statement.

115.    PwC is an international accounting firm that has served as Bloom Energy's auditor out of its San Jose office since 2009 and reviewed Bloom Energy's financial statements in connection with

the IPO

116.    PwC assisted Bloom Energy and the Section 15 Defendants in preparing their financial statements for the IPO and purportedly conducted an adequate and reasonable investigation into the business, operations, financial statements, and accounting of Bloom Energy, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the PwC. During the course of its "due diligence," PwC had continual access to internal, confidential, current corporate information concerning Bloom Energy's most up-to-date operational and financial results and prospects.

117.    PwC is strictly liable to Plaintiffs and the Class for the actionable statements and omissions in the Registration Statement.

118.    The Section 11 Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

119.    None of the Section 11 Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

120.    By reason of the conduct alleged herein, each Section 11 Defendant violated, and/or controlled a person who violated, the Securities Act.

121.    Plaintiffs acquired shares of Bloom Energy common stock pursuant to the Registration Statement.

122.    Plaintiffs and the Class have sustained damages.

123.    By virtue of the foregoing, Plaintiffs and the other Class members are entitled to damages under Section 11 of the Securities Act from all of the Section 11 Defendants, and each of them, jointly and severally.

## COUNT II

### Violation of Section 15 of the Securities Act

### against the Section 15 Defendants

124.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

125.    This Cause of Action is brought pursuant to Section 15 of the Securities Act against the

Section 15 Defendants. Notwithstanding anything to the contrary, for the purposes of this claim, Plaintiffs expressly exclude and disclaims any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.

126.    The Section 15 Defendants were controlling persons of Bloom Energy by virtue of their positions as directors or senior officers of Bloom Energy.

127.    The Section 15 Defendants were senior officers and/or directors of Bloom Energy.

128.    Each of the Section 15 Defendants was involved in the day-to-day operations of Bloom Energy at the highest levels.

129.    Each of the Section 15 Defendants was privy to confidential proprietary information concerning Bloom Energy and its business and operations.

130.    Due to their positions of control and authority, the Section 15 Defendants were able to, and did, control the contents of the Registration Statement that contained untrue statements and/or omissions of material fact.

131.    Bloom Energy's conduct, as alleged herein, constitutes a violation of the Securities Act.

132.    The Section 15 Defendants are liable to Plaintiffs and the other Class members, jointly and severally with and to the same extent as Bloom Energy, under Section 15 of the Securities Act.

133.    As a direct and proximate result of said wrongful conduct, Plaintiffs and the other Class members suffered damages.

## THE EXCHANGE ACT CLAIMS

134.    Separate and apart from the Securities Act claims, Plaintiffs' Exchange Act claims seek to hold the Section 10(b) Defendants and Section 20(a) Defendants liable for intentionally (or with deliberate recklessness) issuing false and misleading statements for the purpose of inducing investors to purchase Bloom Energy's common stock and/or perpetrating a fraudulent scheme or device upon Plaintiffs and other Class members.

135.    Unlike Plaintiffs' Securities Act claims, Plaintiffs' claims under the Exchange Act sound in fraud.  Defendants' deception began with Bloom Energy's IPO. In order to generate interest in the IPO and gain financially, the Section 10(b) Defendants, unbeknownst to the public, made material misrepresentations and/or omissions to artificially inflate Bloom Energy's stock.  The Section 10(b)

Defendants misrepresented Bloom Energy's consolidated financial statements, specifically contingent liabilities, and did not tell investors of the construction delays that were materially impacting revenue at the time of the IPO.

136.    The Section 10(b) Defendants flouted their disclosure obligations and intentionally misled investors so as to benefit financially for their own personal gain. The concrete personal benefits enjoyed by the Section 10(b) Defendants, along with the clear allegations of actual knowledge of wrongdoing, gives rise to a strong, cogent and compelling inference of scienter.

### A.    <u>Defendants' Materially False and Misleading Statements</u>

#### <u>*July 26, 2018 – Registration Statement*</u>

137.    Bloom Energy's Registration Statement was materially false and misleading as it hid from investors that Bloom Energy was already experiencing significant construction delays that were materially impacting revenue for the current third quarter, and failed to disclose its contingent liabilities.

138.    Bloom Energy's Registration Statement described certain "risks" related to Bloom Energy, including that it was dependent on construction schedules that may be delayed. In particular, the Registration Statement stated:

> ***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations.***
>
> Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.
>
> *              *              *
>
> The timing of delivery and installations of our products have a significant impact on the timing of the recognition of product revenue. ***Many factors can cause a lag between the time that a customer signs a purchase order and our recognition of product revenue. These factors include . . . customer facility construction schedules***.

139.    In violation of Section 10(b) of the Exchange Act and Rule 10b-5, the statements identified in emphasis above concealed that Bloom Energy was, at the time of the Registration Statement, already facing significant construction delays that were interfering with its installations and "acceptances." In fact, the construction delays existing at the time of the Registration Statement were so substantial that they prevented Bloom Energy from meeting even the low end of its publicly-stated

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

guidance for "acceptances."

140.    The Section 10(b) Defendants also violated Section 10(b) of the Exchange Act in so far as they failed to comply with Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303. Item 303 requires disclosure in the Registration Statement of any known events or uncertainties that, at the time of the IPO, had caused, or were reasonably likely to cause, a materially negative impact on Bloom Energy.

141.    Bloom Energy's "construction delays" constituted an "uncertainty" under Item 303 that required disclosure in the Registration Statement. The "construction delays" existed prior to and during the IPO.

142.    CW1 corroborates that construction delays were a constant issue at Bloom Energy. CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left in February 2018.

143.    CW1 indicated that during his tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

144.    CW1 also indicated that upper management, all the way up to Sridhar, typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

145.    This is further corroborated by the fact that Furr conceded that Bloom Energy's low rate of "acceptances" in the third quarter of 2018 was "a result of construction delays."

146.    Given that the "construction delays" delayed installation of Energy Servers and that Bloom Energy only recognized revenue after installation (i.e., upon "acceptance"), the Section 10(b) Defendants knew that the delays were causing a material unfavorable impact on its revenues and/or income. This is especially so considering the fact that Bloom Energy knew that many of its customers would not allow construction to proceed during the fourth quarter due to "blackouts," as described by Furr during the November 5, 2018 investor conference call. Accordingly, unless Servers were installed timely in the third quarter, installations would likely be delayed until the first quarter of fiscal 2019 and,

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

as a result, delaying revenue recognition substantially.

147.   Therefore, Bloom Energy and the other Section 10(b) Defendants made materially false and misleading statements or omissions relating to the construction delays in its Registration Statement.

148.   Bloom Energy also materially misrepresented its contingent liabilities that it would incur from the Maintenance Service Agreements. When Bloom Energy sells, leases, or finances one of its Servers, it includes a one-year warranty and performance guarantee with the purchase price. After the initial one-year warranty period ends, Bloom Energy's customers enter into Maintenance Service Agreements with Bloom Energy to extend the initial warranty and performance guarantees, under which Bloom Energy purportedly receives annual service payments from the customer. The life of the Maintenance Service Agreement contract typically lasts from 10 to 21 years and can last as long as 25 years.

149.   The Maintenance Service Agreements also create expenses for Bloom Energy, however. Under the terms of the agreements, Bloom Energy is required to service, repair and replace the Energy Servers when output or efficiency falls below certain thresholds. Bloom Energy is responsible for two types of replacements: its fuel cell servers (the system itself) and the individual fuel cells that go inside the Energy Servers. The expenses and/or contingencies associated with these repairs as of March 31, 2018 were approximately $2.9 billion and exceeded its future service revenues by approximately $1.7 billion. However, Bloom Energy failed to recognize (i.e., book) the $1.7 billion net loss in its financial statements or disclose this material liability to investors in its Registration Statement.

150.   The Section 10(b) Defendants violated Section 10(b) of the Exchange Act by failing to disclose the estimated $2.9 billion in Maintenance Service Agreement liabilities. Not only was this information material (and therefore deserving of disclosure in its own right), but Bloom Energy was required to disclose this information under both Item 303 of Regulation S-K and GAAP related to accounting for loss contingencies and product warranty liabilities. ASC 450-20-50 and ASC 460-10-50. Importantly, registration statements are presumed to be in violation of the Exchange Act if they do not comply with Regulation S-K or GAAP.

151.   Item 303 of Regulation S-K required Bloom Energy to "identify any known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

result in the registrant's liquidity increasing or decreasing in any material way." 17 CFR § 229.303(a)(1). The disclosures of the Maintenance Service Agreement liabilities were false and misleading as they failed to adequately convey the magnitude of these liabilities and the material negative impact they would have on Bloom Energy's liquidity.

152.    A basic premise in GAAP is that "an estimated loss from a loss contingency shall be accrued by a charge to income if" a loss is both probable and "the amount of loss can be reasonably estimated." ASC 450-20-25-2. More specifically, with respect to extended warranty or product maintenance contracts, such as Bloom Energy's Maintenance Service Agreements, GAAP requires a loss to be recognized "if the sum of expected costs of providing services under the contracts and unamortized acquisition costs exceeds related unearned revenue. Extended warranty or product maintenance contracts shall be grouped in a consistent manner to determine if a loss exists. A loss shall be recognized first by charging any unamortized acquisition costs to expense. If the loss is greater than the unamortized acquisition costs, a liability shall be recognized for the excess." ASC 460-10-25-8 and ASC 605-20-25-6.

153.    After the initial one-year warranty period, Bloom Energy's warranty and guarantee could be "renewed annually at the customer's option as an operations and maintenance services agreement at predetermined prices for a period of up to 20 years." Bloom Energy admits that "[h]istorically, [its] customers have almost always exercised their option to renew under these operations and maintenance services agreements" and "virtually no customers have elected to cancel their maintenance agreements." Therefore, Bloom Energy was able to estimate the amount of revenue to be received from the Maintenance Service Agreements.

154.    Additionally, Bloom Energy knew the estimated life of its Energy Servers and fuel cells were less than the life of the Maintenance Service Agreements. In fact, Bloom Energy had already been required to replace Energy Servers and fuel cells under the Maintenance Service Agreements. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the Maintenance Service Agreements and therefore knew it was likely they would have to replace the remaining early generation systems and the cost to do so. In 2015, Bloom Energy implemented a fleet decommissioning program for its early generation Energy Servers. This resulted in "a significant adjustment to revenue in

the quarter ended December 31, 2015."

155.    Bloom Energy admitted that it would have to continue to replace these systems. The Registration Statement stated, in pertinent part, that "[a]s of March 31, 2018, we had a total of 58.5 megawatts in total deployed early generation servers, including our first and second generation servers, out of our total installed base of 312 megawatts. . . . [W]e expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers."

156.    Included in 58.5 megawatts were 30 megawatts of early generation Energy Servers in Delaware that needed immediate replacement within the year. As Bloom Energy had already been required to replace some of the earlier generation systems in 2015, Bloom Energy had historical data upon which they were able to reasonably estimate the costs of replacing other Servers going forward.

157.    Further proof that these liabilities and/or contingencies were estimable comes from the fact that a third-party market analyst, Hindenburg Research, calculated them as of June 30, 2019 in a report dated September 17, 2019. As explained in the report, Bloom Energy had "an estimated [net] $2.2 billion in undisclosed servicing liabilities that the market has missed." Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

158.    Bloom Energy possessed all of this information and, therefore, was able to perform the required calculations, recognize the required loss on the Maintenance Service Agreements in its financial statements, and make the appropriate material disclosures. Bloom Energy admitted that it stopped following the appropriate GAAP in accounting for its Maintenance Service Agreements prior to filing its registration statement:

> Prior to fiscal year 2014, certain MSAs with direct customers were accounted for as separately-priced warranty contracts under ASC 605-20-25 Separately Priced Extended Warranty and Product Maintenance Contracts (formerly FTB 90-1), in which we recorded an accrual for any expected costs that exceed the contracted revenues for that one-year service renewal arrangement, and is included as a component of the accrued warranty liability. The related liability was $15.8 million, $9.2 million and $8.5 million

as of December 31, 2016 and 2017, and as of March 31, 2018, respectively.

159.    Bloom Energy's undisclosed $1.7 billion in net servicing liabilities was material information that should have been disclosed in the Registration Statement.

160.    Therefore, the Registration Statement materially misled investors as to its contingent liabilities from the Maintenance Service Agreements.

161.    Bloom Energy also misrepresented its financial statements in its Registration Statement. In addition to a direct purchase option, Bloom Energy offered its customers several leasing or pay-as-you-go programs, including a "sale-leaseback sublease" arrangement, which Bloom Energy referred to as Managed Services ("MS"). Under its MS program, Bloom Energy sells its Energy Servers to a financing partner (e.g., a bank) and then leases them back. Bloom Energy then subleases these Energy Servers to a customer pursuant to service agreement which encompasses an operating lease. Thus, Bloom Energy acts as both a "lessee" and a "lessor." The service agreements required customers to pay "a monthly equipment fee calculated based on the size of the installation, which covers the amount of [Bloom Energy's] lease payment [to the financing partner], and a service payment based on the monthly output of electric power produced by the energy server."

162.     Bloom Energy recognized a portion of revenue from sales of the Energy Servers upfront and deferred the rest over the duration of the contract. Performance-based payments from customers were recognized as revenue over the duration of the contract. Bloom Energy included the following diagram in its Registration Statement to illustrate its MS program:



SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

163.     A lessee (i.e., the entity leasing equipment) can only classify its leases as either operating or capital.  "The objective of the lease classification criteria … derives from the concept that a lease that transfers substantially all of the benefits and risks incident to the ownership of property [to the lessee] should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee and as a sale or financing by the lessor [i.e., a capital lease]. All other leases should be accounted for as operating leases." ASC 840-10-10-1.

164.     GAAP provides very clear bright line provisions for when a lease should be classified as a capital lease. If, at its inception, a lease meets any of the following four criteria, it is classified as a capital lease by the lessee:

      a.   Ownership is transferred to the lessee by the end of the lease term.

      b.   The lease contains a bargain purchase option.

      c.   The lease term is at least 75% of the property's estimated remaining economic life.

      d.   The present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the lessor at the inception date. ASC 840-10-25-1.

If none of the above criteria are met, a lessee should classify its lease as an operating lease. ASC 840-10-25-29 – 30.

165.     Proper lease classification is extremely important as it not only determines how a lessee accounts for the lease itself, but also how a seller-lessee (such as Bloom Energy) accounts for a sale-leaseback transaction (such as Bloom Energy's MS transactions).

166.     ASC 840, the authoritative accounting standard under GAAP concerning accounting for leases, states that "[i]f the seller-lessee retains, through a leaseback, substantially all of the benefits and risks incident to the ownership of the property sold, the sale-leaseback transaction is merely a financing. The seller-lessee shall not recognize any profit on the sale of an asset if the substance of the sale-leaseback transaction is merely a financing. Accordingly, this Subtopic does not permit any profit to be recognized on a sale if a related leaseback of the entire property sold meets one of the criteria in paragraph 840-10-25-1 for classification as a capital lease." ASC 840-40-25-4. In other words, ASC 840 recognizes a "sale" to be an essential component of a "sale-leaseback" transaction, which only occurs

when "the customer has taken title **and** assumed the risks and rewards of ownership of the products." ASC 605-10-S99 and ASC 840-40-S99. Thus, no gain should be recognized on a failed sale-leaseback transaction because, in substance, the seller-lessee never parted with the asset. Any funds obtained by the seller in a failed sale-leaseback transaction should be recorded as a financing obligation (akin to a loan).

167.   Under an operating lease, the leased asset is not recognized on lessee's books and lease payments are recorded as an expense by the lessee and income by lessor. ASC 840-20-25. On the other hand, a capital lease is recorded on lessee's balance sheet by recognizing an asset and a corresponding liability (i.e., financing obligation). ASC 840-30-25-1 and ASC 840-30-30-1 – 3. The leased asset is "amortized in a manner consistent with the lessee's normal depreciation policy" for owned assets, and lease payments are "allocated by the lessee between a reduction of the obligation and interest expense to produce a constant periodic rate of interest on the remaining balance of the obligation (the interest method)." ASC 840-30-35-1 and ASC 840-30-35-6. Assets and obligations recorded under a capital lease should be separately identified in lessee's financial statements. ASC 840-30-45-1 – 2.

168.   Capital leases are generally less desirable than operating leases because, as stated above, capital leases require a lessee to record the asset and a corresponding liability on its books, which can affect the company's balance sheet ratios and thus, change the way investors and creditors perceive the company's overall financial health. Also, capital leases saddle a lessee's income statement with interest and depreciation expenses. Moreover, in the case of Bloom Energy, capital leases would render the company's MS transactions as failed sale-leaseback transactions, requiring them to be treated as financing transactions and precluding revenue recognition from such "sales" to financing partners altogether.

169.   Seeking to recognize revenue from its "sales" of Energy Servers to financing partners upfront, Bloom Energy improperly accounted for its MS program leases as operating leases, even though they clearly met the aforementioned GAAP criteria to be classified as capital leases. The length of Bloom Energy's MS leases was 6 - 10 years, well in excess of the 75% of the Energy Servers' actual useful life. Moreover, in its restatement, Bloom Energy acknowledged that "the terms of our Managed Services Agreements and similar arrangements, including the events of default provisions," did not "satisfy[y]

the requirements for sales under the revenue accounting standards." In its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, no profit should have been recognized on sales to financing partners and "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

170.    The portion of revenue in 2016, 2017, and the three months ended March 31, 2018 attributable to the MS transactions was 4%, 8%, and 4%, respectively. The chart below shows the impact of Bloom Energy's restatement, primarily due to improper accounting for MS transactions, on its December 31, 2017 and March 31, 2018 financial statements included in the Registration Statement:

| ($ in thousands except per share data) | FY 2017 Reported | FY 2017 Actual | Percent Misstated | Three Months Ended 3/31/18 Reported | Three Months Ended 3/31/18 Actual | Percent Misstated |
|---|---|---|---|---|---|---|
| Total revenue | $375,996 | $365,623 | (2.8%) | $169,361 | $168,582 | (0.5%) |
| Net loss | ($281,265) | ($295,028) | **4.7%** | ($22,348) | ($26,223) | **14.8%** |
| Net loss attributable to common stockholders | ($262,599) | ($276,362) | **5.0%** | ($17,716) | ($21,591) | **17.9%** |
| Net loss per share attributable to common stockholders | ($25.62) | ($26.97) | **5.0%** | ($1.70) | ($2.08) | **18.3%** |

171.    Defendants made materially false and misleading statements in violation of Section 10(b) of the Exchange Act by failing to account for its MS transactions in accordance with GAAP. Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. Importantly, registration statements are presumed to be in violation of the Exchange Act if they contain financial statements which do not comply with GAAP.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

172.    Accordingly, Bloom Energy's Registration Statement was materially false because Bloom Energy falsely reported its financial statements, artificially inflated its revenue, decreased its net loss, and decreased its net loss attributable to common shareholders by improperly accounting for its MS program transactions.

173.    These statements were also material as a reasonable investor would consider the correct revenue and net loss information to be important before purchasing or otherwise acquiring Bloom Energy securities, especially when the net loss was 14% more than what was previously reported.

174.    In connection with its financial statements, Bloom Energy also represented in its Registration Statement that there were no "material weaknesses in internal control over financial reporting at December 31, 2017". This was false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

175.    Accordingly, Bloom Energy's representations relating to its internal controls over financial reporting were materially false and misleading.

176.    Further, Bloom Energy misrepresented that it owned superior technology involving the efficiency of converting fuel to electricity.  Efficiency is defined as the percentage of the energy in the fuel that is converted to electricity. The higher the efficiency, the less fuel used to generate a given unit of electric power output, resulting in lower fuel costs. However, Bloom Energy's claims were materially false and misleading as actuarial analysis of the efficiency of the Bloom Energy's solid oxide fuel cell technology shows that the fuel efficiency of electric generation using the Energy Servers is substantially inferior to what Bloom Energy publicly represented.

177.    In pertinent part, Bloom Energy represented the following about the efficiency of its Energy Servers:

> We have continuously innovated and evolved our technology over time. The latest generation Energy Server delivers five times the energy output of the first generation in a constant footprint. Similarly, we have also improved the beginning-of-life electrical efficiency (the rate at which fuel is converted into electricity) of our Energy Servers from 45% to 65% today, representing the highest delivered power efficiency of any commercially available power solution. In addition, we have expanded the range of available accessories which extend the capability and functionality of our Energy Servers to meet additional customer requirements, such as an uninterruptable power capability.

Our team has decades of experience in the various specialized disciplines and systems engineering concepts unique to this technology. We had 209 issued patents in the United States and 90 issued patents internationally as of March 31, 2018.

\*       \*       \*

*Continual increases in electrical efficiency.* Efficiency is defined as the percentage of the energy in the fuel that is converted to electricity. The higher the efficiency, the less fuel used to generate a given unit of electric power output, resulting in lower fuel costs. Today, our Energy Servers are significantly more efficient than the average of the U.S. grid. The latest generation of our Energy Servers, which began shipping in 2015, is capable of beginning-of-life (BOL) efficiencies of 65%, and we expect to further improve the efficiency in succeeding generations. While the Bloom Energy Server is capable of operating at peak efficiency, typically efficiency of the latest generation of Energy Servers can range from 53% to 65% over the project term depending on environmental conditions and the age of the power modules. We have the flexibility to maintain efficiency at specific levels to comply with customer sustainability, regulatory compliance, or other requirements by managing the replacement cycle of the power modules in the Energy Server.

\*       \*       \*

While solid oxide fuel cell technology offered the best prospects for base load power generation, the challenges associated with fundamental and applied materials and packaging served as a roadblock to commercializing this technology. Bloom has overcome these roadblocks, and our advanced solid oxide fuel cell technology enables both low cost and very high levels of reliability, paving the way for broad commercial application. Compared with legacy fuel cell alternatives, Bloom Energy Servers feature significant advantages:

- *Highest electrical efficiency.* The latest generation of our Energy Servers has greater than 65% BOL electrical efficiency, approximately 40% to 60% higher than that of legacy fuel cells, improving both cost and reducing harmful emissions.

178.     While Bloom Energy indicated efficiencies of 65% in its Registration Statement, a study conducted by the University of Delaware (Wei-Ming Chen, *Energy, Economic, and Social Impacts of a Clean Energy-related Economic Policy: Fuel Cells Deployment in Delaware*, Center for Applied Demography and Survey Research, University of Delaware, 2019) shows that the **actual operating efficiency** of Bloom Energy's solid oxide fuel cells demonstrated an operating at an actuarial efficiency of **approximately 45%** which is substantially below the 65% efficiency claimed by Bloom Energy. The actual level of the Energy Servers' efficiency is comparable to that of a natural gas turbine or just slightly better than a natural gas internal combustion generator which generates electric power at approximately 42% efficiency.

179.     Similarly, Bloom Energy misrepresented to investors the impact of its technology on pollutants. In pertinent part Bloom Energy stated in its Registration Statement the following:

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

The Bloom Energy Server converts standard low-pressure natural gas or biogas into electricity through an electrochemical process without combustion, resulting in very high conversion efficiencies and *lower harmful emissions than conventional fossil fuel generation*.

\*   \*   \*

Our Energy Servers address these requirements and operate on-site at very high efficiencies using natural gas or biogas, *offering significant emissions reductions*, and, unlike prevalent renewable technologies such as wind and solar, provide a viable alternative to the constant base load electricity generated by a central power plant.

\*   \*   \*

*Sustainability.* Bloom Energy Servers provide clean power and because they are fuel-flexible, customers can choose the fuel source that best fits their needs based on availability, cost and carbon footprint. Bloom Energy Servers *deployed since 2012 running on natural gas produce nearly 60% less carbon emissions compared to the average of U.S. combustion power generation*. Bloom Energy Servers can also utilize renewable biogas to generate carbon-neutral electricity. As of March 31, 2018, approximately 9% of our deployed fleet of Energy Servers, by megawatts deployed, utilized biogas. In both cases, our *Energy Servers emit virtually no criteria air pollutants, including NOx or SOx*. Bloom Energy Servers also use virtually no water in normal operation. By comparison, to produce one megawatt per hour for a year, thermoelectric power generation for the U.S. grid withdraws approximately 156 million gallons of water more than Bloom Energy Servers.

180.    These representations proved to be false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838,a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. As set forth in the Court's opinion dated January 9, 2020, at pages 8, 14, and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

181.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants."

182.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially

understated and misrepresented the CO2 emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the CO2 emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *        *        *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data **show that the new fuel cells are exceeding the 700 pounds of CO2 per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of CO2 per MWH (one week old units at Brookside) and 768.4 pounds of CO2 per MWE (four month average old units at Red Lion)**.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that CO2 emissions from the new fuel cells will increase as they age, **probably reaching 900 pounds of CO2 per MWH by the time they are two years old**.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that CO2 emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

183.    Accordingly, the above representations about the Energy Server's efficiency and pollution were materially false and misleading.

184.    Finally, Bloom Energy misrepresented the life of its fuel cells in its Registration Statement, stating that fuel cells installed in 2017 and onward will have a lifespan of over five years:

> Therefore, we experienced losses, particularly during the period between 2013 and 2016, which represented the investment we were willing to make in order to execute our strategy to become the market leader in distributed energy generation. To date, we have seen progress in service financial performance driven by two primary events:
>
> • "time to stack replacement" primarily driven by our fuel cell stack lives—in the early years, replacement was typically 12 to 18 months. Over the years we have made steady improvements in our fuel cell lives, and from 2017 onwards we expect to average over five years between replacements; and
>
> • the cost to refurbish (which include our fuel cells) is coming down. Since 2014, we have driven this cost down by approximately 40%.

At today's pricing, we believe we can break-even in our service business provided the time between stack replacements across all of our fleet is five years or better. Longer term, like many companies with an operation and maintenance business, our strategy is to make our service business a profitable part of our overall business, with predictable annual recurring revenue.

185.   These statements were materially false and misleading. Hindenburg discovered and informed investors that Bloom Energy's fuel cells averaged around three years. Hindenburg stated in pertinent part:

We have tracked data on Bloom projects installed since 2017 through state utility records in New York and California. There were 35 projects in all. After aggregating this data, we found that even Bloom's newest fuel cells will degrade below replacement thresholds in under 3 years, significantly below the company's "expectations". We present this data later in the report.

Our findings were corroborated by multiple experts in the field who were highly skeptical of Bloom's claim that solid oxide fuel cells could last 5 years or longer in the field.

We asked one professional fuel cell technician, with 19 years of experience, whether he believed the company's claims to be able to run solid oxide fuel cells for 5 years. He responded with a curt "no". When asked if the same fuel cells could operate for three years, he replied:

"Do I believe claims of 3 years before service is needed? No. I would be highly skeptical."

Another expert we contacted, with 14 years of experience working in Fuel Cells and Fuel Cell Performance Analysis, who also has a B.S., M.S., and a PhD in Chemical Engineering, also warned about temperature and durability preventing Bloom's cells from running for 5 years:

"They are using the high temperature materials, I think. So, there is advantages and disadvantages. The disadvantage is that degradation is probably high. I doubt they have 5 years life. They may have 1 or 2 max. They cannot achieve 5 years. Or maybe if they have to replace part of the stack, they can achieve 5 years. In general, it's really hard for SOFCs to run 5 years."

\*       \*       \*

Keep in mind that Bloom guarantees both the output (total electricity produced) and the efficiency (how much fuel is used to generate the electricity) of its servers:

"…we typically provide an Output Guaranty of 95% measured annually and an Efficiency Guaranty of 52% measured cumulatively" [Prospectus pg. 75]

Bloom also provides tighter 80% quarterly output guarantees or 45% monthly efficiency guarantees on some of its projects. [Prospectus pg. 88 and 89]

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Efficiency and output decline together: As the systems become less efficient, they produce less electricity, making efficiency degradation key to when fuel cells need to be replaced.

As we have seen from older Bloom project data in California and New York, fuel cell replacements were typically done in the 48%-50% efficiency range.

This chart, based on data from California and New York, shows how rapidly Bloom's newer post-2016 installed servers are declining by month, on average. It also shows how the trend continues:



(Source: New York & California Utility Data & Author Analysis)

After only 25 months, Bloom's newer fuel cell installations had deteriorated from a median starting efficiency of 58.3% down to 51.0%, a decline that puts them on pace to breach the 48% threshold with 34 months (less than three years).[3]

The chart also shows that 45% efficiency (which serves as a 'bare minimum' on some projects) will be breached after only 42 months, or 3.5 years.[4]

186.    This revealed that despite Bloom Energy's representations that its fuel cells would last over five years, in reality, Bloom Energy routinely replaced its fuel cells after just three years.

