1  Sara B. Brody (SBN 130222)
   sbrody@sidley.com
2  Sarah A. Hemmendinger (SBN 298659)
   shemmendinger@sidley.com
3  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
4  San Francisco, CA 94104
   Telephone: (415) 772-1200
5
6  Matthew J. Dolan (SBN 291150)
   mdolan@sidley.com
7  SIDLEY AUSTIN LLP
   1001 Page Mill Road, Building 1
8  Palo Alto, CA 94304
   Telephone: (650) 565-7000
9
   Robin Wechkin (admitted *pro hac vice*)
10 rwechkin@sidley.com
   SIDLEY AUSTIN LLP
11 1420 Fifth Avenue, Suite 1400
   Seattle, WA 98101
12 Telephone: (415) 439-1799

Charlene S. Shimada (SBN 91407)
charlene.shimada@morganlewis.com
Frank Kennamer (SBN 157844)
frank.kennamer@morganlewis.com
MORGAN, LEWIS & BOCKIUS LLP
One Market, Spear Street Tower
San Francisco, California  94105
Telephone: (415) 442-1000

*Attorneys for Defendants J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, KeyBanc Capital Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Cowen and Company, LLC, HSBC Securities (USA) Inc., Oppenheimer & Co. Inc., Raymond James & Associates, Inc. and Robert W. Baird & Co. Incorporated*

13 *Attorneys for Defendants Bloom Energy Corp.,*
   *KR Sridhar, Randy Furr, L. John Doerr, Scott*
   *Sandell, Eddy Zervignon, Colin L. Powell, Peter*
14 *Teti, Mary K. Bush and Kelly A. Ayotte*

15

16                    UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18 ELISSA M. ROBERTS, Individually and on
   Behalf of All Others Similarly Situated,
19
                                  Plaintiff,
20
            vs.
21
   BLOOM ENERGY CORPORATION, et al.,
22
                                  Defendants.
23

Lead Case No. 4:19-cv-02935-HSG

CLASS ACTION

**SECTION 11 DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

Honorable Haywood S. Gilliam, Jr.
Hearing Date:  October 15, 2020
Hearing Time: 2:00 p.m.
Oakland Courthouse, Courtroom 2, 4th Floor

24

25

26

27

28

1

2

### NOTICE OF MOTION AND MOTION TO DISMISS

### TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

3

4

5

Please take notice that on October 15, 2020, at 2:00 p.m., the Section 11 Defendants will and hereby do bring this motion before the Honorable Haywood S. Gilliam, Jr., Courtroom 2, Fourth Floor, Ronald V. Dellums Federal Building, 1301 Clay Street, Oakland, California, 94612.

6

The Section 11 Defendants filing this motion consist of:

7

- Bloom Energy Corporation (Bloom or the Company).

8

9

10

- Nine of Bloom's current or former officers or directors – KR Sridhar, Randy Furr, L. John Doerr, Scott Sandell, Eddy Zervignon, Colin L. Powell, Peter Teti, Mary K. Bush, and Kelly A. Ayotte (the Individual Defendants).

11

12

13

14

15

- The ten underwriters of Bloom's initial public offering – J.P. Morgan Securities LLC, Morgan Stanley & Co. LLC, Credit Suisse Securities (USA) LLC, KeyBanc Capital Markets Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Cowen and Company, LLC, HSBC Securities (USA) Inc., Oppenheimer & Co. Inc., Raymond James & Associates, Inc., and Robert W. Baird & Co. Incorporated (the Underwriter Defendants).[1]

16

17

18

19

As set forth in the attached memorandum, the Court should dismiss the claims against the Section 11 Defendants in their entirety under Federal Rule of Civil Procedure 12(b)(6) because Lead Plaintiff James Everett Hunt, together with other plaintiffs listed in the Second Amended Complaint (Plaintiffs), has failed to state a claim on which relief may be granted.[2]

20

21

22

23

Plaintiffs allege claims under Section 11 of the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77k. Plaintiffs fail, however, to plausibly identify any statement in Bloom's IPO Registration Statement that was materially false or misleading when made. Among other things, Plaintiffs challenge at least four categories of opinion statements but fail to comply with U.S. Supreme Court

24

25

26

27

[1] Plaintiffs name one additional party, PricewaterhouseCoopers LLP (PwC), in their Section 11 claim. PwC is filing a separate motion to dismiss and is not a signatory of this motion or the accompanying memorandum. Bloom and two of the Individual Defendants are also named in Plaintiffs' separately-pled Section 10(b) claim, which those three Defendants address in a separate motion and brief.

28

[2] Concurrently with their motions to dismiss, all Defendants are moving to strike from the Complaint references to all plaintiffs other than the court-appointed Lead Plaintiff.

and Ninth Circuit law governing challenges to opinion statements.

Plaintiffs also allege "controlling person" claims against each of the Individual Defendants under Section 15 of the 1933 Act, 15 U.S.C. §77(o).  These claims fail because Plaintiffs have not established primary violations under Section 11.

This motion is based on the attached memorandum, the Omnibus Request for Judicial Notice, the Omnibus Declaration of Robin Wechkin (to which are attached all exhibits for the briefs filed by the Section 11 Defendants, the Section 10(b) Defendants and PwC), and such argument as may be presented before or at the hearing in this matter.

## **Table of Contents**

I.    INTRODUCTION ........................................................................................................ 1

II.   BACKGROUND ......................................................................................................... 2

III.  DISCUSSION ............................................................................................................. 4

    A.   Plaintiffs Fail To State A Claim In Connection With "Construction Delays." .................... 5

    B.   Plaintiffs Fail To State A Claim Based On Purported Noncompliance With ASC 606. ..... 8

    C.   Plaintiffs Fail To State A Claim In Connection With Contingent Liabilities. .................... 9

    D.   Plaintiffs Fail To State A Claim On The Basis Of Bloom's Estimates Of Fuel Cell Life............................................................................................................. 13

    E.   Plaintiffs Fail To State A Claim Based On Bloom's Accounting For Its Managed Services Agreements. ........................................................................... 15

    F.   Plaintiffs Fail To State A Claim Based On Bloom's Statement That It Had Not Discovered Internal Control Weaknesses As Of December 31, 2017. ........................... 22

    G.   Plaintiffs Fail To State A Claim On The Basis Of Challenged Statements About Efficiency and Emissions. ............................................................................... 23

IV.   CONCLUSION ......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Decisions**

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
 2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ............................................................................18

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ....................................................................................................................7

*In re Bare Escentuals, Inc. Sec. Litig.*,
 745 F. Supp. 2d 1052 (N.D. Cal. 2010) ....................................................................................25

*Bell Atl. Corp. v. Twombly*,
 550 U.S. 544 (2007) ................................................................................................................4-5

*Brown v. Ambow Educ. Holding Ltd.*,
 2014 WL 523166 (C.D. Cal. Feb. 6, 2014) ..............................................................................15

*C.D.T.S. v. UBS AG*,
 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir. 2015) ...................23

*Chapman v. Mueller Water Products, Inc.*,
 2020 WL 3100243 (S.D.N.Y. June 11, 2020) ..........................................................................10

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*,
 856 F.3d 605 (9th Cir. 2017) .............................................................................10, 11, 14, 15

*In re Coty Inc. Sec. Litig.*,
 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...........................................................................7

*In re Donald J. Trump Casino Sec. Litig.*,
 793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (3d Cir. 1993)..................................................8

*Fait v. Regions Fin. Corp.*,
 655 F.3d 105 (2d Cir. 2011)......................................................................................................10

*In re Fannie Mae 2008 Sec. Litig.*,
 742 F. Supp. 2d 382 (S.D.N.Y. 2010).......................................................................................13

*Fogel v. Vega*,
 759 F. App'x 18 (2d Cir. 2018) ................................................................................................22

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
 897 F. Supp. 2d 168 (S.D.N.Y. 2012) *aff'd*, 543 Fed. Appx 72 (2nd Cir. 2013) ...................13, 18

*In re Lone Pine Resources, Inc.*,
 2014 WL 1259653 (S.D.N.Y. Mar. 27, 2014) ..........................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ................................................................................................ *passim*

*Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc.*,
   774 F.3d 598 (9th Cir. 2014) ................................................................................................ 10

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................................... 23

*Shalala v. Guernsey Mem'l Hosp.*,
   514 U.S. 87 (1995) ................................................................................................................. 10

*In re Software Toolworks Inc. Sec. Litig.*,
   50 F.3d 615 (9th Cir. 1994) ................................................................................................... 17

*In re State St. Bank & Trust Co. Fixed Income Funds Inv. Litig.*,
   774 F. Supp. 2d 584 (S.D.N.Y. 2011) ................................................................................... 15

*Tabak v. Canadian Solar Inc.*,
   549 F. App'x 24 (2d Cir. 2013) ............................................................................................. 21

*Thor Power Tool Co. v. Comm'r*,
   439 U.S. 522 (1979) ............................................................................................................ 9, 10

*In re Velti PLC Sec. Litig.*,
   2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ..................................................................... 10, 11

*In re Verifone Sec. Litig.*,
   11 F.3d 865 (9th Cir. 1993) ..................................................................................................... 6