---

[3] We used the median starting point in month 1 because there were outliers in the first month that would have skewed the results significantly downward, likely because systems needed to get fully up and running. We used average thereafter.

[4] Bloom states that its servers degrade linearly over time, thus we extrapolate using straight-line degradation. Per Bloom's filings: "the efficiency of the Energy Server decreases very gradually from the beginning of life efficiency toward the end of life efficiency. This decrease is very nearly linear in nature (i.e., a straight-line slope)." (Pg. 31)

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Accordingly, Bloom Energy's representations that it expected the useful life of its fuel cells to exceed

2   five years was materially false and misleading.

3   *August 7, 2018 – Q2 2018 Letter to Shareholders*

4   187.   On August 7, 2018, the Section 10(b) Defendants released a "Letter to Shareholders"

5   announcing Bloom Energy's fiscal Q2 2018 highlights and providing additional financial information.

6   The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the

7   SEC on August 9, 2018.

8   188.   Bloom Energy's financial information in the letter was materially false and misleading

9   as it failed to account for contingent liabilities arising under the Maintenance Service Agreements. In

10   pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted

11   the amount of contingent liabilities, including the $130 million from replacing the Delaware servers,

12   that were probable and reasonably estimable under ASC 450, and ASC 460, and failed to disclose the

13   contingent liabilities under Item 303.

14   189.   This information was material and should have been disclosed and recorded pursuant to

15   Item 303, ASC 450 and ASC 460, and ASC 460.

16   190.   Bloom Energy's Q2 2018 shareholder letter was also materially false because Bloom

17   Energy falsely reported its financial statements for the three months ended June 30, 2018, artificially

18   inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to

19   common shareholders. As these financial statements were incorrect, Bloom Energy's Q2 2018 Form 10-

20   Q was materially false and misleading.  For example, Bloom Energy reported in its Q2 2018 Form 10-

21   Q that for Q2 2018 total revenue was $168.881 million, gross profit was $32.771 million, net loss was

22   $50.188 million, and net loss attributable to shareholders was $45.677 million or $4.34 per share. In

23   reality, for Q2 2018 total revenue was $138.302 million, gross profit was $26.984 million, net loss was

24   $60.382 million, and net loss attributable to shareholders was $55.998 million or $5.31 per share.

25   191.   The chart below represents the reported financial statements in Bloom Energy's Q2 2018

26   shareholder letter compared to Bloom Energy's actual financial statements as restated in Bloom

27   Energy's 2019 Form 10-K:

28

| ($ in thousands except per share | Three Months | Three Months | Percent Misstated |
|---|---|---|---|

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

| data) | Ended 6/30/18 Reported | Ended 6/30/18 Actual | |
|---|---|---|---|
| Total revenue | $168,881 | $138,302 | **(22.1%)** |
| Gross Profit | $32,771 | $26,984 | **(21.4%)** |
| Net loss | ($50,189) | ($60,382) | **17.1%** |
| Net loss attributable to common stockholders | ($45,677) | ($55,998) | **18.4%** |
| Net loss per share attributable to common stockholders | ($4.34) | ($5.31) | **18.3%** |

192.     The financial statements in Bloom Energy's Q2 2018 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, gross profit, net loss, and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q2 2018 shareholder letter was materially false and misleading.

193.     These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing Bloom Energy securities.

194.     Additionally, Bloom Energy's Q2 2018 shareholder letter misrepresented that it owned superior technology involving the efficiency of converting fuel to electricity. In pertinent part the Q2 shareholder letter stated:

Bloom Energy has harnessed advances in materials science, autonomous control, big data, artificial intelligence and power electronics to create an entirely new paradigm for the production and delivery of on-site electric power. Our platform converts fuel into electricity without combustion, using solid oxide fuel cell technology, using modular, pay-as-you-grow power modules that are assembled in a redundant fault-tolerant architecture.

*A Bloom Energy Server uses less fuel to generate more electricity than a conventional power plant. It also generates cleaner electricity, with 60% less $CO_2$ emissions than the average of the U.S. power generation portfolio*. Because there is no combustion, there are also virtually no smog-forming particulate emissions. Furthermore, generating electricity with solid oxide fuel technology is a highly reliable process. Our platform operates with few moving parts, making it robust and reliable.

195.     The above statement was materially false and misleading as the actual level of the Energy

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Servers' efficiency is comparable to that of a natural gas turbine or just slightly better than a natural gas internal combustion generator which generates electric power at approximately 42% efficiency. Additionally, in litigation involving Bloom Energy, evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims. Accordingly, Bloom Energy's representations that Bloom Energy's servers had better efficiency and were cleaner than traditional fuel were materially false and misleading.

196.   Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *            *            *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data *show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)*.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, *probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old*.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

197.   Accordingly, the above representations about the Energy Servers' efficiency and

pollution were materially false and misleading.

*September 7, 2018 – Q2 2018 Form 10-Q*

198.    On September 7, 2018, after market-trading hours, the Section 10(b) Defendants filed with the SEC Bloom Energy's Form 10-Q for fiscal Q2 2018, ending June 30, 2018. The Form 10-Q was signed by Sridhar and Furr.

199.    In the Q2 2018 Form 10-Q, Bloom Energy warned investors about possible construction delays despite these delays already being underway and affecting acceptances. In pertinent part, the Q2 2018 Form 10-Q states:

> ***Our business is subject to risks associated with construction . . . that may arise in the course of completing installations***.
>
> Because we do not recognize revenue on the sales of our Energy Servers until installation and acceptance, our financial results are dependent, to a large extent, on the timeliness of the installation of our Energy Servers. Furthermore, in some cases, the installation of our Energy Servers may be on a fixed price basis, which subjects us to the risk of cost overruns or other unforeseen expenses in the installation process.
>
> \*          \*          \*
>
> In addition to the other risks described in this "Risk Factors" section, the following factors could also cause our financial condition and results of operations to fluctuate on a quarterly basis . . . the timing of installations, which may depend on many factors such as . . . customer facility construction schedules.

200.    These statements were misleading because the disclosed risks had already come to fruition, as Bloom Energy was facing significant construction delays that would prevent it from reaching even the low end of its publicly stated guidance for acceptances.

201.    Bloom Energy's financial statements in the Q2 2018 Form 10-Q were also materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the Q2 2018 Form 10-Q indicated that "the aggregate amount of extended warranty services payments we expect to receive over the remaining term of the Power Purchase Agreement Projects was $447.2 million as of June 30, 2018." However, Bloom Energy omitted the amount of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, ASC 460, and failed to disclose the contingent liabilities under Item 303.

202.    Further, while Bloom Energy discusses the accrued warranty costs in the notes to the

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

financial statements in the Q2 2018 Form 10-Q, it did not record or disclose the $2 billion of contingent liabilities for the Maintenance Service Agreements. As the amount of contingent liabilities for the Maintenance Service Agreements were probable and reasonably estimable under ASC 450 and ASC 460, they should have been disclosed and accounted for properly.

203.    Although Bloom Energy expected customers to continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to substantially omit the entire actual amount and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been recorded and disclosed under Item 303, ASC 450, and ASC 460.

204.    Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its Form 10-Q, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

205.    Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. The portion of revenue in the three and six months ended June 30, 2018 attributable to MS transaction was 5% and 5%, respectively. The chart below shows the impact of Bloom Energy's restatement on its June 30, 2018 financial statements included in the Form 10-Q:

| ($ in thousands except per share | Three Months | Three Months | Percent Misstated |
|---|---|---|---|

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| data) | Ended 6/30/18 Reported | Ended 6/30/18 Actual | |
|---|---|---|---|
| Total revenue | $168,881 | $138,302 | **(22.1%)** |
| Gross Profit | $32,771 | $26,984 | **(21.4%)** |
| Net loss | ($50,189) | ($60,382) | **17.1%** |
| Net loss attributable to common stockholders | ($45,677) | ($55,998) | **18.4%** |
| Net loss per share attributable to common stockholders | ($4.34) | ($5.31) | **18.3%** |

206.    The financial statements in Bloom Energy's Q2 2018 Form 10-Q were materially false and misleading as Bloom Energy falsely reported its financial statements for the three months ended June 30, 2018, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. As these financial statements were incorrect, Bloom Energy's Q2 2018 Form 10-Q was materially false and misleading.  For example, Bloom Energy reported in its Q2 2018 Form 10-Q that for Q2 2018 total revenue was $168.881 million, gross profit was $32.771 million, net loss was $50.188 million, and net loss attributable to shareholders was $45.677 million or $4.34 per share. In reality, for Q2 2018 total revenue was $138.302 million, gross profit was $26.984 million, net loss was $60.382 million, and net loss attributable to shareholders was $55.998 million or $5.31 per share.

207.    These statements were material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

208.    In connection with its reported financial statements, the Q2 2018 Form 10-Q also states:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934), as amended (the Exchange Act), as of June 30, 2018. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of June 30, 2018 controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management,

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

209.   This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

210.   The Q2 2018 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to the Sarbanes-Oxley Act ("SOX").  These certifications indicated that Sridhar and Furr had both reviewed the Q2 2018 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2018 Form 10-Q, Exs. 31.1 & 31.2.)

211.   Given the false and misleading nature of the statements in the Q2 2018 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted substantially all of the contingent liabilities that should have been disclosed to investors and failed to properly account for its MS leases. By omitting these liabilities and misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial position was stronger than it appeared. These omissions and misrepresentations were material because reasonable investors would consider the accuracy of Bloom Energy's Q2 2018 Form 10-Q including the financial statements, to be important before purchasing or otherwise acquiring Bloom Energy securities.ions.

**B.   <u>The Truth about Bloom Energy's Construction Delays Emerges While Defendants Continue to Mislead Investors about Bloom Energy's Contingent Liabilities</u>**

*<u>November 5, 2018 – Q3 2018 Letter to Shareholders</u>*

212.   On November 5, 2018, Bloom Energy disclosed its operating results for the third quarter of fiscal 2018. Bloom Energy reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that the  low rate of "acceptances" was "a result of construction delays." The effect of the construction delay was amplified given the existence of customer "blackout" dates in the fourth quarter of 2018. This resulted in many Energy Server delays by customers to 2019.

213.   Market analysts from large banks focused on this point. On November 6, 2018, Cowen

1   released an analyst report titled "Growing Pains" and noted that "3Q results were largely impacted by

2   lower than expected acceptances as a result of construction timing delays. While we don't expect the

3   bulk of these projects to commence in 4Q given construction blackout periods during holiday season,

4   we believe the projects will be pushed out into 1H19."

5       214.    Similarly, Credit Suisse published a report titled "Bloom Wilts a Bit on Project Delays."

6   Credit Suisse stated, "Bottom line – near-term challenges due to construction delays" and noted that

7   "Long term GM% on target, but below our expectations for 4Q and 2019 . . . ."

8       215.    J.P. Morgan also concentrated on the construction delays, stating in a report titled "Solid

9   Demand but Delayed Deployment Weighs on 3Q Results and Guidance", that "BE reported 3Q EBITDA

10  slightly ahead of consensus on lower than expected Acceptances. 4Q guidance was lower than expected

11  owing to project timing, in large part specific to one single-site 5MW deployment."

12      216.    In response to the above news, the price of Bloom Energy stock plummeted from $23.01

13  at close on November 5, 2018, to $17.25 at close on November 6, 2018, a decline of 25% on unusually

14  heavy trading volume.

15      217.    The Section 10(b) Defendants continued to mislead investors relating to Bloom Energy's

16  liabilities under the Maintenance Service Agreements.

17      218.    In the shareholder letter for Q3 2018, financial statements and on the conference call, the

18  Section 10(b) Defendants failed to disclose that they knew Bloom Energy was expecting $2 billion in

19  liabilities under the Maintenance Service Agreements.

20      219.    Despite the call being November 5, 2018, on November 11, 2018, just two days later,

21  Bloom Energy quietly filed a construction permit request in Delaware for the replacements. While

22  Bloom Energy omitted the amount of the liabilities to replace the Delaware Energy Servers until August

23  2019, the replacement costs ultimately cost Bloom Energy $130 million, according to market analysts.

24  Bloom Energy failed to disclose this liability to investors.

25      220.    This information was material and should have been disclosed to investors particularly

26  given how it impacts shareholder liquidity and Bloom Energy's path to profitability. Therefore, the

27  omission of this liability was materially false and misleading.

28      221.    Bloom Energy's Q3 2018 shareholder letter was also materially false because Bloom

Energy improperly accounted for its MS leases and falsely reported its financial statements for the three months ended September 30, 2018, artificially inflated its revenue, decreased its net loss, and decreased its net loss attributable to common shareholders. For example, Bloom Energy reported in its Q3 2018 shareholder letter that for Q3 2018 total revenue was $190.190 million, net loss was $82.510 million, and net loss attributable to shareholders was $78.579 million or $0.97 per share. These numbers were materially false and misleading. In reality, for Q3 2018 total revenue was $168.619 million, net loss was $84.432 million, and net loss attributable to shareholders was $80.502 million or $0.99 per share.

222.    The chart below represents the reported financial statements in Bloom Energy's Q3 2018 shareholder letter compared to Bloom Energy's actual financial statements as restated in Bloom Energy's 2019 Form 10-K:

| ($ in thousands except per share data) | Three Months Ended 9/30/18 Reported | Three Months Ended 9/30/18 Actual | Percent Misstated |
|---|---|---|---|
| Total revenue | $190,190 | $168,619 | **(12.8%)** |
| Net loss | ($82,510) | ($84,432) | **2.3%** |
| Net loss attributable to common stockholders | ($78,579) | ($80,502) | **2.4%** |
| Net loss per share attributable to common stockholders | ($0.97) | ($0.99) | **2.0%** |

223.    The financial statements in Bloom Energy's Q3 2018 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, net loss, and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q3 2018 shareholder letter was materially false and misleading.

224.    These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

225.    Additionally, Bloom Energy's Q3 2018 shareholder letter misrepresented that it owned

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

superior technology involving the efficiency of converting fuel to electricity. In pertinent part the Q3 shareholder letter stated:

> The U.S. has reduced energy-related carbon emissions by 14 percent since 2005. According to the Energy Information Administration, 61% of this decline can be attributed to the shift from fossil fuels to natural gas. Bloom Energy Servers convert natural gas to electricity with the highest electrical efficiency of any device, further reducing CO2 emissions. Today, ***our platform produces 60% less CO2 emissions than the power that they offset from the US grid***.

226.    The above statement was materially false and misleading as the actual level of the Energy Servers' efficiency is comparable to that of a natural gas turbine or just slightly better than a natural gas internal combustion generator which generates electric power at approximately 42% efficiency. Additionally, in litigation involving Bloom Energy, evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

227.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the CO2 emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the CO2 emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *          *          *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data ***show that the new fuel cells are exceeding the 700 pounds of CO2 per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of CO2 per MWH (one week old units at Brookside) and 768.4 pounds of CO2 per MWE (four month average old units at Red Lion)***.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that CO2 emissions from the new fuel cells will increase as they age, ***probably reaching 900 pounds of CO2 per MWH by the time they are two years old***.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.

Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

228.    Accordingly, Bloom Energy's representations that the Energy Servers had better efficiency and were cleaner than traditional fuel were materially false and misleading.

### *November 5, 2018 – Q3 2018 Earnings Call*

229.    On November 5, 2018, Bloom Energy held an earnings call to discuss its preliminary Q3 2018 results. Defendants Sridhar and Furr were on the call.

230.    On the call Defendant Furr disclosed that Bloom Energy "achieved 206 acceptances for Q3 or 20.6 megawatts of power capacity. This was below the bottom end of our estimates, which was 215 systems and come as a result of construction delays." This revealed to the market that Bloom Energy's previous statements relating to acceptances were materially false and misleading.

231.    Market analysts from large banks focused on this point. On November 6, 2018, Cowen released an analyst report titled "Growing Pains" and noted that "3Q results were largely impacted by lower than expected acceptances as a result of construction timing delays. While we don't expect the bulk of these projects to commence in 4Q given construction blackout periods during holiday season, we believe the projects will be pushed out into 1H19."

232.    Similarly, Credit Suisse published a report titled "Bloom Wilts a Bit on Project Delays." Credit Suisse stated, "Bottom line – near-term challenges due to construction delays" and noted that "Long term GM% on target, but below our expectations for 4Q and 2019 . . . ."

233.    J.P. Morgan also concentrated on the construction delays, stating in a report titled "Solid Demand but Delayed Deployment Weighs on 3Q Results and Guidance", that "BE reported 3Q EBITDA slightly ahead of consensus on lower than expected Acceptances. 4Q guidance was lower than expected owing to project timing, in large part specific to one single-site 5MW deployment."

234.    In response to the above news, the price of Bloom Energy stock plummeted from $23.01 at close on November 5, 2018, to $17.25 at close on November 6, 2018, a decline of 25% on unusually

heavy trading volume.

235. During the call, the Section 10(b) Defendants also made materially false and misleading statements relating to Bloom Energy's financial statements, and Bloom Energy's efficiency and pollution.

236. For example, Defendant Sridhar stated in pertinent part:

Power that has a very low to 0 net impact on $CO_2$ emissions, the U.S. has reduced energy-related carbon emissions by 14% since 2005. According to the Energy Information Administration, 61% of this decline can be attributed to the shift from fossil fuels to natural gas. Bloom Energy Servers convert natural gas to electricity with the highest electrical efficiency of any commercial device, further reducing $CO_2$ emissions. Today, *our platform produces 60% less $CO_2$ emissions than the average of the U.S. grid*.

\* \* \*

The elimination of criteria pollutants is another important factor. Because we don't burn fuel to generate electricity, *we do not produce criteria pollutants*. The reason you can't breathe in cities like Beijing and Delhi is not because of $CO_2$ but because of smog emissions, and *we do not produce those emissions*, improving respiratory health. In addition, our systems consume no water during normal operation.

237. These representations proved to be false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838, a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. As set forth in a Court opinion dated January 9, 2020, at pages 8 14, and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

238. Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants."

239. Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the

letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *     *     *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data **show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)**.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, **probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old**.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

240.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

241.    Similarly, during the November 5, 2018 investor conference call, Defendant Furr made materially false and misleading statements relating to Bloom Energy's financial statements stating in pertinent part:

> **Revenue was $190.2 million**, up sequentially from 12.6%. Gross margin came in at 20.8%. Our operating income was $5.6 million with adjusted EBITDA coming in at $15.1 million. EPS was a loss of $0.13; and we ended the quarter with $412 million in cash and short-term investments, and this excludes $36.7 million of PPA cash.
>
> *     *     *
>
> **Gross profit, excluding stock-based compensation, improved from $34.7 million in Q2 '18 to $39.5 million in Q3, a 13.8% sequential increase**.

242.    As Bloom Energy was improperly accounting for its MS transactions, the above statements were materially false and misleading. In reality, the actual revenue in Q3 2018 was materially lower. Accordingly, Bloom Energy's Q3 2018 Earnings Call materially misled investors as to the actual

financial condition of Bloom Energy.

*November 13, 2018 – Q3 2018 Form 10-Q*

243.    On November 13, 2018, after market-trading hours, the Section 10(b) Defendants filed with the SEC Bloom Energy's Form 10-Q for fiscal Q3 2018, ending September 30, 2018. The Form 10-Q was signed by Sridhar and Furr.

244.    Bloom Energy's financial statements in the Q3 2018 Form 10-Q were materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the Q3 2018 Form 10-Q indicated that "[t]he aggregate amount of extended warranty services payments we expect to receive over the remaining term of the Power Purchase Agreement Projects $439.0 million as of September 30, 2018." However, Bloom Energy omitted $2 billion of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450, and ASC 460, and failed to disclose the contingent liabilities under Item 303.

245.    While Bloom Energy discussed the accrued warranty costs in the notes to the financial statements in the Q3 2018 Form 10-Q, Bloom Energy did not record or disclose $2 billion of contingent liabilities required to be recorded and disclosed under Item 303, ASC 450 and ASC 460.

246.    As the amount of contingent liabilities for the Maintenance Service Agreements were probable and reasonably estimable under ASC 450 and ASC 460, they should have been disclosed and accounted for properly.

247.    Although Bloom Energy expected customers to continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit substantially all of the actual amount ($2 billion) and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been recorded and disclosed under Item 303, ASC 450 and ASC 460, and ASC 460.

248.    These liabilities were material and should have been recorded and disclosed to investors

under Item 303 ASC 450, and ASC 460, particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability. Therefore, the omission of these liabilities was materially false and misleading.

249.   Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its Form 10-Q, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

250.   Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. The portion of revenue in the three and nine months ended September 30, 2018 attributable to MS transaction was 4% and 4%, respectively. The chart below shows the impact of Bloom Energy's restatement on its September 30, 2018 financial statements included in the Form 10-Q:

| ($ in thousands except per share data) | Three Months Ended 9/30/18 Reported | Three Months Ended 9/30/18 Actual | Percent Misstated |
|---|---|---|---|
| Total revenue | $190,190 | $168,619 | **(12.8%)** |
| Net loss | ($82,510) | ($84,432) | **2.3%** |
| Net loss attributable to common stockholders | ($78,579) | ($80,502) | **2.4%** |
| Net loss per share attributable to common stockholders | ($0.97) | ($0.99) | **2.0%** |

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

251.    The financial statements in Bloom Energy's Q3 2018 Form 10-Q were materially false and misleading because Bloom Energy falsely reported its financial statements for the three months ended September 30, 2018, artificially inflated its revenue, decreased its net loss, and decreased its net loss attributable to common shareholders. For example, Bloom Energy reported in its Q3 2018 Form 10-Q that for Q3 2018 total revenue was $190.190 million, net loss was $82.510 million, and net loss attributable to shareholders was $78.579 million or $0.97 per share. In reality, for Q3 2018 total revenue was $168.619 million, net loss was $84.432 million, and net loss attributable to shareholders was $80.502 million or $0.99 per share.

252.    These statements were material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

253.    In connection with its reported financial statements, the Q3 2018 Form 10-Q also states:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of September 30, 2018. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of September 30, 2018 controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

254.    This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

255.    The Q3 2018 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q3 2018 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements**

made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q3 2018 Form 10-Q, Exs. 31.1 & 31.2.)

256.    Given the false and misleading nature of the statements in the Q3 2018 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to

investors and failed to properly account for its MS leases. By omitting these liabilities and misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial position was stronger than it appeared. These omissions and misrepresentations were material to Bloom Energy's investors because reasonable investors would consider the accuracy of Bloom Energy's Q3 2018 Form 10-Q, including the financial statements, to be important before purchasing or otherwise acquiring Bloom Energy securities..

*February 5, 2019 – Q4 2018 Letter to Shareholders*

257.    On February 5, 2019, Defendants released a "Letter to Shareholders" announcing Bloom Energy's fiscal 2018 highlights and providing additional financial information. The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the SEC on February 6, 2019.

258.    Bloom Energy's financial statements in the letter were materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the $2.0 billion in undisclosed contingent liabilities that were probable and reasonably estimable under ASC 450, and failed to disclose the contingent liabilities under Item 303.

259.    This information was material and should have been recorded and disclosed under Item 303, ASC 450 and ASC 460.

260.    Bloom Energy's Q4 2018 shareholder letter was also materially false because Bloom Energy improperly accounted for its MS transactions and falsely reported its financial statements for the three months ended December 31, 2018, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q4 2018 shareholder letter that for Q4 2018 total revenue was $213.606 million, gross profit was $17.248 million, net loss was $104.443 million, and net loss attributable to shareholders was $99.781 million or $0.91 per share. These numbers were materially false and misleading. In reality, for Q4 2018 total revenue was $157.145 million, gross profit was $6.921 million, net loss was $120.111 million, and net loss attributable to shareholders was $115.449 million or $1.06 per share.

261.    The chart below represents the reported financial statements in Bloom Energy's Q4 2018 shareholder letter compared to Bloom Energy's actual financial statements as restated in Bloom

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Energy's 2019 Form 10-K:

| ($ in thousands except per share data) | Three Months Ended 12/31/18 Reported | Three Months Ended 12/31/18 Actual | Percent Misstated |
|---|---|---|---|
| Total revenue | $213,606 | $157,145 | **(35.9%)** |
| Gross Profit | $17,248 | $6,921 | **(149.2%)** |
| Net loss | ($104,443) | ($120,111) | **13.1%** |
| Net loss attributable to common stockholders | ($99,781) | ($115,449) | **13.6%** |
| Net loss per share attributable to common stockholders | ($0.91) | ($1.06) | **14.2%** |

262.   The financial statements in Bloom Energy's Q4 2018 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, gross profit, net loss, and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q4 2018 shareholder letter was materially false and misleading.

263.   These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

*February 5, 2019 – Q4 2018 Earnings Call*

264.   On February 5, 2019, Bloom Energy held an earnings call to discuss its preliminary Q4 2018 results. Defendants Sridhar and Furr were on the call. During the call, the Section 10(b) Defendants also made materially false and misleading statements relating to Bloom Energy's financial statements, and Bloom Energy's efficiency and pollution.

265.   For example, Defendant Sridhar stated in pertinent part:

As you know, we provide 3 key benefits that our customers highly value today: one, lower cost of power; *two, lower emissions*; three, higher resiliency, including the option for uninterruptible, always-on power.

＊        ＊        ＊

For our customers, biogas-fueled always-on Bloom solutions deliver uninterruptible 24/7 power, enabling them to both *lower their emissions* and to power through events that

Case No. 4:19-cv-02935-HSG

otherwise would pose a risk of operational disruption.

266.    These representations were false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838,.a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. According to the Court's opinion dated January 9, 2020, at pages 8 14, and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

267.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants."

268.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *          *          *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data ***show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)***.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, ***probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old***.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a

substantial fine (e.g., $100,000) for every day that CO2 emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.

Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

269.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

270.    Similarly, Defendant Furr made materially false and misleading statements relating to Bloom Energy's financial statements stating in pertinent part:

Acceptances were 257 systems, a record; ***revenues was $213.6 million, up sequentially by 12.3%***; non-GAAP gross margin come in at 18.1%; our non-GAAP operating income was $4.7 million, with adjusted EBITDA coming in at $14 million; adjusted EPS was a loss of $0.12.

\*      \*      \*

***Revenue totaled $742 million for the year*** and this includes the onetime top line benefit of $45.5 million related to the federal ITC reinstatement as this was for 2017 ITC benefit that was received in Q1 of 2018. Backing out that onetime benefit, the actual 2018 revenue was $697 million, a number that was up significantly from 2017's $376 million where we did not have the federal ITC benefit.

\*      \*      \*

The 257 acceptances translated to ***$213.6 million in revenue***, up 12.3% from Q3's $190.2 million and up significantly from last year's GAAP revenue of $123.3 million.

271.    As Bloom Energy was improperly accounting for its MS transactions, the above statements were materially false and misleading. In reality, the actual revenue and gross profit in Q4 2018 and FY 2018 was materially lower. Accordingly, Bloom Energy's Q4 2018 Earnings Call materially misled investors as to the actual financial condition of Bloom Energy.

### *March 21, 2019 – Fiscal Year 2018 Form 10-K*

272.    On March 21, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC Bloom Energy's Fiscal Year 2018 Form 10-K, for the year ending December 31, 2018. The Form 10-K was signed by Sridhar and Furr.

273.    Bloom Energy's financial statements in the 2018 Form 10-K were materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements.

274.    While Bloom Energy discussed the accrued warranty costs in the notes to the financial

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

statements in the 2018 Form 10-K, Bloom Energy did not record or disclose $2 billion of contingent liabilities, including the $130 million from replacing the Delaware Energy Servers, that were probable and reasonably estimable under ASC 450 and ASC 460, and failed to disclose the contingent liabilities under Item 303. These liabilities were material and the omission of them materially misled investors.

275.   Bloom Energy knew that its customers would continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate if our customers continue to renew their maintenance service agreements in respect of those servers".

276.   As the amount of contingent liabilities ($2 billion) for the Maintenance Service Agreements were probable and reasonably estimable, they should have been disclosed and accounted for under Item 303, ASC 450 and ASC 460. Therefore, the Section 10(b) Defendants materially misled investors to the actual amount of contingent liabilities from Bloom Energy's Maintenance Service Agreements.

277.   This information was material and should have been disclosed to investors particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability.