*In re Worlds of Wonder Sec. Litig.*,
   35 F. 3d 1407 (9th Cir. 1994) .................................................................................................. 4

*Xu v. Gridsum Holdings, Inc.*,
   2020 WL 1508748 (S.D.N.Y. Mar. 30, 2020) ...................................................................... 21

**Statutes**

15 U.S.C. § 77(b)(a) .................................................................................................................. 8

15 U.S.C. § 77g(a) ..................................................................................................................... 8

15 U.S.C. § 77k (Section 11 of the Securities Act of 1933) ............................................ *passim*

15 U.S.C. §77(o) (Section 15 of the Securities Act of 1933) ........................................... ii, 25

H.R. 3606, 112th Cong. § 101 (2012) (JOBS Act) ................................................................... 8

v

**Rules and Regulations**

17 CFR § 229.303(a)(3)(ii) ...................................................................................................7

17 CFR § 229.308 .................................................................................................................22

Fed. R. Civ. Proc. 12(b)(6) ............................................................................................... i, 4

**Other Authorities**

ASC 450-20-25-2 ...................................................................................................................11

ASC 605-10-S99 ...................................................................................................................12

ASC 840 *et seq.*...............................................................................................................18, 19

Financial Accounting Standards Board, *Statement of Financial Accounting Concepts
   No. 2* (2008) .............................................................................................................20, 21

Financial Accounting Standards Board, *Statement of Financial Accounting Concepts
   No. 5* (2008) .....................................................................................................................12

Division of Corporation Finance Financial Reporting Manual, Topic § 11100 ...................8

SEC Staff Accounting Bulletin No. 108,
   71 Fed. Reg. 54,580, 54,582 (Sept. 18, 2006) ..............................................................16

SEC Staff Accounting Bulletin No. 99,
   64 Fed. Reg. 45,150-01 (Aug. 19, 1999) (17 C.F.R. Part 211, Subpt. B)...............19, 20

# I.     INTRODUCTION

Bloom manufactures solid-oxide fuel cells that provide customers with an alternative to accessing energy from the grid.  Bloom's primary product is the Energy Server, which converts natural gas or biogas into electricity without combustion, resulting in lower emissions than conventional fossil fuel generation.  Bloom held its IPO on July 25, 2018, and Plaintiffs now challenge, under Section 11 of the 1933 Act, seven categories of statements in the Company's IPO Registration Statement.  Plaintiffs' burden is to plausibly allege that those statements were materially false or misleading when made.  Plaintiffs fail entirely to carry their burden.  In every instance, Plaintiffs' allegations are based on events post-dating the IPO.  In no instance have Plaintiffs shown that those events reveal that any challenged statement was materially false or misleading.

Plaintiffs begin with a development from November 2018, four months after the IPO.  In August 2018, Bloom had issued third-quarter guidance of 215 to 235 "acceptances," which signify that an Energy Server is fully installed and generating power.  Bloom announced a small miss in November 2018 – 206 acceptances.  Plaintiffs do not challenge Bloom's August 2018 guidance, which was not part of the Registration Statement.  Instead, they challenge Bloom's *warning* that factors beyond its control could cause construction delays.  This is backwards.  The challenged statement did not conceal the risk of missed guidance; it explicitly alerted investors to that risk.

Plaintiffs next invoke a September 2019 critique of Bloom's business and prospects issued by a short seller – an investor motivated to drive Bloom's stock price down. Plaintiffs copy the short seller's critique, claiming that it demonstrates the falsity of Bloom's stated opinions about fuel cell lifespan and contingent liability related to service contracts.  Yet Plaintiffs fail entirely to plead the facts required to challenge opinion statements under controlling law – facts showing that Defendants either *subjectively disbelieved* their opinions or *omitted material facts about the bases* for those opinions.  Plaintiffs explicitly disavow any allegation related to Defendants' subjective beliefs and say nothing at all about the bases for the challenged opinions.

Plaintiffs further seek to capitalize on events post-dating Bloom's IPO by more than 18 months.  In February 2020, Bloom reported that its auditor, PwC, had for the first time raised concerns about the Company's accounting for its Managed Services program, in which Bloom's

1

customers obtain Energy Servers through the participation of a bank financing party.  PwC had previously agreed with Bloom that these transactions should be accounted for as sales, but for the first time in late 2019 and early 2020 raised the issue whether they should instead be treated as loans. This change had the effect of moving certain revenue into later periods, but did not affect the overall amount of revenue Bloom recognizes, and had no impact on cash.  Critically, the change had no material impact at all on Bloom's financial statements for 2016, 2017 and the first quarter of 2018 – which are the only periods reported in the Registration Statement.  Bloom has issued a *revision* of its financial statements for those periods, but revisions – as opposed to restatements – are used to correct immaterial errors.  Bloom has restated its financial statements for the second quarter of 2018 through the third quarter of 2019, but those periods were not reported in the Registration Statement.

Plaintiffs nevertheless claim that the financial statements in the Registration Statement were materially false or misleading.  That claim fails both on materiality grounds and because accounting judgments and interpretations have long been recognized as opinion statements about which companies and auditors may reach a range of permissible conclusions.  Indeed, this case provides an exceptionally clear illustration of the concept:  The same auditor, reviewing the same contracts, reached two different conclusions in two successive years.

Plaintiffs finally challenge statements about the cleanness and efficiency of Bloom's Energy Servers.  In seeking to show that these statements were false or misleading, Plaintiffs rely on obvious apples-to-oranges comparisons between older and newer products and on a lawsuit in which Bloom *prevailed* against the City of Santa Clara by showing that its Energy Servers produce lower emissions than the available alternatives.  None of this amounts to a plausible claim of falsity.

In its Registration Statement, Bloom carefully and comprehensively described its business, including the risks associated with its evolving technology.  Plaintiffs' effort to read subsequent events backwards to the time of the IPO does not plausibly show that any challenged statement was materially false or misleading when made.  The Court should accordingly dismiss Plaintiffs' claims against the Section 11 Defendants in their entirety.

## II.   BACKGROUND

Bloom's Energy Servers provide customers with an alternative to drawing energy from the

grid. ¶ 41.[3]  Bloom generates revenue in three principal ways:  by selling the Energy Servers, by installing the Energy Servers at a customer's location and by providing maintenance after the Energy Servers are installed.  Bloom's customers have multiple options in accessing Energy Server technology.  They can purchase Energy Servers outright, lease the Servers from a bank financing party or pay for power without buying the Servers themselves.  ¶¶ 42-43.

Bloom's IPO took place on July 25, 2018, at $15 per share.  In connection with the IPO, Bloom filed a Registration Statement and Prospectus describing its business and finances in detail and including copious risk disclosures.  Among other things, Bloom warned investors that

- The Company's servicing business had never been profitable, although Bloom believed that this would change as it produced newer-generation fuel cells with extended lifespans.  Ex. 1 at 61.
- Older-generation fuel cells and Energy Servers would continue to burden the Company with expenses if customers chose to renew their service contracts, in which Bloom made various efficiency and performance guarantees.  ¶ 70.
- Bloom's estimates of Energy Server and fuel cell lifespans might prove to be incorrect, which would lead to additional expense.  Ex. 1 at 22-23.
- In 2015, the Company had decommissioned a group of early-generation Energy Servers, which had had a significant impact on revenue.  ¶ 71.
- With respect to its installation business, many factors outside Bloom's control could cause construction delays, from permitting issues to weather to customer financing needs.  ¶ 53; Ex. 1 at 26-27.

On August 7, 2018, Bloom provided guidance for the third quarter of 2018, projecting between 215 and 235 acceptances.  Ex. 2, Shareholder Letter at 16.  Three months later, on November 5, 2018, Bloom reported third-quarter results, including 206 acceptances – its highest quarterly number to date, but slightly off the low end of guidance.  Ex. 5, Shareholder Letter at 2.

That miss was the catalyst for securities litigation, both here and in state court.  The first putative class action was filed in Santa Clara County Superior Court on March 20, 2019, asserting claims under Section 11 of the 1933 Act against the Section 11 Defendants.  A similar class action complaint was filed in this Court on May 28, 2019 against Bloom and its officers and directors. Dkt. No. 1.  Following lead plaintiff proceedings, the Court on September 3, 2019, appointed James Everett Hunt lead plaintiff and Levi & Korsinsky lead counsel.  Dkt. No. 39.  Meanwhile, the state-court action has been stayed pending a ruling on the pleading motions in this case.

---

[3] All "¶ _" citations refer to paragraphs in the Second Amended Complaint, Dkt. No. 113.   All "Ex. _" citations refer to exhibits to the concurrently-filed Omnibus Declaration of Robin Wechkin.

On September 17, 2019, an entity called Hindenburg Research issued a critique of Bloom's business. Hindenburg holds a short position in Bloom's stock, which gives it an incentive to drive the stock price down. Ex. 21 at 59. The Hindenburg authors projected that Bloom's service business would be massively unprofitable in the future, as the Company fulfills obligations under future service contracts. The authors disputed Bloom's estimate that its newer-generation fuel cells have a five-year lifespan, projecting instead a lifespan of less than three years. The authors also claimed that the Energy Servers are neither efficient nor clean. Hunt incorporated these critiques into an amended complaint filed November 4, 2019 and has incorporated it again into the current complaint. ¶¶ 72-77, 96-103.