278.   Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its 2018 Form 10-K, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

279.   Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract

The chart below shows the impact of Bloom Energy's restatement included in the 2018 Form 10-K:

| ($ in thousands except per share data) | FY 2018 Reported | FY 2018 Actual | Percent Misstated | Three Months Ended 12/31/18 Reported | Three Months Ended 12/31/18 Actual | Percent Misstated |
|---|---|---|---|---|---|---|
| Total revenue | $742,038 | $632,648 | **(17.3%)** | $213,606 | $157,145 | **(35.9%)** |
| Gross Profit | $117,070 | $105,750 | **(10.7%)** | $17,248 | $6,921 | **(149.2%)** |
| Net loss | ($259,489) | ($291,276) | **10.9%** | ($104,443) | ($120,111) | **13.1%** |
| Net loss attributable to common stockholders | ($241,753) | ($273,540) | **11.6%** | ($99,781) | ($115,449) | **13.6%** |
| Net loss per share attributable to common stockholders | ($4.54) | ($5.14) | **11.7%** | ($0.91) | ($1.06) | **14.2%** |

280.     The financial statements in Bloom Energy's 2018 Form 10-K were materially false and misleading as they reiterated the false and misleading financial statements from Q1, Q2, and Q3 as stated above. Additionally, the 2019 Form 10-K incorrectly stated the actual amounts of total revenue, gross profit, net loss, and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's 2018 Form 10-K was materially false and misleading.

281.     Bloom Energy's 2018 Form 10-K was also materially false because Bloom Energy falsely reported its financial statements, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its 2018 Form 10-K that for Fiscal Year 2018 revenue was $742.038 million, gross profit was $117.070 million, net loss was $259.489 million, and net loss attributable to shareholders was $241.753 million, or $4.54 per share. These numbers were materially false and misleading. In reality, for Fiscal Year 2018 revenue was $632.648 million, gross profit was $105,750 million, net loss was $291.276 million, and net loss attributable to shareholders was $273.540 million, or $5.14 per share.

282.     Similarly, Bloom Energy misrepresented its financial statements for the three months ended December 31, 2018. For Q4 2018, Bloom Energy reported that revenue was $213.606 million, gross profit was $17.248 million, net loss was $104.443 million, and net loss attributable to shareholders

was $99.781 million or $0.91 per share. These numbers were materially false and misleading. In reality, for Q4 2018 total revenue was $157.145 million, gross profit was $6.921 million, net loss was $120.111 million, and net loss attributable to shareholders was $115.449 million or $1.06 per share.

283.    These statements were also material as reasonable investors would consider the accuracy of Bloom Energy's 2018 Form 10-K, including the financial statements, to be important before purchasing or otherwise acquiring Bloom Energy securities..

284.    In connection with its reported financial statements, the 2018 Form 10-K also states:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of December 31, 2018. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of December 31, 2018, controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

285.    This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

286.    The 2018 Form 10-K was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the 2018 Form 10-K and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

> 1. I have reviewed this Annual Report on Form 10-K for the year ended December 31, 2018 of Bloom Energy Corporation;
>
> 2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**
>
> 3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   c. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(2018 Form 10-K, Exs. 31.1 & 31.2.)

287. Given the false and misleading nature of the statements in the 2018 Form 10-K described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-K omitted the contingent liabilities that should have been disclosed to investors and failed to properly account for its MS leases. By omitting these liabilities and misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial position was stronger than it appeared. These omissions and misrepresentations were material to Bloom Energy's investors because investors would have declined to purchase Bloom Energy's stock had they

known that the 2018 Form 10-K contained material misrepresentations and/or omissions.

288.    Additionally, Bloom Energy misrepresented to investors the impact of its technology on pollutants. In pertinent part Bloom Energy stated in its 2018 Form 10-K the following:

> The Bloom Energy Server converts standard low-pressure natural gas or biogas into electricity through an electrochemical process without combustion, resulting in very high conversion efficiencies and *lower harmful emissions than conventional fossil fuel generation.*
>
> *                *                *
>
> *Sustainability.* Bloom Energy Servers provide clean power and, because they are fuel-flexible, customers can choose the fuel source that best fits their needs based on availability, cost and carbon footprint. *Bloom Energy Servers deployed since 2012 running on natural gas produce nearly 60% less carbon emissions compared to the average of U.S. combustion power generation*. Bloom Energy Servers can also utilize renewable biogas to generate carbon-neutral electricity. In both cases, our *Energy Servers emit virtually no criteria air pollutants, including NOx or SOx.* Bloom Energy Servers also use virtually no water during normal operation.

289.    These representations proved to be false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838, a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. According to the Court's opinion dated January 9, 2020, at pages 8, 14 and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

290.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants."

291.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the CO2 emissions of its Bloom Energy servers. In pertinent part, the letter states:

DNREC had previously been put on notice that Bloom had likely understated the CO2 emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.

*       *       *

Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data *show that the new fuel cells are exceeding the 700 pounds of CO2 per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of CO2 per MWH (one week old units at Brookside) and 768.4 pounds of CO2 per MWE (four month average old units at Red Lion)*.

Furthermore, data from the New York State Energy & Development Administration indicate that CO2 emissions from the new fuel cells will increase as they age, *probably reaching 900 pounds of CO2 per MWH by the time they are two years old*.

In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that CO2 emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.

Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

292.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

### *May 6, 2019 – Q1 2019 Letter to Shareholders*

293.    On May 6, 2019, the Section 10(b) Defendants released a "Letter to Shareholders" announcing Bloom Energy's Q1 fiscal 2019 highlights and providing additional financial information. The letter was issued by Sridhar and Furr. The letter was also attached to a Form 8-K filing with the SEC on May 9, 2019.

294.    Bloom Energy's financial statements in the letter were materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the $2.0 billion in undisclosed contingent liabilities that were probable and reasonably estimable under ASC 450 and ASC 460, and failed to disclose the contingent liabilities under Item 303.

295.    This information was material and should have been recorded and disclosed under Item

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

303, ASC 450 and ASC 460.

296.   Bloom Energy's Q1 2019 shareholder letter was also materially false because Bloom Energy falsely reported its financial statements for the three months ended March 31, 2019, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q1 2019 shareholder letter that for Q1 2019 total revenue was $200.707 million, gross profit was $15.755 million, net loss was $88.273 million, and net loss attributable to shareholders was $84.441 million or $0.76 per share. These numbers were materially false and misleading. In reality, after the restatement for Q1 2019 total revenue was $147.731 million, gross profit was $1.079 million, net loss was $109.329 million, and net loss attributable to shareholders was $105.497 million or $0.94 per share. Additionally, after the restatement and the adoption of ASC 606 for Q1 2019 total revenue was $147.001 million, gross profit was $1.564 million, net loss was $108.752 million, and net loss attributable to shareholders was $104.920 million or $0.94 per share.

297.   The chart below represents the reported financial statements in Bloom Energy's Q1 2019 shareholder letter compared to Bloom Energy's actual financial statements as restated and recast in Bloom Energy's 2019 Form 10-K:

| ($ in thousands except per share data) | Three Months Ended 3/31/19 (Reported) | Three Months Ended 3/31/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $200,707 | $147,731 | **(35.9%)** | $147,001 | **(36.5%)** |
| Gross Profit | $15,755 | $1,079 | **(1,360.1%)** | $1,564 | **(907.4%)** |
| Net loss | ($88,273) | ($109,329) | **19.3%** | ($108,752) | **18.8%** |
| Net loss attributable to common stockholders | ($84,441) | ($105,497) | **20.0%** | ($104,920) | **19.5%** |
| Net loss per share attributable to common stockholders | ($0.76) | ($0.94) | **20.0%** | ($0.94) | **19.5%** |

298.   The financial statements in Bloom Energy's Q1 2019 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, net loss, and net loss

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q1 2019

2   shareholder letter was materially false and misleading.

3       299.     These statements were also material as a reasonable investor would consider the financial

4   statements, including figures for revenue and net loss, to be important before purchasing or otherwise

5   acquiring Bloom Energy securities.

6                       *May 6, 2019 – Q1 2019 Earnings Call*

7       300.     On May 6, 2019, Bloom Energy held an earnings call to discuss its preliminary Q1 2019

8   results. Defendants Sridhar and Furr were on the call. During the call, the Section 10(b) Defendants also

9   made materially false and misleading statements relating to Bloom Energy's financial statements, and

10  Bloom Energy's efficiency and pollution.

11      301.     For example, Defendant Sridhar stated in pertinent part:

12      As a reminder, Bloom Energy delivers 3 key benefits to our customers: lower and more
        predictable cost of power; ***lower emissions***; and higher resiliency including the option
13      for uninterruptible power. In our previous calls, I have talked at length about our cost
        reduction programs. These continue to be a strong focus. During this call, I will focus on
14      the other 2 value propositions: emissions and resiliency. Let us start with an update on
        our lowered emissions profile, our strategy for decarbonization leading to 0 carbon
15      solutions.

16      Our decarbonization strategy is multifaceted. To date, ***all of our customers have reduced***
17      ***carbon footprint when using the Bloom Energy Server fed by natural gas when***
        ***compared to securing their power from the utility grid***. They also reduced smog-creating
18      pollutants and avoid consumption of water. Currently, our primary solution for 0 carbon
        power generation is to offer customers Energy Server solutions running on directed
19      biogas. Some of our well-known customers, including Apple and the retailer IKEA have
        selected this path. In addition to directed biogas, it is our expectation that biogas
20      generated from landfill, wastewater treatment plants and plant and animal wastes will be
        converted on-site to electricity using our technology.
21

22      302.     These representations proved to be false. In recent litigation in the Superior Court of

23  California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-

24  cv-348838, a number of different points were argued that pointed to the excessive costs and pollution

25  attendant upon the use of Bloom Energy's technology. According to the Court's opinion dated January

26  9, 2020, at pages 8, 14 and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends

27  to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for

28  fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by

Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

303.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants."

304.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the CO2 emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the CO2 emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *          *          *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data *show that the new fuel cells are exceeding the 700 pounds of CO2 per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of CO2 per MWH (one week old units at Brookside) and 768.4 pounds of CO2 per MWE (four month average old units at Red Lion)*.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that CO2 emissions from the new fuel cells will increase as they age, *probably reaching 900 pounds of CO2 per MWH by the time they are two years old*.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that CO2 emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

305.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

306.    Defendant Sridhar also made materially false and misleading statements relating to

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Bloom Energy's quarterly financial statements. He stated in pertinent part:

**We achieved $200.7 million of revenue in Q1 of FY 2019**. Removing the impact of the onetime retroactive ITC benefit for FY '17 that we recognized in Q1 2018, our revenues increased 62% year-over-year.

307.    Similarly, Defendant Furr made materially false and misleading statements relating to Bloom Energy's financial statements stating in pertinent part:

Acceptances were 257 systems, a record; **revenues was $213.6 million, up sequentially by 12.3%**; non-GAAP gross margin come in at 18.1%; our non-GAAP operating income was $4.7 million, with adjusted EBITDA coming in at $14 million; adjusted EPS was a loss of $0.12.

*        *        *

**Revenue was $200.7 million, up approximately 62%** when excluding the onetime retroactive ITC adjustment from 2017 that flowed into Q1 of last year. Non-GAAP gross margin come in at 15%. Our non- GAAP operating income was a loss of $8.8 million with adjusted EBITDA coming in at a slight profit of $2.1 million. Adjusted EPS was a loss of $0.22 and we ended the quarter with $327.9 million in cash and short-term investments and this excludes $42 million of PPA cash.

Now onto some color for the quarter. Referring to Slide 4, the 235 acceptances translated to **$200.7 million in revenue**, both Q1 records for Bloom, in line with Q1 historically being down seasonally on a sequential basis, we saw a revenue decline by 6% from Q4's $213.6 million. However, **on a year-over-year basis, revenue was up by 18.5% from Q1 '18's reported $169.4** million and if you exclude the $45.5 billion (sic) [ $45.5 million ] of onetime retroactive ITC that related to 2017 revenue that was included in Q1 '18, revenue was up by approximately 62% year-over-year.

*        *        *

Gross profit, excluding stock-based compensation, **was down from $38.7 million in Q4 '18 to $30.1 million in Q1**. This was in line with expectations given the lower volume of acceptances that we were expecting due to the Q1 seasonality. On a year-over-year basis, and once again excluding the onetime ITC retroactive benefit received in Q1 '18, gross profit increased over 200% from Q1 '18's $9.5 million to $30.1 million this year.

308.    As Bloom Energy was improperly accounting for its MS transactions, the above financial statements were materially false and misleading. In reality, the actual revenue and gross profit in Q1 2019 was materially lower. Accordingly, in Bloom Energy's Q1 2019 Earnings Call the Section 10(b) Defendants materially misled investors as to the actual financial condition of Bloom Energy.

### *May 14, 2019 – Q1 2019 Form 10-Q*

309.    On May 14, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC their Form 10-Q for fiscal Q1 2019, ending March 31, 2019. The Form 10-Q was signed by Sridhar and Furr.

310.    Bloom Energy's financial statements in the Q1 2019 Form 10-Q were materially false and misleading as they failed to account for contingent liabilities arising under the Maintenance Service Agreements.

311.    While Bloom Energy discussed the accrued warranty costs in the notes to the financial statements in the Q1 2019 Form 10-Q, Bloom Energy did not record or disclose $2 billion of contingent liabilities, including the $130 million from replacing the Delaware servers, that were probable and reasonably estimable under ASC 450 and ASC 460, and failed to disclose the contingent liabilities under Item 303.

312.    As the amount of contingent liabilities for the Maintenance Service Agreements were probable and reasonably estimable under ASC 450 and ASC 460, they should have been disclosed and accounted for properly.

313.    Although Bloom Energy expected customers to continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount ($2 billion) and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been recorded and disclosed under Item 303, ASC 450 and ASC 460.

314.    This information was material and should have been disclosed to investors particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability.

315.    Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its Form 10-Q, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

316.    Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. The portion of revenue in the three months ended March 31, 2019 attributable to MS transaction was 2%. The chart below shows the impact of Bloom Energy's restatement and adoption on its March 31, 2019 financial statements included in the Form 10-Q:

| ($ in thousands except per share data) | Three Months Ended 3/31/19 (Reported) | Three Months Ended 3/31/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $200,707 | $147,731 | **(35.9%)** | $147,001 | **(36.5%)** |
| Gross Profit | $15,755 | $1,079 | **(1,360.1%)** | $1,564 | **(907.4%)** |
| Net loss | ($88,273) | ($109,329) | **19.3%** | ($108,752) | **18.8%** |
| Net loss attributable to common stockholders | ($84,441) | ($105,497) | **20.0%** | ($104,920) | **19.5%** |
| Net loss per share attributable to common stockholders | ($0.76) | ($0.94) | **20.0%** | ($0.94) | **19.5%** |

317.    The financial statements in Bloom Energy's Q1 2019 Form 10-Q were materially false and misleading because Bloom Energy falsely reported its financial statements for the three months ended March 31, 2019, artificially inflated revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q1 2019 Form 10-Q that for Q1 2019 total revenue was $200.707 million, gross profit was $15.755 million, net loss was $88.273 million, and net loss attributable to shareholders was $84.441 million or $0.76 per share. These numbers were materially false and misleading. In reality, after the restatement for Q1 2019 total revenue was $147.731 million, gross profit was $1.079 million, net loss was $109.329 million, and net loss attributable to shareholders was $105.497 million or $0.94 per share. Additionally, after the restatement and the adoption of ASC 606 for Q1 2019 total revenue was $147.001 million, gross profit

was $1.564 million, net loss was $108.752 million, and net loss attributable to shareholders was $104.920 million or $0.94 per share.

318.     These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

319.     In connection with its reported financial statements, the Q1 2019 Form 10-Q also states:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of March 31, 2019. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of March 31, 2019, controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding its required disclosure.

320.     This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

321.     The Q1 2019 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q1 2019 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended March 31, 2019 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;**

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q1 2019 Form 10-Q, Exs. 31.1 & 31.2.)

      322.    Given the false and misleading nature of the statements in the Q1 2019 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors and failed to properly account for its MS leases. By omitting these liabilities and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial statements were stronger than they appeared. These omissions and misrepresentations were material because reasonable investors would consider the accuracy of Bloom Energy's Q1 2019 Form 10-Q, including the financial statements, to be important before purchasing or otherwise acquiring Bloom Energy securities.

*May 14, 2019 – Conference Presentation*

323.    On May 14, 2019, Defendant Sridhar also participated on a conference presentation with JP Morgan Chase & Co. At the presentation, Sridhar made materially false and misleading statements about Bloom Energy's pollutants. In pertinent part, Sridhar stated:

> So what does the customer get? So our proposition to the customer in the places where we operate today is we will give you electricity at a cheaper price than what you're paying today to the utility. And by the way, for all the reasons that, Paul, you alluded to, the future cost of electricity buying from the utility, you don't know, but we can guarantee that for you, so price predictability.

> We will give you sustainability because compared to the U.S. grid, **we are 60% lower in carbon even when you use natural gas**. If you use biomethane, we are 0 carbon. **We are 0 NOx, SOx particulates.**

> Why do those things matter? The reason you cannot breathe in Shanghai and Delhi is not CO2, it is those small causing pollutants. We are 0 on those. We consume 0 water. So we give you all that sustainability, in addition to the economics. We give you reliability because of the modular nature of our box, and you don't have to worry about the transmission distribution and some neighbor's tree falling on some line or a hurricane coming in because you're not tied to that system. So we give you reliability and resiliency. So better reliability, better resiliency, better sustainability. And by the way, we save you money. Using that model, we sell to commercial and industrial customers in 8 or 9 different verticals, but the 3 major verticals, where we see the maximum traction is edge data centers, health care, hospitals and in retail, big boxes.

324.    These representations proved to be false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838, a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. According to the Court's opinion dated January 9, 2020, at pages 8, 14 and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

325.    Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants."

326.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *            *            *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data *show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)*.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, *probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old*.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

327.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

*June 19, 2019 – Conference Presentation*

328.     On May 14, 2019, Defendant Furr participated on a conference presentation with JP Morgan Chase & Co. At the presentation, Furr made materially false and misleading statements about Bloom Energy's pollutants. In pertinent part, Furr stated:

> What we do is we take just basic pipeline natural gas or as an alternative, we can use biogas. But about 90% of our customers use plain pipeline natural gas delivered to the curb. Nothing else is done. We use that natural gas for the systems there to power the systems.
>
> **We have about 50% less CO2 than the average U.S. grid. So they are cleaner than using a grid. And really no socks [sic] [SOx], no knocks [sic] [NOx] or particulate emissions**, which is very important in other parts of -- or parts of the world like Beijing and Delhi, where particulate in socks [sic] [SOx], knocks [sic] [NOx] is of concern given all the pollution.
>
> *             *             *
>
> Secondly, as mentioned today, we're about 50% cleaner than the average grid when it comes to CO2. But **I got to again stress, no socks [sic] [SOx], knocks [sic] [NOx], particulates** and really very, very little water use. We use some water to start the system up and we generate our own water. So a combination of that has driven a lot of customers to come to Bloom just for that aspect as well. But in every case that we have, we've ended up saving our customers' money on their power bill. And it's 2 aspects to that. One is we generally start off at a lower cost than they've been paying for the grid. And secondly, we have a lower escalator. And then all of this is predictable over time, so that predictability, that ability to save. And again, you can imagine if you see -- you can think of some of the big box retail customers, they're at Bloom for that very reason. So different reasons, different customers drive to Bloom, but these are our 3 main value propositions that we offer to our customers.

329.     These representations proved to be false. In recent litigation in the Superior Court of California, *Bloom v. City of Santa Clara et al, Superior Court of California*, County of Santa Clara, 19-cv-348838, a number of different points were argued that pointed to the excessive costs and pollution attendant upon the use of Bloom Energy's technology. According to the Court's opinion dated January 9, 2020, at pages 8, 14 and 15, experts in that case agreed that biogas, the fuel that Bloom Energy intends to use to prevent the emission of greenhouse gases is "prohibitively expensive and thus infeasible for fuel-cell use." Further evidence was produced showing that additional pollutants that are produced by Bloom Energy's technology include nitrogen oxides, volatile organic compounds and hazardous solid waste. According to the Court's opinion, Bloom Energy did not substantively dispute these claims.

330.     Similarly, Hindenburg reported on September 17, 2019 that data it collected from Bloom

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants."

331.    Further, on February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *        *        *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data *show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)*.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, *probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old*.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

332.    Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

**C.    The Truth about Bloom Energy's Liabilities Begins to Emerge**

*June 21, 2019 – Press Release to Upgrade Delaware Fuel Cell Project*

333.    On June 21, 2019, Bloom Energy announced that it "will deploy the latest generation of its Bloom Energy Servers at an existing 30 megawatt (MW) fuel cell project located on two sites in New

Castle and Newark, Delaware."

334.    Bloom Energy also announced that they would be using funds invested by Southern Power to do so, and that "[t]he fuel cell project was previously owned by Bloom Energy and a tax equity investor. As part of the transaction to upgrade the project, Southern Power will become the majority co-owner with Bloom Energy."

335.    This was evidence that Bloom Energy was subject to significant repair liabilities and costs under the Maintenance Service Agreements. Additionally, investors began to realize that Bloom Energy's public statements were not entirely true because these costs should have been disclosed in the IPO and prior filings. It further created the suspicion that additional liabilities under the Maintenance Service Agreement were just around the corner.

336.    Additionally, the June 21, 2019 press release failed to disclose the amount of liabilities it would incur from the Delaware replacements, and that Bloom Energy still had approximately $2 billion in undisclosed contingent liabilities arising from the Maintenance Service Agreements.

337.    Therefore, this information only partially revealed to the market that Bloom Energy was required to replace a number of servers in Delaware and would face additional undisclosed liabilities.

338.    As a result of this news, Bloom Energy's stock dropped from $12.37 at open on June 21, 2019, to close at $11.56 on June 22, 2019, a drop of 6.5%.

### *August 12, 2019 - Q2 2019 Letter to Shareholders and Earnings Call*

339.    On August 12, 2019, after hours, Defendants announced in a "Letter to Shareholders" filed with the SEC, Q2 Fiscal 2019 results ending June 30, 2019. Defendants also held a Conference Call and issued slides included "Supplemental Financial Information" to discuss Bloom Energy's financial results.

340.    In the letter, Bloom Energy disclosed to investors that revenue was down 3.8% sequentially due, in part, "from the PPA II upgrade" where they replaced the Delaware servers. Additionally, Bloom Energy disclosed a onetime $5.9 million charge associated with the Delaware upgrade. Finally, Bloom Energy disclosed a write-off of PPA II decommissioned assets (the Delaware assets) of $25,613,000, and "payments to redeemable noncontrolling interests related to the PPA II [Delaware] decommissioning" $18,690,000 for the three months ending June 30, 2019. On the

conference call Furr again revealed that the decrease in sequential revenue was due, in part, "from the PPA II [Delaware] upgrade."

341.   This revealed to the market the extent of liabilities from the Delaware replacement project, and partially revealed to the market that Bloom Energy had hidden contingent liabilities from investors relating to the replacement of its servers.

342.   As a result of this news, Bloom Energy's stock price dropped from $8.00 at close on August 12, 2019, to $4.60 at close on August 13, 2019 the following trading day, a decrease of 42.5% on unusually heavy trading volume.

343.   Bloom Energy's financial statements in the letter were, however, also materially false and misleading as they failed to account for the remaining $2.0 billion in undisclosed contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the amount of contingent liabilities. This information was material and should have been disclosed to investors.

344.   Bloom Energy's Q2 2019 shareholder letter was also materially false because Bloom Energy falsely reported its financial statements for the three months ended June 30, 2019, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q2 2019 shareholder letter that for Q2 2019 total revenue was $233.782 million, gross profit was $41.673 million, net loss was $67.231 million, and net loss attributable to shareholders was $62.216 million or $0.55 per share. These numbers were materially false and misleading. In reality, after the restatement for Q2 2019 total revenue was $211.743 million, gross profit was $38.292 million, net loss was $77.166 million, and net loss attributable to shareholders was $72.151 million or $0.64 per share. Additionally, after the restatement and the adoption of ASC 606 for Q2 2019 total revenue was $200.326 million, gross profit was $28.350 million, net loss was $86.926 million, and net loss attributable to shareholders was $81.911 million or $0.72 per share.

345.   The chart below represents the reported financial statements in Bloom Energy's Q2 2019 shareholder letter compared to Bloom Energy's actual financial statements as restated and recast in Bloom Energy's 2019 Form 10-K:

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| ($ in thousands except per share data) | Three Months Ended 6/30/19 (Reported) | Three Months Ended 6/30/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $233,782 | $211,743 | **(10.4%)** | $200,326 | **(16.7%)** |
| Gross Profit | $41,673 | $38,292 | **(8.8%)** | $28,350 | **(47.0%)** |
| Net loss | ($67,231) | ($77,166) | **12.9%** | ($86,926) | **22.7%** |
| Net loss attributable to common stockholders | ($62,216) | ($72,151) | **13.8%** | ($81,911) | **24.0%** |
| Net loss per share attributable to common stockholders | ($0.55) | ($0.64) | **13.8%** | ($0.72) | **23.6%** |

346.    The financial statements in Bloom Energy's Q2 2019 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, net loss, and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q2 2019 shareholder letter was materially false and misleading.

347.    These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

### *August 12, 2019 – Q2 2019 Earnings Call*

348.    On August 12, 2019, Bloom Energy held an earnings call to discuss its preliminary Q2 2019 results. Defendants Sridhar and Furr were on the call. During the call, the Section 10(b) Defendants also made materially false and misleading statements relating to Bloom Energy's financial statements.

349.    For example, Defendant Sridhar stated in pertinent part:

In Q2, we achieved 271 system acceptances, a 50% year-over-year increase. ***We achieved $233.8 million of revenue*** which is an all-time record for Bloom. Our gross margin was 17.8% and operating loss was $67.2 million. Excluding stock-based compensation, our non-GAAP gross margin was 22.3% and non-GAAP operating income was $1.1 million. Overall, a strong performance.

350.    Similarly, Defendant Furr made materially false and misleading statements relating to Bloom Energy's financial statements stating in pertinent part:

In   summary,   a   very   respectable   quarter.   Acceptances   were   271   systems,   up

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

approximately 50% from Q2 2018's 181 systems. **Revenue was $233.8 million, up approximately 38% year-over-year.** Non-GAAP gross margin came in at 22.3%. Our non-GAAP operating income was $1.1 million with adjusted EBITDA coming in at $21.9 million. Adjusted EPS was a loss of $0.13, and we ended the quarter with $314.4 million in cash and short-term investments, and this excludes $56.6 million of PPA cash.

\*      \*      \*

With that behind us, on to Slide 5. The 271 acceptances and **$193.2 million in [adjusted] revenue** were both Q2 records for Bloom. Acceptances were up 49.7% year-over-year and up 15.3% sequentially. Adjusted revenue was 14.4% year-over-year. Sequentially, revenue growth is down 3.8% due to a mix of lower ASPs, this coming from international, which once again, does not have installation revenue, and the PPA II upgrade, which had minimal installation revenue. Included in Q2's mix of acceptances were health care, technology, data centers, universities, sports venues, utility-scale projects and food and beverage retail. In total, the 271 systems were spread over 10 different customers in 5 different geographic markets. The majority of the installations were in it that United States.

\*      \*      \*

Turning to Slide 7. Adjusted gross profit, excluding stock-based compensation, was up almost 50% **from $30.1 million in Q1 '19 to $45.1 million in Q2**. On a year-over-year basis, adjusted gross profit increased 30%. Adjusted gross margin come in at 23.4%, a number nicely above last year's 20.6% and Q1 '19's 15%. Adjusted nonoperating income for Q2 was $114,000. Again, this number excludes stock-based compensation.

351.    As Bloom Energy was improperly accounting for its MS transactions, the above financial statements were materially false and misleading. In reality, the actual revenue and gross profit in Q1 2019 was materially lower. Accordingly, in Bloom Energy's Q2 2019 Earnings Call the section 10(b) Defendants materially misled investors as to the actual financial condition of Bloom Energy.

*August 13, 2019 – Q2 2019 Form 10-Q*

352.    On August 13, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC Bloom Energy's Form 10-Q for fiscal Q2 2019, ending June 30, 2019. The Form 10-Q was signed by Sridhar and Furr.