Hunt alleged a Section 11 claim against the Underwriter Defendants for the first time in his November 4, 2019 complaint and repeats the claim in the current complaint. Plaintiffs make only scant and generic allegations about the Underwriter Defendants' role in Bloom's IPO and do not allege that these defendants were involved in preparing Bloom's financial statements. Underwriters are not required to duplicate the work of auditors or conduct an independent investigation into expert accounting matters. 15 U.S.C. § 77k(b)(3)(C); *see also In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1421 (9th Cir. 1994). Plaintiffs also make no post-IPO allegations about the Underwriter Defendants.

On February 12, 2020 Bloom announced that it would shortly (1) restate its financial statements for the second quarter of 2018 through the third quarter of 2019, and (2) revise its financial statements for 2016, 2017 and the first quarter of 2018, which are the only periods reported in the Registration Statement. ¶ 400; *see also* Ex. 13. Bloom explained that PwC had for the first time raised concerns about the accounting for Bloom's Managed Services transactions – accounting that PwC had previously considered and agreed was appropriate. *Id.* On March 31, 2020, Bloom issued its 2019 Form 10-K, which includes the revised and restated financial statements. Ex. 12 at 164-212. The current complaint followed on April 21, 2020.

## III.   DISCUSSION

Under Rule 12(b)(6), a complaint must be dismissed if plaintiffs cannot plausibly state a claim on which relief may be granted. "[A] plaintiff's obligation to provide the grounds of his

1    entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

2    elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

3    (internal quotation marks omitted).  "Factual allegations must be enough to raise a right to relief

4    above the speculative level." *Id.* (citations omitted).  In addition to this general pleading standard,

5    special requirements apply to Plaintiffs' challenges to opinion statements – which include most of

6    the statements challenged here.  We discuss these requirements further below.

7        **A.      Plaintiffs Fail To State A Claim In Connection With "Construction Delays."**

8        Plaintiffs first challenge Bloom's warning to investors that its construction business is subject

9    to unpredictable delays.  ¶¶ 53-62.  Bloom cautioned investors that the process leading to acceptance

10   is lengthy, running to 12 months or more.  Ex. 1 at 26-27.  The process is also highly complex,

11   which makes the timing of acceptance difficult to predict:

12           Many factors can cause a lag between the time that a customer signs a purchase order and our
             recognition of product revenue.  These factors include the number of Energy Servers
13           installed per site, local permitting and utility requirements, environmental, health and safety
             requirements, weather and customer facility construction schedules.  Many of these factors
14           are unpredictable and their resolution is often outside of our or our customers' control.
             Customers may also ask us to delay an installation for reasons unrelated to the foregoing,
15           including delays in their obtaining financing.  Further, due to unexpected delays,
             deployments may require unanticipated expenses . . . . These unexpected delays and expenses
16           can be exacerbated in periods in which we deliver and install a larger number of smaller
             products.

17   ¶ 53; Ex. 1 at 94.

18       Following its IPO, Bloom provided third-quarter guidance, including 215 to 235 acceptances.

19   ¶ 59.  On November 5, 2018, Bloom reported a narrow miss:  206 third-quarter acceptances, less

20   than five percent off the low end of the range.  *Id.*  Bloom attributed the miss to construction delays,

21   including delays caused by extreme weather events – hurricanes in the East and fires in California.

22   Ex. 3 at 6, 8.  Such delays are virtually impossible to predict.

23       Notwithstanding these delays, 206 acceptances was Bloom's highest quarterly figure to date;

24   it exceeded by 40 percent the number of acceptances Bloom had received in the third quarter of

25   2017.  Ex. 5, Shareholder Letter at 2, 8.  Significantly, Bloom also exceeded analysts' consensus

26   projection for third-quarter *earnings*:  The slight miss on acceptances was offset by higher than

27   anticipated sales prices.  Ex. 23 at 1.  Analysts noted that the demand for Bloom's Energy Servers

28   remained strong and that its fundamentals were intact.  Ex. 23 at 2; ¶ 60.  This was confirmed in the

5

fourth quarter of 2018, when Bloom reported 257 acceptances – another record high.  Ex. 7 at 3.

From these events, Plaintiffs claim that statements in Bloom's July 2018 Registration Statement were materially false or misleading.  Plaintiffs single out the very statements in which the Company warned investors that various factors could delay the processes of installation and acceptance, making timing difficult to predict.  ¶ 53; Ex. 1 at 94.  According to Plaintiffs, these statements were misleading because Bloom purportedly "did not disclose that . . . at the time of the Registration Statement, [it was] already facing significant construction delays that were interfering with its installations and 'acceptances.'" ¶ 54.

This is baffling.  Fairly read, the Registration Statement plainly *did* tell investors that installation delays and the difficulty in predicting the timing of acceptances were ongoing features of its business.  Bloom warned investors that "[m]any factors can cause a lag" in the process leading to acceptance and that "[m]any of these factors are unpredictable."  ¶ 53.  More generally, Bloom noted that "[o]nce a customer makes a formal decision to purchase our product, the fulfillment of the sales order by us requires a substantial amount of time," and that "[t]his lengthy sales and installation cycle is subject to a number of risks over which we have little or no control."  Ex. 1 at 26-27.  Any reasonable investor reading these risk warnings would conclude that Bloom had already experienced and would continue to experience construction delays.

Plaintiffs nevertheless claim that Bloom's risk warnings about the acceptance process were misleading, citing the fact Bloom missed its third-quarter guidance. ¶ 54.  But Plaintiffs do not and could not challenge the guidance, which lies outside the four corners of the Registration Statement and hence is not actionable under Section 11.  15 U.S.C. § 77k.  In any event, Bloom cannot be faulted for failing to disclose or predict in July 2018 the results of a quarter that did not end until September 30, 2018.  *See, e.g., In re Verifone Sec. Litig.*, 11 F.3d 865, 869 (9th Cir. 1993).

Other than seeking to read these later results backwards to the time of the IPO, Plaintiffs' only basis for challenging Bloom's risk warnings comes from an account purportedly furnished by Plaintiffs' sole confidential witness, CW1.  ¶¶ 55-58.  Plaintiffs attribute to this witness the view that "construction delays were a constant issue at Bloom Energy," and that "upper management, all the way up to [CEO] Sridhar, typically became aware right away."  ¶¶ 55-57.

1    These allegations do not establish, even as a pleading matter, that the challenged statements

2 were materially false or misleading.  Conclusory or speculative allegations attributed to a

3 confidential witness cannot support a Section 11 claim.  *See, e.g., In re Coty Inc. Sec. Litig.*, 2016

4 WL 1271065, at *6 (S.D.N.Y. Mar. 29, 2016) (collecting authorities).  Even outside the heightened

5 pleading standards of the Private Securities Litigation Reform Act, securities plaintiffs must allege

6 facts that give rise to a plausible claim for relief, a standard governed by "judicial experience and

7 common sense."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Plaintiffs' allegations affirmatively

8 show that CW1's purported account can only be the product of speculation:  Plaintiffs admit that

9 CW1 left Bloom in February 2018, five months before the IPO.  ¶ 55.  Plaintiffs claim that CW1 has

10 "stated that the construction delays were occurring at Bloom Energy before he started working there

11 in June 2016, and continued after he left in February 2018," but this only underscores the speculative

12 nature of CW1's account.  ¶ 56.  Plaintiffs plead no facts showing that CW1 had a basis for reaching

13 conclusions about which he can have had no personal knowledge.  Plaintiffs' deficient CW

14 allegations do not show that the challenged statements – in which, again, Bloom *disclosed* that many

15 factors can delay acceptance and make predictions difficult – were materially false or misleading.

16    Plaintiffs finally claim that Bloom violated Item 303 of Regulation S-K, and in particular the

17 requirement that issuers "[d]escribe any known trends or uncertainties that have had or that the

18 registrant reasonably expects will have a material favorable or unfavorable impact on net sales or

19 revenues or income from continuing operations."  17 CFR § 229.303(a)(3)(ii); ¶¶ 61-62.  Plaintiffs

20 are clutching at straws.  Construction delays did *not* have a material impact on Bloom's third-quarter

21 2018 net revenue or income; as analysts pointed out, the slight miss on the number of acceptances

22 was more than offset by an increase in purchase price, leading to earnings that exceeded analysts'

23 consensus estimate for the third quarter.  Ex. 23 at 1.  Plaintiffs suggest that third-quarter delays

24 were "especially" significant in light of seasonal factors, since construction activity may slow with

25 the end-of-the-year holidays in the fourth quarter.  ¶ 62.  But Bloom's fourth-quarter results – 257

26 acceptances, the most to date – show that this is meritless.  Ex. 7 at 3.