353.    The Q2 2019 Form 10-Q revealed that Bloom Energy incurred expenses in the amount of $130 million from the decommissioning of old Energy Servers in Delaware:

The PPA II Project occurs in two phases, phase 1 where initially SPDS had its purchased interest in 9.7 megawatts of Energy Servers installed during June 2019, and its remaining phase 2 purchased interest in 8.0 megawatts of Energy Servers to be installed which is expected to occur during the remainder of 2019. As of June 30, 2019, we have sold 9.7 megawatts of our current generation Energy Servers for $87.8 million to DSGP subsequent to its deconsolidation, which is included in product revenue, and recognized installation services of $3.9 million which is included in installation revenue, in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Concurrently, we had repurchased and written-off 10.0 megawatts of our earlier generation

energy serves [sic] for $25.6 million and had installed the 9.7 megawatts of servers at a cost of goods sold of $26.3 million, which is included in cost of product revenue in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. In anticipation of replacing the remaining installed 9.0 megawatts of Energy Servers during 2019 under phase 2 which reduced their previously expected useful lives, we recognized charges related to the decommissioning of PPA II Energy Servers of $8.1 million, which is included in cost of electricity revenue in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Additionally, in paying-off the outstanding debt and interest of PPA II amounting to $77.7 million, we incurred a debt payoff make-whole penalty of $5.9 million, which is included in general and administrative expense in our condensed consolidated statements of operations for the three and six months ended June 30, 2019. Finally, we had PPA II debt issuance costs written-off of $1.0 million and additional interest expense incurred for PPA 2 debt payoff of $0.1 million, which is included in interest expense in our condensed consolidated statements of operations for the three and six months ended June 30, 2019.

354.    This reiterated the substantial costs to Bloom Energy in replacing Energy Servers under the Maintenance Service Agreements that were disclosed on August 12, 2019.

355.    The Q2 2019 Form 10-Q was also materially false and misleading as Bloom Energy's financial statements failed to account for the remaining contingent liabilities arising under the Maintenance Service Agreements. While Bloom Energy discussed the accrued warranty costs in the notes to the financial statements in the Q2 2019 Form 10-Q, Bloom Energy did not record or disclose $2 billion of contingent liabilities that were probable and reasonably estimable under ASC 450 and ASC 460, and failed to disclose the contingent liabilities under Item 303.

356.    As the amount of contingent liabilities for the Maintenance Service Agreements were probable and reasonably estimable under ASC 450 and ASC 460, they should have been disclosed and accounted for properly.

357.    Although Bloom Energy expected customers to continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount and misrepresented to investors the actual financial health of Bloom Energy. This information was material and should have been recorded and disclosed under Item 303, ASC 450 and ASC 460.

358.    Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its Form 10-Q, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

359.    Bloom Energy improperly classified its Energy Server leases with its financing partners as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. The portion of revenue in the three and six months ended June 30, 2019 attributable to MS transaction was 2% and 2%, respectively. The chart below shows the impact of Bloom Energy's restatement and adoption on its June 30, 2019 financial statements included in the Form 10-Q:

| ($ in thousands except per share data) | Three Months Ended 6/30/19 (Reported) | Three Months Ended 6/30/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $233,782 | $211,743 | **(10.4%)** | $200,326 | **(16.7%)** |
| Gross Profit | $41,673 | $38,292 | **(8.8%)** | $28,350 | **(47.0%)** |
| Net loss | ($67,231) | ($77,166) | **12.9%** | ($86,926) | **22.7%** |
| Net loss attributable to common stockholders | ($62,216) | ($72,151) | **13.8%** | ($81,911) | **24.0%** |
| Net loss per share attributable to common stockholders | ($0.55) | ($0.64) | **13.8%** | ($0.72) | **23.6%** |

360.    The financial statements in Bloom Energy's Q2 2019 Form 10-Q were materially false and misleading false because Bloom Energy falsely reported its financial statements for the three months ended June 30, 2019, artificially inflated its revenue and gross profit, and artificially decreased its net

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q2 2019 Form 10-Q that for Q2 2019 total revenue was $233.782 million, gross profit was $41.673 million, net loss was $67.231 million, and net loss attributable to shareholders was $62.216 million or $0.55 per share. These numbers were materially false and misleading. In reality, after the restatement for Q2 2019 total revenue was $211.743 million, gross profit was $38.292 million, net loss was $77.166 million, and net loss attributable to shareholders was $72.151 million or $0.64 per share. Additionally, after the restatement and the adoption of ASC 606 for Q2 2019 total revenue was $200.326 million, gross profit was $28.350 million, net loss was $86.926 million, and net loss attributable to shareholders was $81.911 million or $0.72 per share.

361.    These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

362.    In connection with its reported financial statements, the Q2 2019 Form 10-Q also states:

> Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of June 30, 2019. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of June 30, 2019, controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding our required disclosure.

363.    This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

364.    The Q2 2019 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q2 2019 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

> 1. I have reviewed this Quarterly Report on Form 10-Q for the period ended June 30, 2019 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

   a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q2 2019 Form 10-Q, Exs. 31.1 & 31.2.)

365.     Given the false and misleading nature of the statements in the Q2 2019 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors and failed to properly account for its MS leases. By omitting these liabilities and misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial statements were stronger than they appeared. These omissions and misrepresentations were material because reasonable investors would consider the accuracy of Bloom Energy's Q2 2019 Form 10-Q, including the financial statements, to be important before purchasing or otherwise acquiring Bloom Energy securities.

**D.     The Truth about Bloom Energy's Pollutants Begins to Emerge**

*September 17, 2019 – Hindenburg Research Report*

366.     On September 17, 2019, prior to the market opening, Hindenburg Research published a report revealing to the market the extent of Defendants' undisclosed contingent liabilities and the lifespan of Bloom's systems. Hindenburg reported in pertinent part that it "uncovered an estimated $2.2 billion in undisclosed servicing liabilities that the market has missed, even in its most recent re-valuation of Bloom [Energy] shares." According to Hindenburg, "Bloom[ Energy]'s tricky accounting allows it to mask servicing costs and shift write-downs to other periods, thereby avoiding recognizing major recent additional losses."

367.     These liabilities related to the performance guarantees in the Maintenance Service Agreements, and Bloom Energy's responsibility to replace its fuel cell servers (the system itself) and the individual fuel cells that go inside the servers.

368.     Hindenburg reported that "Bloom's fuel cells and systems degrade significantly faster than expectations, yet the company barely records any liability for these issues." Hindenburg discloses that this is because Bloom Energy does not recognize future expenses until the customer renews its Maintenance Service Agreement each year. However, while customers have the right to renew each

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

year, "virtually no customers have elected to cancel their maintenance agreements" and Bloom Energy admits that they "expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level."

369.    Hindenburg based its calculation on, among other things, (i) the cost to replace fuel cells, (ii) fuel cell life, (iii) length of time on average contract, (iv) average number of times the fuel cells will be replaced, (v) current replacement cycle, (vi) cumulative install base (KW), and (vii) cost to replace servers (per KW).

370.    Using these factors, and data from Bloom Energy's public filings, Hindenburg concluded that the liabilities for fuel cell replacement alone was $1.8 billion, and server replacement liabilities were $1.4 billion, which, after off-setting the service liabilities with service revenue, resulted in over $2 billion in service liabilities from the Maintenance Service Agreements.

371.    Accordingly, the report fully disclosed to the market that Bloom Energy "only books the next year of servicing liabilities, rather than accounting for the liabilities across the full 10-25 years of the contract" and that Bloom Energy hid up to $2 billion in contingent liabilities.

372.    Similarly, Hindenburg also revealed to the market the true life of Bloom Energy fuel cells. Hindenburg stated:

> We have tracked data on Bloom projects installed since 2017 through state utility records in New York and California. There were 35 projects in all. After aggregating this data, we found that even Bloom's newest fuel cells will degrade below replacement thresholds in under 3 years, significantly below the company's "expectations". We present this data later in the report.
>
> Our findings were corroborated by multiple experts in the field who were highly skeptical of Bloom's claim that solid oxide fuel cells could last 5 years or longer in the field.
>
> We asked one professional fuel cell technician, with 19 years of experience, whether he believed the company's claims to be able to run solid oxide fuel cells for 5 years. He responded with a curt "no". When asked if the same fuel cells could operate for three years, he replied:
>
> "Do I believe claims of 3 years before service is needed? No. I would be highly skeptical."
>
> Another expert we contacted, with 14 years of experience working in Fuel Cells and Fuel Cell Performance Analysis, who also has a B.S., M.S., and a PhD in Chemical Engineering, also warned about temperature and durability preventing Bloom's cells

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

from running for 5 years:

"They are using the high temperature materials, I think. So, there is advantages and disadvantages. The disadvantage is that degradation is probably high. I doubt they have 5 years life. They may have 1 or 2 max. They cannot achieve 5 years. Or maybe if they have to replace part of the stack, they can achieve 5 years. In general, it's really hard for SOFCs to run 5 years."

\* \* \*

Keep in mind that Bloom guarantees both the output (total electricity produced) and the efficiency (how much fuel is used to generate the electricity) of its servers:

"…we typically provide an Output Guaranty of 95% measured annually and an Efficiency Guaranty of 52% measured cumulatively" [Prospectus pg. 75]

Bloom also provides tighter 80% quarterly output guarantees or 45% monthly efficiency guarantees on some of its projects. [Prospectus pg. 88 and 89]

Efficiency and output decline together: As the systems become less efficient, they produce less electricity, making efficiency degradation key to when fuel cells need to be replaced.

As we have seen from older Bloom project data in California and New York, fuel cell replacements were typically done in the 48%-50% efficiency range.

This chart, based on data from California and New York, shows how rapidly Bloom's newer post-2016 installed servers are declining by month, on average. It also shows how the trend continues:



(Source: New York & California Utility Data & Author Analysis)

After only 25 months, Bloom's newer fuel cell installations had deteriorated from a median starting efficiency of 58.3% down to 51.0%, a decline that puts them on pace to

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

breach the 48% threshold with 34 months (less than three years).[5]

The chart also shows that 45% efficiency (which serves as a 'bare minimum' on some projects) will be breached after only 42 months, or 3.5 years.[6]

373.    This revealed that despite Bloom Energy's representations that its fuel cells would last over five years, in reality, Bloom Energy routinely replaced its fuel cells after just three years. Accordingly, Bloom Energy's representations that it expected the useful life of its fuel cells to exceed five years was materially false and misleading.

374.    Hindenburg also reported that data it collected from Bloom Energy projects showed "that they generate more $CO_2$ than the electric grid in key states they operate in and produce $CO_2$ levels comparable to modern natural gas power plants." This revealed to the market that while Bloom Energy claimed to be "clean" these representations were materially false.

375.    On this news, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at close on September 17, 2019, a drop of 21% on unusually high trading volume.

### *November 7, 2019 – Q3 2019 Letter to Shareholders*

376.    On November 7, 2019, after hours, the Section 10(b) Defendants announced in a "Letter to Shareholders" published to Bloom Energy's website, and filed with the SEC on November 8, 2019, Q3 Fiscal 2019 results ending September 30, 2019. Defendants also held a Conference Call on November 7, 2019 and issued slides included "Supplemental Financial Information" to discuss Bloom Energy's financial results.

377.    Bloom Energy's financial statements in the letter were materially false and misleading as they failed to account for the remaining $2.0 billion in undisclosed contingent liabilities arising under the Maintenance Service Agreements. In pertinent part, the letter included Bloom Energy's quarterly revenue and financial results but omitted the amount of contingent liabilities. This information was

---

[5] We used the median starting point in month 1 because there were outliers in the first month that would have skewed the results significantly downward, likely because systems needed to get fully up and running. We used average thereafter.

[6] Bloom states that its servers degrade linearly over time, thus we extrapolate using straight-line degradation. Per Bloom's filings: "the efficiency of the Energy Server decreases very gradually from the beginning of life efficiency toward the end of life efficiency. This decrease is very nearly linear in nature (i.e., a straight-line slope)." (Pg. 31)

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

material and should have been disclosed to investors.

378.     Bloom Energy's Q3 2019 shareholder letter was also materially false because Bloom Energy falsely reported its financial statements for the three months ended September 30, 2019, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q3 2019 shareholder letter that for Q3 2019 total revenue was $233.782 million, gross profit was $53.465 million, net loss was $67.231 million, and net loss attributable to shareholders was $62.216 million or $0.55 per share. These numbers were materially false and misleading. In reality, after the restatement for Q3 2019 total revenue was $211.743 million, gross profit was $54.289 million, net loss was $77.166 million, and net loss attributable to shareholders was $72.151 million or $0.64 per share. Additionally, after the restatement and the adoption of ASC 606 for Q3 2019 total revenue was $224.307 million, gross profit was $42.725 million, net loss was $56.641 million, and net loss attributable to shareholders was $51.750 million or $0.44 per share.

379.     The chart below represents the reported financial statements in Bloom Energy's Q3 2019 shareholder letter compared to Bloom Energy's actual financial statements as restated and recast in Bloom Energy's 2019 Form 10-K:

| ($ in thousands except per share data) | Three Months Ended 9/30/19 (Reported) | Three Months Ended 9/30/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $233,471 | $238,330 | 2.0% | $224,307 | **(4.1%)** |
| Gross Profit | $53,465 | $54,289 | 1.5% | $42,725 | **(25.1%)** |
| Net loss | ($39,930) | ($45,596) | **12.7%** | ($56,641) | **29.7%** |
| Net loss attributable to common stockholders | ($34,903) | ($40,705) | **14.3%** | ($51,750) | **32.6%** |
| Net loss per share attributable to common stockholders | ($0.30) | ($0.35) | **14.3%** | ($0.44) | **31.8%** |

380.     The financial statements in Bloom Energy's Q3 2019 shareholder letter were materially false and misleading as they incorrectly stated the actual amounts of total revenue, gross profit, net loss,

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

and net loss attributable to shareholders. As these financial statements were incorrect, Bloom Energy's Q3 2019 shareholder letter was materially false and misleading.

381.    These statements were also material as a reasonable investor would consider the financial statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

*November 7, 2019 – Q3 2019 Earnings Call*

382.    On November 7, 2019, Bloom Energy held an earnings call to discuss its preliminary Q3 2019 results. Defendants Sridhar and Furr were on the call. In pertinent part, Defendant Furr included additional information about its loss contingencies for service contracts. In pertinent part, Furr states:

> In 2017, we incurred an approximate service loss of $6 million. Last year, that number was about $8 million. For this year, we expect to see service losses in Tiers 1 and 3 and service profits in Tiers 2 and 4 with full year service losses in the $3 million to $6 million range for this year.
>
> Quarterly or even annual fluctuations can and may occur. We did see a relatively higher Q3 service loss. This was driven by accelerating some Q4 cell replacements into Q3 to avoid doing this work during the peak winter time and ahead of the holiday season, which is certainly appreciated by our retail and data center customers.
>
> With respect to our service P&L accounting, in addition to selling our energy servers installed at the customer site, we sell ongoing operating and maintenance contracts to our customers. We refer to this as service contracts and these service contracts can and are generally renewed annually by our customers.
>
> In summary, the revenue associated with the service contracts is recognized radically over their service contract term, again, generally 12 months. The treatment of the cause depends on whether we estimate a profit or loss on the contract. If we estimate a profit on the contract, which we do for all contracts that we've signed over the last several years, then the cost associated with the contract is expensed as incurred.
>
> If however, the service contract is estimated to have a loss, we expense the loss at the time of the contract signing or renewal. Again, all service contracts executed since the beginning of 2015 are profitable.

383.    This revealed to the market that the Hindenburg article was correct and Bloom Energy was failing to properly account for its loss contingencies. For example, Bloom Energy states that "all service contracts executed since the beginning of 2015 are profitable," while at the same time stating that the service contracts have resulted in losses in 2017, 2018, and that they expected losses for 2019.

Accordingly, investors were aware that Bloom Energy was not properly accounting for its loss contingencies.

384.    During the call, the Section 10(b) Defendants also made materially false and misleading statements relating to Bloom Energy's financial statements.

385.    For example, Defendant Furr stated in pertinent part:

So on to Slide 3. In summary, this was another very respectable quarter. Acceptances were 302 systems, up 47% from Q3 2018's 206 systems. ***Revenue was $233.5 million, up approximately 23% year-over-year***. Non-GAAP gross margin come in at 25.8%, up 5% from Q3, 2018 and up 350 basis points sequentially.

Our non-GAAP operating income was 15.2 million, with adjusted EBITDA coming in at $40.8 million. Adjusted EPS was $0.01 and we ended the quarter with $357.9 million in consolidated cash and short term investments which includes $23.8 million of PPA cash. So excluding the PPA cash, we have $334.1 million of cash and short term investments.

Now onto some color for the quarter and on to Slide 4. The 302 acceptances and ***$233.5 million in revenue*** were both two 3 records for Bloom. Acceptances were up 46.6% year-over-year and ended up 11.4% sequentially.

                          *       *       *

Turning to Slide 6. Gross profit, excluding stock-based compensation was up almost 53% from ***39.5 million in Q3 of '18 to 60.3 million in Q3 of this year***. On a sequential basis, gross profit increased 15.7%. Gross Margin came in at 25.8%, a number nicely above last year's 20.8% and Q2 '19 22.3%. Operating expenses for Q3 were at the lower end of our estimates. Non-GAAP operating income in Q3 was fixed 15.2, again this number excludes stock-based compensation, again, was up significantly both on year-over-year and sequential basis. Our reported adjusted EBITDA was 48 million for the quarter. Not operating expenses were plan and adjusted EPS come in at one set.

386.    As Bloom Energy was improperly accounting for its MS transactions, the above financial statements were materially false and misleading. In reality, the actual revenue and gross profit in Q3 2019 was materially lower. Accordingly, Bloom Energy's Q3 2019 Earnings Call materially misled investors as to the actual financial condition of Bloom Energy.

### *November 14, 2019 – Q3 2019 Form 10-Q*

387.    On November 13, 2019, after market-trading hours, the Section 10(b) Defendants filed with the SEC Bloom Energy's Form 10-Q for fiscal Q3 2019, ending September 30, 2019. The Form 10-Q was signed by Sridhar and Furr.

388.    The Q3 2019 Form 10-Q was also materially false and misleading as Bloom Energy's financial statements failed to account for the remaining contingent liabilities arising under the

Maintenance Service Agreements. While Bloom Energy discussed the accrued warranty costs in the notes to the financial statements in the Q3 2019 Form 10-Q, Bloom Energy did not record or disclose $2 billion of contingent liabilities that were probable and reasonably estimable under ASC 450 and ASC 460, and failed to disclose the contingent liabilities under Item 303.

389.    As the amount of contingent liabilities for the Maintenance Service Agreements were probable and reasonably estimable under ASC 450 and ASC 460, they should have been disclosed and accounted for properly.

390.    Although Bloom Energy expected customers to continue to renew the Maintenance Service Agreements and "expect[ed] that [its] deployed early generation Energy Servers may continue to perform at a lower output and efficiency level and, as a result, the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers," the Section 10(b) Defendants continued to omit the actual amount and misrepresented to investors the actual financial health of Bloom Energy.

391.    These liabilities were material and should have been recorded and disclosed to investors under Item 303, ASC 450 and ASC 460, particularly given how it impacts shareholder liquidity and Bloom Energy's path to profitability. Therefore, the omission of these liabilities was materially false and misleading.

392.    Bloom Energy's financial statements were also materially false and misleading as they failed to correctly account for its MS transactions in accordance with GAAP. In its Form 10-Q, Bloom Energy accounted for its MS program leases as operating leases. However, in its restatement, Bloom Energy admitted that it should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards." Consequently, "[t]he revenue for the Managed Services Agreements and similar transactions" should have been "recognized over the duration of the contract instead of upfront."

393.    Bloom Energy improperly classified its Energy Server leases with its financing partners

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

as operating leases, which enabled Bloom Energy to misapply sale-leaseback accounting guidance and recognize revenue from sales of the Energy Servers upfront, rather than over the duration of the contract. The portion of revenue in the three and nine months ended September 30, 2019 attributable to MS transaction was 2% and 2%, respectively. The chart below shows the impact of Bloom Energy's restatement and adoption on its September 30, 2019 financial statements included in the Form 10-Q:

| ($ in thousands except per share data) | Three Months Ended 9/30/19 (Reported) | Three Months Ended 9/30/19 (Restated) | Percent Misstated (Reported to Restated) | ASC 606 Adoption (Actual) | Percent Misstated (Reported to Actual) |
|---|---|---|---|---|---|
| Total revenue | $233,471 | $238,330 | 2.0% | $224,307 | **(4.1%)** |
| Gross Profit | $53,465 | $54,289 | 1.5% | $42,725 | **(25.1%)** |
| Net loss | ($39,930) | ($45,596) | **12.7%** | ($56,641) | 29.7% |
| Net loss attributable to common stockholders | ($34,903) | ($40,705) | **14.3%** | ($51,750) | **32.6%** |
| Net loss per share attributable to common stockholders | ($0.30) | ($0.35) | **14.3%** | ($0.44) | **31.8%** |

394.    The financial statements in Bloom Energy's Q3 2019 Form 10-Q were materially false and misleading because Bloom Energy falsely reported its financial statements for the three months ended September 30, 2019, artificially inflated its revenue and gross profit, and artificially decreased its net loss and net loss attributable to common shareholders. For example, Bloom Energy reported in its Q3 2019 Form 10-Q that for Q3 2019 total revenue was $233.782 million, gross profit was $53.465 million, net loss was $67.231 million, and net loss attributable to shareholders was $62.216 million or $0.55 per share. These numbers were materially false and misleading. In reality, after the restatement for Q3 2019 total revenue was $211.743 million, gross profit was $54.289 million, net loss was $77.166 million, and net loss attributable to shareholders was $72.151 million or $0.64 per share. Additionally, after the restatement and the adoption of ASC 606 for Q3 2019 total revenue was $224.307 million, gross profit was $42.725 million, net loss was $56.641 million, and net loss attributable to shareholders was $51.750 million or $0.44 per share.

395.    These statements were also material as a reasonable investor would consider the financial

statements, including figures for revenue and net loss, to be important before purchasing or otherwise acquiring Bloom Energy securities.

396.   In connection with its reported financial statements, the Q3 2019 Form 10-Q also states:

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act), as of September 30, 2019. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that as of September 30, 2019, controls and procedures were effective to provide reasonable assurance that information required to be disclosed in the reports we file and submit under the Exchange Act is recorded, processed, summarized and reported as and when required, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding our required disclosure.

397.   This was materially false and misleading. As shown above and admitted by Bloom Energy in its 2019 Form 10-K, Bloom Energy had "a material weakness in [its] internal control over financial reporting related to the accounting for complex or non-routine transactions."

398.   The Q3 2019 Form 10-Q was also materially misleading given that it included certifications by Sridhar and Furr pursuant to SOX.  These certifications indicated that Sridhar and Furr had both reviewed the Q3 2019 Form 10-Q and that it was materially accurate and not misleading. Specifically, Sridhar and Furr each certified that:

1. I have reviewed this Quarterly Report on Form 10-Q for the period ended September 30, 2019 of Bloom Energy Corporation;

2. **Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;**

3. **Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report**;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(Q3 2019 Form 10-Q, Exs. 31.1 & 31.2.)

399. Given the false and misleading nature of the statements in the Q3 2019 Form 10-Q described above, Sridhar's and Furr's certifications were false and/or materially misleading. Specifically, the Form 10-Q omitted the contingent liabilities that should have been disclosed to investors and failed to properly account for its MS leases. By omitting these liabilities and misrepresenting Bloom Energy's financial statements, the Section 10(b) Defendants misled investors to believe that Bloom Energy's financial statements were stronger than they appeared. These omissions and misrepresentations were material reasonable investors would consider the accuracy of Bloom Energy's Q3 2019 Form 10-Q, including the financial statements, to be important before purchasing or

otherwise acquiring Bloom Energy securities.

### E.   The Truth about Bloom Energy's False Financial Statements Begins to Emerge

#### *February 12, 2020 – Form 8-K*

400.   On February 12, 2020, after hours, Bloom Energy filed with the SEC a Form 8-K announcing that shareholders should not rely on Bloom Energy's previously issued financial statements or audit reports. In pertinent part the Form 8-K stated:

**Item 4.02.    Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**

On February 11, 2020, the Audit Committee of the Board of Directors (the "Audit Committee") of Bloom Energy Corporation (the "Company" or "Bloom") determined that its previously issued financial statements as of and for the year ended December 31, 2018, as well as financial statements for the three-month period ended March 31, 2019, the three- and six-month periods ended June 30, 2019 and 2018 and the three- and nine month periods ended September 30, 2019 and 2018 (collectively, the "Prior Period Financial Statements"), should no longer be relied upon due to an error in accounting for the Company's Managed Services Agreements (the "Impacted MSAs"). The majority of these Impacted MSAs were originally recorded as sales, subject to an operating lease, in which revenues and associated costs were recognized at the time of installation and acceptance of the Bloom Energy Server at the customer site. The Audit Committee and PricewaterhouseCoopers LLP ("PwC"), the Company's independent registered public accounting firm, have now determined that the Impacted MSAs should have been accounted for as financing transactions, in which revenue is recognized over the life of the Impacted MSAs. This change will require restating the Prior Period Financial Statements (collectively, the "Restated Prior Period Financial Statements").

While the timing of the Company's revenue recognition for the Impacted MSAs will change as a result of this revised accounting treatment, the revised accounting treatment does not impact cash, cash equivalents or service contracts, nor does it impact the economic terms or substance of the Company's transactions with the bank financing party or the end customer. The Company anticipates that the primary effects to the Prior Period Financial Statements from this accounting change are as follows:

• Product and installation revenue will change from upfront recognition to recognition over the term of the Impacted MSAs;
• Bloom expects to report a decrease in net revenue in its consolidated statements of operations for the Restated Prior Period Financial Statements in a range of $165 million to $180 million and will now recognize this revenue over the remaining term of the Impacted MSAs;
• Bloom expects to report an increase in operating loss in a range of $20 million to $35 million for the Restated Prior Period Financial Statements; and
• Bloom expects to report an increase in net loss in a range of $55 million to $75 million for the Restated Prior Period Financial Statements.

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

In the interest of clarity, the Company's total cash flows and cash and cash equivalents for all prior and future periods will not be affected by this change in accounting for the Impacted MSAs. This accounting change relates solely to the Company's MSAs, is unrelated to its service business, fuel cell stack life, service contracts, and has no material impact on its service revenue and service liability. The Company expects that it will be in compliance with all of its financial covenants under its credit facilities and notes after giving effect to the restatement.

Bloom's customers use MSAs to finance their acquisition of Bloom Energy Servers. The Managed Services program is one of several financing vehicles the Company uses to sell its Energy Servers. Under the Company's Managed Services program, Bloom sells its equipment to a bank financing party, which pays Bloom for the Energy Server and takes title to the Energy Server. Bloom then enters into a service contract with an end customer, which pays the bank a fixed, regular fee for its use of the Energy Server and pays Bloom for its maintenance and operation of the Energy Server.

At the inception of entering into the Impacted MSAs, the Company reviewed their accounting treatment with PwC. The Company and PwC concluded that it was appropriate under U.S. GAAP to account for a majority of the Impacted MSAs as a sale, subject to an operating lease. Subsequently, PwC issued unqualified audit opinions on the Company's financial statements for the years ended December 31, 2016, December 31, 2017 and December 31, 2018. During this period, at Audit Committee meetings, PwC did not express any concern with respect to the Company's accounting treatment for the Impacted MSAs.

In December 2019, in the course of reviewing a managed service transaction that closed on November 27, 2019 under an MSA financing (as reported in the Company's Form 8-K filed on December 5, 2019), PwC identified an issue it had not previously identified related to the accounting for the Impacted MSA transactions. The issue primarily related to whether the terms of the Impacted MSAs, including the events of default provisions, satisfied the requirements for sales accounting or required the Company to follow lease accounting standards. Subsequently, the Company and PwC reevaluated the accounting for the managed services transactions, including reconsideration of the Impacted MSAs that had been previously provided to PwC and had not changed, and determined that the previous accounting for the Impacted MSAs was in error.

At all times, PwC had access to all relevant audit evidence with respect to the Impacted MSAs. The accounting error did not result from a change in the accounting literature for leases during the relevant time period or from any override of controls or from any misconduct. Additionally, PwC has not informed the Audit Committee of any issues related to an override of controls or misconduct.