27    Plaintiffs' Item 303 challenge also fails for a more basic reason.  The provision on which

28 Plaintiffs rely requires issuers to report "trends and uncertainties," and Plaintiffs claim that

7

1    construction delays presented an "uncertainty."  ¶ 62.  But Bloom *did* disclose an uncertainty.  The

2    Company warned investors that many of the factors bearing on the timing of installation and

3    acceptance are unpredictable and represent risks the Company cannot control.  It is difficult to think

4    of a clearer illustration of an "uncertainty."  *See, e.g., In re Donald J. Trump Casino Sec. Litig.*, 793

5    F. Supp. 543, 558 (D.N.J. 1992) (rejecting allegation that issuer failed to disclose "known . . .

6    uncertainties" about its ability to service debt where prospectus repeatedly warned of uncertainty on

7    this issue), *aff'd*, 7 F.3d 357 (3d Cir. 1993).  Bloom's discussion of construction delays in the

8    Registration Statement fully complied with Item 303.

9          **B.    Plaintiffs Fail To State A Claim Based On Purported Noncompliance With ASC**
10               **606.**

11         Plaintiffs next contend that Bloom "made a false and self-serving claim" in describing the

12   applicability and effective date of new accounting guidance issued by the Financial Accounting

13   Standards Board in 2014.  ¶ 78.  The new guidance, ASC 606, amends principles governing the

14   recognition of contract-based revenue.  Plaintiffs contend that the effective date of ASC 606 for all

15   public companies was December 15, 2017, and that Bloom "improperly delayed adopting the new

16   revenue recognition guidelines until the fourth quarter 2019."  ¶ 80.

17         This claim borders on the frivolous.  With the 2012 JOBS Act, Congress created a new

18   category of public securities issuers – Emerging Growth Companies, or EGCs.  H.R. 3606, 112th

19   Cong. § 101 (2012).  EGCs are issuers whose annual gross revenue is less than $1.07 billion.  *Id.*; 15

20   U.S.C. § 77(b)(a).  Bloom fit within that category at the time of the IPO and throughout the

21   purported class period.  Ex. 12 at 43 (showing annual gross revenue of less than $1 billion every year

22   from 2016 through 2019).  The JOBS Act lessens certain financial reporting burdens on EGCs by

23   providing that EGCs "may not be required to comply with *any new or revised financial accounting*

24   *standard* until such date that a company that is not an issuer . . . is required to comply with such new

25   or revised accounting standard." 15 U.S.C. § 77g(a) (emphasis added).  In other words, EGCs are

26   permitted to adopt new or revised accounting standards on the same schedule as private companies.

27         The SEC has confirmed the application of this provision of the JOBS Act to ASC 606 in

28   particular.  The Division of Corporation Finance Financial Reporting Manual provides that EGCs

1   need not apply ASC 606 to any annual reporting period before 2019.  Ex. 19, Topic 11 § 11100.

2   Bloom timely adopted ASC 606 for in its 2019 Form 10-K.  *E.g.*, Ex. 12 at 6, 44 n.1, 59.  Plaintiffs'

3   claim that this was improper is baseless.

### C.   Plaintiffs Fail To State A Claim In Connection With Contingent Liabilities.

5   Plaintiffs next claim that Bloom failed to follow GAAP in accounting for contingent

6   liabilities related to its service contracts.  ¶¶ 63-74.[4]  When Bloom provides an Energy Server to a

7   customer, it typically includes a one-year warranty and performance guarantee.  ¶ 63.  At the end of

8   the one-year term, customers may – and virtually always do – renew their service contracts for

9   additional successive one-year terms.  *Id.*  Bloom recognizes services revenue on these one-year

10  contracts ratably over the course of the one-year contract term.  Ex. 1 at 97.  Bloom records costs

11  associated with the contracts in one of two ways.  If Bloom estimates a loss on the one-year contract,

12  it expenses the estimated loss value at the time of contract renewal.  *See, e.g.*, ¶ 382.  If Bloom

13  estimates a profit on the one-year contract, it expenses costs as incurred within that period.  *Id.*

14  Bloom's accounting for costs on service contracts has passed muster both through PwC's yearly

15  audits and through the comprehensive restatement process.  Only Plaintiffs in this case have ever

16  suggested that this accounting violates GAAP.  Plaintiffs' theory is that GAAP requires Bloom to

17  estimate and record contingent liabilities related to service contracts *beyond* their one-year term, for

18  an unspecified number of years in the future.  Plaintiffs claim that if these costs had been "booked,"

19  Bloom would have shown net liabilities of $1.7 billion related to its service contracts.  ¶ 64.

20  GAAP-based claims that turn on accounting judgments are analyzed as challenges to opinion

21  statements.  "Accountants long have recognized that 'generally accepted accounting principles' are

22  far from being a canonical set of rules that will ensure identical accounting treatment of identical

23  transactions.  'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable'

24  treatments leaving the choice among alternatives to management."  *Thor Power Tool Co. v. Comm'r*,

---

26  [4]  Bloom's service contracts are in some public filings referred to as Maintenance Service
27  Agreements, which is sometimes shortened to "MSAs."  *See, e.g.*, ¶ 63.  Because "MSA" is also at
     times used to refer to Bloom's Managed Services Agreements, we refer to the Maintenance Service
     Agreements as "service contracts" hereafter to avoid the risk of confusing Maintenance Service
28   Agreements with Managed Services Agreements.  We discuss Plaintiffs' challenge to Bloom's
     accounting for its Managed Services Agreements below at pages 16-22

439 U.S. 522, 544 (1979) (internal citations omitted).  Likewise, "[f]inancial accounting is not a science.  It addresses many questions as to which the answers are uncertain and is a process that involves continuous judgments and estimates." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995) (internal citation and notations omitted); *see also, e.g., Oregon Pub. Emps. Ret. Fund v. Apollo Group Inc*., 774 F.3d 598, 609 (9th Cir. 2014) (citing *Thor Power Tool*).

Because statements in a company's financial reports that reflect accounting judgments are opinion statements, they are analyzed under the framework established by the Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015).  *E.g., City of Dearborn Heights Act 345 Police & Fire Ret. Sys v. Align Tech., Inc.*, 856 F.3d 605, 610-13 (9th Cir. 2017) (statements related to goodwill valuation are opinion statements); *see also, e.g., Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110-13 (2d Cir. 2011) (where financial statements "depend[ ] on the particular methodology and assumptions used," they are "subjective" opinions that "do not involve misstatements or omissions of material fact") (citations omitted); *Chapman v. Mueller Water Prods., Inc.*, 2020 WL 3100243, at *10 (S.D.N.Y. June 11, 2020) (same; dismissing challenge to company's statement about warranty reserves under *Omnicare*).

*Omnicare* gives Section 11 plaintiffs two possible ways to challenge opinion statements.  First, under a false statement theory, plaintiffs may show that a speaker did not subjectively believe the stated opinion.  575 U.S. at 186.   That method is unavailable here:  Plaintiffs have disavowed "any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct."  ¶ 49.  As a pleading matter, that is dispositive.  *Omnicare*, 575 U.S. at 186 (plaintiffs cannot assert a false statement challenge to an opinion statement where their complaint "explicitly excludes and disclaims any allegation sounding in fraud or deception") (internal quotation marks omitted); *In re Velti PLC Sec. Litig*., 2015 WL 5736589, at *18 (N.D. Cal. Oct. 1, 2015) (dismissing false statement challenge to opinion statement where complaint "disavows any allegation sounding in fraud or deception in support of plaintiffs' Securities Act claims").

That leaves only *Omnicare*'s second prong, which is derived from Section 11's omission clause.  Under this prong, securities plaintiffs can plead a claim only if they are able to "identify particular (and material) facts going to the basis for the issuer's opinion – facts about the inquiry the

10

1   issuer did or did not conduct or the knowledge it did or did not have – whose omission makes the

2   opinion statement at issue misleading."  575 U.S. at 194.  The Supreme Court has emphasized that

3   stating a claim under this theory is "no small task for an investor."

4          Plaintiffs have not stated a claim under *Omnicare*'s second prong either.  The complaint is

5   entirely silent about the "inquiry" and "knowledge" underlying Bloom's treatment of contingent

6   losses related to its service contracts.  That is dispositive.  Plaintiffs who challenge opinion

7   statements under an omission theory must identify, with particularity, omitted facts about the basis

8   of the challenged opinion.  *Align*, 856 F.3d at 619.  Equally fatal, the principal fact on which

9   Plaintiffs rely in challenging Bloom's accounting – that customers virtually always renewed their

10  service contracts for additional one-year terms – was not omitted but *disclosed*.  ¶ 68.  That too is

11  fatal.  *Velti*, 2015 WL 5736589, at *20-24 (dismissing claim under *Omnicare*'s omission prong

12  where defendants disclosed the purportedly omitted information).