The Company plans to (i) restate its financial statements as of and for the year ended December 31, 2018 and its quarterly financial information for the quarters ended March 31, 2019, June 30, 2019 and 2018, September 30, 2019 and 2018, and December 31, 2018 and (ii) revise its financial statements for the year ended December 31, 2017, its quarterly financial information for the quarter ended March 31, 2018, and its selected financial data for the year ended December 31, 2016 in connection with the filing of its

Form 10-K for the year ended December 31, 2019 in compliance with all required filing deadlines.

The Audit Committee has discussed with PwC the matters disclosed in this Item 4.02(a) Form 8-K.

On February 12, 2020, the Company issued a press release providing an update on the timing of its fourth quarter and full year 2019 earnings report and announcing the restatement of certain financial statements. A copy of this press release is attached hereto as Exhibit 99.1.

401.   Bloom Energy also attached as Exhibit 99.1 the below press release.

SAN JOSE, Calif., February 12, 2020 – Bloom Energy (NYSE: BE) today announced that the Company expects to present its fourth quarter and full year results on or before March 16, 2020 and to file its Annual Report on Form 10-K for the year ended December 31, 2019 in compliance with the required filing deadline.

The Company also announced it will restate certain prior period financial statements due to an accounting error related to its Managed Services Agreements ("MSAs"). MSAs are one of the Company's three customer financing options to acquire Bloom Energy servers.

The revenue for the Managed Services transactions will now be recognized over the duration of the contract instead of upfront. Additionally, these adjustments are unrelated to the service business, life of the servers, or service contracts. The adjustment has no impact on Bloom's total cash and cash equivalents or total cash flows and the adjustment does not impact the economic terms or substance of the MSAs.

The total estimated change to net revenue amounts to less than 10% of the total revenue over the affected period for Q1 of 2016 through Q3 of 2019. The affected period includes material impacts to our financial statements from Q2 of 2018 to Q3 of 2019 and immaterial impacts to our financial statements in the periods of Q1 of 2016 to Q1 of 2018.

John Doerr, Lead Independent Director, said: "Bloom Energy has a long track-record of groundbreaking innovation that is overseen by a highly engaged Board and experienced management team. We are committed to upholding the highest standards of oversight and compliance and remain focused on executing our long-term strategy and creating value for all stakeholders."

402.   The above statements revealed to the market that Bloom Energy had been falsely reporting its financial information dating back to Bloom Energy's IPO.

403.   On February 13, 2020, Market Watch published an article titled "*Bloom Energy has provided incorrect financial results since IPO, stock sinks more than 20%.*" The article states in pertinent part:

Short-seller Hindenburg Research's report that wreaked havoc on Bloom's stock last fall focused on Bloom's lack of accounting liabilities related to the same managed-services

agreements, which have to be renewed every year but guarantee energy rates that would make cancelation unlikely. Bloom attempted to separate Wednesday's announcements from Hindenberg's [sic] accusations in Wednesday's release, stating that "these adjustments are unrelated to the service business, life of the servers or service contracts."

"These restatements clearly vindicate the findings of our report," Hindenberg [sic] Research founder Nate Anderson in an email Wednesday afternoon. "We remain short and believe Bloom's equity will ultimately be rendered worthless."

404.    As a result of this news, Bloom Energy's stock dropped from $10.46 at close on February 12, 2020, to open at $9.02 on February 13, 2020, a drop of 13.8% on high volume.

### F.    Post Class Period Statements

#### *February 24, 2020 – Senate Letter*

405.    On February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the $CO_2$ emissions of its Bloom Energy servers. In pertinent part, the letter states:

> DNREC had previously been put on notice that Bloom had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. This point was read into the record by Amy Roe at the January 13, 2019 public hearing on said application.
>
> *            *            *
>
> Some of the new fuel cells are now operating at Red Lion and Brookside, and the Delaware Public Service Commission has received some actual operating data. These data ***show that the new fuel cells are exceeding the 700 pounds of $CO_2$ per megawatt hour (MWH) limit that was forecast. Specifically, the readings are 751.3 pounds of $CO_2$ per MWH (one week old units at Brookside) and 768.4 pounds of $CO_2$ per MWE (four month average old units at Red Lion)***.
>
> Furthermore, data from the New York State Energy & Development Administration indicate that $CO_2$ emissions from the new fuel cells will increase as they age, ***probably reaching 900 pounds of $CO_2$ per MWH by the time they are two years old***.
>
> In your order approving the permit, it is stated that enforcement actions will be taken if permitted emissions are exceeded. Based on the foregoing, we would suggest a substantial fine (e.g., $100,000) for every day that $CO_2$ emissions from the Bloom fuel cells exceed 700 pounds per MWH. Further, given that the burden of the Qualified Fuel Cell Provider Tariff is borne by Delmarva Power ratepayers resident in Delaware, we would suggest that the fines imposed be rebated to said ratepayers on their electric bills.
>
> Additional fines may be in order regarding VOC (volatile organic compounds) emissions, coking operations, and the undisclosed disposal of tons of hazardous solid waste. We would be glad to get some experts involved to review the details with your staff.

406. Accordingly, the above representations about the Energy Servers' efficiency and pollution were materially false and misleading.

407. As a result of this news, Bloom Energy's stock dropped from $11.76 at close on February 24, 2020, to close at $10.75 on February 25, 2020, a drop of 8.62% on high volume.

### *March 16, 2020 – Q4 2019 Letter to Shareholders & Form NT 10-K*

408. On March 16, 2020, Bloom Energy announced that it was unable to complete its Form 10-K in a timely manner. Additionally, Bloom Energy posted to its website its "Letter to Shareholders" announcing its Q4 Fiscal 2019 results ending December 31, 2019. Defendants also held a Conference Call and issued slides included "Supplemental Financial Information" to discuss Bloom Energy's financial results.

409. In the shareholder letter for Q4 2019, Bloom Energy announced restated financial statements for Fiscal Year 2018, Q3 2019 and Q4 2018. Additionally, Bloom Energy announced that "[t]he impact of ASC 606 and the adjustments related to the restatement resulted in a decrease to revenue of $142.9 million in 2019, compared to a decrease in revenue of $108.4 million in 2018."

410. As a result of this news, Bloom Energy's stock dropped from $5.31 at close on March 16, 2020, to close at $4.08 on March 17, 2020, a drop of 30.2% on high volume.

### *March 31, 2020 – Fiscal Year 2019 Form 10-K*

411. On March 31, 2020, after hours, Bloom Energy filed its 2019 Form 10-K with the SEC. The 2019 Form 10-K was signed by Defendants Sridhar and Furr. In its 2019 Form 10-K Bloom Energy released to investors, Bloom Energy's correct financial statements dating back to the IPO.

412. In pertinent part, the 2019 Form 10-K corrected Bloom Energy's revenue, net losses, and net losses attributed to shareholders. Bloom Energy attributed this correction to improper accounting for its Maintenance Service Agreements. In pertinent part, Bloom Energy states:

On February 11, 2020, our management, in consultation with the Audit Committee of our Board of Directors, determined that Bloom's previously issued consolidated financial statements as of and for the year ended December 31, 2018, as well as the unaudited interim financial statements for the three-month period ended March 31, 2019, the three- and six-month periods ended June 30, 2019 and 2018 and the three- and nine-month periods ended September 30, 2019 and 2018, should no longer be relied upon due to misstatements related to our Managed Services Agreements and similar arrangements, and we would restate such financial statements to make the necessary accounting

corrections. The revenue for the Managed Services Agreements and similar transactions will now be recognized over the duration of the contract instead of upfront. In addition, management determined that the impact of these misstatements to periods prior to the three months ended June 30, 2018 was not material to warrant restatement of reported figures, however, our consolidated financial statements as of and for the year ended December 31, 2017, selected financial data as of and for the year ended December 31, 2016 and the relevant unaudited selected quarterly financial data for the three month period ended March 31, 2018 would be revised to correct these misstatements.

*     *     *

In December 2019, in the course of reviewing a Managed Services transaction that closed on November 27, 2019 under a Managed Services Agreements financing (as reported in our Current Report on Form 8-K filed with the SEC on December 5, 2019), an issue was identified related to the accounting for our Managed Services Agreements transactions. The issue primarily related to whether the terms of our Managed Services Agreements and similar arrangements, including the events of default provisions, satisfied the requirements for sales under the revenue accounting standards or instead required us to follow lease accounting standards (ASC 840). Subsequently, it was determined that the previous accounting for the Managed Services Agreements and similar transactions resulted in material misstatements, as the Managed Services Agreements and similar transactions should have been accounted for as financing transactions under lease accounting standards.

The impact of the correction of the misstatement is to recognize amounts received from the bank financing party as a financing obligation, and the Energy Server is recorded within property, plant and equipment, net on our consolidated balance sheets. In addition, payments received by the bank from the customer now cover amounts owed to the bank based on the power generated by the systems. We recognize revenue for the electricity generated by the systems, based on these payments, and the corresponding financing obligation to the bank is also amortized as payments are received from the customer, with interest thereon being calculated on an effective interest rate basis. Depreciation expense is also recognized over the estimated useful life of the Energy Server.

In addition, another error was identified related to stock-based compensation costs associated with manufacturing employees that were previously expensed, but should have been capitalized as a component of Energy Server manufacturing costs to inventory, deferred cost of revenues, construction-in-progress and property, plant and equipment as per ASC 330 and SEC Staff Accounting Bulletin Topic 14. These costs will now be expensed on consumption of the related inventory and over the economic useful life of the property, plant and equipment, as applicable.

Also, as part of a review of historical revenue agreements as a result of the issues above, it was noted that the Company failed to identify embedded derivatives in certain revenue agreements for an escalator price protection ("EPP") feature given to its customers. As a result, the Company has recorded a derivative liability, with an offset to revenue, to account for the fair value of this feature at inception and will record the liability at its then fair value at each period end.

Finally, there were certain other immaterial misstatements identified or which had been previously identified which are also being corrected in connection with the restatement

and/or revision of previously issued financial statements.

The correction of the misstatements resulted in a cumulative overstatement of revenue totaling $192.1 million through September 30, 2019, including $178.8 million relating to the cumulative period from April 1, 2018 through September 30, 2019 that is being restated in this Annual Report on Form 10-K, and $13.3 million relating to the cumulative period from January 1, 2016 through March 31, 2018 that is being revised in this Annual Report on Form 10-K. The corresponding cumulative overstatement of cost of revenue totaled $166.1 million through September 30, 2019, including $149.4 million relating to the cumulative period from April 1, 2018 through September 30, 2019 that is being restated in this Annual Report on Form 10-K, and additionally $16.7 million relating to the cumulative period from January 1, 2016 through March 31, 2018 that is being revised in this Annual Report on Form 10-K. We do not believe that the misstatements are material to any period prior to the three month period ended June 30, 2018.

413.    The below chart indicates the financial statements previously reported by Bloom Energy compared to the actual restated financial statements:

**Bloom Energy Corporation**
**Restatement Summary**
**(in thousands, except per share data)**

| | 2017 Full Year | Three Months Ended | | | | 2018 Full Year | Three Months Ended | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 3/31/2018 (1Q 2018) | 6/30/2018 (2Q 2018) | 9/30/2018 (3Q 2018) | 12/31/2018 (4Q 2018) | | 3/31/2019 (1Q 2019) | 6/30/2019 (2Q 2019) | 9/30/2019 (3Q 2019) | (Jan 1, 2017-Sept 30, 2019) |
| **Total Revenue** | | | | | | | | | | |
| As prev. rptd. | $ 375,996 | $169,361 | $168,881 | $190,190 | $ 213,606 | $ 742,038 | $ 200,707 | $233,782 | $233,471 | $ 1,785,994 |
| As Restated | $ 365,623 | $168,582 | $138,302 | $168,619 | $ 157,145 | $ 632,648 | $ 147,001 | $200,326 | $224,307 | $ 1,569,905 |
| Misstated $ | $ (10,373) | $     (779) | $(30,579) | $(21,571) | $ (56,461) | $(109,390) | $ (53,706) | $(33,456) | $ (9,164) | $ (216,089) |
| Misstated % | -2.8% | -0.5% | -22.1% | -12.8% | -35.9% | -17.3% | -36.5% | -16.7% | -4.1% | -13.8% |
| | | | | | | | | | | |
| **Gross Profit** | | | | | | | | | | |
| As prev. rptd. | $ (18,044) | $ 43,666 | $ 32,771 | $ 23,385 | $ 17,248 | $ 117,070 | $ 15,755 | $ 41,673 | $ 53,465 | 209,919 |
| As Restated | $ (16,311) | $ 44,435 | $ 26,984 | $ 27,410 | $ 6,921 | $ 105,750 | $ 1,564 | $ 28,350 | $ 42,725 | 162,078 |
| Misstated $ | $ 1,733 | $ 769 | $ (5,787) | $ 4,025 | $ (10,327) | $ (11,320) | $ (14,191) | $(13,323) | $(10,740) | $ (47,841) |
| Misstated % | -10.6% | 1.7% | -21.4% | 14.7% | -149.2% | -10.7% | -907.4% | -47.0% | -25.1% | -29.5% |
| | | | | | | | | | | |
| **Net loss (common shareholders)** | | | | | | | | | | |
| As prev. rptd. | $(262,599) | $(17,716) | $(45,676) | $(78,580) | $ (99,781) | $(241,753) | $ (84,441) | $(62,216) | $(34,903) | $ (685,912) |
| As Restated | $(276,362) | $(21,591) | $(55,998) | $(80,502) | $(115,449) | $(273,540) | $(104,920) | $(81,911) | $(51,750) | $ (788,483) |
| Misstated $ | $ (13,763) | $ (3,875) | $(10,322) | $ (1,922) | $ (15,668) | $ (31,787) | $ (20,479) | $(19,695) | $(16,847) | $ (102,571) |
| Misstated % | 5.0% | 17.9% | 18.4% | 2.4% | 13.6% | 11.6% | 19.5% | 24.0% | 32.6% | 13.0% |
| | | | | | | | | | | |
| **Net loss per common share** | | | | | | | | | | |
| As prev. rptd. | $ (25.62) | $ (1.70) | $ (4.34) | $ (0.97) | $ (0.91) | $ (4.54) | $ (0.76) | $ (0.55) | $ (0.30) | |
| As Restated | $ (26.97) | $ (2.08) | $ (5.31) | $ (0.99) | $ (1.06) | $ (5.14) | $ (0.94) | $ (0.72) | $ (0.44) | |
| Misstated $ | $ (1.35) | $ (0.38) | $ (0.97) | $ (0.02) | $ (0.15) | $ (0.60) | $ (0.18) | $ (0.17) | $ (0.14) | |
| Misstated % | 5.0% | 18.3% | 18.3% | 2.0% | 14.2% | 11.7% | 19.1% | 23.6% | 31.8% | |

Does not include $6.1m increase in accumulated deficit for pre-2017 cumulative restatement adjustments.

414.    The above information revealed to the market that Bloom Energy's previously reported financial statements were materially false and misleading. The information previously provided to investors altered the total mix of information to investors such that a reasonable investor would have

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

considered the information important when deciding whether to make an investment in Bloom Energy.

415.   Bloom Energy's 2019 Form 10-K also stated in pertinent part:

In connection with the restatement, our management has assessed the effectiveness of our internal control over financial reporting. Based on this assessment, management identified a material weakness in our internal control over financial reporting resulting in the conclusion by our Chief Executive Officer and Chief Financial Officer that our internal control over financial reporting and our disclosure controls and procedures were not effective as of December 31, 2019.

\*         \*         \*

We recently identified a material weakness in our internal control over financial reporting related to the accounting for complex or non-routine transactions. If we do not effectively remediate the material weakness or if we otherwise fail to maintain effective internal control over financial reporting, our ability to report our financial results on a timely and an accurate basis may adversely affect the market price of our Class A common stock.

The Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act") requires, among other things, that public companies evaluate the effectiveness of their internal control over financial reporting and disclosure controls and procedures. As a recently public company and as an emerging growth company, we elected to delay adopting the requirements of the Sarbanes-Oxley Act as is our option under the Sarbanes-Oxley Act. While we have not yet adopted the requirements under Section 404B of the Sarbanes-Oxley Act, we did identify a material weakness in internal control over financial reporting at December 31, 2019, as we did not design and maintain an effective control environment with a sufficient complement of resources with an appropriate level of accounting knowledge, expertise and training to evaluate the accounting implications of complex or non-routine transactions commensurate with our financial reporting requirements. Please see Item 9A, Controls and Procedures, in this Annual Report on Form 10-K for additional information regarding the identified material weakness and our actions to date to remediate the material weakness. Subsequent testing by us or our independent registered public accounting firm, which has not yet performed an audit of our internal control over financial reporting, may reveal additional deficiencies in our internal control over financial reporting that are deemed to be material weaknesses.

To comply with Section 404B, we may incur substantial costs, expend significant management time on compliance-related issues, and hire additional accounting, financial, and internal audit staff with appropriate public company experience and technical accounting knowledge. Moreover, if we are not able to comply with the requirements of Section 404B in a timely manner or if we or our independent registered public accounting firm identify deficiencies in our internal control over financial reporting that are deemed to be material weaknesses, we could be subject to sanctions or investigations by the SEC or other regulatory authorities, which would require additional financial and management resources. Any failure to maintain effective disclosure controls and procedures or internal control over financial reporting could have a material adverse effect on our business and operating results and cause a decline in the price of our Class A common stock. For further discussion on Section 404 compliance, see our Risk Factor: "We are an 'emerging growth company' and we cannot be certain if the reduced disclosure requirements applicable to emerging growth companies will make our

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

Class A common stock less attractive to investors and may make it more difficult to compare our performance with other public companies."

416.     This revealed to investors that Bloom Energy's previous statements relating to its internal controls were materially false and misleading.

417.     As a result of this news, Bloom Energy's stock dropped from $5.23 per share at close on March 31, 2020, to close at $4.46 per share on April 1, 2020, a drop of 14.7% on high volume.

### G.     Defendants' Acted with Scienter

418.     For the purposes of Plaintiffs' claims under the Exchange Act only, Plaintiffs allege that the above material misrepresentations and omissions were made by the Section 10(b) Defendants either intentionally and/or with reckless disregard to accuracy for the purposes of: (a) personal financial gain; and (b) inflating market demand for Bloom Energy shares in the IPO.

419.     The Section 10(b) Defendants were aware of the construction delays at the time they made material misrepresentations and were aware that Bloom Energy was not accounting for its contingent liabilities.   The Section 10(b) Defendants provided investors with material information concerning Bloom Energy's financial statements while at the same time knowing that it would have to continue to take losses relating to its Maintenance Service Agreements.

*The Section 10(b) Defendants Acted with Actual Knowledge or Were Deliberately Reckless*

420.     At all times, the Section 10(b) Defendants knew that they had undisclosed contingent liabilities because their early generation systems and fuel cells would need to be replaced under the Maintenance Service Agreements. Bloom Energy admitted this in their filings with the SEC.

421.     For example, Bloom Energy admits that "virtually no customers have elected to cancel their maintenance agreements," and that "as we expect our customers to renew their maintenance service agreements each year, the total liability over time may be more than the accrual." As the Section 10(b) Defendants knew the estimated life of its Energy Servers were less than the life of the contracts, the Section 10(b) Defendants knew that the liabilities were probable.

422.     Additionally, Bloom Energy had already been required to replace Energy Servers and fuel cells under the Maintenance Service Agreements. Prior to the IPO, Bloom Energy was required to replace some of its earlier systems under the Maintenance Service Agreements and therefore knew it was likely they would have to replace the remaining early generation systems and knew the costs to do

so. In fiscal year 2015, the Section 10(b) Defendants implemented a fleet decommissioning program for its early generation servers. This resulted in "a significant adjustment to revenue in the quarter ended December 31, 2015."

423.    Similarly, Defendants admit that they would have to continue to replace these systems. The Registration Statement and later filings stated in pertinent part, "***we expect that our deployed early generation Energy Servers may continue to perform at a lower output and efficiency level, and as a result the maintenance costs may exceed the contracted prices that we expect to generate in respect of those servers if our customers continue to renew their maintenance service agreements in respect of those servers.***"

424.    As "virtually no customers have elected to cancel their maintenance agreements" and Bloom Energy "anticipates that almost all of its customers will continue to renew their maintenance services agreement each year," the fact that the maintenance costs would exceed the proceeds was probable.

425.    Additionally, the proximity of the Delaware replacements to the IPO and other public statements shows that the Section 10(b) Defendants knew they would need to replace additional fuel cells and servers and therefore had undisclosed contingent liabilities. On June 21, 2019, less than a year after the IPO, Defendants disclosed it was commencing a project to "decommission" 30 megawatts worth of Energy Servers in Delaware. These Energy Servers were only about 7 years old, yet Bloom Energy was required to replace all of them. The proximity to the IPO shows that at the time of the IPO this replacement was probable and reasonably estimable.

426.    Despite the fact that Bloom Energy could reasonably estimate the contingent liabilities under the Maintenance Service Agreements, and the fact that the liabilities were probable, the Section 10(b) Defendants refused to record the liabilities in Bloom Energy's financial statements or disclose this material information to the public. Indeed, the Section 10(b) Defendants went out of their way to hide this information from the public, redacting pertinent information in correspondence with the SEC that would have let investors know the extent of contingent liabilities Bloom Energy was subject to.

427.    Accordingly, the Section 10(b) Defendants had actual knowledge or were deliberately reckless in not complying with ASC 450, ASC 460, and Item 303.

428.   The Section 10(b) Defendants similarly acted with actual knowledge or deliberate recklessness when they hid from investors the fact that Bloom Energy was facing significant construction delays at the time of the IPO.

429.   The Section 10(b) Defendants' knowledge about the construction delays at the time of the Registration Statement is evident by the fact that the construction delays were currently on-going at the time of the IPO. This is apparent because the third quarter was already well underway on July 25, 2018, the date of the IPO, and had been since at least June 2016 according to CW1.

430.   CW1 corroborates that construction delays were a constant issue at Bloom Energy. CW1 indicated that during his tenure at Bloom Energy, construction delays occurred during almost every project. CW1 indicated that these delays typically were delayed by a quarter or half quarter. CW1 indicated that he was "very familiar with the delays" and the reasons behind them. According to CW1, Bloom Energy has a poorly managed design program and the design problems, short comings, and cost savings efforts led directly to the construction delays and field problems.

431.   CW1 stated that the construction delays were occurring at Bloom Energy before he started working there in June 2016, and continued after he left in February 2018.

432.   CW1 also indicated that upper management, all the way up to Sridhar, typically became aware right away as the construction delays were constant, on-going, and there was a lot of effort to displace those delays from Bloom Energy onto other contracting partners.

433.   The fact that the construction delays were a constant issue and that these delays were reported immediately all the way up to Defendants Sridhar shows that Sridhar knew of these problems at the time of the IPO, but intentionally misled investors.

434.   Further, the Section 10(b) Defendants acted with actual knowledge when misrepresenting their financial statements as they knew they should account for the MS transactions over the life of the contract. For example, Bloom Energy's Registration Statement states that "for customers who purchase our Energy Servers through our managed services program *we recognize revenue ratably over the life of the contracts as product revenue* and for customers who purchase our Energy Servers through a power purchase agreement (PPA) arrangement structured as an operating lease, *we recognize revenue ratably over the life of the contracts as electricity revenue and not at acceptance*."

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

435.     Similarly, the Registration Statement states,

"As the Energy Servers are determined not to be integral equipment, we determine if the leaseback is classified as a capital lease or an operating lease. The Company's managed services arrangements are classified as operating leases. As operating leases, **we recognize a portion of the revenue and the associated cost of sale and defer the portion of revenue and cost of sale that represents the gross profit that is equal to the present value of the future minimum lease payments over the master leaseback term**. For both capital and operating leasebacks, we record the deferred gross profit in our consolidated balance sheet as deferred income and amortize the deferred income over the leaseback term as a reduction to the leaseback rental expense included in operating leases. To date, our managed services has been classified as operating leases.

436.     The Registration Statement goes further when discussing product revenue for 2017 stating, "Product revenue increased for 2017 relative to 2016 even though product acceptances declined by 9.5% over that same time period as the mix in financing options with which our customers chose to deploy their systems reflected a smaller portion of *managed services customer purchase options (where revenue is recognized ratably) versus direct sales (where revenue is recognized up front)*." This shows that not only did the Section 10(b) Defendants know that the revenue should be accounted for ratably over the life of the contract, but that the Section 10(b) Defendants deliberately and knowingly changed the accounting to artificially inflate its financial statements. This materially affected Bloom Energy's financial statements and misled investors.

437.     The fact that the Section 10(b) Defendants disclosed the proper way to account for the MS transactions in the Registration Statement but instead accounted for the revenue upfront shows that Defendants acted with actual knowledge or deliberate recklessness.

438.     Additionally, as the Section 10(b) Defendants knowingly misrepresented investors about Bloom Energy's financial statements, the Section 10(b) Defendants also knew their SOX certifications and statements relating to internal controls were materially false and misleading.

439.     Finally, the Section 10(b) Defendants knew that the Energy Servers were not as clean as they represented to investors. As shown in the Senate letter, Bloom Energy was on notice as of January 2019 as Amy Roe read into the record that Bloom Energy had likely understated the $CO_2$ emissions cited in their permit application of October 2018 for the new fuel cells. Additionally, Bloom Energy's servers are its core operation. Bloom Energy routinely serviced the servers and therefore it is absurd to suggest that the Section 10(b) Defendants did not know that the servers produced pollutants, including

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   nitrogen oxides, volatile organic compounds and hazardous solid waste. The fact that Bloom Energy

2   was unable to disprove this fact at trial also shows that Defendants had no reasonable basis to ever make

3   this claim.

4        440.    Accordingly, the Section 10(b) Defendants acted with deliberate recklessness or actual

5   knowledge when warning of risks that were already underway.

### *The Section 10(b) Defendants Were Financially Motivated to Commit Fraud*

7        441.    The Section 10(b) Defendants' motivation behind the misrepresentations and omissions

8   in the Registration Statement and throughout the Class Period stems from their desire to profit

9   financially, their need for financing via the IPO, and the risk that Bloom Energy would be unable to pay

10   the Section 10(b) Defendants their annual employee and director compensation.

11       442.    On March 26, 2019, Bloom Energy filed with the SEC its DEF 14A proxy statement that

12   disclosed Defendants Sridhar's and Furr's compensation in 2018, and bonuses for taking Bloom Energy

13   public. According to the DEF 14A, "[i]n 2018, Defendant Sridhar was awarded a cash and equity bonus

14   to be payable or become vested upon the achievement of certain corporate initiatives, ***specifically the***

15   ***consummation of the IPO and related subsequent milestones***.  Mr. Sridhar received $2,000,000 of the

16   $3,000,000 cash bonus opportunity in 2018 as a result of having completed two of the milestones and

17   remains eligible to receive the remaining $1,000,000 of this cash bonus program in 2019. In addition,

18   ***Mr. Sridhar received an equity bonus of RSUs***."

19       443.    Bloom Energy refers investors to the "the 'Bonus' and 'Stock Awards' columns in the

20   2018 Summary Compensation Table for the amount of bonuses paid to [Defendant] Sridhar." According

21   to the Compensation Table, as a direct result of taking Bloom Energy public, Sridhar received

22   $44,259,315 in vested RSUs, along with a $2 million cash bonus.

23       444.    Sridhar received an annual salary of $524,039 in 2017 and $607,500 in 2018.

24   Accordingly, Sridhar's bonus to take Bloom Energy public was ***7,285%*** higher than his 2018 yearly

25   salary. This is money that Sridhar would not have been awarded had Bloom Energy not gone public.

26       445.    Defendant Furr similarly profited from the IPO. While Bloom Energy does not disclose

27   Furr's compensation from 2017, and therefore his 2017 salary is unknown, Furr's salary for 2018 was

28   $407,154. In connection with the IPO, Furr was granted $11,276,283 in vested RSUs. This is ***2,769%***

higher than his 2018 yearly salary.

446.   At the time of these bonuses, Bloom Energy operated at a net loss of $281,265,000 for fiscal year 2017, and $259,952,000 for fiscal year 2018.  Accordingly, the amount of the bonuses for taking a company that was pre-profit public was material and unreasonable. Thus, the Section 10(b) Defendants were motivated to consummate a public offering.

447.   Additionally, the Section 10(b) Defendants desperately needed additional funding with $379.2 million in debt is coming due by the end of 2020, with significant 2021 maturities thereafter. Bloom Energy currently had $308 million in cash on hand (as of June 30, 2019), down from $325.1 million in December 2018. Bloom Energy currently has $701.3 million in total debt, with $431.7 million of that total listed as recourse debt.