13         Even if Plaintiffs could comply with *Omnicare*'s requirements, moreover, they would not

14  have stated a claim based on allegedly concealed contingent liabilities.  The GAAP provisions

15  Plaintiffs themselves cite make clear that Bloom was required to accrue costs only for liabilities

16  incurred within the one-year term of its service contracts.  Plaintiffs cite ASC 450-20-25-2 for the

17  "basic premise" that "an estimated loss from a loss contingency shall be accrued by a charge to

18  income" if the loss is both probable and reasonably estimable.  ¶ 67.  But Plaintiffs omit critical

19  language from this GAAP provision.  The provision is not triggered whenever a loss is probable in

20  the abstract.  The provision is triggered when it is probable that "a liability had been incurred *at the

21  date of the financial statements*."  Ex. 14, ASC 450-20-25-2 (emphasis added).  The language is very

22  clear:  "[E]ven losses that are reasonably estimable shall not be accrued if it is not probable that . . . a

23  liability has been incurred at the date of an entity's financial statements because those losses relate to

24  a future period rather than the current or a prior period."  *Id.*  Bloom incurred liability on its one-year

25  service contracts when both the customer and Bloom – either of which could elect not to renew –

26  agreed on renewal.  Until both parties agreed to renew, no contract beyond the one-year term was yet

27  in existence.  Bloom was not required – or, indeed, permitted – to accrue even "reasonably

28  estimable" costs for periods beyond the one-year contract term.

11

1    This outcome is self-evident in the context of contractual revenue recognition.  A company

2 may not recognize revenue until, among other things, "persuasive evidence of an arrangement"

3 exists.  *See* ¶ 462.  For a company that relies on written customer contracts, such "evidence" takes

4 the form of a written binding agreement.  Ex. 15, ASC 605-10-S99 SEC Materials-General, at 40.

5 Bloom did not – and was not permitted to – recognize revenue it might later earn until service

6 contracts were renewed, even if it was highly that renewal would occur.

7    That principle applies equally to costs Bloom might later incur in connection with future

8 contracts.  Under GAAP's principles of "matching," companies are directed to account for the costs

9 of goods sold (here, the renewed service contracts) in the same period in which they recognize

10 revenue from the sale of those goods.  Ex. 18, FAS CON 5 ¶ 86 (costs of goods sold "are matched

11 with revenues – they are recognized upon recognition of revenues that result directly and jointly

12 from the same transactions or other events as the expenses").  To claim that Bloom was required to

13 recognize contractual liabilities related to contracts not in existence defies common sense.[5]

14    Beyond the fact that it is contradicted by the very GAAP provisions on which they rely,

15 Plaintiffs' contingent liability challenge fails because it depends on entirely unsupported speculation.

16 Plaintiffs claim inconsistently that contingent liabilities related to Bloom's service contracts

17 exceeded future contract revenue by $1.7 billion, by $2 billion, and by $2.2 billion.  ¶¶ 64, 72, 74.

18 Other than referring to the elements of an unspecified "calculation" purportedly performed by short

19 seller Hindenburg, however, Plaintiffs offer no support for these figures.  ¶ 72.  Conclusory

20 allegations of this sort do not plausibly establish that an opinion statement is false or misleading.[6]

21

---

[5] Plaintiffs claim that Bloom has "admitted" that beginning in 2014, it "stopped following the
22 appropriate GAAP" in recording liabilities associated with its service contracts.  ¶ 73.  Plaintiffs cite
Bloom's statement that "[p]rior to 2014, certain [service contracts] with direct customers were
23 accounted for as separately-priced warranty contracts under ASC 605-20-25."  *Id.*  This is not an
"admission" that Bloom ceased following GAAP.  To apply a different GAAP provision when
24 aspects of a company's business change is not to "stop following" GAAP; it is to apply GAAP
appropriately.  *See* Ex. 1 at F-22 (explaining that Bloom began applying GAAP provisions
25 governing multiple-element arrangements as opposed to separately-priced contracts to reflect
changes it in its business).

26 [6] Later events further underscore Plaintiffs' shortfall in pleading falsity. Although Bloom has
restated its later-period financial statements in connection with a different issue, *infra* at 16-17,
27 Bloom has not restated any aspect of its financial statements related to contingent liabilities – despite
the rigorous and wide-ranging re-evaluation that accompanies any restatement.  This too undermines
28 falsity.  *See, e.g., Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 181 (S.D.N.Y.
2012) ("Further negating any inference that [the company] materially misstated its financials is the

Plaintiffs' failure to comply with *Omnicare* is fatal not only to their contingent liability claim but also to their attack on Bloom's estimates of fuel cell life, accounting judgments related to Managed Services Agreements, and single statement about internal controls.  These are also opinions, and Plaintiffs have not satisfied *Omnicare* with respect to any of them.

**D.  Plaintiffs Fail To State A Claim On The Basis Of Bloom's Estimates Of Fuel Cell Life.**

On the issue of fuel cell life, Plaintiffs cite the "Letter from our Chief Financial Officer" in the Registration Statement.  Then-CFO Randy Furr explained that Bloom's service business had not historically been profitable, but that Bloom expected the economics of its service business to change.  While earlier generations of Bloom's fuel cells had needed replacement every 12 to 18 months, "from 2017 onwards, we expect to average over five years between replacements."  ¶ 75; Ex. 1 at 61.  Thus "[a]t today's pricing, we believe we can break-even in our service business provided the time between [fuel cell] stack replacements across all of our fleet is five years or better."  *Id.*

Plaintiffs claim that Bloom's five-year estimate was wrong, again citing Hindenburg.  Indeed, Plaintiffs simply copy a page and a half of Hindenburg's critique, with virtually no explanation.  ¶ 76.  In that excerpt, the authors claim to have spoken with two unnamed persons, a fuel cell technician and an industry expert.  Both are said to have believed that Bloom's five-year estimate was too high, but neither is claimed to have had any experience with Bloom or its products.  *Id.*  The authors also includes a graph in which a 34-month fuel cell life is "extrapolated" from public utility data.  *Id.*  The authors do not claim that the fuel cells at issue *actually* needed to be replaced at 34 months – only that they derived this estimate from a limited set of data.  *Id.*

Plaintiffs are again attacking statements of opinion here – "we *expect* to average over five years between replacements"; "we *believe* we can break-even in our service business."  ¶ 75.  Plaintiffs' claim fails, most fundamentally, because Plaintiffs have pled no facts showing that Bloom's opinion was wrong.  Plaintiffs claim that "[t]he Hindenburg report revealed that . . .

---

fact that the company never issued a restatement . . . . [The company's] financial results have been scrutinized by several entities . . . yet the company was never asked to issue a restatement") *aff'd,* 543 Fed. Appx 72 (2nd Cir. 2013); *In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 408 (S.D.N.Y. 2010) (dismissing claim where "only the Plaintiffs contend[ed] that [the defendant had] committed these GAAP violations – federal regulators have never claimed any violation").

1   [Bloom] routinely replaced its fuel cells after just three years." ¶ 77.  That is false on its face.  In the

2   very excerpt Plaintiffs copy, the Hindenburg authors *project* fuel cell replacements at 34 months.

3   ¶ 76.  Neither Hindenburg nor Plaintiffs present facts about the *actual* replacement schedule of

4   Bloom's later-generation fuel cells, which will be available only with the passage of time.

5          But even if Plaintiffs had pled facts showing that the five-year estimate proved to be

6   incorrect, they once again do not come within either of *Omnicare*'s two prongs.   The first,

7   subjective prong is foreclosed, as Plaintiffs disavow both fraud and scienter.  *Supra* at 10.  Plaintiffs

8   do not come within *Omnicare*'s second prong either:  They do not, as they must, identify material

9   facts *omitted* from the Registration Statement.  *Id.*   Plaintiffs' claim is that the five-year estimate

10  was wrong – not that Bloom failed to disclose facts about that estimate.

11         Plaintiffs' challenge would fail, moreover, even if they had framed it as an omission claim.

12  *Omnicare*'s second prong deals with omissions of a very specific type.  Liability under this prong

13  attaches only "when 'a registration statement omits material facts *about the issuer's inquiry into or*

14  *knowledge concerning a statement of opinion*' and 'those facts conflict with what a reasonable

15  investor would take from the statement itself.'" *Align*, 856 at 615 (quoting *Omnicare*, 575 U.S. at

16  188) (emphasis added).  Plaintiffs plead no such facts here:  They say absolutely nothing about the

17  knowledge or inquiry underlying Bloom's estimate.

18         Rather than alleging what *Omnicare* requires – purportedly omitted facts about the bases for

19  Bloom's opinion – Plaintiffs contend that the short seller formed a different opinion on the basis of

20  its own assumptions and calculations.  The Ninth Circuit has squarely rejected this method of

21  challenging opinion statements:

22         The common element underlying both flaws in Plaintiff's theory of falsity is Plaintiff's
           failure to allege the actual assumptions that Defendants relied upon in conducting their
23         goodwill analysis.  Without this allegation, it cannot be plausibly inferred that Defendants
           intentionally disregarded the [alleged] events and circumstances . . . .  Plaintiff's pleading of
24         its own calculations indicating impairment of [goodwill] . . . does not provide a sufficient
           substitute for Plaintiff's failure to plead the actual assumptions used by Defendants.  As aptly
25         noted by the district court, "[t]hat Plaintiff selected certain assumptions to reach a conclusion
           of impairment does not demonstrate what assumptions *Align* made in conducting its . . .
26         impairment analysis . . ."