448.   Of Bloom Energy's $431.7 million in recourse debt, $296.2 million represents convertible notes due in December 2020.  These notes present a problem for Bloom Energy, as the conversion price is now far out of the money, at $11.25 per share of common stock (Bloom Energy currently trades below $3 per share of common stock). This likely means that, upon maturity, Bloom will have to pay cash, unless it can refinance.

449.   Bloom Energy was also incentivized to artificially inflate the stock price at the IPO due to notes that were convertible at the option of the holder at the time of the IPO. Specifically, 25,812,404 shares of Bloom Energy Class B common stock were issuable upon the conversion of Bloom Energy's outstanding 6.0% notes due 2020 (6% Notes). This was set to convert at a price of 75% of the IPO price of $15 per share.

450.   Additionally, 865,060 shares of Bloom Energy's Class B common stock were issuable upon the conversion of Bloom Energy's outstanding Constellation Note, which was convertible, at the option of the holder, prior to the completion of IPO, into shares of Series G convertible preferred stock or, following the completion of the IPO, into shares of Class B common stock. Further, approximately 800,000 shares of Bloom Energy's Class B common stock was issuable upon the conversion of accrued interest payable on its 6% Notes, 8% Notes and Constellation Note after March 31, 2018.

451.   Once the IPO was completed, $221.6 million of principal and accrued interest of outstanding 8% Notes automatically converted into additional paid-in capital, the conversion of which

included all the related-party noteholders. The 8% Notes converted to shares of Series G convertible preferred stock and, concurrently, each such share of Series G convertible preferred stock converted automatically into one share of Class B common stock. Upon the IPO, conversions of 5,734,440 shares of Class B common stock were issued and the 8% Notes were retired.

452.    Total, this resulted in 33,211,904 in Bloom Energy stock, worth $412,161,960 at $15 per share, to satisfy debt obligations alone.

453.    Had Bloom Energy's share price not been inflated, Bloom Energy would not have been able to satisfy its debt obligations at the number of shares that it did.

454.    As Bloom Energy preferred to convert the debt to Bloom Energy equity rather than pay cash, Bloom Energy was motivated to artificially inflate Bloom Energy's stock price by rebooking replacement servers and fuel cells, hiding construction delays, and omitting the amount of contingent liabilities that should have been in its financial statements. Therefore, the Section 10(b) Defendants' motivation for committing fraud is indicative of scienter.

*Insider Stock Sales*

455.    After PwC identified the improper accounting for its MS transactions in December 2019, Defendants Sridhar and Furr sold a substantial amount of stock prior to announcing Bloom Energy's restatement. Had Defendants Sridhar and Furr waited until after Bloom Energy published its restatement on March 31, 2020, Defendants Sridhar and Furr would have received $2,244,874 less than they did by selling prior to the restatement.

456.    The below chart represents Defendants Sridhar's and Furr's stock sales directly after they found out that Bloom Energy would need to restate its financial statements:

| Defendant | Date Sold | Shares Sold | Average Stock Price Sold | Total Gain from Sale | Stock Price on April 1, 2020 | Gain if sold on April 1, 2020 | Amount Gained by Selling pre-restatement |
|---|---|---|---|---|---|---|---|
| Furr | 12/4/2019 | 100,044 | $5.72 | $572,251 | $4.46 | $446,196 | ($126,055) |
| Sridhar | 12/19/2019 | 473,175 | $6.55 | $3,099,296 | $4.46 | $2,110,360 | ($988,935) |
| Sridhar | 12/27/2019 | 491,558 | $6.37 | $3,131,224 | $4.46 | $2,192,348 | ($938,876) |
| Furr | 1/27/2020 | 42,827 | $8.40 | $359,748 | $4.46 | $168,739 | ($191,008) |

457.    As Sridhar's annual salary was $524,039 in 2017 and $607,500 in 2018, his gain of

$1,927,811 by selling prior to the restatement was material.

458.    Similarly, as Furr's salary for 2018 was $407,154 his gain of $317,063 by selling prior to the restatement was material.

459.    These sales by Sridhar and Furr were also unusual in timing and quantity. Prior to these sales, Sridhar had never sold stock in the open market. Similarly, Furr had only one previous sale on May 28, 2019.

460.    Accordingly, the fact that Defendants Sridhar and Furr profited substantially from the inflated stock price shows that Defendants Sridhar and Furr acted with scienter.

### *The Accounting Violations Are Indicative of Scienter*

461.    Under sale-leaseback agreements, one company sells an asset — such as real estate or equipment — to a third party to get quick cash, offload the asset from its balance sheet, or reduce risks associated with the asset. The third party then leases it back to the seller (often simultaneously), and in turn typically receives a long-term stream of interest payments.

462.    In the case of Bloom Energy's MS transactions, determining whether a sale (a necessary component of a "sale-leaseback" transaction) of Energy Servers to a financing partner has occurred is a straight-forward process which is based on four criteria clearly laid out in GAAP. Defendants disclosed these criteria in Bloom Energy's Registration Statement and explained how they were applied in accounting for direct customer sales:

> Revenue from the sale and installation of Energy Servers to direct customers is recognized when all of the following criteria are met:
> - ***Persuasive Evidence of an Arrangement Exists.*** The Company relies upon non-cancelable sales agreements and purchase orders to determine the existence of an arrangement.
> - ***Delivery and Acceptance has Occurred.*** The Company uses shipping documents and confirmation from the Company's installations team that the deployed systems are running at full power, as defined in each contract, to verify delivery and acceptance.
> - ***The Fee is Fixed or Determinable.*** The Company assesses whether the fee is fixed or determinable based on the payment terms associated with the transaction.
> - ***Collectability is Reasonably Assured.*** The Company assesses collectability based on the customer's credit analysis and payment history.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

463.    In order to recognize revenues from a sale-leaseback transaction, GAAP requires transfer of not only the title but also the risks and rewards of ownership of the underlying asset from the seller-lessee to the buyer-lessor. ASC 840-40-25-4, ASC 605-10-S99 and ASC 840-40-S99. In other words, it is not enough for the title to legally pass from one party to another, the transaction has to be a sale in substance. Determining whether Bloom Energy's financing partner has taken title **and** assumed the risks and rewards of ownership of Energy Servers is the key indicator of whether the aforementioned "delivery and acceptance" criterion is met.

464.    The evaluation of a sale-leaseback transaction is also impacted by the seller-lessee's classification of its lease as either an operating or a capital lease. "The objective of the [capital] lease classification criteria … derives from the concept that a lease that transfers substantially all of the benefits and risks incident to the ownership of property should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee and as a sale or financing by the lessor. All other leases should be accounted for as operating leases." ASC 840-10-10-1.

465.    Therefore, if a lease is classified by the seller-lessee as a capital lease, the delivery and acceptance criteria is not met, and the sale has not occurred because the seller-lessee has retained substantially all of the benefits and risks of ownership. Such transactions are accounted for as failed sale-leaseback transactions and do not give rise to revenue recognition. ASC 840-40-25-2 and ASC 840-40-25-4. Moreover, capital leases are generally less desirable than operating leases because capital leases require a lessee to record the asset and a corresponding liability on its books, which can affect the company's balance sheet ratios and, thus, change the way investors and creditors perceive the company's overall financial health. Also, capital leases saddle a lessee's income statement with interest and depreciation expenses.

466.    For these reasons, it was vital for Bloom Energy to avoid classifying leases with its financing partners as capital leases. GAAP provides very clear bright line provisions for when a lease should be classified as a capital lease. If, at its inception, a lease meets any of the following four criteria, it is classified as a capital lease by the lessee:

    a.    Ownership is transferred to the lessee by the end of the lease term.

    b.    The lease contains a bargain purchase option.

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

c.   The lease term is at least 75% of the property's estimated remaining economic life.

d.   The present value of the minimum lease payments at the beginning of the lease term is 90% or more of the fair value of the leased property to the lessor at the inception date. ASC 840-10-25-1.

If none of the above criteria is met, a lessee should classify its lease as an operating lease. ASC 840-10-25-29 – 30.

467.   As FASB and international standard setters adopt new standards which shift accounting guidance away from rules-based to principal-based, the aforementioned set of capital lease criteria, with its clear bright-line provisions, is often cited as the prime example of rules-based accounting guidance that requires little judgment to apply. Moreover, it is also the prime example of when transaction terms are manipulated to achieve a desired accounting outcome (e.g., adjusting lease duration and equipment estimated economic life or lease payments terms to be just under the 75% estimated remaining economic life, or 90% fair value thresholds, respectively). However, in the case of Bloom Energy's MS transactions, the Section 10(b) Defendants simply invented their own GAAP to achieve the much-desired operating lease classification for leases with its financing partners and the resulting sale-leaseback accounting treatment:

*Sale-Leaseback (Managed Services)*

The Company is a party to master lease agreements that provide for the sale of Energy Servers to third-parties and the simultaneous leaseback of the systems, which the Company then subleases to its customers. **In sale-leaseback sublease arrangements (also referred to as managed services), the Company first determines whether the Energy Servers under the sale-leaseback arrangement are "integral equipment." An Energy Server is determined to be integral equipment when the cost to remove the system from its existing location, including the shipping costs of the Energy Server at the new site, including any diminution in fair value, exceeds 10% of the fair value of the Energy Server at the time of its original installation.**

**As the Energy Servers are determined not to be integral equipment, the Company determines if the leaseback is classified as a capital lease or an operating lease. The Company's managed services arrangements are classified as operating leases.** As operating leases, the Company recognizes a portion of the net revenue, net of any commitments made to the customer to cover liabilities associated with insurance, property taxes and/or incentives recorded as managed service liabilities, and the associated cost of sale and defers the portion of net revenue and cost of sale that represents the gross profit

that is equal to the present value of the future minimum lease payments over the master leaseback term. For both capital and operating leasebacks, the Company records the net deferred gross profit in its consolidated balance sheet as deferred income and amortizes the deferred income over the leaseback term as a reduction to the leaseback rental expense included in operating leases. [**Emphasis added**.]

468.     It is important to note that ASC 840, the authoritative accounting standard under GAAP concerning accounting for leases, is effectively divided into guidance applicable to lessees and to lessors. ASC 840-10-25 and ASC 840-40-25. The sale-leaseback accounting guidance is further divided between sale-leaseback transactions involving real estate and sale-leaseback transactions not involving real estate. ASC 840-40-25. The determination of whether equipment is "integral" in accounting for a sale-leaseback transaction does not apply to seller-lessees (such as Bloom Energy) or sale-leaseback transactions not involving real estate (such as Bloom Energy's MS transactions). Therefore, Defendants' self-serving decisions of whether or not Bloom Energy's leases with financing partners should be classified as capital or operating were not based on the relevant accounting standards but on Defendants' need to recognize profits on sales to financing partners.

469.     In addition, Defendants disregarded the fact that the 6 to 10-year length of Bloom Energy's MS leases was well in excess of the 75% of the Energy Servers' actual useful life. In light of their knowledge to the contrary, Defendants continued to represent to the world that Bloom Energy's Energy Servers had useful lives of 15 to 21 years. After all, to acknowledge that its Energy Servers had a much shorter life span would have been catastrophic. Not only would it result in MS leases being classified as capital leases (resulting in failed sale-leaseback accounting due to retention of substantially all of the benefits and risks of ownership of Energy Servers by Bloom Energy), it would have also required depreciating the Energy Servers more quickly (leading to a larger depreciation expense). Also, it would have made it harder, if not impossible, for Bloom Energy to avoid recording a $2 billion loss related to its Maintenance Service Agreement liabilities.

470.     Had the Defendants bothered to actually apply, or heed the result of applying, the relevant provisions in ASC 840 to "Managed Services Agreements and similar arrangements, including the events of default provisions," they would have determined, as they did during the restatement process, that Bloom Energy should have accounted for leases with its financing partners as capital leases because "risks of ownership have not completely transferred to the financing party" and, therefore, its "Managed

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   Services Agreements and similar transactions should have been accounted for as financing transactions
2   under lease accounting standards." Consequently, no profit should have been recognized on sales to
3   financing partners and "[t]he revenue for the Managed Services Agreements and similar transactions"
4   should have been "recognized over the duration of the contract instead of upfront."

5   471.   Defendant Furr, was Bloom Energy's CFO since April 2015 and was responsible for the
6   decisions made in selecting accounting treatment for the MS transactions. Furr had 30+ years of relevant
7   experience, held a bachelor's degree in business administration from the University of Oklahoma, and
8   was a Certified Public Accountant. Therefore, Furr possessed sufficient knowledge and experience to
9   determine that Bloom Energy's accounting for its MS transactions violated the clear GAAP provisions.

10   *The SOX Certifications*

11   472.   The Section 10(b) Defendants also repeatedly represented to investors that Bloom
12   Energy's financial statements were adequate and that Sridhar and Furr were complying with their
13   obligations under SOX. The Section 10(b) Defendants made these representations notwithstanding the
14   fact that they knew that Bloom Energy was not properly accounting for their contingent liabilities.

15   473.   For example, the Section 10(b) Defendants represented that "the financial statements,
16   and other financial information included in this report, fairly present in all material respects the financial
17   condition, results of operations and cash flows of the registrant as of, and for, the periods presented in
18   this report." The fact that the Section 10(b) Defendants reviewed its financial reporting is highly
19   indicative that the Section 10(b) Defendants reviewed ASC 450 and ASC 460 but purposely ignored it.
20   Accordingly, the fact that the Section 10(b) Defendants regularly reviewed Bloom Energy's financial
21   statements and the disclosure requirements show that Defendants acted with scienter.

22   474.   In addition, the core-function of the CEO and CFO is to monitor and ensure adequate
23   financial statements of a company.  Bloom Energy stated that Furr was qualified to serve as CFO due to
24   his "30+ years of experience in the technology sector" and disclosed that Furr "is an experienced
25   financial and operations executive." Furr also "holds a Bachelor of Business Administration degree from
26   the University of Oklahoma and is a certified public accountant." Accordingly, Furr was familiar with
27   the accounting standards, including ASC 450 and ASC 460, and knew that Bloom Energy was required
28   to disclose its contingent liabilities under ASC 450 and ASC 460.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

475.   This is further evidence that the Section 10(b) Defendants knew or were deliberately reckless by failing to properly account for the contingent liabilities.

### *Change in Risk Warnings*

476.   Further evidence that Bloom Energy knew about the fraud was the risk warning added to Bloom Energy's Fiscal Year 2018 Form 10-K. Prior to the March 22, 2019 Form 10-K Bloom Energy hid the fact that they were not accounting for their future expenses for the Maintenance Service Agreements under GAAP. However, starting in the 2018 Form 10-K, Bloom Energy made the conscious decision to inform investors that they only accounted for its service liabilities yearly when the service contracts were renewed. This shows that the Section 10(b) Defendants knew of the service liabilities but hid them from investors.

477.   The Section 10(b) Defendants' knowledge of the accounting rules is highly indicative of the fact that they acted with scienter when making the false and misleading statements.

### *Corporate Scienter*

478.   Bloom Energy is also liable for the acts of the Section 20(a) Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency, as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

479.   Similarly, the scienter of the Section 20(a) Defendants and other employees and agents of Bloom Energy is imputed to Bloom Energy under *respondeat superior* and common law agency principles.

## H.   **Loss Causation and Economic Loss**

480.   The Section 10(b) Defendants' materially misleading statements and omissions during the Class Period resulted in Plaintiffs and the other Class members purchasing Bloom Energy's shares at artificially inflated prices, and thereby directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiffs and the other Class members.

481.   As alleged herein:

a.   The market for Bloom Energy's stock was open, well-developed and efficient at all relevant times;

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

b.      The Section 10(b) Defendants' above-detailed materially misleading statements and/or material omissions had the effect of creating in the market an unrealistically positive assessment of Bloom Energy and its prospects, thus causing Bloom Energy's shares to be overvalued and the market price of Bloom Energy's shares to be artificially inflated during the Class Period;

c.      The Section 10(b) Defendants created an unrealistically positive assessment of Bloom Energy and its prospects by, in part, concealing risks associated with exposure arising from Bloom Energy's construction delays, and contingent liabilities;

d.      Plaintiffs and the other Class members purchased or otherwise acquired Bloom Energy stock relying upon the integrity of the market price for Bloom Energy shares and market information relating to Bloom Energy;

e.      The risks associated with exposure arising from Bloom Energy's construction delays and contingent liabilities began to materialize and, in turn, investors began to discover that the Section 10(b) Defendants' public statements were materially misleading; and

f.      Upon discovery of Defendants' materially misleading statements and/or material omissions, Bloom Energy's share price suffered severe devaluation.

482.    The Section 10(b) Defendants' disclosures and/or events on the below dates resulted in damages to investors caused by misrepresentations and omissions in public statements. In each instance, the disclosure revealed material information related to the false statements.

483.    **November 5, 2018**.  On November 5, 2018, Bloom Energy disclosed its operating results for the third quarter of fiscal 2018. Bloom Energy reported only 206 "acceptances," which was materially below its guidance number of 215 to 235. During an investor conference call held after market hours that same day, Furr conceded that the  low rate of "acceptances" was "a result of construction delays." Accordingly, this announcement revealed to the market that Bloom Energy had been experiencing construction delays that affected its Q3 acceptances and would also affect Q4 acceptances. In response to the above news, the price of Bloom Energy stock declined substantially from $23.01 at

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

close on November 5, 2018, to $17.25 at close on November 6, 2018, a decline of 25% on unusually heavy trading volume.

484.   **June 21, 2019.** On June 21, 2019, Bloom Energy announced that it "will deploy the latest generation of its Bloom Energy Servers at an existing 30 megawatt (MW) fuel cell project located on two sites in New Castle and Newark, Delaware." This was confirmation of a previous article that noted that Bloom Energy had approximately $100-150 million in undisclosed contingent liabilities arising from the replacement of the Delaware servicers. While this press release was Bloom Energy's first public mention of the Delaware replacement, this confirmed the previous articles concerns. Therefore, this information partially revealed to the market that Bloom Energy was required to replace a number of Energy Servers in Delaware and would face additional undisclosed liabilities. As a result of this news, Bloom Energy's stock dropped from $12.37 at open on June 21, 2019, to close at $11.56 at close on June 22, 2019, a drop of 6.5%.

485.   **August 12, 2019**. On August 12, 2019, after hours, Defendants announced in a "Letter to Shareholders" filed with the SEC, Q2 Fiscal 2019 results ending June 30, 2019. Defendants also held a Conference Call and issued slides included "Supplemental Financial Information" to discuss Bloom Energy's financial results. In the letter, Bloom Energy disclosed to investors that revenue was down 3.8% sequentially due, in part, "from the PPA II upgrade" where they replaced the Delaware servers. Additionally, Bloom Energy disclosed a onetime $5.9 million charge associated with the Delaware upgrade. Finally, Bloom Energy disclosed a write-off of PPA II decommissioned assets (the Delaware assets) of $25,613,000, and "payments to redeemable noncontrolling interests related to the PPA II [Delaware] decommissioning" of $18,690,000 for the three months ending June 30, 2019. On the conference call Furr again revealed that the decrease in sequential revenue was due, in part, "from the PPA II [Delaware] upgrade." This revealed to the market the extent of liabilities from the Delaware replacement project, and partially revealed to the market that Bloom Energy had hidden contingent liabilities from investors relating to the replacement of its servers. As a result of this news, Bloom Energy's stock price dropped from $8.00 at close on August 12, 2019, to $4.60 at close on August 13, 2019 the following trading day, a decrease of 42.5% on unusually heavy trading volume.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

486.  **September 17, 2019.**  On September 17, 2019, prior to the market opening, Hindenburg Research published a report revealing to the market the extent of Defendants' undisclosed contingent liabilities. Hindenburg reported in pertinent part that it "uncovered an estimated $2.2 billion in undisclosed servicing liabilities that the market has missed, even in its most recent re-valuation of Bloom [Energy] shares." According to Hindenburg, "Bloom[ Energy]'s tricky accounting allows it to mask servicing costs and shift write-downs to other periods, thereby avoiding recognizing major recent additional losses." These liabilities related to the performance guarantees in the Maintenance Service Agreements, and Bloom Energy's responsibility to replace its fuel cell servers (the system itself) and the individual fuel cells that go inside the servers. Accordingly, this report fully disclosed to the market that Bloom Energy "only books the next year of servicing liabilities, rather than accounting for the liabilities across the full 10-25 years of the contract" and that Bloom Energy hid up to $2 billion in contingent liabilities. Hindenburg also revealed to the market the true life of Bloom Energy fuel cells and that Bloom Energy's servers produce CO2 levels comparable to modern natural gas power plants. These revelations showed that Bloom Energy's prior representations into the fuel cell life and pollutants were materially false and misleading. On this news, Bloom Energy's stock price decreased from $4.19 at close on September 16, 2019, to $3.31 at close on September 17, 2019, a drop of 21% on unusually high trading volume.

487.  **February 12, 2020.** On February 12, 2020, after hours, Bloom Energy filed with the SEC a Form 8-K announcing that shareholders should not rely on Bloom Energy's previously issued financial statements or audit reports. This caused Bloom Energy's stock to plummet as this revealed that Bloom Energy's previously reported financial statements and SOX certifications were materially false and misleading. As a result of this news, Bloom Energy's stock dropped from $10.46 at close on February 12, 2020, to open at $9.02 on February 13, 2020, a drop of 13.8% on high volume.

488.  **February 24, 2020.** On February 24, 2020, 16 Delaware State Senators wrote a letter to the Department of Natural Resources and Environmental Control, and sent copies to the Governor, Attorney General, and the Delaware Public Service Commission noting that Bloom Energy substantially understated and misrepresented the CO2 emissions of its Bloom Energy servers. Accordingly, the above representations about Bloom Energy's efficiency and pollution were materially false and misleading. As a result of this news, Bloom Energy's stock dropped from $11.76 at close on February 24, 2020, to

Case No. 4:19-cv-02935-HSG

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

close at $10.75 on February 25, 2020, a drop of 8.6% on high volume.

489.   **March 16, 2020**. On March 16, 2020, Bloom Energy announced that it was unable to complete its Form 10-K in a timely manner and posted to its website its "Letter to Shareholders" announcing the restated financial statements for Fiscal Year 2018, Q3 2019 and Q4 2018. This was the first correction of Bloom Energy's financial statements and showed the extent of the misstatement. This shows that the revelation caused the decline in Bloom Energy's stock as a result of Bloom Energy's prior misstatements. As a result of this news, Bloom Energy's stock dropped from $5.31 at close on March 16, 2020, to close at $4.08 on March 17, 2020, a drop of 30.2% on high volume.

490.   **March 31, 2020**. On March 31, 2020, after hours, Bloom Energy filed its 2019 Form 10-K with the SEC. The 2019 Form 10-K was signed by Defendants Sridhar and Furr. In its 2019 Form 10-K Bloom Energy released to investors Bloom Energy's correct financial statements dating back to the IPO. This fully revealed the extent of the Section 10(b) Defendants accounting fraud and the material weaknesses in Bloom Energy's internal controls over financial reporting. As a result of this news, Bloom Energy's stock dropped from $5.23 per share at close on March 31, 2020, to close at $4.46 per share on April 1, 2020, a drop of 14.7% on high volume.

491.   The Section 10(b) Defendants failed to disclose to investors material information concerning its contingent liabilities and accounting practices. As the Class Period progressed, investors became increasingly aware of these risks that were previously undisclosed to them by the Section 10(b) Defendants.  As the risks surrounding Defendants' conduct materialized during the Class Period, Bloom Energy's stock price substantially decreased.  Each decline in Bloom Energy's stock price is evidence that the risks concealed by the Section 10(b) Defendants gradually materialized.  The total decline in Bloom Energy's stock price is attributable to the Section 10(b) Defendants' fraudulent and/or deliberately reckless conduct pursuant to the materialization-of-the-risk doctrine.

## I.      Presumption of Reliance: Fraud-On-The-Market

492.   At all relevant times, the market for Bloom Energy's common stock was an efficient market for the following reasons, among others:

   a.   Bloom Energy common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

b.  Bloom Energy communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

c.  Bloom Energy was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

d.  unexpected material news about Bloom Energy was reflected in and incorporated into Bloom Energy's stock price during the Class Period.

493.  As a result of the foregoing, the market for Bloom Energy common stock promptly digested current information regarding Bloom Energy from all publicly available sources and reflected such information in Bloom Energy's stock price. Under these circumstances, all purchasers of Bloom Energy's common stock during the Class Period suffered similar injury through their purchase of Bloom Energy's common stock at artificially inflated prices, and a presumption of reliance applies.

494.  Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures.  Positive proof of reliance is not a prerequisite to recovery pursuant to the ruling of the U.S. Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### J.  Presumption of Reliance: Fraud Created the Market

495.  In the alternative, Bloom Energy's common stock should not have been introduced into the market at the time of the IPO because it was objectively unmarketable. Contrary to the information represented in Bloom Energy's Registration Statement, Bloom Energy was actual liable for over $2 billion in liabilities and was already experiencing construction delays.  Where, as here, actors introduce an otherwise unmarketable security into the market by means of fraud, they have effectively manipulated the market. Accordingly, Plaintiffs and the Class are entitled to a presumption of reliance because they

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1   relied on the integrity of the market rather than on individual fraudulent disclosures.

2   **K.    No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine**

3   496.    The statutory safe harbor provided for forward-looking statements under certain

4   circumstances does not apply to any of the material misrepresentations and omissions alleged in this

5   Complaint.

6   497.    To the extent certain of the statements alleged to be misleading or inaccurate may be

7   characterized as forward-looking, they were not identified as "forward-looking statements" when made

8   and there were no meaningful cautionary statements identifying important factors that could cause actual

9   results to differ materially from those in the purportedly forward-looking statements.

10   498.    Defendants are also liable for any false or misleading "forward-looking statements"

11   pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

12   "forward-looking statement" was false or misleading and the "forward-looking statement" was

13   authorized and/or approved by an executive officer of Bloom Energy who knew that the "forward-

14   looking statement" was false. Alternatively, none of the historic or present-tense statements made by

15   Defendants were assumptions underlying or relating to any plan, projection, or statement of future

16   economic performance, as they were not stated to be such assumptions underlying or relating to any

17   projection or statement of future economic performance when made, nor were any of the projections or

18   forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-

19   tense statements when made.

20   **COUNT III**

21   **Violation of Section 10((b) and SEC Rule 10b-5(b)**

22   **against the Section 10(b) Defendants**

23   499.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

24   forth herein.

25   500.    This Count is asserted against the Section 10(b) Defendants and is based upon Section

26   10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

27   501.    During the Class Period, the Section 10(b) Defendants engaged in a plan, scheme,

28   conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts,

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Bloom Energy's common stock; and (iii) cause Plaintiffs and other Class members to purchase or otherwise acquire Bloom Energy's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, the Section 10(b) Defendants, and each of them, took the actions set forth herein.

502.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Section 10(b) Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Bloom Energy's common stock.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Bloom Energy's finances, accounting, and business prospects.

503.    By virtue of their positions at Bloom Energy, the Section 10(b) Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other Class members, or, in the alternative, the Section 10(b) Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Section 10(b) Defendants.  Said acts and omissions of the Section 10(b) Defendants were committed willfully or with reckless disregard for the truth. In addition, each Section 10(b) Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

504.    Information showing that the Section 10(b) Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Section 10(b) Defendants' knowledge and control.  As the

1  senior managers and/or directors of Bloom Energy, the Section 10(b) Defendants had knowledge of the

2  details of Bloom Energy's internal affairs.

3  505.    The Section 10(b) Defendants are liable both directly and indirectly for the wrongs

4  complained of herein.  Because of their positions of control and authority, the Section 10(b) Defendants

5  were able to and did, directly or indirectly, control the content of the statements of Bloom Energy.  As

6  officers and/or directors of a publicly-held company, the Section 10(b) Defendants had a duty to

7  disseminate timely, accurate, and truthful information with respect to Bloom Energy's business

8  operations, accounting, and finances.  As a result of the dissemination of the aforementioned false and

9  misleading reports, releases and public statements, the market price of Bloom Energy's common stock

10  was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Bloom

11  Energy's business, accounting, and financial condition which were concealed by the Section 10(b)

12  Defendants, Plaintiffs and the other Class members purchased or otherwise acquired Bloom Energy's

13  common stock at artificially inflated prices and relied upon the price of the common stock, the integrity

14  of the market for the common stock and upon the statements disseminated by the Section 10(b)

15  Defendants, and were damaged thereby.

16  506.    During the Class Period, Bloom Energy's common stock was traded on an active and

17  efficient market.  Plaintiffs and the other Class members, relying on the materially false and misleading

18  statements described herein, which the Section 10(b) Defendants made, issued or caused to be

19  disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of

20  Bloom Energy's common stock at prices artificially inflated by the Section 10(b) Defendants' wrongful

21  conduct.  Had Plaintiffs and the other Class members known the truth, they would not have purchased

22  or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at

23  the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the

24  Class, the true value of Bloom Energy's common stock was substantially lower than the prices paid by

25  Plaintiffs and the other Class members. The market price of Bloom Energy's common stock declined

26  sharply upon materialization of undisclosed risks and/or public disclosure of the facts alleged herein to

27  the injury of Plaintiffs and Class members.