27  *Align*, 856 F.3d at 618 (emphasis and square brackets in original).  That analysis applies equally

28  here.  Plaintiffs fail to plead facts about the assumptions and calculations underlying *Bloom's*

                                                     14

1    estimate, and the short seller's assumptions and calculations cannot substitute for this.[7]

2         Plaintiffs also fail to state a claim as to Bloom's fuel cell life estimates for an independent

3    reason.  Plaintiffs claim that the "truth" about the lifespan of Bloom's later-generation fuel cells was

4    concealed until Hindenburg published its report on September 17, 2019 and Bloom's stock price fell

5    in response to that revelation.  ¶ 486.  This case, however, was filed on May 28, 2019, nearly four

6    months *before* the appearance of the Hindenburg report.

7         Under Section 11(e), damages are capped by the stock price decline on the day litigation is

8    commenced:  Plaintiffs are entitled to recover only the difference between the price at which they

9    purchased stock and the value of the stock on the day the complaint was filed (or, if they sold the

10   stock before filing suit, the value on the day of that sale).  15 U.S.C. § 77k(e).  Section 11 also

11   provides an affirmative defense to defendants who can establish the absence of causation by showing

12   that the stock price decline for which plaintiffs seek to recover was caused by factors other than the

13   challenged statement and its correction.  *Id.*; *see also Brown v. Ambow Educ. Holding Ltd.*, 2014 WL

14   523166, at *14 (C.D. Cal. Feb. 6, 2014); *In re State St. Bank & Trust Co. Fixed Income Funds Inv.*

15   *Litig.*, 774 F. Supp. 2d 584, 587 n.4 (S.D.N.Y. 2011) (negative causation under Section 11 is the

16   "mirror image" of loss causation under Section 10(b)).  And in cases where negative causation is

17   apparent on the face of a complaint, dismissal is appropriate.  *Brown*, 2014 WL 523166, at *14.

18        Dismissal is appropriate here.  Plaintiffs have affirmatively pled that the stock price decline

19   triggered by the revelation of the purported truth about fuel cell life occurred *after* the date on which

20   damages are capped.  The challenged statement thus cannot have caused recoverable losses – which

21   means that Plaintiffs have failed to state a claim on which relief may be granted.

22        **E.    Plaintiffs Fail To State A Claim Based On Bloom's Accounting For Its Managed**

23             **Services Agreements.**

24        Plaintiffs next seek to cast Bloom's March 2020 restatement and revision back to the July

25   2018 IPO.  But Plaintiffs are again challenging an opinion statement without following *Omnicare*'s

---

26   [7] The Ninth Circuit in *Align* undertook the analysis cited above in evaluating plaintiff's claims under
27   *Omnicare*'s first prong – which contains a subjective, scienter-like element – but relied on the same
     reasoning in evaluating the claim under *Omnicare*'s second, objective, omission-based prong.  *Id.* at
28   619 ("Finally, Plaintiff's failure to allege the assumption underlying Defendants' goodwill
     valuations . . . also prevents Plaintiff from pleading objective falsity . . . .").

1    requirements, and have not established materiality in any event.

2         Bloom advised investors on February 12, 2020 that they should no longer rely on the

3    Company's financial statements for the second quarter of 2018 through the third quarter of 2019.

4    ¶ 400.  None of these periods was reported in the Registration Statement.  *Id.*  Bloom also announced

5    that it would revise its financial statements for the periods that *were* reported in the Registration

6    Statement – 2016, 2017 and the first quarter of 2018.  A revision is distinct from a restatement.

7    Companies revise previously-issued financial statements to correct immaterial errors.  *See* SEC Staff

8    Accounting Bulletin 108, 71 Fed. Reg. 54,580, 54,582 (Sept. 18, 2006).

9         Bloom further explained that the restatement and revision were required because PwC had

10   raised an issue related to the accounting of Bloom's Managed Services Agreements (or MSAs),

11   about which it had never previously expressed any concern.  ¶ 400.  MSAs are contracts governing

12   the relationship between Bloom and bank financing parties (hereinafter, banks) in Bloom's Managed

13   Services program.  Under this program, Bloom sells an Energy Server to a bank, which pays Bloom

14   for and takes title to the equipment.  *Id.*  The bank then leases the Energy Server back to Bloom, and

15   Bloom subleases the Energy Server to the customer for whom it was built.  Ex. 12 at 48.  After

16   installation and acceptance, the customer pays the bank a fixed fee for use of the Energy Server and

17   enters into a service contract with Bloom for maintenance and operation of the equipment.  ¶ 400.

18   Before the restatement, Bloom accounted for the relevant MSA transactions as sales, and therefore

19   recognized the payments it received from banks as revenue at the time of acceptance.

20        In late 2019, however, while reviewing a Managed Services transaction with certain unusual

21   terms, PwC identified an issue with that transaction that potentially applied to Bloom's accounting

22   for its MSAs more generally.  ¶ 400.  During this later review, PwC (and ultimately Bloom) came to

23   a different conclusion – that the revenue related to Bloom's sale of an Energy Server to a bank did

24   not qualify for sale accounting treatment but should instead be treated as a financing, *i.e.*, a *loan*

25   from the bank to Bloom.  This altered the timing of revenue recognition.  With the MSAs now

26   accounted for as loans, Bloom would recognize revenue not at acceptance but instead over the loan

27   term, as its customers made payments to banks.  Ex. 12 at 5.

28        Bloom also explained in its Form 8-K that before December 2019, PwC had been completely

                                              16

in agreement with the Company's accounting for its MSAs:

> At the inception of entering into the Impacted MSAs, the Company reviewed their accounting treatment with PwC.  The Company and PwC concluded that it was appropriate under U.S. GAAP to account for a majority of the Impacted MSAs as a sale, subject to an operating lease.  Subsequently, PwC issued unqualified audit opinions on the Company's financial statements for the years ended December 31, 2016, December 31, 2017 and December 31, 2018.  During this period, at Audit Committee meetings, PwC did not express any concern with respect to the Company's accounting treatment for the Impacted MSAs. . . .
>
> At all times, PwC had access to all relevant audit evidence with respect to the Impacted MSAs.  The accounting error did not result from a change in the accounting literature for leases during the relevant time period or from any override of controls or from any misconduct.  (¶ 400.)

On March 31, 2020, Bloom filed its 2019 Form 10-K, in which it restated its financial statements for all periods from the second quarter of 2018 through the third quarter of 2019 and revised its financial statements for the periods reported in the Registration Statement – 2016, 2017 and the first quarter of 2018.  In the revised and restated financial statements, the MSAs are now treated as loans from banks rather than sales to banks, and revenue is recognized over the loan term rather than on acceptance.[8]

Nothing in this series of events and nothing alleged in the complaint supports Plaintiffs' claim that the Registration Statement contained materially false or misleading statements for which Plaintiffs are entitled to recover alleged investment losses.

***Plaintiffs once again fail to satisfy Omnicare's requirements.***  There can be little question that Bloom's recognition of revenue for its MSAs is the product of accounting judgments.  This case provides a particularly clear illustration of a judgment as to which reasonable persons can differ: Here, the *same* auditors, considering the same contracts, differed in their judgment about how to apply accounting rules.  Such judgments fall squarely within *Omnicare*.  "[I]f determining the relevant provision of GAAP to apply in a certain area of accounting or with respect to a certain transaction involved a subjective evaluation, then any data resulting from that application of GAAP would be a statement of opinion."  *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at

---

[8] If this case moves forward, the Underwriter Defendants intend to assert the affirmative defense that they played no role in the restatement or in any other accounting determinations, and that no "red flags" existed at the time of the IPO that would raise doubts about relying on the judgment of Bloom's accounting experts.  Underwriters are not required to duplicate the work of accounting experts and may rely on audited financial statements and other portions of a registration statement prepared or certified by experts.  15 U.S.C. § 77k(b)(3); *see also In re Software Toolworks Inc. Sec. Litig.*, 50 F.3d 615, 623 (9th Cir. 1994); *supra* at 4.

1   *14 (S.D.N.Y. Sept. 9, 2019); *see also, e.g., Kuriakose*, 897 F. Supp. 2d at 181 ("As accountants and

2   courts have long recognized, GAAP provisions are subject to interpretation"; dismissing GAAP-

3   based claim on falsity grounds).  Plaintiffs once again fail to meet *Omnicare*'s requirements.  They

4   have disavowed fraud and fail to identify omitted information about the bases for Bloom's opinions.

5          Perhaps because they seek to avoid *Omnicare*, Plaintiffs claim that the accounting issues here

6   are subject to "very clear bright line provisions," suggesting that no interpretation or judgment is

7   required.  ¶ 84.  Plaintiffs are wrong about this for at least two reasons.  The "bright line provision"

8   Plaintiffs cite, ASC 840-10-25-1, is used to determine whether a lease should be classified as a

9   capital or an operating lease.  *Id.*  But this is only one step in the GAAP analysis.  Before the

10  restatement, Bloom accounted for the MSAs as *sales*, and PwC agreed that this accounting treatment

11  was appropriate.  The relevant GAAP provisions here are ASC 840-40-55-22 and ASC 840-40-55-

12  24, the latter of which provides that certain sales-leaseback-sublease transactions are appropriately

13  accounted for as sales – "[t]hat is, the seller-lessee-sublessor records the sale, removes the asset from

14  its balance sheet, and classifies the leaseback in accordance with 840-10-25-43."  Ex. 16.