28  507.    By reason of the conduct alleged herein, the Section 10(b) Defendants knowingly or

recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

508.   As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of Bloom Energy's common stock during the Class Period, upon the disclosure that Bloom Energy had been disseminating false and/or misleading statements and information to the investing public.

<u>**COUNT IV**</u>

<u>**Violation of Section 20((a) of the Exchange Act**</u>

<u>**against the Section 20(a) Defendants**</u>

509.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

510.   During the Class Period, the Section 20(a) Defendants participated in the operation and management of Bloom Energy, and conducted and participated, directly and indirectly, in the conduct of Bloom Energy's business affairs.  Because of their senior positions, they knew the adverse non-public information about Bloom Energy's misstatement of construction delays, and contingent liabilities.

511.   As officers and/or directors of a publicly owned company, the Section 20(a) Defendants had a duty to disseminate accurate and truthful information with respect to Bloom Energy's financial condition and results of operations, and to correct promptly any public statements issued by Bloom Energy which had become materially false or misleading.

512.   Because of their positions of control and authority as senior officers, the Section 20(a) Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Bloom Energy disseminated in the marketplace during the Class Period concerning Bloom Energy's operations.  Throughout the Class Period, the Section 20(a) Defendants exercised their power and authority to cause Bloom Energy to engage in the wrongful acts complained of herein. The Section 20(a) Defendants therefore, were "controlling persons" of Bloom Energy within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Bloom Energy's common stock.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

513.   Each of the Section 20(a) Defendants, therefore, acted as a controlling person of Bloom Energy.  By reason of their senior management positions and/or being directors of Bloom Energy, each of the Section 20(a) Defendants had the power to direct the actions of, and exercised the same to cause, Bloom Energy to engage in the unlawful acts and conduct complained of herein. Each of the Section 20(a) Defendants exercised control over the general operations of Bloom Energy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other Class members complain.

514.   By reason of the above conduct, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Bloom Energy.

## CLASS ACTION ALLEGATIONS

515.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased or otherwise acquired shares of Bloom Energy common stock: (i) in Bloom Energy's IPO; and/or (ii) on the public market between July 25, 2018 and September 16, 2019, inclusive, and who were damaged upon revelation of the truth. Excluded from the Class are Defendants and their families, the officers, directors, and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

516.   The Class members are so numerous that joinder of all members is impracticable. Bloom Energy's stock is actively traded on the New York Stock Exchange under the ticker symbol "BE" and millions of shares were sold in the IPO.

517.   As of March 16, 2020, there were 90,231,067 shares of Bloom Energy Class A common stock outstanding, and 34,872,888 shares of Bloom Energy Class B common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands if not millions of members in the proposed Class.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

518.    Record owners and other Class members may be identified from records maintained by Bloom Energy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

519.    Plaintiffs' claims are typical of the claims of the Class members, as all Class members are similarly affected by defendants' conduct in violation of federal securities law that is complained of herein.

520.    Plaintiffs will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class and securities litigation.

521.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

> (a) whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> (b) whether the Registration Statement contained untrue statements of material fact, omitted to state a material fact required to be stated therein, and/or omitted to state material facts necessary to make statements therein not misleading;
>
> (c) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business operations, financial statements, and accounting of Bloom Energy;
>
> (d) whether Defendants caused Bloom Energy to issue false and misleading statements during the Class Period; and
>
> (e) whether the Class members have sustained damages and, if so, what is the proper measure of damages.

522.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the class representatives;

B.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.


Dated: April 21, 2020                    Respectfully submitted,

                                         **LEVI & KORSINSKY, LLP**

                                          */s/ Adam M. Apton*
                                         Adam M. Apton (SBN 316506)
                                         Adam C. McCall (SBN 302130)
                                         388 Market Street, Suite 1300
                                         San Francisco, CA 94111
                                         Telephone: (415) 373-1671
                                         Email: aapton@zlk.com
                                         Email: amccall@zlk.com

                                         Nicholas I. Porritt
                                         **LEVI & KORSINSKY, LLP**
                                         1101 30th Street N.W., Suite 115
                                         Washington, D.C. 20007
                                         Tel:     (202) 524-4290
                                         Email: nporritt@zlk.com
                                         (*admitted pro hac vice*)

                                         *Lead Counsel for Plaintiffs and the Class*

                                         -and-

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Reed R. Kathrein (SBN 139394)
Lucas Gilmore (SBN 250893)
Danielle Smith (SBN 291237)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tel:     (510) 725-3000
Email: reed@hbsslaw.com
Email: lucasg@hbsslaw.com
Email: danielles@hbsslaw.com

Steve W. Berman
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Email: steve@hbsslaw.com
(to be *admitted pro hac vice*)

*Additional Counsel for Plaintiffs and the Class*

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS

# EXHIBIT A

# LEVI&KORSINSKY LLP

55 Broadway, 10th Floor
New York, NY 10006
T:212-363-7500
F:212-363-7171
www.zlk.com

CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, James Everett Hunt, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. The transaction(s) in Bloom Energy Corporation which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of April 2020.

Signed: _James Everett Hunt_
Name: James Everett Hunt

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 1/28/2019 | Acquisition | 25,947 | * |
| 2/15/2019 | Bought | 2,523 | 11.690 |
| 6/24/2019 | Sold | 2,677 | 11.3943 |
| 6/26/2019 | Sold | 2,281 | 12.0501 |
| 7/11/2019 | Sold | 7,927 | 12.787 |
| 10/22/2019 | Sold | 10,400 | 2.765 |
| 10/22/2019 | Sold | 5,185 | 2.775 |

* On January 28, 2019, George B. Hunt acquired 25,947 shares of Bloom Energy Class A common stock through AEI Greentech Investments ("AEI"). In 2009, George elected to make an investment in AEI, a fund who invested in Bloom Energy preferred stock. At the closing of the Bloom Energy IPO these preferred shares were converted to Bloom Energy Class B shares. AEI's sole managing member, Spruce Direct Investment Fund, then caused AEI to convert the Class B shares to Class A shares and distributed the Class A shares to George through his account at American Stock Transfer & Trust Company, LLC after expiration of the lock-up period.

# EXHIBIT B



55 Broadway, 10th Floor
New York, NY 10006
T:212-363-7500
F:212-363-7171
www.zlk.com

CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Juan R. Rodriguez, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. The transaction(s) in Bloom Energy Corporation which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 14th day of April 2020.

Signed:

Name:                              Juan R. Rodriguez

Juan Rodriguez
Transactions in Bloom Energy Corporation (BE)

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 9/6/2018 | Bought | 1,000 | 28.3991 |
| 9/6/2018 | Bought | 1,000 | 28.5513 |
| 9/6/2018 | Bought | 1,000 | 28.739 |
| 9/7/2018 | Sold | 3,000 | 28.5387 |
| 9/10/2018 | Bought | 1,000 | 30.8499 |
| 9/10/2018 | Bought | 1,000 | 27.939 |
| 9/10/2018 | Sold | 200 | 29.03 |
| 9/10/2018 | Sold | 100 | 29.02 |
| 9/10/2018 | Sold | 700 | 29.0001 |
| 9/11/2018 | Bought | 985 | 28.1199 |
| 9/11/2018 | Bought | 15 | 28.03 |
| 9/11/2018 | Bought | 1,000 | 28.8272 |
| 9/11/2018 | Bought | 1,000 | 29.1699 |
| 9/11/2018 | Sold | 100 | 29.01 |
| 9/11/2018 | Sold | 400 | 29.001 |
| 9/11/2018 | Sold | 500 | 29.0001 |
| 9/11/2018 | Sold | 1,000 | 29.2801 |
| 9/11/2018 | Sold | 1,000 | 29.221 |
| 9/12/2018 | Sold | 1,000 | 31.2609 |
| 9/13/2018 | Bought | 1,000 | 33.1288 |
| 9/13/2018 | Bought | 1,000 | 33.3491 |
| 9/13/2018 | Bought | 200 | 33.7 |
| 9/13/2018 | Bought | 800 | 33.6999 |
| 9/13/2018 | Bought | 100 | 33.75 |
| 9/13/2018 | Bought | 400 | 33.7 |
| 9/13/2018 | Bought | 500 | 33.6599 |
| 9/13/2018 | Bought | 700 | 33.329 |
| 9/13/2018 | Bought | 300 | 33.3135 |
| 9/13/2018 | Bought | 1,000 | 30.9999 |
| 9/13/2018 | Bought | 1,000 | 31.0362 |
| 9/13/2018 | Bought | 500 | 30.679 |
| 9/13/2018 | Bought | 500 | 30.6549 |
| 9/13/2018 | Bought | 1,000 | 31.0789 |
| 9/13/2018 | Bought | 1,000 | 31.4876 |
| 9/14/2018 | Bought | 1,000 | 29.4499 |
| 9/14/2018 | Bought | 1,000 | 30.189 |
| 9/14/2018 | Sold | 1,000 | 30.6501 |
| 9/14/2018 | Sold | 1,000 | 30.6526 |
| 9/14/2018 | Bought | 1,000 | 29.954 |
| 9/14/2018 | Bought | 1,000 | 29.6099 |

Juan Rodriguez
Transactions in Bloom Energy Corporation (BE)

| | | | |
|---|---|---|---|
| 9/14/2018 | Sold | 1,000 | 29.541 |
| 9/14/2018 | Sold | 1,000 | 29.541 |
| 9/14/2018 | Sold | 5,000 | 29.8057 |
| 9/14/2018 | Bought | 5,000 | 29.7099 |
| 9/17/2018 | Bought | 1,000 | 29.5002 |
| 9/17/2018 | Bought | 1,000 | 29.7072 |
| 9/17/2018 | Sold | 902 | 30.1725 |
| 9/17/2018 | Sold | 1,098 | 30.167 |
| 9/18/2018 | Sold | 1,000 | 29.2754 |
| 9/18/2018 | Sold | 1,000 | 29.2701 |
| 9/19/2018 | Bought | 1,000 | 30.7205 |
| 9/19/2018 | Bought | 1,000 | 30.7491 |
| 9/19/2018 | Sold | 1,000 | 29.7014 |
| 9/21/2018 | Bought | 1,000 | 31.138 |
| 9/26/2018 | Sold | 1,000 | 36.0701 |
| 9/26/2018 | Sold | 4,000 | 36.0121 |
| 9/26/2018 | Sold | 4,801 | 36.1177 |
| 9/26/2018 | Sold | 70 | 36.116 |
| 9/26/2018 | Sold | 129 | 36.1112 |
| 9/27/2018 | Bought | 1,000 | 37.4999 |
| 9/27/2018 | Bought | 1,000 | 36.6881 |
| 9/27/2018 | Bought | 600 | 37.2979 |
| 9/27/2018 | Bought | 100 | 37.29 |
| 9/27/2018 | Bought | 100 | 37.27 |
| 9/27/2018 | Bought | 200 | 37.25 |
| 9/27/2018 | Bought | 1,000 | 37.2474 |
| 9/27/2018 | Bought | 900 | 37.2499 |
| 9/27/2018 | Bought | 100 | 37.23 |
| 9/27/2018 | Sold | 400 | 36.85 |
| 9/27/2018 | Sold | 4,600 | 36.8401 |
| 9/27/2018 | Bought | 1,000 | 36.8769 |
| 9/27/2018 | Bought | 1,000 | 36.0985 |
| 9/27/2018 | Bought | 1,000 | 36.0387 |
| 9/27/2018 | Bought | 1,000 | 35.7199 |
| 9/27/2018 | Bought | 1,000 | 35.6519 |
| 9/27/2018 | Bought | 1,000 | 34.7885 |
| 9/27/2018 | Sold | 1,000 | 33.9301 |
| 9/27/2018 | Sold | 100 | 33.85 |
| 9/27/2018 | Sold | 700 | 33.8226 |
| 9/27/2018 | Sold | 200 | 33.8201 |
| 9/27/2018 | Sold | 269 | 33.675 |

Juan Rodriguez
Transactions in Bloom Energy Corporation (BE)

| | | | |
|---|---|---|---|
| 9/27/2018 | Sold | 200 | 33.661 |
| 9/27/2018 | Sold | 231 | 33.66 |
| 9/27/2018 | Sold | 300 | 33.621 |
| 9/27/2018 | Sold | 400 | 33.48 |
| 9/27/2018 | Sold | 600 | 33.4701 |
| 9/27/2018 | Sold | 1,000 | 33.3001 |
| 9/27/2018 | Sold | 1,000 | 33.3201 |
| 9/28/2018 | Bought | 1,000 | 34.3671 |
| 9/28/2018 | Sold | 1,000 | 34.424 |
| 9/28/2018 | Bought | 1,000 | 33.8271 |
| 9/28/2018 | Bought | 1,000 | 33.4099 |
| 9/28/2018 | Bought | 1,000 | 33.4999 |
| 10/1/2018 | Bought | 1,000 | 33.8699 |
| 10/1/2018 | Bought | 1,000 | 33.2899 |
| 10/1/2018 | Bought | 6 | 33.6799 |
| 10/1/2018 | Bought | 500 | 33.6733 |
| 10/1/2018 | Bought | 33 | 33.66 |
| 10/1/2018 | Bought | 90 | 33.65 |
| 10/1/2018 | Bought | 71 | 33.64 |
| 10/1/2018 | Bought | 300 | 33.63 |
| 10/1/2018 | Sold | 1,000 | 32.8616 |
| 10/1/2018 | Bought | 1,000 | 32.2099 |
| 10/1/2018 | Bought | 1,000 | 32.2099 |
| 10/1/2018 | Bought | 481 | 32.3 |
| 10/1/2018 | Bought | 419 | 32.299 |
| 10/1/2018 | Bought | 100 | 32.28 |
| 10/2/2018 | Bought | 1,000 | 32.4999 |
| 10/2/2018 | Bought | 1,000 | 32.6999 |
| 10/4/2018 | Bought | 1,000 | 29.8293 |
| 10/4/2018 | Bought | 1,000 | 29.7399 |
| 10/4/2018 | Bought | 1,000 | 29.6499 |
| 10/5/2018 | Sold | 1,000 | 27.7333 |
| 10/5/2018 | Sold | 19 | 27.41 |
| 10/5/2018 | Sold | 981 | 27.4001 |
| 10/5/2018 | Sold | 1,000 | 27.3215 |
| 10/15/2018 | Sold | 200 | 26.36 |
| 10/15/2018 | Sold | 1,080 | 26.35 |
| 10/31/2018 | Sold | 930 | 23.7769 |
| 11/7/2018 | Sold | 500 | 18.035 |
| 11/7/2018 | Sold | 500 | 18.0116 |
| 11/7/2018 | Sold | 570 | 18.0116 |
| 11/7/2018 | Sold | 500 | 17.9824 |

Juan Rodriguez
Transactions in Bloom Energy Corporation (BE)

| | | | |
|---|---|---|---|
| 11/7/2018 | Sold | 504 | 17.9824 |
| 11/15/2018 | Sold | 1,000 | 16.5209 |
| 11/15/2018 | Sold | 1,000 | 15.4275 |
| 11/16/2018 | Bought | 100 | 16.49 |
| 11/16/2018 | Bought | 300 | 16.47 |
| 11/16/2018 | Bought | 500 | 16.45 |
| 11/16/2018 | Bought | 100 | 16.44 |
| 11/20/2018 | Sold | 611 | 13.56 |
| 11/20/2018 | Sold | 3,000 | 13.4972 |
| 11/28/2018 | Bought | 400 | 15.04 |
| 11/29/2018 | Bought | 995 | 15.8286 |
| 12/7/2018 | Bought | 1,000 | 15.8958 |
| 12/10/2018 | Sold | 1,000 | 15.8724 |
| 12/10/2018 | Sold | 1,000 | 15.9019 |
| 12/10/2018 | Sold | 1,000 | 16.4316 |
| 12/11/2018 | Bought | 1,000 | 16.23 |
| 12/11/2018 | Sold | 1,000 | 16.3314 |
| 12/11/2018 | Bought | 1,000 | 15.7679 |
| 12/11/2018 | Sold | 1,000 | 15.8514 |
| 12/17/2018 | Bought | 1,000 | 13.2887 |
| 12/17/2018 | Sold | 511 | 12.9302 |
| 12/17/2018 | Sold | 489 | 12.9 |

# EXHIBIT C



55 Broadway, 10th Floor
New York, NY 10006
T:212-363-7500
F:212-363-7171
www.zlk.com

CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Kurt Voutaz, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. The transaction(s) in Bloom Energy Corporation which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20 day of April 2020.

Signed:

Name:  Kurt Voutaz

IP: 67.164.194.148

1

Kurt Voutaz
Transactions in Bloom Energy Corporation (BE)

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 7/27/2018 | Bought | 200 | 23.825 |
| 7/30/2018 | Bought | 700 | 23.8472 |
| 7/30/2018 | Bought | 300 | 23.84 |
| 7/30/2018 | Bought | 50 | 21.6878 |
| 9/17/2019 | Sold | 1,250 | 3.1979 |

# EXHIBIT D

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Scott Kline, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the Second Amended Complaint for Violations of the Federal Securities Laws and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction in Bloom Energy Corporation, which is the subject of this litigation as set forth in the complaint, is a purchase of 80 shares on July 26, 2018 at $24.80 per share.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

7. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 20 day of April 2020.

_____
Scott Kline

# EXHIBIT E

## CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Joel White, duly certify and say, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the second amended complaint and authorize its filing.

2. I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel in order to participate in this private action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. The transactions in Bloom Energy Corporation which are the subject of this litigation during the Class Period set forth in the second amended complaint are set forth in the Chart attached hereto.

5. Within the last 3 years, I have not served as a class representative in any securities case. On or about January 3, 2020, I sought to serve as lead plaintiff in the federal securities fraud class action entitled *Bolouri v. Bloom Energy, et al.*, No. 4:19-cv-07259-HSG (N.D. Cal.).

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 14th day of April, 2020.

Signed: _Joel White_

JOEL WHITE

Joel White
Transactions in Bloom Energy Corporation (BE)

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 06/06/19 | Bought | 100 | $10.0175 |
| 06/06/19 | Bought | 2,500 | $10.3400 |
| 06/06/19 | Bought | 400 | $10.0149 |
| 06/06/19 | Bought | 500 | $10.0623 |
| 06/06/19 | Bought | 500 | $10.2400 |
| 06/07/19 | Sold | 1,000 | $10.2854 |
| 06/07/19 | Sold | 1,000 | $10.2900 |
| 06/07/19 | Sold | 200 | $10.1761 |
| 06/07/19 | Sold | 2,000 | $10.1700 |
| 06/07/19 | Sold | 2,000 | $10.2830 |
| 06/07/19 | Sold | 300 | $10.1781 |
| 06/07/19 | Bought | 2,500 | $9.9899 |
| 06/12/19 | Bought | 1,000 | $10.5000 |
| 06/12/19 | Bought | 2,000 | $10.5000 |
| 06/13/19 | Sold | 1,500 | $10.6100 |
| 06/13/19 | Sold | 1,500 | $10.7100 |
| 06/14/19 | Sold | 1,000 | $11.1100 |
| 06/14/19 | Sold | 1,000 | $11.1223 |
| 06/14/19 | Sold | 1,000 | $11.1400 |
| 06/14/19 | Sold | 1,000 | $11.1600 |
| 06/14/19 | Sold | 1,000 | $11.1900 |
| 06/14/19 | Sold | 2,000 | $11.0770 |
| 06/14/19 | Bought | 1,000 | $10.8177 |
| 06/14/19 | Bought | 1,000 | $10.9200 |
| 06/14/19 | Bought | 1,000 | $10.9849 |
| 06/14/19 | Bought | 1,000 | $11.0900 |
| 06/14/19 | Bought | 200 | $10.8212 |
| 06/14/19 | Bought | 2,000 | $11.1641 |
| 06/14/19 | Bought | 800 | $10.8399 |
| 06/18/19 | Bought | 2,500 | $11.9999 |
| 06/18/19 | Bought | 500 | $12.0451 |
| 06/18/19 | Bought | 500 | $12.0300 |
| 06/18/19 | Sold | 500 | $11.9000 |
| 06/19/19 | Sold | 1,800 | $12.1400 |
| 06/19/19 | Sold | 200 | $12.1450 |
| 06/19/19 | Sold | 2,000 | $12.1163 |
| 06/19/19 | Bought | 1,000 | $11.7500 |
| 06/20/19 | Sold | 2,000 | $12.4500 |
| 06/20/19 | Bought | 1,000 | $11.9450 |
| 06/20/19 | Bought | 3,000 | $12.0000 |
| 06/21/19 | Bought | 1,000 | $12.2900 |
| 06/21/19 | Bought | 1,200 | $11.7871 |
| 06/21/19 | Bought | 2,000 | $12.0100 |
| 06/21/19 | Bought | 300 | $11.7835 |
| 06/21/19 | Bought | 500 | $11.7817 |
| 06/21/19 | Bought | 3,000 | $12.0000 |
| 06/21/19 | Bought | 2,000 | $11.9300 |
| 06/24/19 | Bought | 2,000 | $11.4400 |
| 06/24/19 | Bought | 700 | $11.7600 |
| 06/26/19 | Sold | 100 | $11.6900 |
| 06/26/19 | Sold | 100 | $11.8325 |
| 06/26/19 | Sold | 1,000 | $11.8836 |
| 06/26/19 | Sold | 1,400 | $11.6875 |
| 06/26/19 | Sold | 1,500 | $11.8336 |
| 06/26/19 | Sold | 19 | $11.8361 |
| 06/26/19 | Sold | 200 | $11.8310 |
| 06/26/19 | Sold | 2,000 | $11.8000 |
| 06/26/19 | Sold | 2,500 | $11.8000 |
| 06/26/19 | Sold | 269 | $11.8300 |
| 06/26/19 | Sold | 31 | $11.8332 |
| 06/26/19 | Sold | 800 | $11.8301 |
| 06/26/19 | Sold | 81 | $11.8347 |
| 06/26/19 | Sold | 2,000 | $11.8700 |
| 06/26/19 | Sold | 1,500 | $11.8000 |
| 06/26/19 | Sold | 500 | $11.8000 |
| 06/26/19 | Sold | 200 | $11.8000 |
| 06/26/19 | Sold | 100 | $11.7900 |
| 06/26/19 | Sold | 2,000 | $11.8200 |
| 06/26/19 | Bought | 1,500 | $11.6700 |
| 06/26/19 | Bought | 1,500 | $11.6900 |
| 06/27/19 | Bought | 3,000 | $11.8500 |
| 06/27/19 | Bought | 2,000 | $11.8500 |
| 06/27/19 | Bought | 1,500 | $11.6500 |
| 06/27/19 | Bought | 1,500 | $11.6100 |
| 06/27/19 | Bought | 1,000 | $11.5448 |
| 06/27/19 | Bought | 1,000 | $11.9000 |

| 06/27/19 | Bought | 1,000 | $11.9500 |
|---|---|---|---|
| 06/27/19 | Bought | 1,500 | $11.6076 |
| 06/27/19 | Bought | 2,000 | $11.8000 |
| 06/27/19 | Bought | 2,000 | $12.0100 |
| 06/28/19 | Sold | 2,000 | $12.0143 |
| 06/28/19 | Sold | 2,000 | $12.0200 |
| 06/28/19 | Sold | 2,000 | $12.0270 |
| 06/28/19 | Sold | 2,500 | $12.0000 |
| 06/28/19 | Bought | 42 | $11.8500 |
| 06/28/19 | Sold | 2,000 | $12.0200 |
| 06/28/19 | Sold | 100 | $12.1100 |
| 06/28/19 | Sold | 1,900 | $12.1000 |
| 06/28/19 | Sold | 2,000 | $12.0800 |
| 06/28/19 | Sold | 2,000 | $12.1100 |
| 07/01/19 | Sold | 1,000 | $12.7900 |
| 07/01/19 | Bought | 1,000 | $12.4500 |
| 07/01/19 | Bought | 1,000 | $12.5200 |
| 07/01/19 | Bought | 102 | $12.7000 |
| 07/01/19 | Bought | 200 | $12.6850 |
| 07/01/19 | Bought | 388 | $12.6625 |
| 07/01/19 | Bought | 618 | $12.7100 |
| 07/01/19 | Bought | 692 | $12.6600 |
| 07/01/19 | Bought | 958 | $12.5331 |
| 07/01/19 | Sold | 1,000 | $12.7402 |
| 07/01/19 | Bought | 800 | $12.6200 |
| 07/01/19 | Bought | 100 | $12.6100 |
| 07/01/19 | Bought | 100 | $12.6000 |
| 07/01/19 | Bought | 3,500 | $12.4500 |
| 07/02/19 | Bought | 1,500 | $12.4100 |
| 07/02/19 | Bought | 1,000 | $12.3500 |
| 07/02/19 | Bought | 900 | $12.3200 |
| 07/02/19 | Bought | 100 | $12.3100 |
| 07/02/19 | Bought | 3,000 | $12.2700 |
| 07/02/19 | Bought | 1,000 | $12.3400 |
| 07/02/19 | Bought | 1,500 | $12.6400 |
| 07/02/19 | Sold | 1,500 | $12.6303 |
| 07/02/19 | Sold | 1,500 | $12.6361 |
| 07/02/19 | Sold | 1,500 | $12.6440 |
| 07/02/19 | Sold | 1,500 | $12.6451 |
| 07/02/19 | Sold | 2,000 | $12.6300 |
| 07/02/19 | Sold | 2,000 | $12.6400 |
| 07/02/19 | Sold | 2,000 | $12.5500 |
| 07/02/19 | Sold | 1,500 | $12.6200 |
| 07/02/19 | Sold | 2,000 | $12.6300 |
| 07/02/19 | Sold | 500 | $12.6300 |
| 07/02/19 | Sold | 1,500 | $12.6500 |
| 07/02/19 | Bought | 1,000 | $12.2159 |
| 07/02/19 | Bought | 1,000 | $12.2956 |
| 07/02/19 | Bought | 1,000 | $12.3600 |
| 07/02/19 | Bought | 1,500 | $12.2235 |
| 07/02/19 | Bought | 1,500 | $12.2844 |
| 07/03/19 | Bought | 1,000 | $12.4200 |
| 07/03/19 | Bought | 1,000 | $12.4200 |
| 07/03/19 | Bought | 2,500 | $12.3700 |
| 07/03/19 | Bought | 500 | $12.3800 |
| 07/03/19 | Bought | 2,000 | $12.3800 |
| 07/03/19 | Bought | 1,000 | $12.4200 |
| 07/03/19 | Bought | 1,000 | $12.4600 |
| 07/03/19 | Bought | 1,000 | $12.5000 |
| 07/03/19 | Bought | 2,000 | $12.4000 |
| 07/03/19 | Bought | 2,500 | $12.4000 |
| 07/03/19 | Bought | 500 | $12.3977 |
| 07/05/19 | Sold | 2,500 | $12.7100 |
| 07/05/19 | Sold | 2,500 | $12.7800 |
| 07/05/19 | Sold | 5,000 | $12.8800 |
| 07/08/19 | Sold | 100 | $12.8511 |
| 07/08/19 | Sold | 1,400 | $12.8500 |
| 07/08/19 | Sold | 1,500 | $12.8100 |
| 07/08/19 | Sold | 1,500 | $12.8400 |
| 07/08/19 | Sold | 1,500 | $12.8736 |
| 07/08/19 | Sold | 2,200 | $12.9164 |
| 07/08/19 | Sold | 300 | $12.9112 |
| 07/08/19 | Sold | 3,000 | $12.7200 |
| 07/08/19 | Sold | 2,599 | $12.9400 |
| 07/08/19 | Sold | 1,462 | $12.9500 |
| 07/08/19 | Sold | 100 | $12.9500 |
| 07/08/19 | Sold | 300 | $12.9300 |
| 07/08/19 | Sold | 438 | $12.9300 |
| 07/08/19 | Sold | 200 | $12.9300 |
| 07/08/19 | Sold | 901 | $12.9000 |
| 07/08/19 | Sold | 100 | $12.9100 |