15         Bloom explained in its February 2020 Form 8-K that PwC and the Company ultimately

16  reached a different conclusion.  They determined that payments for certain Energy Servers in the MS

17  program should be accounted for as loans rather than sales because certain contractual provisions –

18  including events-of-default terms – left Bloom with certain risks of ownership inconsistent with a

19  true sale.  ¶ 400; *see also* Ex. 16, ASC 840-20-40-3 ("The sale of property subject to an operating

20  leases . . . shall not be treated as a sale if the seller . . . retains substantial risks of ownership in the

21  leased property"); *Id.* at ASC 840-40-25-4 ("If the seller-lessee retains, through a leaseback,

22  substantially all of the benefits and risks incident to the ownership of the property sold, the sale-

23  leaseback transaction is merely a financing").  But evaluating events-of-default terms to determine

24  whether a company has retained substantial risks of ownership is not a matter of bright lines.  It

25  requires analysis of complex contract terms within the context of a company's business, including

26  comparison of terms from one contract to another.

27         As to the difference between operating and capital leases, this is not a matter of bright line

28  provisions either, and Plaintiffs' own allegations illustrate the point.  ASC 840-10-25-1 sets out a

18

test with four conditions.  ¶ 84.  If a lease meets any one of the four, it is a capital lease; otherwise, it is an operating lease.  *Id.*  Plaintiffs contend that Bloom's MSAs came within the third of the four conditions, which is that "[t]he lease term is at least 75% of the property's estimated remaining economic life."  *Id.*  According to Plaintiffs, "the length of [Bloom's] [MSA] leases was 6-10 years, well in excess of the 75% of the Energy Servers' actual useful life."  ¶ 89.  But Plaintiffs do not even attempt to specify the economic life of an Energy Server, and they acknowledge that Bloom calculated depreciation based on an estimated 15-21 year lifespan. ¶ 469.  A 6-10 year lease term, of course, is far less than 75 percent of a 15-21 year economic life.

Plaintiffs go on to insinuate, in connection with their Section 10(b) claim, that Bloom had a motive to falsify the Energy Servers' lifespan.  According to Plaintiffs, for Bloom "to acknowledge that its Energy Servers had a much shorter life span [than 15-21 years] would have been catastrophic" in that Bloom would then have had to classify the MSAs as capital leases.  *Id.*  This is entirely circular.  Plaintiffs cannot plead falsity simply by alleging that the purported truth would have been damaging.  Positing a hypothetical motive does not show that a statement was false.

For all their talk of bright line provisions, therefore, Plaintiffs are unable to show – even with the benefit of the restatement – why the MSAs are capital leases.  Plaintiffs' own allegations reveal that accounting for the MSAs was not a simple process with a single clear answer.  Accounting for the MSAs required a series of judgments applied to highly complex sets of contracts. Plaintiffs are challenging opinions, not facts, and they have failed to comply with the requirements for doing so.

***The errors in the financial statements included in the Registration Statement were immaterial.***  Plaintiffs' attack on Bloom's MSA accounting also fails on materiality grounds.  Bloom did not restate its financial statements for any period reported in the Registration Statement.  Bloom revised these financial statements, and PwC agreed that revision, rather than restatement, was appropriate.  A revision, as noted, is performed to correct immaterial errors.  *Supra* at 16.

Plaintiffs clearly fail to plead materiality with respect to Bloom's 2016 and 2017 audited financial statements.  Plaintiffs identify no revision to the 2016 or 2017 financial statements that exceeds five percent, and no qualitative factors that would render an error of five percent or less material in this context.  ¶¶ 90, 413; *see* SEC *Staff Accounting Bulletin No. 99*, 64 Fed. Reg. 45150-

01 (Aug. 19, 1999) (17 C.F.R. Part 211, Subpt. B) (discussing 5 percent rule of thumb for assessing quantitative materiality).

The errors in Bloom's unaudited financial statements for the first quarter of 2018 – the final period reported in the Registration Statement – were also immaterial.  Plaintiffs concede that Bloom overstated revenue for this period by only $779,000, or 0.5 percent and again identify no relevant qualitative factors.  ¶ 90.  Plaintiffs do note that the revision to Bloom's *net loss* for the first quarter of 2018 was more significant – 14.8 percent for Bloom as a whole and 17.9 percent as applied to the Company's common stockholders.  *Id.*  Numbers alone, however, do not establish materiality.  In its authoritative treatment of the issue, the Financial Accounting Standards Board has emphasized that "magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment."  Ex. 17 FASB *Concepts Statement No. 2*, at CON2-3.  Following that guidance, the SEC has instructed market participants in SAB 99 to consider a variety of qualitative factors in making materiality determinations.  SAB 99, 64 Fed. Reg. 45,150, 45,151. In summarizing this accounting literature, courts have explained that the most significant qualitative factors relate to "(1) whether there was a concealment of an unlawful transaction; (2) the significance of the misstatement in relation to the company's operations; and (3) management's expectation the misstatement will result in a significant market reaction."  *In re Lone Pine Res., Inc.*, 2014 WL 1259653, at *4 (S.D.N.Y. Mar. 27, 2014).  Above all, the analysis of materiality must "include[] the factual context in which the user of financial statements would view the financial statement item."  SAB 99, 64 F.R. at 45151.

Factual context is critical here.  The effect of the revision on Bloom's first-quarter 2018 net income was simply to change a loss (approximately $18 million as originally reported) into a slightly larger loss (approximately $22 million as revised).  Ex. 12 at 187.  The error did not lead to a false impression of profitability, and Plaintiffs have pled no facts suggesting that the difference between an $18 million and a $22 million quarterly loss was significant in the context of Bloom's business.

Historical context makes the immateriality of the revision to net income even clearer.  Bloom has sustained net losses for every period from 2016 to the present.  Ex. 1 at F-4; Ex. 12 at 164. Bloom is a developing company – by definition an Emerging Growth Company – and investors

20

1   purchase its stock not because it is currently profitable but because they believe in its future. Such

2   market factors are an important part of the qualitative materiality analysis. Ex. 17, FASB No. 2 at

3   CON2-30 (an item is material only if "it is probable that the judgment of a reasonable person relying

4   upon the report would have been changed or influenced by the inclusion or correction of the item").

5          Finally, the effect of the revision on Bloom's *operating* income – as opposed to its net

6   income – was *positive*. As a result of its accounting error, Bloom *understated* operating income for

7   the first quarter of 2018 by 11 percent. Ex. 12 at 187 (operating income was $5.7 million as

8   originally reported and $6.4 million as revised). Only when non-operational items are factored in

9   does the revision have a negative impact on income for this period. As Bloom explained, because

10  the MSAs were ultimately accounted for as loans rather than sales, the Company was required to

11  recognize an *interest* expense in connection with payments it received from the banks (although

12  Bloom in reality paid no interest). Ex. 12 at 187-88 & note f. It was this interest expense that

13  increased Bloom's net loss from $18 million to $22 million. *Id.* Neither this interest expense nor

14  any other aspect of the revision – or, indeed, the restatement – had any impact on cash. ¶ 400.

15  Investors understand that such non-operational items are largely irrelevant in understanding the

16  financial condition and trajectory of development-stage companies like Bloom.

17         Consistent with the accounting guidance discussed above, courts can and do consider such

18  qualitative factors in adjudicating materiality on motions to dismiss, and they grant motions where

19  plaintiffs cannot establish qualitative materiality. *E.g.*, *Xu v. Gridsum Holdings, Inc.*, 2020 WL

20  1508748, at *9 (S.D.N.Y. Mar. 30, 2020) (dismissing Section 11 claim on materiality grounds

21  notwithstanding restatement where plaintiffs failed to show that accounting error resulting in a

22  threefold understatement of company's income tax expense was "indicative of this company's

23  success to investors"); *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 27 (2d Cir. 2013) (alleged

24  misstatement is not qualitatively material where, among other things, it does not enable company to

25  conceal a downward trend). Given the negligible effect of the revision on Bloom's first-quarter

26  2018 revenue and the fact that the financial statement errors in no way affected the trends shown in

27

28

21

1     Bloom's financial statements as originally reported, Plaintiffs have failed to establish materiality.[9]

2     **F.     Plaintiffs Fail To State A Claim Based On Bloom's Statement That It Had Not Discovered Internal Control Weaknesses As Of December 31, 2017.**

4     Plaintiffs next claim that Bloom represented in the Registration Statement "that there were no 'material weaknesses in internal control over financial reporting at December 31, 2017.'" ¶ 94. Plaintiffs contend that because Bloom later identified a material weakness existing as of December 31, 2019, Bloom's statement about internal controls in the Registration Statement – relating to conditions as of December 31, 2017 – was materially false and misleading.