| Date | Type | Quantity | Price |
|---|---|---|---|
| 07/08/19 | Sold | 384 | $12.9100 |
| 07/08/19 | Sold | 100 | $12.9100 |
| 07/08/19 | Sold | 3 | $12.9100 |
| 07/08/19 | Sold | 10 | $12.9100 |
| 07/08/19 | Sold | 3 | $12.9100 |
| 07/08/19 | Sold | 230 | $12.9100 |
| 07/08/19 | Sold | 31 | $12.9100 |
| 07/08/19 | Sold | 100 | $12.9000 |
| 07/08/19 | Sold | 69 | $12.9000 |
| 07/08/19 | Sold | 370 | $12.9000 |
| 07/08/19 | Sold | 100 | $12.9000 |
| 07/08/19 | Sold | 1,000 | $12.9000 |
| 07/08/19 | Sold | 600 | $12.9200 |
| 07/08/19 | Sold | 200 | $12.9100 |
| 07/08/19 | Sold | 500 | $12.9100 |
| 07/08/19 | Sold | 200 | $12.9100 |
| 07/08/19 | Bought | 100 | $12.6100 |
| 07/08/19 | Bought | 1,000 | $12.4100 |
| 07/08/19 | Bought | 1,400 | $12.6199 |
| 07/08/19 | Bought | 1,500 | $12.4500 |
| 07/08/19 | Bought | 1,500 | $12.4900 |
| 07/08/19 | Bought | 1,500 | $12.6000 |
| 07/08/19 | Bought | 1,500 | $12.7199 |
| 07/08/19 | Bought | 3,000 | $12.5700 |
| 07/10/19 | Sold | 1,500 | $13.1200 |
| 07/10/19 | Bought | 1,500 | $13.0200 |
| 07/11/19 | Bought | 2,500 | $13.1200 |
| 07/11/19 | Bought | 2,500 | $13.1200 |
| 07/11/19 | Bought | 2,500 | $13.1100 |
| 07/11/19 | Bought | 2,500 | $13.1700 |
| 07/11/19 | Bought | 2,500 | $13.0100 |
| 07/11/19 | Bought | 1,200 | $12.9100 |
| 07/11/19 | Bought | 1,300 | $12.9000 |
| 07/11/19 | Bought | 2,500 | $12.8400 |
| 07/11/19 | Bought | 2,500 | $13.0150 |
| 07/11/19 | Bought | 2,500 | $13.0565 |
| 07/11/19 | Bought | 2,500 | $13.0607 |
| 07/11/19 | Bought | 2,500 | $13.1000 |
| 07/11/19 | Bought | 2,500 | $13.1161 |
| 07/12/19 | Sold | 100 | $13.0881 |
| 07/12/19 | Sold | 1,000 | $13.0861 |
| 07/12/19 | Sold | 1,000 | $13.1053 |
| 07/12/19 | Sold | 1,500 | $13.0700 |
| 07/12/19 | Sold | 1,500 | $13.0700 |
| 07/12/19 | Sold | 1,500 | $13.0711 |
| 07/12/19 | Sold | 1,500 | $13.0817 |
| 07/12/19 | Sold | 2,500 | $13.1241 |
| 07/12/19 | Sold | 3,500 | $13.0292 |
| 07/12/19 | Sold | 900 | $13.0822 |
| 07/12/19 | Sold | 700 | $13.0800 |
| 07/12/19 | Sold | 800 | $13.0800 |
| 07/12/19 | Sold | 677 | $13.0800 |
| 07/12/19 | Sold | 323 | $13.0700 |
| 07/12/19 | Sold | 90 | $13.0800 |
| 07/12/19 | Sold | 18 | $13.0700 |
| 07/12/19 | Sold | 100 | $13.0700 |
| 07/12/19 | Sold | 100 | $13.0700 |
| 07/12/19 | Sold | 100 | $13.0700 |
| 07/12/19 | Sold | 192 | $13.0700 |
| 07/12/19 | Sold | 900 | $13.0700 |
| 07/12/19 | Sold | 1,000 | $13.1200 |
| 07/12/19 | Sold | 600 | $13.1200 |
| 07/12/19 | Sold | 200 | $13.1200 |
| 07/12/19 | Sold | 1,700 | $13.1000 |
| 07/12/19 | Sold | 2,500 | $13.0900 |
| 07/12/19 | Sold | 1,000 | $13.1100 |
| 07/12/19 | Sold | 1,500 | $13.0700 |
| 07/15/19 | Bought | 1,500 | $13.0100 |
| 07/15/19 | Bought | 3,500 | $12.9600 |
| 07/15/19 | Bought | 2,000 | $12.9100 |
| 07/15/19 | Bought | 3,000 | $12.9200 |
| 07/15/19 | Bought | 2,000 | $12.7700 |
| 07/15/19 | Bought | 2,051 | $12.5900 |
| 07/15/19 | Bought | 100 | $12.5800 |
| 07/15/19 | Bought | 100 | $12.5800 |
| 07/15/19 | Bought | 100 | $12.5800 |
| 07/15/19 | Bought | 49 | $12.5800 |
| 07/15/19 | Bought | 51 | $12.5800 |
| 07/15/19 | Bought | 49 | $12.5700 |
| 07/15/19 | Bought | 500 | $12.5700 |
| 07/15/19 | Bought | 2,500 | $12.3300 |

| | | | |
|---|---|---|---|
| 07/15/19 | Bought | 2,500 | $12.3333 |
| 07/15/19 | Bought | 2,500 | $12.5499 |
| 07/15/19 | Bought | 2,500 | $12.8000 |
| 07/15/19 | Bought | 2,500 | $12.9100 |
| 07/18/19 | Bought | 1,395 | $11.3750 |
| 07/18/19 | Bought | 300 | $11.3800 |
| 07/18/19 | Bought | 305 | $11.4001 |
| 07/18/19 | Bought | 448 | $11.3799 |
| 07/18/19 | Bought | 52 | $11.3950 |
| 07/24/19 | Sold | 1,500 | $10.8941 |
| 07/26/19 | Sold | 100 | $10.7010 |
| 07/26/19 | Sold | 300 | $10.7001 |
| 07/26/19 | Sold | 600 | $10.7046 |
| 08/01/19 | Sold | 1,000 | $10.7601 |
| 08/01/19 | Sold | 1,000 | $10.7611 |
| 08/05/19 | Bought | 2,000 | $9.5716 |
| 08/05/19 | Bought | 2,000 | $9.8000 |
| 08/06/19 | Sold | 2,000 | $9.8200 |
| 08/06/19 | Bought | 2,000 | $9.6200 |
| 08/07/19 | Bought | 1,000 | $8.8028 |
| 08/07/19 | Bought | 2,000 | $9.0500 |
| 08/30/19 | Sold | 1,500 | $4.5502 |
| 09/04/19 | Sold | 100 | $4.5234 |
| 09/04/19 | Sold | 1,400 | $4.5238 |
| 09/05/19 | Sold | 1,000 | $4.5338 |
| 09/05/19 | Sold | 200 | $4.7000 |
| 09/05/19 | Sold | 800 | $4.7001 |
| 09/06/19 | Sold | 1,500 | $4.7400 |
| 09/06/19 | Sold | 200 | $4.7400 |
| 09/06/19 | Sold | 100 | $4.7400 |
| 09/06/19 | Sold | 394 | $4.7300 |
| 09/06/19 | Sold | 300 | $4.7300 |
| 09/06/19 | Sold | 6 | $4.7300 |
| 09/06/19 | Sold | 2,500 | $4.7400 |
| 09/11/19 | Sold | 1,500 | $5.1200 |
| 09/11/19 | Sold | 1,000 | $5.0000 |
| 09/11/19 | Sold | 1,000 | $5.0000 |
| 09/11/19 | Sold | 1,500 | $5.0811 |
| 09/16/19 | Sold | 1,000 | $4.5500 |
| 09/18/19 | Sold | 1,500 | $3.3300 |
| 09/18/19 | Sold | 1,500 | $3.3300 |
| 09/19/19 | Sold | 500 | $3.5200 |
| 09/19/19 | Sold | 1,000 | $3.5500 |
| 09/19/19 | Sold | 1,000 | $3.5085 |
| 09/19/19 | Sold | 1,000 | $3.5300 |
| 09/19/19 | Sold | 1,000 | $3.5600 |
| 09/19/19 | Sold | 1,000 | $3.7400 |
| 09/19/19 | Sold | 500 | $3.5234 |
| 09/25/19 | Sold | 1,000 | $3.4726 |
| 09/25/19 | Sold | 500 | $3.4755 |
| 09/25/19 | Sold | 1,000 | $3.4200 |
| 09/25/19 | Sold | 1,500 | $3.4300 |
| 09/27/19 | Sold | 2,000 | $3.6000 |
| 09/27/19 | Sold | 1,500 | $3.5900 |
| 09/27/19 | Sold | 2,500 | $3.5900 |
| 11/11/19 | Sold | 200 | $5.4678 |
| 11/11/19 | Sold | 100 | $5.4679 |
| 11/11/19 | Sold | 1,700 | $5.4611 |
| 11/11/19 | Sold | 400 | $5.4550 |
| 11/11/19 | Sold | 1,300 | $5.4501 |
| 11/11/19 | Sold | 300 | $5.4500 |
| 11/11/19 | Bought | 1,000 | $5.3700 |
| 11/11/19 | Bought | 100 | $5.3100 |
| 11/11/19 | Bought | 300 | $5.3000 |
| 11/11/19 | Bought | 100 | $5.2900 |
| 11/11/19 | Bought | 400 | $5.2899 |
| 11/11/19 | Bought | 100 | $5.2850 |
| 11/11/19 | Bought | 1,000 | $5.3850 |
| 11/11/19 | Bought | 500 | $5.0560 |
| 11/11/19 | Bought | 500 | $4.9900 |
| 11/12/19 | Bought | 1,400 | $5.4439 |
| 11/12/19 | Bought | 100 | $5.4400 |
| 11/12/19 | Bought | 1,000 | $5.4334 |
| 11/12/19 | Bought | 1,000 | $5.4550 |
| 11/12/19 | Bought | 100 | $5.4799 |
| 11/12/19 | Bought | 200 | $5.4796 |
| 11/12/19 | Bought | 1,200 | $5.4750 |
| 11/12/19 | Sold | 1 | $5.5550 |
| 11/12/19 | Sold | 899 | $5.5542 |
| 11/12/19 | Sold | 100 | $5.5540 |
| 11/12/19 | Sold | 1,000 | $5.6100 |

| | | | |
|---|---|---|---|
| 11/12/19 | Sold | 1,000 | $5.6250 |
| 11/12/19 | Sold | 1,000 | $5.6349 |
| 11/12/19 | Sold | 1,000 | $5.6050 |
| 11/13/19 | Sold | 1,000 | $5.2850 |
| 11/13/19 | Sold | 500 | $5.3157 |
| 11/13/19 | Sold | 500 | $5.3057 |
| 11/13/19 | Bought | 1,500 | $5.3551 |
| 11/13/19 | Bought | 1,000 | $5.3350 |
| 11/13/19 | Bought | 500 | $5.3168 |
| 11/13/19 | Bought | 1,000 | $5.3457 |
| 11/13/19 | Bought | 500 | $5.3050 |
| 11/13/19 | Bought | 500 | $5.2800 |
| 11/13/19 | Bought | 2,000 | $5.2000 |
| 11/14/19 | Bought | 1,000 | $5.0600 |
| 11/14/19 | Sold | 500 | $5.3260 |
| 11/14/19 | Sold | 500 | $5.4000 |
| 11/14/19 | Sold | 500 | $5.4961 |
| 11/14/19 | Sold | 500 | $5.4900 |
| 11/14/19 | Sold | 489 | $5.4961 |
| 11/14/19 | Sold | 11 | $5.4950 |
| 11/14/19 | Sold | 500 | $5.4880 |
| 11/14/19 | Sold | 500 | $5.5200 |
| 11/14/19 | Sold | 500 | $5.5058 |
| 11/14/19 | Sold | 1,000 | $5.4861 |
| 11/14/19 | Sold | 1,000 | $5.2600 |
| 11/18/19 | Sold | 1,000 | $6.7000 |
| 11/18/19 | Sold | 1,500 | $6.6950 |
| 11/18/19 | Bought | 1,500 | $6.4650 |
| 11/18/19 | Bought | 300 | $6.4800 |
| 11/18/19 | Bought | 400 | $6.4700 |
| 11/18/19 | Bought | 300 | $6.4700 |
| 11/18/19 | Bought | 1,000 | $6.6300 |
| 11/19/19 | Bought | 500 | $6.5100 |
| 11/19/19 | Bought | 500 | $6.4100 |
| 11/19/19 | Bought | 100 | $6.3400 |
| 11/19/19 | Bought | 200 | $6.3400 |
| 11/19/19 | Bought | 200 | $6.3300 |
| 11/19/19 | Bought | 1,000 | $6.6499 |
| 11/19/19 | Bought | 500 | $6.4800 |
| 11/20/19 | Bought | 500 | $6.2100 |
| 11/20/19 | Bought | 500 | $6.2000 |
| 11/20/16 | Bought | 500 | $6.2200 |
| 11/20/19 | Sold | 500 | $6.2200 |
| 11/20/19 | Sold | 500 | $6.2700 |
| 11/20/19 | Sold | 450 | $6.2800 |
| 11/20/19 | Sold | 50 | $6.2800 |
| 11/20/19 | Sold | 1,000 | $6.3300 |
| 11/20/19 | Sold | 500 | $6.3200 |
| 11/20/19 | Sold | 1,000 | $6.3700 |
| 11/20/19 | Bought | 500 | $6.2000 |
| 11/20/19 | Bought | 190 | $6.2500 |
| 11/20/19 | Bought | 810 | $6.2448 |
| 11/20/19 | Bought | 500 | $6.2240 |
| 11/20/19 | Bought | 500 | $6.1639 |
| 11/20/19 | Bought | 500 | $6.2140 |
| 11/20/19 | Bought | 500 | $6.1948 |
| 11/20/19 | Sold | 500 | $6.2800 |
| 11/20/19 | Sold | 250 | $6.3800 |
| 11/20/19 | Sold | 250 | $6.3335 |
| 11/20/19 | Sold | 1,000 | $6.3218 |
| 11/20/19 | Sold | 1,500 | $6.4452 |
| 11/20/19 | Sold | 600 | $6.4560 |
| 11/20/19 | Sold | 200 | $6.4550 |
| 11/20/19 | Sold | 700 | $6.4549 |
| 11/21/19 | Sold | 1,000 | $6.3800 |
| 11/21/19 | Bought | 500 | $6.2261 |
| 11/21/19 | Bought | 500 | $6.2148 |
| 11/21/19 | Bought | 500 | $6.2839 |
| 11/21/19 | Bought | 500 | $6.2900 |
| 11/21/19 | Bought | 500 | $6.2748 |
| 11/21/19 | Bought | 1,000 | $6.2200 |
| 11/21/19 | Bought | 500 | $6.2248 |
| 11/21/19 | Bought | 1,000 | $6.2200 |
| 11/21/19 | Bought | 500 | $6.1748 |
| 11/21/19 | Bought | 500 | $6.1737 |
| 11/22/19 | Sold | 1,000 | $6.3400 |
| 11/22/19 | Sold | 500 | $6.3126 |
| 11/22/19 | Sold | 500 | $6.2871 |
| 11/22/19 | Sold | 500 | $6.2652 |
| 11/22/19 | Sold | 500 | $6.2700 |
| 11/22/19 | Sold | 100 | $6.2536 |

| Date | Type | Quantity | Price |
|---|---|---|---|
| 11/22/19 | Sold | 900 | $6.2472 |
| 11/22/19 | Sold | 1,000 | $6.2752 |
| 11/25/19 | Sold | 1,500 | $6.2800 |
| 11/25/19 | Sold | 1,000 | $6.2952 |
| 11/25/19 | Sold | 300 | $6.3000 |
| 11/25/19 | Sold | 950 | $6.2900 |
| 11/25/19 | Sold | 300 | $6.2550 |
| 11/25/19 | Sold | 950 | $6.2549 |
| 11/25/19 | Bought | 2,000 | $6.1600 |
| 11/25/19 | Bought | 1,000 | $6.1623 |
| 11/25/19 | Bought | 1,000 | $6.0900 |
| 11/25/19 | Bought | 400 | $6.0564 |
| 11/25/19 | Bought | 600 | $6.0550 |
| 11/26/19 | Bought | 1,500 | $6.1900 |
| 11/26/19 | Bought | 1,000 | $6.1885 |
| 11/26/19 | Bought | 200 | $6.1900 |
| 11/26/19 | Bought | 800 | $6.1899 |
| 11/26/19 | Bought | 300 | $6.2099 |
| 11/26/19 | Bought | 700 | $6.2044 |
| 11/26/19 | Bought | 400 | $6.1999 |
| 11/26/19 | Bought | 100 | $6.1950 |
| 11/26/19 | Bought | 3,500 | $6.1500 |
| 11/26/19 | Sold | 500 | $6.2658 |
| 11/26/19 | Sold | 1,000 | $6.3058 |
| 11/26/19 | Sold | 1,000 | $6.3152 |
| 11/26/19 | Sold | 1,000 | $6.3400 |
| 11/26/19 | Sold | 1,000 | $6.3317 |
| 11/26/19 | Sold | 500 | $6.3252 |
| 11/26/19 | Sold | 500 | $6.3394 |
| 11/26/19 | Sold | 500 | $6.3352 |
| 11/26/19 | Sold | 1,000 | $6.2849 |
| 11/26/19 | Sold | 1,500 | $6.2824 |
| 11/27/19 | Sold | 1,034 | $6.2800 |
| 11/27/19 | Sold | 966 | $6.2700 |
| 11/27/19 | Sold | 100 | $6.2950 |
| 11/27/19 | Sold | 600 | $6.2900 |
| 11/27/19 | Sold | 1,300 | $6.2800 |
| 11/27/19 | Bought | 1,500 | $6.2787 |
| 11/27/19 | Bought | 500 | $6.2761 |
| 11/27/19 | Bought | 5 | $6.1982 |
| 11/27/19 | Bought | 800 | $6.1970 |
| 11/27/19 | Bought | 100 | $6.1930 |
| 11/27/19 | Bought | 95 | $6.4900 |
| 11/27/19 | Bought | 1,000 | $6.2148 |
| 12/02/19 | Bought | 1,500 | $6.3798 |
| 12/02/19 | Bought | 1,000 | $6.2888 |
| 12/02/19 | Bought | 1,000 | $6.2969 |
| 12/02/19 | Bought | 500 | $6.3044 |
| 12/03/19 | Bought | 1,000 | $6.1100 |
| 12/03/19 | Bought | 1,000 | $6.0262 |
| 12/06/19 | Sold | 1,000 | $5.4144 |
| 12/09/19 | Sold | 500 | $5.3445 |
| 12/09/19 | Sold | 500 | $5.3700 |
| 12/09/19 | Sold | 500 | $6.3759 |
| 12/09/19 | Sold | 400 | $5.3902 |
| 12/09/19 | Sold | 100 | $5.3901 |
| 12/09/19 | Sold | 500 | $5.3943 |
| 12/09/19 | Sold | 500 | $5.4000 |
| 12/09/19 | Sold | 500 | $5.3925 |
| 12/09/19 | Sold | 1,500 | $5.3861 |
| 12/10/19 | Sold | 1,000 | $5.3056 |
| 12/10/19 | Sold | 1,000 | $5.2956 |
| 12/10/19 | Bought | 1,000 | $5.2095 |
| 12/10/19 | Bought | 500 | $5.2344 |
| 12/10/19 | Bought | 500 | $5.2739 |
| 12/10/19 | Bought | 1,500 | $5.1852 |
| 12/10/19 | Bought | 500 | $5.1795 |
| 12/10/19 | Bought | 1,500 | $5.1582 |
| 12/10/19 | Bought | 500 | $5.1354 |
| 12/11/19 | Sold | 500 | $5.2753 |
| 12/11/19 | Sold | 2,000 | $5.3300 |
| 12/11/19 | Sold | 500 | $5.3343 |
| 12/11/19 | Sold | 1,000 | $5.3310 |
| 12/13/19 | Sold | 1,500 | $6.4930 |
| 12/13/19 | Bought | 1,500 | $6.1293 |
| 12/16/19 | Sold | 1,000 | $6.6600 |
| 12/16/19 | Sold | 1,000 | $6.7600 |
| 12/16/19 | Sold | 1,000 | $6.7600 |
| 12/16/19 | Sold | 1,000 | $6.8500 |
| 12/16/19 | Sold | 1,000 | $6.8200 |
| 12/16/19 | Bought | 1,000 | $6.6700 |

| Date | Action | Quantity | Price |
|---|---|---|---|
| 12/16/19 | Bought | 500 | $6.6750 |
| 12/16/19 | Bought | 200 | $6.6999 |
| 12/16/19 | Bought | 800 | $6.6950 |
| 12/16/19 | Bought | 1,000 | $6.6800 |
| 12/16/19 | Bought | 500 | $6.6500 |
| 12/16/19 | Bought | 500 | $6.6300 |
| 12/16/19 | Bought | 500 | $6.5800 |
| 12/16/19 | Bought | 500 | $6.4400 |
| 12/16/19 | Bought | 500 | $6.7200 |
| 12/16/19 | Bought | 500 | $6.6900 |
| 12/16/19 | Bought | 500 | $6.6400 |
| 12/16/19 | Bought | 500 | $6.6300 |
| 12/16/19 | Bought | 2,000 | $6.7000 |
| 12/16/19 | Bought | 500 | $6.6100 |
| 12/17/19 | Bought | 3 | $6.5500 |
| 12/17/19 | Bought | 100 | $6.5500 |
| 12/17/19 | Bought | 797 | $6.5500 |
| 12/17/19 | Bought | 100 | $6.5500 |
| 12/17/19 | Bought | 1,000 | $6.5600 |
| 12/17/19 | Bought | 500 | $6.7095 |
| 12/17/19 | Bought | 2,500 | $6.5500 |
| 12/17/19 | Bought | 1,000 | $6.5650 |
| 12/17/19 | Sold | 300 | $6.8156 |
| 12/17/19 | Sold | 100 | $6.8150 |
| 12/17/19 | Sold | 600 | $6.8149 |
| 12/17/19 | Sold | 1,500 | $6.8107 |
| 12/17/19 | Sold | 500 | $6.6700 |
| 12/17/19 | Sold | 1,000 | $6.7300 |
| 12/17/19 | Sold | 1,000 | $6.8100 |
| 12/18/19 | Sold | 500 | $6.7100 |
| 12/18/19 | Sold | 500 | $6.7500 |
| 12/18/19 | Sold | 1,000 | $6.7600 |
| 12/18/19 | Sold | 1,000 | $6.8101 |
| 12/18/19 | Sold | 1,000 | $6.8407 |
| 12/18/19 | Sold | 500 | $6.8056 |
| 12/18/19 | Sold | 20 | $6.8400 |
| 12/18/19 | Sold | 200 | $6.8150 |
| 12/18/19 | Sold | 300 | $6.8101 |
| 12/18/19 | Sold | 980 | $6.7724 |
| 12/19/19 | Bought | 1,500 | $7.0947 |
| 12/19/19 | Bought | 500 | $7.0550 |
| 12/19/19 | Bought | 1,500 | $6.9300 |
| 12/19/19 | Bought | 1,000 | $6.9435 |
| 12/19/19 | Bought | 500 | $6.7100 |
| 12/23/19 | Sold | 1,000 | $6.5162 |
| 12/23/19 | Sold | 1,000 | $6.5300 |
| 12/23/19 | Sold | 1,000 | $6.5362 |
| 12/23/19 | Sold | 1,000 | $6.5264 |
| 12/23/19 | Sold | 1,000 | $6.5262 |
| 01/29/20 | Bought | 1,500 | $8.3944 |
| 01/29/20 | Bought | 100 | $8.2500 |
| 01/30/20 | Bought | 400 | $8.2162 |
| 01/30/20 | Bought | 1,500 | $8.2265 |
| 01/30/20 | Sold | 1,000 | $8.4300 |
| 01/30/20 | Sold | 1,000 | $8.4400 |
| 01/30/20 | Sold | 500 | $8.2150 |
| 01/30/20 | Sold | 500 | $8.2348 |
| 01/30/20 | Sold | 500 | $8.2650 |
| 01/30/20 | Sold | 500 | $8.2240 |
| 01/30/20 | Sold | 500 | $8.2155 |
| 01/30/20 | Sold | 1,500 | $8.2149 |
| 01/30/20 | Bought | 826 | $8.2399 |
| 01/30/20 | Bought | 174 | $8.2350 |
| 01/30/20 | Bought | 1,000 | $8.1137 |
| 01/30/20 | Bought | 500 | $8.1051 |
| 01/31/20 | Bought | 2,500 | $8.0500 |
| 01/31/20 | Bought | 500 | $7.7650 |
| 01/31/20 | Bought | 500 | $7.7850 |
| 01/31/20 | Bought | 500 | $7.7354 |
| 02/03/20 | Bought | 1,500 | $8.0149 |
| 02/03/20 | Sold | 500 | $8.0350 |
| 02/03/20 | Sold | 500 | $8.0650 |
| 02/03/20 | Sold | 500 | $8.1500 |
| 02/03/20 | Sold | 500 | $8.1000 |
| 02/03/20 | Sold | 1,000 | $8.1500 |
| 02/03/20 | Sold | 1,000 | $8.1500 |
| 02/03/20 | Sold | 1,500 | $8.1214 |
| 02/04/20 | Sold | 750 | $9.3599 |
| 02/04/20 | Sold | 750 | $9.3200 |
| 02/04/20 | Sold | 200 | $9.2848 |
| 02/04/20 | Sold | 600 | $9.2801 |

| 02/04/20 | Sold | 200 | $9.2700 |
|---|---|---|---|
| 02/04/20 | Sold | 200 | $9.2800 |
| 02/04/20 | Sold | 800 | $9.2700 |
| 02/04/20 | Bought | 1,500 | $8.9898 |
| 02/04/20 | Bought | 1,500 | $9.1100 |
| 02/04/20 | Bought | 500 | $9.0850 |
| 02/05/20 | Bought | 3,000 | $9.1500 |
| 02/05/20 | Bought | 500 | $9.0700 |
| 02/05/20 | Sold | 500 | $9.3400 |
| 02/05/20 | Sold | 1,000 | $9.4000 |
| 02/05/20 | Sold | 500 | $9.4550 |
| 02/05/20 | Sold | 300 | $9.3713 |
| 02/05/20 | Sold | 200 | $9.3696 |
| 02/05/20 | Sold | 500 | $9.3296 |
| 02/05/20 | Sold | 500 | $9.3534 |
| 02/06/20 | Bought | 1,139 | $9.3700 |
| 02/07/20 | Sold | 1,500 | $9.8500 |
| 02/07/20 | Bought | 361 | $9.4100 |
| 02/12/20 | Bought | 1,000 | $9.2500 |
| 02/12/20 | Bought | 1,500 | $8.5000 |

# EXHIBIT F

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Andrew Austin, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the second amended complaint and authorize its filing.

2.  I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  The transactions in Bloom Energy Corporation which are the subject of this litigation during the Class Period set forth in the second amended complaint are set forth in the Chart attached hereto.

5.  Within the last 3 years, I have not served nor sought to serve as a class representative in any securities case.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 20th day of April, 2020.

Signed: _____

ANDREW AUSTIN

Andrew Austin

Transactions in Bloom Energy Corporation (BE)

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 08/06/18 | Bought | 50 | $29.8100 |

# EXHIBIT G

**CERTIFICATION OF PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS**

I, Ryan Fishman, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.  I have reviewed the second amended complaint and authorize its filing.

2.  I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel in order to participate in this private action.

3.  I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  The transactions in Bloom Energy Corporation which are the subject of this litigation during the Class Period set forth in the second amended complaint are set forth in the Chart attached hereto.

5.  Within the last 3 years, I have not served nor sought to serve as a class representative in any securities case.

6.  I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 20th day of April, 2020.

Signed:  _Ryan Fishman_
E544655D7ABF4E6...

RYAN FISHMAN

Ryan Fishman
Transactions in Bloom Energy Corporation (BE)

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 07/26/18 | Bought | 1,000 | $24.5100 |