9     This claim fails, most fundamentally, because Plaintiffs have mischaracterized the challenged statement. Bloom did not, as Plaintiffs claim, "represent[ ] in its Registration Statement that there were no 'material weaknesses'" in its internal controls. Issuers are not required to include in an IPO registration statement the management certification of internal controls required in subsequent periodic filings by the Sarbanes-Oxley Act. 17 CFR § 229.308, *Instructions* (annual Sarbanes-Oxley assessment of internal controls is not required until a company files its second annual report following its IPO). Bloom therefore did not include any such certification in the Registration Statement. Bloom stated in a risk disclosure that it had not "discover[ed] any material weaknesses" as of December 31, 2017, but this was plainly not a representation that no material weaknesses existed. Plaintiffs have alleged no facts suggesting that the statement Bloom actually made was false or misleading – nothing suggesting that Bloom *did* discover internal control weaknesses existing as of December 31, 2017. That in itself disposes of this challenge.

21     The challenge also shares fatal defects with other attacks on the Registration Statement. A company's statements about internal controls are statements of opinion. *E.g.*, *Fogel v. Vega*, 759 F. App'x 18, at *24 (2d Cir. 2018) (affirming dismissal of claim challenging internal control certifications where plaintiff "does not meet the standard for actionable opinion statements under

---

[9] Plaintiffs' attack on Bloom's MSA accounting also fails on causation and damages grounds for the same reason Plaintiffs' challenge to statements about fuel cell life fails. Plaintiffs allege that the "truth" about Bloom's MSA accounting was concealed until the Company issued its February 12, 2020 press release and March 31, 2020 Form 10-K, which contains the restated and revised financial statements. ¶¶ 487, 489-90 ("this was the first correction of [Bloom's] financial statements"). This post-dated the commencement of this action by nine months. The investment losses available for recovery under Section 11 – which are capped at the commencement of an action – were therefore necessarily caused by factors other than Bloom's MSA accounting. *Supra* at 15.

22

1    *Omnicare*"); *In re Sanofi Sec. Litig.,* 155 F. Supp. 3d 386, 402 (S.D.N.Y. 2016).  Plaintiffs once

2    again fail to comply with either of *Omnicare*'s two prongs.

3          Plaintiffs also again disregard chronology, wrongly seeking to read the events of 2019-2020

4    backwards onto 2017.  Bloom's statement in its March 2020 Form 10-K that a control weakness

5    existed as of December 31, 2019 does not mean that the same weakness also existed as of December

6    31, 2017.  Even if Plaintiffs' allegations supported that inference, moreover, a "later realization that

7    risk controls were not catching certain conduct and could be improved upon" is "insufficient to

8    support an inference of falsity at the time the alleged statements were made."  *C.D.T.S. v. UBS AG*,

9    2013 WL 6576031, at *4 (S.D.N.Y. Dec. 13, 2013), *aff'd*, 604 F. App'x 5 (2d Cir. 2015).

10   ## G.    Plaintiffs Fail To State A Claim On The Basis Of Challenged Statements About
11            Efficiency and Emissions.

12         Last, Plaintiffs challenge Bloom's statements about Energy Server technology.  Plaintiffs

13   take aim at Bloom's statement that the "latest generation of our Energy Servers" is capable of

14   "beginning-of-life efficiencies of 65%" and an overall range of 53% to 65%.  ¶ 97.  Plaintiffs claim

15   that these statements are false in light of a study from an associate policy scientist at the University

16   of Delaware, who purportedly showed that Bloom's products have "an actuarial efficiency of

17   approximately 45% which is substantially below the 65% claimed by [Bloom]."  ¶ 98; Ex. 22 at 17.

18         Plaintiffs are comparing apples with oranges.  The study they cite is an analysis not of

19   Bloom's latest-generation Energy Servers but of older-generation Servers; the study's author

20   explicitly acknowledges Bloom's statements that its newer-generation servers are more efficient.

21   Ex. 22 at 12.  The author also notes that even Bloom's older technology had "better than the average

22   efficiency from other fossil fuel-based power plants and nuclear power in the U.S."  *Id.*  Plaintiffs

23   have pled no facts showing that Bloom's statements about efficiency were false or misleading.

24         As to emissions, Plaintiffs challenge Bloom's statements that (1) its Energy Servers have

25   lower harmful emissions than conventional fossil fuel, (2) Energy Servers deployed since 2012 that

26   run on natural gas produce nearly 60 percent less carbon emissions than "average U.S. combustion

27   power generation," (3) 9 percent of Bloom's Energy Servers use biogas (which is cleaner than

28   natural gas), and (4) Energy Servers emit "virtually no NOx or SOx."  ¶ 99.  Plaintiffs attack these

23

1    statements based on a successful lawsuit Bloom brought against the City of Santa Clara, the short-

2    seller critique and a letter from Delaware state senators.  ¶¶ 100-02.  Plaintiffs are again comparing

3    apples to oranges; none of these sources shows that Bloom's statements were false or misleading.

4         Taking the lawsuit first:  Bloom sought and obtained a writ of mandamus blocking the City

5    of Santa Clara from prohibiting the installation of Energy Servers powered by natural gas (as

6    opposed to biogas).  The litigation was not, as Plaintiffs claim, about "the excessive cost and

7    pollution" of Energy Servers.  The question was whether Santa Clara could enforce its prohibition

8    without preparing an environmental impact statement.  Ex. 24 at 2.  Bloom prevailed because it

9    showed that natural gas-powered Energy Servers are *better* for the environment than the alternatives

10   available to the City – and hence an environmental impact statement was required.  *Id.* at 16-17.

11        In the face of Bloom's victory, Plaintiffs claim that a court order in the action shows that

12   experts in the case agreed that biogas is "prohibitively expensive and thus infeasible for fuel-cell

13   use." ¶ 100.  That is untrue.  The text of the cited order shows that experts agreed that it would be

14   infeasible for Bloom to use *exclusively* biogas in *all* Energy Servers in Santa Clara.  Ex. 24 at 7.

15   That expert opinion is entirely consistent with the Registration Statement, in which Bloom disclosed

16   that only 9 percent of its Energy Servers run on biogas.  ¶ 99.  The fact that 100 percent use of

17   biogas may have been infeasible in a particular California market at a particular time does not show

18   that any challenged statement was materially false or misleading.

19        Plaintiffs also claim that the same court order establishes that Bloom's technology produces

20   "nitrogen oxides, volatile organic compounds and hazardous solid waste." ¶ 100.  This does not

21   show that any challenged statement was false or misleading either.  Bloom has never represented

22   that its Energy Servers produce *no* emissions.  What Bloom told investors is that emissions from

23   Energy Servers compared favorably with emissions from other specified energy sources.  ¶ 99.  The

24   Santa Clara order does not refute this comparison – it affirms it.  The question in the lawsuit was

25   whether Energy Servers running on natural gas produce *lower* emissions than other specified

26   sources, and the court found that this was the case.  Ex. 24 at 16-17.  This was the very reason the

27   court ruled that Santa Clara could not prohibit the use of Energy Servers without first studying the

28   environmental impact of such a ban.  *Id.* at 17.

The Hindenburg critique does not show falsity either.  Plaintiffs say that the Hindenburg authors, based on unspecified data, concluded that Bloom's Energy Servers "generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants."  ¶ 101.  This again does not contradict any challenged statement.  Bloom's only challenged statement related to carbon emissions is that "Bloom Energy Servers deployed since 2012 running on natural gas produce nearly 60% less carbon emissions compared to the average U.S. combustion power generation."  ¶ 99.  The Hindenburg authors' comparison of Bloom's technology to "*the electric grid in key states*" does not show or suggest that Bloom's comparison of Bloom's technology to *combustion power generation* is inaccurate or misleading.

Plaintiffs finally cite a February 24, 2020 letter in which 16 Delaware state senators claimed that operating data from two Delaware sites show that Bloom's technology exceeds CO2 levels specified in the permitting process.  ¶ 102; Ex. 20 at 1.  This partisan political document does not show that any challenged statement was false or misleading.  Bloom made no guarantee in the Registration Statement that emissions would in all cases be below a particular CO2 level.  Bloom compared CO2 emissions from its Energy Servers with CO2 emissions from combustion power generation, and said that its emissions were lower.  The Delaware letter does not bear on that issue.

## IV.    CONCLUSION

The Court should dismiss Plaintiffs' Section 11 claims for the reasons above.  The Court should also dismiss Plaintiffs' claim for controlling person liability against the Individual Defendants under Section 15 of the 1933 Act.  That claim depends on an underlying primary violation, which Plaintiffs have failed to plead here.  *E.g., In re Bare Escentuals, Inc. Sec. Litig.*, 745 F. Supp. 2d 1052, 1081-82 (N.D. Cal. 2010).

1

2   Date:  July 1, 2020                              SIDLEY AUSTIN LLP

3                                                    By: */s/ Sara B. Brody*
                                                         Sara B. Brody (SBN 130222)
4
                                                       *Attorneys for Bloom and the Individual*
5                                                      *Defendants*

6

7                                                    MORGAN, LEWIS & BOCKIUS LLP

8
                                                     By: */s/ Charlene S. Shimada*
9                                                        Charlene S. Shimada (SBN 91407)

10                                                   *Attorneys for the Underwriter Defendants*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28