UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAMES EVERETT HUNT, et al.,

              Plaintiffs,

   v.

BLOOM ENERGY CORPORATION, et al.,

              Defendants.

Case No.  19-cv-02935-HSG

**ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS**

Re: Dkt. Nos. 127, 129, 130

In his second amended complaint, Lead Plaintiff James Everett Hunt and additional plaintiffs assert violations of the federal securities laws under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"); Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"); and SEC Rule 10b-5 against Bloom Energy Corporation and certain of its top officials (collectively, "Defendants").  *See* Dkt. No. 113 ("SAC") at ¶ 1.

Pending before the Court are three motions to dismiss the second amended complaint. *First*, the Section 11 Defendants[1] bring a motion to dismiss the Section 11 claims, as well as the Section 15 "controlling persons" claims.  Dkt. No. 130.  *Second*, Pricewaterhouse Coopers LLP ("PwC"), Bloom's independent auditor, brings its own motion to dismiss the Section 11 claims. Dkt. No. 127.  *Third*, the Section 10(b) Defendants[2] bring a motion to dismiss the Section 10(b) claims.  Dkt. No. 129.  The Court finds these matters appropriate for disposition without oral argument and the matters are deemed submitted.  *See* Civil L.R. 7-1(b).  For the following reasons,

---

[1] The Section 11 Defendants include Bloom Energy Corporation, nine of Bloom's current and former officers and directors, and the ten underwriters of Bloom's initial public offering.  *See* Dkt. No. 130.

[2] The Section 10(b) Defendants include Bloom Energy Corporation, Bloom's CEO KR Sridhar, and Bloom's former CFO Randy Furr.  *See* Dkt. No. 129.

United States District Court
Northern District of California

the Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.

## I.   BACKGROUND

Plaintiff Elissa M. Roberts initially filed this securities class action on behalf of all persons who purchased or otherwise acquired Bloom Energy Corporation common stock during Bloom's July 25, 2018 initial public stock offering (the "IPO" or "Offering"). *See* Dkt. No. 1. The original complaint asserted claims under Sections 11 and 15 of the Securities Act. *Id.* at ¶ 2. On September 3, 2019, the Court[3] appointed James Everett Hunt as the lead plaintiff in this action. *See* Dkt. No. 39. As part of the motion granting the appointment, the Court granted Lead Plaintiff Hunt leave to file an amended complaint. *See id.*

On April 21, 2020, Lead Plaintiff Hunt filed a second amended complaint. *See* SAC. As relevant to the pending motions, the SAC alleges that Bloom manufactures and leases solid-oxide fuel cells, called "Energy Servers," which convert natural gas or biogas into electricity. *See id.* at ¶¶ 2–3, 41. These Energy Servers provide customers with an alternative to drawing energy from the electrical grid. *See id.* at ¶ 41. After many years as a private company, Bloom held its IPO on July 25, 2018. *Id.* at ¶¶ 2, 50–51. The Registration Statement included Bloom's disclosures regarding the nature of its business, risk factors, executive compensation, and numerous other matters. *See* Dkt. No. 131-1, Ex. 1. It also included Bloom's financial statements for the years 2016 and 2017, and for the first three months of 2018. The Registration Statement also included PwC's audit report on Bloom's 2016 and 2017 annual financial statements. *Id.* The Registration Statement registered over 20 million Bloom shares of common stock for sale, and the stock sold in the IPO at $15 per share. *See* SAC at ¶ 51. Bloom received net proceeds of $284.3 million from the IPO. *Id.*

Plaintiffs allege that on September 17, 2019, a third-party market analyst, Hindenburg Research, issued a critique of Bloom's business. *See id.* at ¶ 72. The Hindenburg authors projected that Bloom's business would be massively unprofitable in the future. They calculated that Bloom had "an estimated [net] $2.2 billion in undisclosed servicing liabilities" to repair and

---

[3] On December 13, 2019, the matter was reassigned from the Honorable Judge Orrick to this Court. *See* Dkt. No. 100.

United States District Court
Northern District of California

1   replace the Energy Servers that Bloom had omitted from the Registration Statement at the time of

2   the IPO.  *Id.* (alteration in original).  In reaching this conclusion, the authors reasoned that the

3   lifespan of Bloom's fuel cells was materially shorter, their efficiency was lower than represented,

4   and they therefore needed to be replaced years earlier than represented by Bloom in the

5   Registration Statement.  *Id.* at ¶¶ 72–74.

6        Plaintiffs further allege that in February 2020, Bloom restated the financial statements that

7   it gave to investors in the IPO.  *See id.* at ¶¶ 3, 400–417.  In doing so, Bloom disclosed that (1) its

8   net loss attributable to common stockholders for 2017 was in fact $276.362 million, or 5.2%

9   worse than the loss of $262.599 million reported in its Registration Statement; and (2) the net loss

10   attributable to common stockholders for the first three months in 2018 ending March 31, 2018 was

11   $21.591 million, or 21.9% worse than the loss of $17.716 million that Bloom initially reported.

12   *See id.* at ¶¶ 90, 413.  Plaintiffs also allege that Bloom had considerable "construction delays,"

13   which impeded Bloom's ability to install the Energy Servers.  *Id.* at ¶¶ 55–59.

14        Plaintiffs allege that since the IPO, Bloom's stock price has declined from $15 per share of

15   common stock, to a 52-week low of $2.44 per share of common stock.  *See id.* at ¶ 4.  Plaintiffs

16   bring their Securities Act and Exchange Act claims on behalf of themselves and other similarly

17   situated persons who purchased or otherwise acquired Bloom common stock in Bloom's IPO

18   and/or on the public market between July 25, 2018 and February 12, 2020.  *See id.* at ¶ 1.

19   **II.    LEGAL STANDARD**

20       **A.    Rule 12(b)(6) Standard**

21        Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain

22   statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A

23   defendant may move to dismiss a complaint for failing to state a claim upon which relief can be

24   granted under Federal Rule of Civil Procedure 12(b)(6).  "Dismissal under Rule 12(b)(6) is

25   appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support

26   a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th

27   Cir. 2008).  To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a

28   claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

United States District Court
Northern District of California

3

1     A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw

2     the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*,

3     556 U.S. 662, 678 (2009).

4           In reviewing the plausibility of a complaint, courts "accept factual allegations in the

5     complaint as true and construe the pleadings in the light most favorable to the nonmoving party."

6     *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  Nonetheless,

7     Courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of

8     fact, or unreasonable inferences."  *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir.

9     2008).

10          **B.      Heightened Pleading Standard**

11          Section 10(b) of the Securities Exchange Act of 1934 provides that it is unlawful "[t]o use

12    or employ, in connection with the purchase or sale of any security registered on a national

13    securities exchange or any security not so registered . . . any manipulative or deceptive device or

14    contrivance . . . ." 15 U.S.C. § 78j(b).  Under this section, the SEC promulgated Rule 10b–5,

15    which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or

16    to omit to state a material fact necessary in order to make the statements made, in the light of the

17    circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b–5(b).  To

18    prevail on a claim for violations of either Section 10(b) or Rule 10b–5, a plaintiff must prove six

19    elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a

20    connection between the misrepresentation or omission and the purchase or sale of a security; (4)

21    reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

22    *Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

23          At the pleading stage, a complaint alleging claims under Section 10(b) and Rule 10b–5

24    must not only meet the requirements of Federal Rule of Civil Procedure 8, but also satisfy the

25    heightened pleading requirements of both Federal Rule of Civil Procedure 9(b) and the Private

26    Securities Litigation Reform Act ("PSLRA").  *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869,

27    876 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are subject to a heightened pleading

28    requirement, which requires that a party "state with particularity the circumstances constituting

United States District Court
Northern District of California

4

1    fraud or mistake." Fed. R. Civ. P. 9(b).  Additionally, all private securities fraud complaints are

2    subject to the "more exacting pleading requirements" of the PSLRA, which require that the

3    complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v. Digimarc*

4    *Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

5    **III.    DISCUSSION**

6        **A.    Section 11 Motion**

7            Under Section 11 of the Securities Act, Plaintiffs contend that Bloom's Registration

8    Statement contained several untrue statements and omissions of material facts.  *See* SAC at ¶ 52.

9    According to Plaintiffs, the challenged statements involved (1) the existence and scale of

10   construction delays; (2) improper accounting under Generally Accepted Accounting Principles

11   ("GAAP") for loss contingencies and revenue relating to the Energy Servers; (3) the life cycle of

12   the fuel cells in the Energy Servers; (4) weaknesses in Bloom's internal controls; and (4) the

13   efficiency and emissions of the Energy Servers.  *See id.* at ¶¶ 52–103.  The Section 11 Defendants

14   contend that even under the more lenient Rule 8(a) standard, Plaintiffs have failed to plausibly

15   allege that these statements were materially false or misleading.  *See* Dkt. No. 130.  They ask the

16   Court to dismiss Plaintiffs' claims in their entirety.

17           "[S]ection 11 of the 1933 Securities Act creates a private remedy for any purchaser of a

18   security if 'any part of the registration statement, when such part became effective, contained an

19   untrue statement of a material fact or omitted to state a material fact required to be stated therein

20   or necessary to make the statements therein not misleading.'"  *In re Daou Sys., Inc.*, 411 F.3d

21   1006, 1027 (9th Cir. 2005) (quoting 15 U.S.C. § 77k(a)).  To allege a Section 11 claim, a plaintiff

22   must show "(1) that the registration statement contained an omission or misrepresentation, and

23   (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable

24   investor about the nature of his or her investment."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d

25   1156, 1161 (9th Cir. 2009) (quotation omitted).  Importantly, "[n]o scienter is required for liability

26   under § 11; defendants will be liable for innocent or negligent material misstatements or

27   omissions."  *In re Daou*, 411 F.3d at 1027 (quotation omitted).

28           Unlike Section 10(b) claims, the heightened pleading standards of the PSLRA do not apply

United States District Court
Northern District of California

to Section 11 claims.  *See Rubke*, 551 F.3d at 1161.  Instead, "only allegations of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b)," and "[a]llegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."  *In re Daou*, 411 F.3d at 1027.  Here, Plaintiffs have explicitly disavowed "any allegation that any Section 11 Defendant engaged in fraud or any other deliberate and intentional misconduct."  SAC at ¶ 49.  Accordingly, the Rule 8(a) pleading standard applies.  Because Plaintiffs challenge discrete categories of statements in the Registration Statement, the Court addresses the Section 11 Defendants' motion by category below.

### i.   Accounting Errors

Plaintiffs assert that the Section 11 Defendants failed to follow the relevant GAAP provisions for Bloom's liabilities and revenue in its financial statements.[4]

### a.  Maintenance Service Agreements

Plaintiffs first claim that Bloom failed to follow GAAP in accounting for contingent liabilities related to Bloom's service contracts.  Plaintiffs allege that when Bloom sells, leases, or finances an Energy Server, it includes a one-year warranty and performance guarantee as part of the purchase price.  SAC at ¶ 63.  At the end of this one-year term, customers may then enter into Maintenance Service Agreements ("service contracts") to extend the initial warranty and performance guarantee.  *See id.*  Customers may elect to either renew or cancel their service contracts for successive one-year terms for a period up to 20–25 years.  *Id.* at ¶¶ 63, 68.  Plaintiffs allege that "virtually no customers have elected to cancel their [service contracts]."  *See id.* at ¶ 68.  These service contracts generate both revenue and expenses for Bloom.  *See id.* at ¶¶ 63–64.  Under the terms of the agreements, Bloom must service, repair, and replace Energy Servers when their output or efficiency falls below a certain threshold.  *See id.* at ¶ 64.  And customers, in turn, make annual service payments to Bloom under these agreements.  *See id.* at ¶ 63.

---

[4] Plaintiffs appear to have abandoned any argument that Bloom failed to comply with or made "false and self-serving statements" regarding the new revenue recognition guidance under the Financial Accounting Standards Board Accounting Standards Codification ("ASC") 606 for purposes of its Section 11 and Section 10(b) claims.  *See generally* Dkt. No. 138; Dkt. No. 139; *see also* SAC at ¶¶ 78–80.  The Court therefore **GRANTS** the motion to dismiss on this basis.

Plaintiffs allege that as of March 2018, "[t]he expenses and/or contingencies associated with these repairs" were approximately $2.9 billion, and exceeded any future revenue from the service contracts by approximately $1.7 billion. *See id.* at ¶ 64. Plaintiffs allege that the Section 11 Defendants failed to disclose the $2.9 billion liabilities from the service contracts. *See id.* at ¶ 65.

Rather, Bloom recognized revenue on these service contracts ratably over the course of the one-year contract term. *See* SAC at ¶ 382; Dkt. No. 131-1, Ex. 1 at 97. Bloom recorded costs associated with the contracts in one of two ways. If Bloom estimated a loss on the one-year contract, it expensed the estimated loss value at the time of contract renewal. *See* SAC at ¶ 382. If Bloom estimated a profit on the one-year contract, it expensed the costs as incurred within that period. *Id.* Plaintiffs urge that such practices violate various ASC provisions, as well as Item 303 of Regulation S-K. *See id.* at ¶¶ 65–66. Plaintiffs therefore conclude that Bloom's Registration Statement contained false and misleading statements about its contingent liabilities.

As an initial matter, Defendants respond that such statements in its financial reports reflect accounting judgments, and are therefore opinion statements that should be analyzed under the framework established by the Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). *See* Dkt. No. 130 at 9–10. In *Omnicare*, the Supreme Court held that "a statement of opinion is not misleading just because external facts show the opinion to be incorrect," so long as the opinion is honestly believed. 575 U.S. at 188. *Omnicare* therefore limited what constitutes an actionable opinion statement. Where, as here, a plaintiff seeks to establish liability under the omissions clause based on a statement of opinion, the complaint must: (1) "identify particular [omitted] facts going to the basis for the [defendant's] opinion—facts about the inquiry the [defendant] did or did not conduct or the knowledge it did or did not have"; (2) establish that the facts are material, *i.e.*, that "there is a substantial likelihood that a reasonable investor would consider [them] important;" and (3) establish that the omission of the facts rendered the opinion statement misleading to a reasonable person reading it "fairly and in context," *i.e.*, "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information," as well as "the customs and practices of the

7

1    relevant industry." *Id.* at 190, 194–96.

2         As Defendants note, the Supreme Court has acknowledged that "[g]enerally accepted

3    accounting principles [] tolerate a range of reasonable treatments, leaving the choice among

4    alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979)

5    (quotations omitted).  The Ninth Circuit has also recognized that the application of GAAP—at

6    least at times—requires a company to exercise its judgment, such that a company's financial

7    statements may constitute opinions.  *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*

8    *v. Align Tech., Inc.*, 856 F.3d 605, 621 (9th Cir. 2017) (finding statements related to company's

9    goodwill valuation were opinion statements subject to *Omnicare*).  But Plaintiffs respond that their

10   particular GAAP-based claims are premised on "very clear bright line [GAAP] provisions," and

11   therefore do not hinge on estimates or the exercise of management's judgment.  *See* Dkt. No. 138

12   at 8, 13–14.

13        Plaintiffs' argument is undermined by the plain language of their GAAP-based claims.

14   Plaintiffs first cite ASC 450-20-25-2, which discusses obligations that are included in the sale of a

15   product, rather than as a separately priced contract.  *See* SAC at ¶¶ 65, 67; *see also* Dkt. No. 131-

16   13, Ex. 14 ("ASC 450").  Even assuming ASC 450 would apply to the service contracts at issue

17   here, the provision requires companies to report "reasonable estimates" of "probable" future

18   losses.  *See id.*  Under ASC 450, therefore, Bloom had to determine the likelihood that it would

19   incur costs associated with service contracts during the period covered by its financial statement,

20   and whether it could reasonably estimate such costs based on its experience and other available

21   data.  As other courts have explained, ASC 450 thus asks companies to provide "an educated

22   approximation of future claims, i.e., an opinion."  *See Kanefsky v. Honeywell Int'l Inc.*, No. 18-

23   CV-15536, 2020 WL 2520669, at *5 (D.N.J. May 18, 2020) (citing *In re Hertz Glob. Holdings,*

24   *Inc. Sec. Litig.*, 2017 WL 1536223, at *11 (D.N.J. Apr. 27, 2017)).

25        Plaintiffs also rely on ASC 605-20-25-6, which discusses separately priced extended

26   warranty and product maintenance contracts.  Dkt. No. 138-8, Ex. 33 ("ASC 605").  ASC 605

27   provides that "[a] loss shall be recognized on extended warranty or product maintenance contracts

28   if the sum of expected costs of providing services under the contracts and unamortized acquisition

United States District Court
Northern District of California

8

costs exceeds related unearned revenue."  *See* ASC 605.  Much like ASC 450, ASC 605 asks

companies to estimate future costs for existing contracts.  Companies must estimate expected costs

to determine whether they exceed expected revenue.

Because both ASC 450 and ASC 605 require the exercise of judgment, the Court finds that

Bloom's statements about its contingent liabilities are opinion statements, and the *Omnicare*

framework applies.  As an initial step, Plaintiffs must therefore "call into question [Defendants']

basis for offering the opinion" about Bloom's contingent liabilities.  *Id.* at 175.  To do so,

Plaintiffs must identify particular facts that Defendants omitted "about the inquiry [Defendants]

did or did not conduct or the knowledge [they] did or did not have."  *Omnicare*, 575 U.S. at 194.

"[C]onclusory assertions" are insufficient.  *Id.*

Here, Plaintiffs do not directly explain how their allegations satisfy *Omnicare*.  *See* Dkt.

No. 138 at 13–17.  The complaint does not address what "inquiry" Defendants did or did not make

with respect to the service contracts or Bloom's GAAP compliance.  Nor does the complaint

address Bloom's purported knowledge that the service contracts should have been accounted for

differently under GAAP.

Rather, Plaintiffs identify several facts that Defendants purportedly knew about the service

contracts.  More specifically, Plaintiffs allege that Bloom had information about (1) the cost to

replace fuel cells; (2) the average fuel cell life; (3) the length of time of an average service

contract; (4) the average number of times fuel cells are replaced; (5) the current replacement cycle;

(6) the cumulative install base; and (7) the cost to replace the Energy Servers.  *See* SAC at ¶¶ 69–

73.  Plaintiffs allege that based on these "known" facts, Defendants could have—and should

have—estimated the costs of the service contracts and disclosed these contingent liabilities in the

Registration Statement.  Plaintiffs then conclude, without explanation, that the contingent

liabilities from these service contracts totaled $2.9 billion.  *Id.* at ¶ 64.

The allegations about Defendants' alleged knowledge, however, are conclusory and belied

by other allegations in the complaint.  For example, Plaintiffs contend that the service contracts

"*typically* last[] from 10 to 21 years and can last as long as 25 years," in total, and are renewed

each year at the customer's option.  SAC at ¶¶ 63, 68 (emphasis added).  But Plaintiffs fail to

United States District Court
Northern District of California

1   explain how Defendants could meaningfully estimate the length of future contracts from such a

2   large range.  Plaintiffs also suggest that Bloom knew the estimated life of its Energy Servers and

3   fuel cells because it had to replace some of its earlier generation systems.  *See id.* at ¶¶ 69–70.  But

4   as Plaintiffs' allegations inherently acknowledge, Bloom also had newer systems in place, and

5   Plaintiffs do not explain how Defendants could extrapolate to determine the life or replacement

6   schedule for all its Energy Servers.  *See id.* at ¶ 75 (statement by Bloom that "[o]ver the years we

7   have made steady improvements in our fuel cell lives . . .").

8        Instead, Plaintiffs appear to suggest that because Hindenburg Research came up with an

9   estimate of contingent liabilities from the service contracts in September 2019, Bloom should have

10  done so as well.  *See* SAC at ¶¶ 72–73.  Plaintiffs explain that the Hindenburg authors estimated

11  that Bloom had  "$2.2 billion in undisclosed servicing liabilities that the market has missed."  *Id.*

12  at ¶ 72.  Plaintiffs do not explain how the authors arrived at this figure or why it constitutes a

13  reasonable estimate.  Plaintiffs also fail to provide any information regarding the authors of this

14  report or their qualifications.

15       In opposition, Plaintiffs suggest that the Court should simply consider the Hindenburg

16  report—and its analysis—in its entirety.  *See* Dkt. No. 138 at 17.  But the report indicates that

17  Hindenburg Research holds a short position in Bloom's stock.  *See* Dkt. No. 138-4, Ex. 29

18  ("Hindenburg Report") at 2, 51.  The report recognizes that Hindenburg "therefore stands to

19  realize significant gains in the event that the price of any [Bloom stock] declines."  *Id.* at 51.  In

20  short, Plaintiffs do not adequately explain why this self-interested report supports their claim of

21  falsity.  *See In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *10 (N.D.

22  Cal. July 13, 2020).  Even if the Court were to consider the report, it says nothing about Bloom's

23  inquiry into or knowledge about how to account for the service contracts under GAAP.

24       Plaintiffs have failed to plead that any of the opinion statements about Bloom's contingent

25  liabilities were false or misleading under *Omnicare*.  The Court **GRANTS** the motion to dismiss

26  on this basis.

27              **b.  Managed Service Agreements**

28       Plaintiffs also challenge Defendants' accounting for Bloom's Managed Service

10

Agreements ("MSAs").  Under an MSA, Bloom sells its Energy Servers to a bank, which then leases the equipment back to the company.  *See* SAC at ¶ 400.  Bloom, in turn, subleases the equipment to a customer.  *Id.*  Under the MSAs, the customer pays the bank a fixed fee for its use of the Energy Server and also pays Bloom for its maintenance and operation of the Energy Server. *Id.* at ¶¶ 81, 400.  Plaintiffs note that Bloom was therefore both "lessee" and "lessor" in this arrangement.  *See id.* at ¶ 81.  Plaintiffs allege that when Bloom filed its Registration Statement, it accounted for MSAs as operating leases instead of capital leases, in violation of GAAP.  *Id.* at ¶¶ 81–93 (citing ASC 840-10-10-1, ASC 840-10-25-1).  Plaintiffs note that capital leases are generally less desirable because companies must record both the asset and corresponding liability on its books.  *See id.* at ¶ 88.  Plaintiffs assert that by accounting for the MSAs as operating leases, Bloom improperly recognized revenue from the "sales" of Energy Servers to the banks upfront, rather than recognizing any revenue over the term of the MSA.  *See id.* at ¶¶ 89–91.  Doing so, Plaintiffs argue, materially misrepresented Bloom's financial position.  *Id.* at ¶ 81.

Prior to late 2019, Bloom had concluded, and PwC had concurred, that its treatment of MSAs was proper.  *Id.* at ¶ 400.  But on February 12, 2020, Bloom announced that it would "restate" certain prior financial statements from 2018 and 2019 and "revise" other prior financial statements for 2016, 2017, and 2018 to account for the change in treatment of certain MSAs as financings (*i.e.*, loans from the banks rather than sales).  *Id.*  Bloom acknowledged that this would alter its reported losses and the timing of revenue recognition, with the company recognizing revenue over the loan term as customers made payments to the banks.  *See id.*

Here too, Defendants urge that *Omnicare* applies because Bloom's treatment of the MSAs and its recognition of revenue from them was the product of accounting judgments.  *See* Dkt. No. 130 at 17–19.

Plaintiffs respond that Bloom's "statements of total revenue, net loss, and net loss per share" are not statements of opinion, but rather objective facts.  *See* Dkt. No. 138 at 7–8. However, the considerations underlying these figures—such as which GAAP provisions apply and how to apply them—may require the exercise of judgment.  *See Align*, 856 F.3d at 621; *In re AmTrust Fin. Servs., Inc. Sec. Litig.*, No. 17-CV-1545 (LAK), 2019 WL 4257110, at *14

(S.D.N.Y. Sept. 9, 2019).  As the court in *In re AmTrust Financial Service* aptly explained:

> If the numbers underlying that data consist only of figures that were then presently known, fixed, or definite – e.g., the price of widgets and number of widgets sold in a previous month – then any resulting data would be a statement of fact.  Likewise, if the relevant provision of GAAP or ASC topic applied to produce the data called only for the application of or evaluation under objective criteria, then the resulting data would be a statement of fact.  If, however, the relevant accounting guidance called for the exercise of judgment, then the resulting data would be a statement of opinion.  And, if determining the relevant provision of GAAP to apply in a certain area of accounting or with respect to a certain transaction involved a subjective evaluation, then any data resulting from that application of GAAP would be a statement of opinion.

*In re AmTrust*, 2019 WL 4257110, at *14.  Plaintiffs assert that the relevant ASC provisions here are "very clear bright line provisions for when a lease should be classified as a capital lease."  *See* SAC at ¶ 84; *see also* Dkt. No. 138 at 8–9.

    *First*, Plaintiffs point to ASC 840-10-25-1, which lists four criteria to consider when determining whether to classify a lease as a capital lease:

> a.    The lease transfers ownership of the property to the lessee by the end of the lease term.
> b.    The lease contains a bargain purchase option.
> c.    The lease term is equal to 75 percent or more of the estimated economic life of the leased property.
> d.    The present value at the beginning of the lease term of the minimum lease payments . . . exceeds 90 percent of the excess of the fair value of the leased property to the lessor at lease inception . . . .

*See* Dkt. No. 131-15, Ex. 16 ("ASC 840") at 2.  As Plaintiffs note in the complaint, "[i]f, at its inception, a lease meets any of the [] four criteria, it is classified as a capital lease by the lessee." SAC at ¶ 84.  The complaint focuses exclusively on the third criterion.  Plaintiffs assert that "[t]he length of Bloom Energy's MS[A] leases was 6 – 10 years, well in excess of the 75% of the Energy Servers' actual useful life."  *See* SAC at ¶ 89.  Plaintiffs therefore conclude that Bloom should have treated the MSAs as capital leases.  *Id.*

    *Second*, Plaintiffs cite ASC 840-10-10-1, which describes "[t]he objective of the lease classification criteria" in ASC 840.  *See id.* at ¶ 84; *see also* Dkt. No. 138 at 8.  The provision

states that the classification criteria "derive[] from the concept that a lease that transfers substantially all of the benefits and risks incident to the ownership of property should be accounted for as the acquisition of an asset and the incurrence of an obligation by the lessee and as a sale or financing by the lessor.  All other leases should be accounted for as operating leases." *See* SAC at ¶ 83 (quoting ASC 840-10-10-1).  Plaintiffs argue that a "sale-leaseback" transaction like the MSAs should not be treated as an operating lease because "the seller-lessee never parted with the asset."  *See id.* at ¶ 86.  Plaintiffs further argue that compliance with ASC 840-10-10-1 is a threshold requirement, and the Court need not consider any other provisions in ASC 840 to determine whether Defendants accurately classified the MSAs.  *See* Dkt. No. 130 at 8.

By its terms, however, ASC 840-10-10-1 merely states the "objectives" underlying the more detailed provisions that follow.  Despite Plaintiffs' urging, it does not appear to provide the definitive method for classifying a lease.  ASC 840-40-25-4, for example, appears to specifically address a sale-leaseback and the recognition of related profits:

> If the seller-lessee retains, through a leaseback, substantially all of the benefits and risks incident to the ownership of the property sold, the sale-leaseback transaction is merely a financing.  The seller-lessee shall not recognize any profit on the sale of an asset if the substance of the sale-leaseback transaction is merely a financing.  Accordingly, *this Subtopic does not permit any profit to be recognized on a sale if a related leaseback of the entire property sold meets one of the criteria in paragraph 840-10-25-1.*

*Id.* at 16 (emphasis added).  This provision thus refers back to the four criteria discussed above in ASC 840-10-25-1.

In their opposition brief, Plaintiffs do not even reference ASC 840-10-25-1.  Nor do they explain why the application of this provision does not require the exercise of judgment.  Although a somewhat close call, in the Court's view, ASC 840-10-25-1 appears to involve complex considerations of the specific terms of the MSAs and the value of the Energy Servers.

Rather than discuss the ASC provision directly, Plaintiffs rely heavily on the fact that Bloom decided to revise and restate its financial statements as evidence that Bloom's treatment of the MSAs was "objectively incorrect."  *See* Dkt. No. 138 at 8–10, & n.5–6.  Plaintiffs point out

that "[a] restatement is the 'process of revising previously issued financial statements to reflect the correction of an error in those financial statements.'"  *Id.* at 9 (quoting ASC 250-10-20).  But Plaintiffs do not cite any case law supporting their theory that a restatement alone can establish that a statement is one of fact rather than of opinion.  As Defendants note, opinion statements can still be wrong such that a company may seek to correct them.  This does not, however, transform the opinion statement into an objective statement of fact.  The Supreme Court in *Omnicare* implicitly recognized this, explaining that "an investor cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion."  *See Omnicare*, 575 U.S. at 194.

Plaintiffs have not alleged facts calling into question Defendants' basis for concluding that the MSAs could be treated as sales rather than capital leases.  Plaintiffs do not sufficiently explain how the MSAs meet any of the four criteria in ASC 840-10-25-1.  In the complaint, Plaintiffs do not specify the economic life of an Energy Server, a necessary input to determine whether the lease term is at least 75% of the Energy Servers' estimated economic life under the third criterion.  As Defendants point out, the only insight Plaintiffs provide is that Bloom represented that the Energy Servers had useful lives of 15 to 21 years.  *See* SAC at ¶ 469.  Even assuming a useful life of 15 years, Plaintiffs have not established that the MSAs meet the 75% of estimated useful life threshold in ASC 840-10-25-1.  And Plaintiffs do not allege that the MSAs meet any of the other three criteria.  The Court therefore **GRANTS** the motion to dismiss regarding the treatment of Bloom's MSAs.

### ii.    Fuel Cell Life

Plaintiffs next challenge Bloom's representations about the Energy Servers' fuel cell life.  In the Registration Statement, Defendants included a letter from then-CFO Randy Furr.  *See* SAC at ¶ 75; *see also* Dkt. No. 131-1, Ex. 1 at 68–70.  In the letter, Mr. Furr acknowledged that Bloom's service business "experienced losses" historically as it installed Energy Servers that had a lifespan below the company's break even point.  *See* Dkt. No. 131-1, Ex. 1 at 68.  However, Mr. Furr expressed optimism that Bloom could break even in its service business in the future "provided the time between [fuel cell] stack replacements across all of our fleet is five years or

14

1    better."  *Id.*  Mr. Furr explained that although earlier generations of Bloom's fuel cells had needed

2    replacement "typically [every] 12 to 18 months," "[o]ver the years we have made steady

3    improvements in our fuel cell lives, and from 2017 onwards we expect to average over five years

4    between replacements."  *See id.*

5         Plaintiffs assert that these statements were materially false and misleading because in

6    reality, "Bloom Energy routinely replaced its fuel cells after just three years."  *See* SAC at ¶ 77.

7    Here again, Plaintiffs base their allegations on the Hindenburg Research report.  *See id.* at ¶ 76.  In

8    their September 2019 report, the Hindenburg authors explained that they had collected public

9    utility records for New York and California for generators installed after 2016, covering 35 of

10   Bloom's projects.  Hindenburg Report at 10–12, 46–48; *see also* SAC at ¶ 76.  The authors

11   concluded that "[a]fter aggregating this data, [they] found that even Bloom's newest fuel cells will

12   degrade below replacement thresholds in under 3 years . . . ."  Hindenburg Report at 11.  The

13   authors also cited to several unnamed experts who said that they would be "highly skeptical" of

14   solid oxide fuel cells lasting five years or longer in the field.  *Id.* at 11.

15        Defendants again argue that Plaintiffs are challenging statements of opinion.  *See* Dkt. No.

16   130 at 13–14.  They point out that in the letter, Mr. Furr states that "*we expect* to average over five

17   years between [fuel cell] replacements" from 2017 onward.  *See* Dkt. No. 131-1, Ex. 1 at 68

18   (emphasis added).  The letter further said "*we believe* we can break-even in our service business

19   provided the time between stack replacements across all of our fleet is five years or better."

20   *Id.* (emphasis added).  Plaintiffs respond that Mr. Furr's statements, taken in their entirety, contain

21   an embedded statement of fact that Defendants "saw improvements in fuel cell life averaging five

22   years between replacements."  *See* Dkt. No. 138 at 21.

23        The Supreme Court in *Omnicare* recognized that the use of "words like 'I believe'" is not

24   dispositive of whether a statement is one of fact or opinion.  *See Omnicare*, 575 U.S. at 185.  For

25   example, the Supreme Court provided a hypothetical in which a CEO said "I believe our TVs have

26   the highest resolution available because we use a patented technology to which our competitors do

27   not have access."  *Id.*  The Court explained that the statement not only affirms the CEO's opinions

28   about the company's TV resolution, "but also an underlying fact:  that the company uses a

United States District Court
Northern District of California

15

patented technology." *Id.*  Defendants do not appear to contest that Mr. Furr's statements contain an embedded statement of fact like the hypothetical in *Omnicare*.  *See* Dkt. No. 145 at 6.  And the Court agrees that despite the use of the words "expect" and "believe," Mr. Furr's letter represents that Bloom saw improvements in fuel cell life.  *See* Dkt. No. 131-1, Ex. 1 at 68.  However, the Court disagrees with Plaintiffs' interpretation that Mr. Furr's letter contains any embedded statement of fact about how much improvement Bloom saw in fuel cell life.  Rather, Mr. Furr simply offered his opinion that based on the improvement the company had seen in the past, they expected "to average over five years between [fuel cell] replacements" from 2017 onward.  *See* Dkt. No. 131-1, Ex. 1 at 68.

Plaintiffs' basis for concluding that this statement is false appears to rest entirely on the Hindenburg report.  As the Court has already discussed, the authors of this report are short sellers with a financial interest in highlighting possible problems with Bloom's business.  *See* Hindenburg Report at 2, 51.  The Hindenburg authors state that they analyzed California and New York public utility data.  *Id.* at 10–11.  Given the deterioration that the authors saw in the efficiency of Bloom's newest generation fuel cells, the authors explained that the cells were on track to need replacement within three—not five—years.  *See id.*  As Defendants note, however, this is just a projection.  *See* Dkt. No. 145 at 6.  The public utility data does not appear to bear on the veracity of Mr. Furr's statement that Bloom saw improvement in its fuel cell technology over time.

The Hindenburg authors also appear to rely on other experts to buttress their analysis.  The report cites to unnamed experts who express skepticism that Bloom could achieve an average fuel cell life over five years.  *See id.*  The two quotations from "experts in the field" state that they are "highly skeptical" and "doubt" Bloom's claim.  *Id.* at 11.  But critically, none of these experts claim to have any experience with or knowledge of Bloom's Energy Servers or their fuel cells.  To the extent Plaintiffs rely on these other anonymous experts, the Court does not find this probative of falsity.  The Court finds that Plaintiffs have not plausibly alleged falsity as to Bloom's average fuel cell life and **GRANTS** the motion on this basis.

//

16

United States District Court
Northern District of California

### iii.     Efficiency and Emissions

Plaintiffs also challenge statements that Bloom made about the efficiency and emissions of its latest Energy Server technology.  *See* SAC at ¶¶ 96–103.

*First*, Plaintiffs challenge Defendants' assertion in the Registration Statement that the "latest generation of [Bloom's] Energy Servers" is capable of "beginning-of-life efficiencies of 65%," with an efficiency "range from 53% to 65% over the project term depending on environmental conditions and the age of the power modules."  *See* SAC at ¶ 97; *see also* Dkt. No. 131-1, Ex. 1 at 9, 14.  To establish the falsity of this statement, Plaintiffs cite a 2019 study conducted by the University of Delaware in which the author found that the actual operating efficiency of Bloom's fuel cells was only 45% in 2018.  *See* SAC at ¶ 98; *see also* Dkt. No. 131-21, Ex. 22.  Defendants point out that in the study, the author acknowledges that they did not evaluate the newest model of Energy Server.  *See* Dkt. No. 130 at 23.  However, Bloom's alleged misstatement was limited to the "latest generation."  *See* SAC at ¶ 97.  In their opposition brief, Plaintiffs appear to acknowledge this and do not explain why the University of Delaware study is nonetheless evidence of falsity.

Instead, Plaintiffs point out that the Hindenburg report, which evaluated Energy Servers installed after 2016, found that "Bloom's newer fuel cell installations" had "a median starting efficiency of 58.3%," which is below the stated 65%.  *See* Dkt. No. 138 at 22 (citing SAC at ¶ 76).  Defendants argue that the authors do not explain their methodology.  *See* Dkt. No. 145 at 13.  However, the report explains that the authors analyzed monthly performance data from the California Self-Generation Incentive Program and the New York State Energy Research and Development Authority.  *See* Hindenburg Report at 47.  The report also includes links to the reports, and notes how the authors sorted the data to look at Bloom's latest Energy Servers.  *Id.*  Defendants also argue that the "58.3% 'median' figure does not show that the latest-generation Energy Servers were not capable of 65% efficiency."  *See* Dkt. No. 145 at 13.  The Court is not persuaded.  Defendants no doubt disagree with the report's conclusions and the weight of the evidence Plaintiffs have pled.  But at this stage, Plaintiffs need only plead enough facts to make it plausible that Bloom's statement about the Energy Servers was false, and they have done so.

*Second*, Plaintiffs challenge several of Bloom's statements regarding emissions.  Plaintiffs identify statements that (1) "Energy Servers deployed since 2012 running on natural gas produce nearly 60% less carbon emissions compared to the average U.S. combustion power generation"; and (2) "Energy Servers emit virtually no criteria air pollutants, including NOx or SOx."  SAC at ¶ 99.[5]  Plaintiffs contend that these statements were false because the Energy Servers in fact produce pollutants such as nitrogen oxides, volatile organic compounds, and hazardous solid waste.  *See id.* at ¶ 100.  Plaintiffs identify recent litigation in the Superior Court of California in which concerns were raised about the pollution from Bloom's technology.  *See id.* (citing *Bloom v. City of Santa Clara*, Superior Court of California, County of Santa Clara, 19-cv-348838).  The Hindenburg report also noted that the Servers "generate more CO2 than the electric grid in key states they operate in and produce CO2 levels comparable to modern natural gas power plants." *Id.* at ¶ 101.  And in February 2020, 16 Delaware state senators wrote to the Department of Natural Resources and Environmental Control, expressing concern over Bloom's alleged misrepresentations about the Energy Servers' CO2 emissions.  *See id.* at ¶ 102.

Defendants argue that Plaintiffs are "comparing apples to oranges," and that none of the cited sources establish that Bloom's statements were false and misleading.  *See* Dkt. No. 130 at 23–24.  Defendants urge that Bloom "never represented that its Energy Servers produce *no* emissions," just that they compare favorably to other energy sources.  *See id.* at 24 (emphasis in original).  But as Plaintiffs point out, at least one of Defendants' challenged statements is that "Energy Servers emit *virtually no criteria air pollutants*, including NOx or SOx."  SAC at ¶ 99 (emphasis added).

Nevertheless, Plaintiffs offer few allegations to support the falsity of the statement.  Plaintiffs cite the court's order in *Bloom v. City of Santa Clara*.  *See* Dkt. No. 138 at 22.  In the order, the court noted that Santa Clara "cite[d] materials showing [Bloom's Energy Server fuel cells] produce NOx, CO2, VOCs, and hazardous solid waste."  *See* Dkt. No. 131-23, Ex. 24 at 8.

---

[5] Although the complaint includes additional statements from Bloom about its emissions, Plaintiffs do not appear to address these in their opposition and instead focus only on these two statements. *See* Dkt. No. 38 at 22–23.

However, the court did not cite to these materials or adopt their findings.  Rather, later in the order the court indicated that one report showed that Energy Servers "do not produce SOx."  *See id.* at 14.  The report also found that the NOx emission factor for the Energy Servers was .0017, lower than the NOx emission factor for the natural gas power plant that the report analyzed.  *See id.*; *see also id.* at 6.  Plaintiffs do not explain how this supports their theory of falsity.

Regarding Bloom's claim that its Energy Servers emit 60% less carbon emissions than the average U.S. combustion power generation, Plaintiffs again cite the Hindenburg report.  *See* SAC at ¶ 101.  The report concludes that the "Servers emit significantly more $CO_2$ than the electric grid in key states where it operates . . . comparable to those of modern natural gas power plants."  *See* Dkt. No. 138 at 22 (quoting Hindenburg Report at 1).  The complaint does not explain how the "power grid in key states" compares to "U.S. combustion power generation."  In opposition, Plaintiffs suggest that "combustion power plants are included in 'the grid.'"  *See* Dkt. No. 138 at 23.  However, they offer no support for this conclusion, and importantly have not alleged this is in the complaint.  Plaintiff also notes that "Bloom self-identified as a 'large quantity generator of hazardous waste,' to the EPA."  *See* Dkt. No. 138 at 22.  Yet again, however, Plaintiffs do not explain how this is relevant to the challenged statements about the Energy Servers' carbon emissions compared to U.S. combustion power generation.

The Court therefore **GRANTS IN PART** the motion as it relates to statements about Bloom's emissions, but otherwise **DENIES** the motion as to claims based on Bloom's statements about the Energy Servers' efficiency.

### iv.    Construction Delays

Plaintiffs challenge statements in the Registration Statement about "risks" of delay related to Bloom's construction schedule.  SAC at ¶ 54.  In particular, Bloom noted that its "business is subject to risks associated with construction . . . that may arise in the course of completing installations."  *See id.* at ¶ 53.  Plaintiffs contend that these were not just possible risks, but that construction delays actually existed at the time of the Registration Statement.  *See id.* at ¶¶ 54–58.  According to a confidential witness ("CW1"), a senior program manager for Bloom from June 2016 to February 2018, construction delays were "constant, "on-going," and "occurred during

almost every project." *See id.* at ¶¶ 55–57.  Plaintiffs allege that Bloom "did not disclose that . . . at the time of the Registration Statement, [it was] already facing significant construction delays that were interfering with its installations and 'acceptances.'"[6] SAC at ¶ 54.  And on November 5, 2018, after the IPO, Bloom reported that it had only achieved 206 acceptances, less than the 215 to 235 acceptances it had provided as third-quarter guidance.  *See id.* at ¶ 59.

Defendants first argue that "the Registration Statement plainly *did* tell investors that installation delays and the difficulty in predicting the timing of acceptances were ongoing features of its business."  *See* Dkt. No. 130 at 6 (emphasis in original).  For example, Bloom warned investors that "[m]any factors can cause a lag" in the construction process and that "[m]any of these factors are unpredictable."  SAC at ¶ 53.  Defendants argue that reasonable investors would assume after reading these risks that Bloom had already experienced construction delays.  *See* Dkt. No. 130 at 6.

Defendants cite to *Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1161–62 (D. Ariz. 2017), to support their contention that Bloom sufficiently warned that construction delays existed.  *See* Dkt. No. 145 at 12, & n.7.  In *Lomingkit*, the company's Form 10-K stated "[f]rom time to time we experience intermittent outages of the information technology systems used by our students and by our employees."  *See id.* at 1161.  The court found that these were not "future-oriented warnings" but rather discussed issues that the company was experiencing.  *See id.* at 1161–62.  However, the court in *Lomingkit* also recognized that a "where a party states that something *might* occur, that warning may be actionable because it omits that 'that something' has already occurred."  275 F. Supp. 3d at 1161.  Here, Defendants stated that construction delays "may" arise.  Although a factfinder may ultimately agree with Defendants' interpretation, the Court finds that it is not the only plausible interpretation.  Based on the allegations and language of the Registration Statement, a factfinder could conclude that Defendants failed to disclose preexisting construction delays.

Defendants next argue that Plaintiffs' only evidence of preexisting construction delays is

---

[6] "Acceptances" signify that an Energy Server is fully installed and running at full power.  *See, e.g.*, SAC at ¶ 44; Dkt. No. 130 at 1.

United States District Court
Northern District of California

statements from CW1, and that this is insufficient because CW1 is unreliable.  *See* Dkt. No. 130 at

6–7.  Defendants argue that even as alleged, CW1 left Bloom in February 2018, five months

before the IPO.  *See* SAC at ¶ 55.  Defendant thus urges that CW1 could have no personal

knowledge about construction delays at the time of the IPO.  Dkt. No. 130 at 7.  The complaint

alleges that in his role, CW1 "was responsible for overseeing sales from development to

acceptance, providing technical help during installation and sales, overseeing construction

contracts, and ensuring that the construction and installation met all government requirements."

*See* SAC at ¶ 58.  Plaintiffs have therefore alleged how CW1 was in a position to know about

construction delays at Bloom.

The Court further finds that the timing of CW1's departure from Bloom does not

undermine the basis for his knowledge for purposes of Plaintiffs' Section 11 claims in this case.

As the Ninth Circuit has recognized, prior information may still "confirm what a defendant should

have known during the class period."  *Webb v. Solarcity Corp.*, 884 F.3d 844, 851, n.1 (9th Cir.

2018).  Here, although CW1 left before the IPO, he indicated that Bloom's construction delays

were "constant" and "on-going" during his time with the company.  *See* SAC at ¶¶ 56–57.  Thus,

as of at least February 2018, Bloom was allegedly experiencing construction delays for Q3 2018,

the sales cycle that was ongoing at the time of the IPO.  *See* Dkt. No. at 5 ("[T]he process leading

to acceptance is lengthy, running to 12 months or more."); Dkt. 131-1, Ex. 1 at 33 ("Our sales

cycle is typically 12 to 18 months.").  Plaintiffs have therefore established how CW1 had

information about construction delays relevant to the IPO.  But Defendants couched construction

delays as possible risks rather than actual problems at the company.  A reasonable investor could

find this misleading.  The Court understands that Defendants disagree with the accuracy of

Plaintiffs' allegations.  But that is not the Court's inquiry at this stage.  The Court therefore

**DENIES** the motion on this basis.

### v.   Internal Control Weaknesses

Lastly, Plaintiffs claim that Bloom misrepresented in the Registration Statement "that there

were no 'material weaknesses in internal control over financial reporting at December 31, 2017.'"

*See* SAC at ¶ 94.  Plaintiffs note that in its 2019 Form 10-K, Bloom recognized that the company

United States District Court
Northern District of California

1    "had 'a material weakness in [its] internal control over financial reporting related to the accounting

2    for complex or non-routine transactions.'" *Id.*

3        Defendants argue that Plaintiffs misstate Bloom's representation about internal controls,

4    and that in a risk disclosure the company stated that it had not "discover[ed] any material

5    weaknesses" as of December 31, 2017. *See* Dkt. No. 130 at 22.  Plaintiffs appear to concede that

6    Defendants are correct as to the actual statement Bloom made about internal controls. *See* Dkt.

7    No. 138 at 23–24.  They argue, however, that they still represented to investors that they had

8    adequately reviewed internal controls.  But Plaintiffs do not plead any facts to support the

9    contention that Bloom did not engage in the appropriate level of review.  Plaintiffs have also failed

10   to plead any facts to explain why possible financial reporting controls in 2019 or 2020 would

11   implicate representations about financial controls in 2017.  The Court therefore **GRANTS** the

12   motion on this basis.

13       **B.    PwC Motion**

14       PwC filed its own motion to dismiss the Section 11 claim that Plaintiffs assert against it.

15   *See* Dkt. No. 127.  Plaintiffs allege that PwC reviewed Bloom's financial statements in connection

16   with the IPO. *See* SAC at ¶¶ 35, 115.  Bloom's Registration Statement contained PwC's audit

17   report, which stated that Bloom's 2016 and 2017 financial statements "present fairly, in all

18   material respects, the financial position of the Company as of December 31, 2017 . . . ." *See* Dkt.

19   No. 131-1, Ex. 1 at 227.  PwC argues that its audit report and the statements contained within it

20   are opinions subject to the *Omnicare* framework. *See* Dkt. No. 127 at 6–7.  They contend that

21   Plaintiffs have failed to sufficiently allege that the audit report was objectively and subjectively

22   false, and the Section 11 claim against them should thus be dismissed. *Id.*

23       In response, Plaintiffs clarify that it contends PwC is liable under Section 11 both for

24   misstatements in the audit report and for the GAAP errors in the 2017 financial statements related

25   to the treatment of the MSAs. *See* Dkt. No. 140 at 5–7, 9–10; *see also* Section III.A.i.b

26   (discussing MSAs).  Under Section 11, accountants are liable for errors in "any part of the

27   registration statement" that they "prepared or certified." *See* 15 U.S.C. § 77k(a)(4).  Plaintiffs

28   argue that PwC does not dispute that it (1) certified the financial statements; or that (2) the 2017

22

financial statements were false.  Dkt. No. 140 at 6–7.  Plaintiffs urge that PwC therefore concedes liability for them.  *Id.*  The Court is not persuaded.  PwC contends that "PwC's opinion was that there were no material errors in the 2016 and 2017 financial statements," and that Plaintiffs fail to allege that the 2016 and 2017 financial statements were materially misstated.  *See* Dkt. No. 127 at 1; *see also id.* at 11, n.3.  The Court therefore considers PwC's motion to dismiss the Section 11 claim as to the alleged misstatements in the audit report and the financial statements.

### i.  *Omnicare*

As a threshold issue, the parties disagree on whether the audit report and the financial statements are opinions subject to *Omnicare*.  Neither party cites to any Ninth Circuit authority resolving this issue.  Instead, the parties note that there is a split in authority regarding whether such material should be considered opinion.

Plaintiffs first highlight the district court's order in *Special Situations Fund III QP, L.P. v. Marrone Bio Innovations, Inc.*, 243 F. Supp. 3d 1109, 1116–118 (E.D. Cal. 2017), which explicitly rejected the application of *Omnicare* to auditors.  The court reasoned that "audit opinions are not of the same substance as those discussed in *Omnicare*," which referenced a hypothetical CEO opining that the company's TVs had "'the highest resolution available on the market.'"  *Id.* (quoting *Omnicare*, 575 U.S. at 183).  The court in *Marrone* said this hypothetical is "qualitatively different from an auditor's professional opinion about the soundness of a company's financial statements."  *Id.*  This Court respectfully disagrees.  The Court sees no meaningful distinction between the professional knowledge that a CEO has and the opinions he offers about a company's technology and the professional knowledge that an auditor has and the opinions it offers about a company's financial statements.  The Supreme Court did not recognize any "auditor" exception to its holding, and the Court finds no basis for creating such an exception. *Accord Querub v. Moore Stephens Hong Kong*, 649 F. App'x 55, 58 (2d Cir. 2016) (Summary Order); *Johnson v. CBD Energy Ltd.*, No. CV H-15-1668, 2016 WL 3654657, at *10 (S.D. Tex. July 6, 2016) (collecting cases).

Rather, the Supreme Court in *Omnicare* defined an opinion broadly as "a belief[,] a view, or a sentiment which the mind forms of persons or things."  *Omnicare*, 575 U.S. at 183 (quotation

omitted) (alteration in original).  Therefore, the critical difference between a fact and an opinion is that "a statement of fact ('the coffee is hot') expresses certainty about a thing, whereas a statement of opinion ('I think the coffee is hot') does not."  *Id.*  The Court further emphasized that Section 11 "does not allow investors to second guess inherently subjective and uncertain assessments."  *Id.* It thus matters under *Omnicare* that PwC's audit report and statements in the Registration Statement were explicitly identified as opinions.  *Accord Querub*, 649 F. App'x at 58 ("Audit reports, labeled 'opinions' and involving considerable subjective judgment, are statements of opinion subject to the *Omnicare* standard for Section 11 claims."); *see also Buttonwood Tree Value Partners, LP v. Sweeney*, 2012 WL 2086607, at *2 (C.D. Cal. June 7, 2012) (finding "both GAAS and GAAP are a collection of broad standards that are couched in rather general and in some cases inherently subjective terms . . . to which reasonable professionals planning or conducting an audit reasonably and frequently could disagree.").

Here, in the Registration Statement PwC identified its "*Opinion on the Financial Statements*" for 2016 and 2017.  *See* Dkt. No. 131-1, Ex. 1 at 227 (emphasis added).  PwC stated:

> *In our opinion*, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2017 and December 31, 2016, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2017 in conformity with accounting principles generally accepted in the United States of America.

*Id.* (emphasis added).  PwC further explained that although the "financial statements are the responsibility of the Company's management," PwC's "responsibility is to *express an opinion* on the Company's consolidated financial statements based on [its] audits."  *Id.* (emphasis added). They therefore conducted the audit "to obtain reasonable assurance about whether the consolidated financial statements [were] free of material misstatement, whether due to error or fraud."  *Id.*  As the Supreme Court confirmed, a reasonable person "recognizes the import of words like 'I think' or 'I believe,' and grasps that they convey some lack of certainty as to the statement's content." *Omnicare*, 575 U.S. at 187.  Moreover, as discussed in more detail in Section III.A.i.b above, the GAAP provisions regarding sale-leaseback transactions like the MSAs are complex and may

require the exercise of considerable judgment.

Plaintiffs further contend that apart from the audit report itself, PwC also "certified" Bloom's 2017 financial statements so as to be liable under 15 U.S.C. § 77k(a)(4).  *See* Dkt. No. 140 at 5–7.  Section 11(a)(4) provides a cause of action against a professional "who has with his consent been named as having prepared or certified any part of the registration statement."  15 U.S.C. § 77k(a)(4).  Plaintiffs suggest that "certified" in this context means PwC guaranteed that there were no material misstatements in Bloom Energy's 2017 financial statements.  The Court disagrees that there is a meaningful distinction between any "certification" of the 2017 financial statements and PwC's audit report.  *Accord Johnson*, 2016 WL 3654657, at *10–11.  PwC explicitly stated that it was providing an opinion based on its audit of these financial statements.  This is consistent with the SEC's definition that "[t]he term certified, when used in regard to financial statements, means examined and reported upon with an opinion expressed by an independent public or certified public accountant."  17 C.F.R. § 230.405.  The Court therefore finds that the *Omnicare* framework applies to PwC's statements in its audit report and the 2017 financial statements.

Plaintiffs argue that even if PwC's statements are considered opinions, they have pled a claim based on "embedded statements of fact" under *Omnicare*.  *See* Dkt. No. 140 at 11 (citing *In re Petrobras Sec. Litig.*, 14-cv-9662 (JSR), 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016)).  Plaintiffs urge that "the facts of Bloom's financial statements violating GAAP" are embedded in PwC's audit opinion.  *Id.*  The Court rejects Plaintiffs' attempt to cast any alleged errors in the financial statements as embedded statements of fact.  The court in *Johnson v. CBD Energy Ltd.* addressed this precise argument and found it premised on a misinterpretation of *Omnicare*.  2016 WL 3654657, at *12.  The Court finds the reasoning in *Johnson* persuasive and adopts it here.

### ii.    Subjective Falsity

To plead falsity for opinion statements under a material misstatement theory of liability, Plaintiffs must allege "both objective and subjective falsity."  *Align*, 856 F.3d at 615 (citing *Omnicare*, 575 U.S. at 183–86).  Plaintiffs appear to concede that they have not alleged subjective falsity as required under *Omnicare*.  And the Court finds that they have failed to plead any facts

1   suggesting that PwC did not sincerely believe that the "financial statements present fairly, in all

2   material respects, the financial position of the Company as of December 31, 2017 . . . ." *See* Dkt.

3   No. 131-1, Ex. 1 at 227.  The complaint hardly mentions PwC or its audit report at all, stating

4   simply that PwC "purportedly conducted an adequate and reasonable investigation into the

5   business, operations, financial statements, and accounting of Bloom Energy." *See* SAC at ¶ 116.

6   The Court therefore **GRANTS** PwC's motion to dismiss.

7           **C.    Section 10(b) Motion**

8            Under Section 10(b) of the Exchange Act, Plaintiffs seek to hold Defendants Bloom,

9   Sridhar, and Furr liable for issuing false and misleading statements either intentionally or with

10  deliberate recklessness to induce investors to purchase Bloom's common stock.  *See* SAC at

11  ¶¶ 134–508.  "To plead a claim under section 10(b) and Rule 10b-5, the Plaintiffs must allege:

12  (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the

13  misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic

14  loss; and (6) loss causation." *Align*, 856 F.3d at 613 (quotation omitted).  Plaintiffs acknowledge

15  that their Section 10(b) claims are subject to a heightened pleading standard under Rule 9(b).  *See*

16  Dkt. No. 139 at 4; *see also* SAC at ¶ 135 ("Plaintiffs' claims under the Exchange Act sound in

17  fraud.").

18           Plaintiffs' Section 10(b) and Section 11 claims are based on largely overlapping statements

19  involving (1) Bloom's financial statements, including improper accounting as to the maintenance

20  service agreements and MSAs; (2) the life cycle of the fuel cells in the Energy Servers; (3) the

21  efficiency and emissions of the Energy Servers; (4) construction delays; and (5) weaknesses in

22  Bloom's internal controls.  *See* SAC at ¶¶ 134–508.  Under Section 10(b), the challenged

23  statements include those in the Registration Statement, as well as others that Plaintiffs allege

24  occurred after the IPO and throughout the class period.  The Section 10(b) Defendants move to

25  dismiss the claims against them, arguing that Plaintiffs have failed to sufficiently plead falsity,

26  scienter, and economic loss.  *See* Dkt. No. 129.  The Section 10(b) Defendants also explicitly

27  incorporate by reference the arguments in the Section 11 Defendants' motion.  *See* Dkt. No. 129 at

28  1.  For the reasons detailed in Section III.A above, the Court agrees that Plaintiffs have failed to

United States District Court
Northern District of California

26

adequately plead falsity as to the statements regarding accounting errors, fuel cell life, emissions, and internal controls. The Court therefore **GRANTS IN PART** the Section 10(b) Defendants' motion on that basis. Accordingly, the Court only addresses the Section 10(b) Defendants' separate arguments that Plaintiffs failed to plead scienter and loss causation.

### i.    Scienter

Under the PSLRA, whenever intent is an element of a claim, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "The PSLRA's strong inference requirement has teeth," and "is an exacting pleading obligation." *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020) (quotation omitted) (citing *Zucco*, 552 F.3d at 990). "The inference of scienter must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The required state of mind is one of at least "deliberate recklessness." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999), *as amended* (Aug. 4, 1999). "[R]ecklessness only satisfies scienter under § 10(b) to the extent that it reflects some degree of intentional or conscious misconduct." *Id.* at 977.

The Court first turns to the specific alleged misstatements and Plaintiffs' allegations of scienter as they relate to these statements. The Court then makes a holistic assessment of the factual allegations.

### a.    Accounting Errors

Plaintiffs first contend that Defendants knew, or were deliberately reckless in not knowing, that Bloom was incorrectly accounting for its maintenance service agreements and MSAs. *See* Dkt. No. 139 at 9–16; *see also* SAC at ¶¶ 461–71. Plaintiffs suggest that scienter may be inferred from the accounting errors alone because the alleged GAAP violations were so "significant," and the GAAP provisions themselves so "basic" and straightforward to apply. *See* Dkt. No. 139 at 9–10. Plaintiffs argue, for example, that "determining the correct accounting for the MSAs was as simple as reviewing the default terms of the MSAs." *See id.* at 10 (citing SAC at ¶ 400). As the Court detailed in Section III.A.i above, however, the application of GAAP to Bloom's maintenance service agreements and MSAs involved a complex inquiry. As the district court in

27

*Oklahoma Firefighters Pension & Ret. Sys. v. IXIA* explained:

> A plaintiff . . . cannot merely point to a GAAP principle and contend that a correct interpretation was simple or obvious. At the very least, the plaintiff must present facts demonstrating that the defendant was aware of the relevant GAAP principle and that this defendant knew how that [principle] was being interpreted. The plaintiff must then plead facts explaining how the defendant's incorrect interpretation was so unreasonable or obviously wrong that it should give rise to an inference of deliberate wrongdoing.

50 F. Supp. 3d 1328, 1361 (C.D. Cal. 2014) (quotation omitted). Plaintiffs have not alleged any facts that demonstrates that Messrs. Sridhar or Furr knew of the relevant GAAP provisions or knew that Bloom's interpretation and application of them was unreasonable under the circumstances. The Court simply disagrees that as alleged these errors "were readily apparent" and "indicative of scienter." *See* Dkt. No. 139 at 13.

### b. Fuel Cell Life

Next Plaintiffs contend that Defendants knew, or were deliberately reckless in not knowing, that Bloom's fuel cells could not last five years. *See* Dkt. No. 139 at 18–19. Plaintiffs state that "Bloom's fuel cells were a core part of Bloom's business," and it would therefore be "absurd" for Defendants not to know that they had never reached an average life of five years. *Id.* But the challenged statement was simply a projection about future performance based on the company's technological advances. *See* SAC at ¶ 184. And Plaintiffs have not alleged sufficient facts about what either Mr. Sridhar or Mr. Furr actually knew about fuel cell life estimates.

### c. Efficiency and Emissions

Plaintiffs similarly contend that scienter can be assumed based on the centrality to Bloom's business and marketing strategy that its Energy Servers provide "clean energy." *See* Dkt. No. 139 at 19–20 (citing SAC at ¶¶ 179, 194, 288, 328). Plaintiffs contend that both Messrs. Sridhar and Furr promoted the Energy Servers as providing "clean energy." *Id.* However, the Ninth Circuit has cautioned that it is "not easy" to allege scienter based on a "core operations theory," *i.e.*, that "corporate officers have knowledge of the critical core operation of their companies." *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d, 1051, 1062 (9th Cir. 2014). Here,

United States District Court
Northern District of California

28

Plaintiffs offer no allegations about Messrs. Sridhar and Furr's "detailed involvement in the minutia of [the] company's operations, such as data monitoring" or "witness accounts demonstrating that [the] executives had actual involvement in creating false reports." *Id.* Nor are there any allegations about Bloom's technological advancements over time.

### d. Construction Delays

Plaintiffs contend that Defendants' statements regarding Bloom's ongoing construction delays were made with scienter. Plaintiffs again rely on CW1 to establish that Messrs. Sridhar and Furr had knowledge of the *existing* construction delays. *See* SAC at ¶ 144. Plaintiffs allege that CW1 "indicated that upper management, all the way up to Sridhar, typically became aware right away" of such construction delays. *See id.* In their opposition brief, Plaintiffs also contend that "CW1 would have direct knowledge of who was informed of the delays." Dkt. No. 139 at 18. But the complaint offers no basis for CW1's purported knowledge about what Messrs. Sridhar and Furr did or did not know. CW1 does not explain how he knows "upper management" was informed of the construction delays. In fact, the complaint does not allege that CW1 ever even interacted with Messrs. Sridhar or Furr.

### e. Internal Control Weaknesses

Plaintiffs also challenge the statements that Messrs. Sridhar and Furr made in their Sarbanes-Oxley certifications that they had evaluated internal controls and concluded that those controls were "effective to provide reasonable assurance" that the company disclosed the required information under the Exchange Act. *See* SAC at ¶¶ 208, 253, 284. The Ninth Circuit has found that such "[b]oilerplate language in a corporation's 10–K form, or required certifications under Sarbanes–Oxley section 302(a), . . . add[s] nothing substantial to the scienter calculus." *Zucco*, 552 F.3d at 1003–04. In their opposition brief, Plaintiffs nevertheless contend that "[i]f the Court finds that Sridhar and Furr acted with scienter" with regard to the alleged accounting errors, "it stands to reason that Sridhar and Furr acted with scienter by indicating there was [*sic*] no internal weaknesses in internal controls and certifying its financial statements despite Bloom's improper accounting." *See* Dkt. No. 139 at 21. However, the Court has found that Plaintiffs have *not* sufficiently alleged that the individual Defendants acted with scienter with regard to the

29

1   maintenance service contracts or MSAs.  *See* Section III.C.i.a.  In short, Plaintiffs have not pled

2   any facts suggesting that Messrs. Sridhar or Furr knew at any point during the purported class

3   period of any defect in internal controls.

### f.  Defendants' Motive

5        Plaintiffs also cite several other general allegations about Defendants' financial incentives

6   to support their claim that they have adequately pled scienter.  "Motive and opportunity [are] not

7   enough to create a strong inference of scienter."  *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156,

8   1166 (9th Cir. 2009); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002)

9   ("If scienter could be pleaded merely by alleging that officers and directors possess motive and

10   opportunity to enhance a company's business prospects, virtually every company in the United

11   States that experiences a downturn in stock price could be forced to defend securities fraud

12   actions.") (quotation omitted).

13        **Incentive Compensation.**  Plaintiffs contend that Messrs. Sridhar and Furr were

14   financially motivated to inflate Bloom's stock price because they profited from the IPO.  *See* SAC

15   at ¶¶ 442–46.  Plaintiffs allege that while Mr. Sridhar received an annual salary of $524,039 in

16   2017 and $607,500 in 2018, *id.* at ¶ 444, he also received a cash and equity bonus for taking Bloom

17   public totaling $2,000,000 in cash and $44,259,315 in vested RSUs, *id.* at ¶ 443.  Plaintiffs further

18   allege that Mr. Furr's salary for 2018 was $407,154, but that because of the IPO, Mr. Furr was granted

19   $11,276,283 in vested RSUs.  *Id.* at ¶ 445.  Plaintiffs urge that these bonuses were unreasonable for "a

20   company that was pre-profit."  *See id.* at ¶ 446.  Yet Plaintiffs have not alleged that Messrs. Sridhar

21   and Furr were responsible for setting the amount of their bonuses and compensation.

22        As Plaintiffs point out, the Ninth Circuit has stated that "[a] strong correlation between

23   financial results and stock options or cash bonuses for individual defendants may occasionally be

24   compelling enough to support an inference of scienter."  *Zucco*, 552 F.3d at 1004.  However, the

25   Ninth Circuit has also cautioned that "it is common for executive compensation, including stock

26   options and bonuses, to be based partly on the executive's success in achieving key corporate

27   goals."  *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).  The Supreme

28   Court has therefore cautioned against "conclud[ing] that there is fraudulent intent merely because

*United States District Court*
*Northern District of California*

30

a defendant's compensation was based in part on [] successes" in achieving corporate goals. *Rigel*, 697 F.3d at 884.  Specifically with respect to IPOs, the Ninth Circuit has concluded that "allegations regarding Defendants-Appellees' motive to boost the company's profitability and stock prices in the months surrounding the company's IPO are not 'specific' or 'particularized,' as our precedents require." *Webb v. Solarcity Corp.*, 884 F.3d 844, 856 (9th Cir. 2018).

Here, Plaintiffs offer a conclusory statement that the bonus structure was unreasonable. SAC at ¶ 446.  But Plaintiffs do not provide any detailed allegations about how the bonus structure worked or what the milestones were that the individual Defendants had to achieve in order to receive their bonuses. *See id.* at ¶¶ 441–46.  Plaintiffs suggest, for example, that the inflated share price was critical to ensure Bloom could satisfy its debt obligations. *See id.* at ¶ 453.  But Plaintiffs do not allege that Mr. Sridhar's or Mr. Furr's compensation was tied to the share price in the IPO.  The Court finds that Plaintiffs have not pled a sufficiently strong correlation between Bloom's financial performance and Messrs. Sridhar and Furr's stock and cash bonuses to support a finding of scienter in light of the work involved in helping the company through its IPO.

**Stock Sales.**  Plaintiffs further contend that Messrs. Sridhar and Furr's stock sales support a finding of scienter. *See* SAC at ¶¶ 455–60.  Plaintiffs allege that after PwC identified problems with the accounting of the MSAs, but before the company published its restatement in March 2020, Messrs. Sridhar and Furr sold a substantial amount of stock. *See id.*  Plaintiffs allege that prior to these sales, Mr. Sridhar had never sold stock in the open market and Mr. Furr had only done so once. *See id.* at ¶ 459.  Plaintiffs allege that by selling when they did, Messrs. Sridhar and Furr prevented losses of $1,927,811, and $317,063, respectively. *See id.* at ¶ 455.

The Ninth Circuit has stated that "[u]nusual' or 'suspicious' stock sales by corporate insiders may constitute circumstantial evidence of scienter . . . ." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1146 (9th Cir. 2017) (quotation omitted).  Courts may consider factors such as "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." *Id.* (quotation omitted).  Although Plaintiffs have alleged that the sales are not consistent with the individual Defendants' trading history, Bloom's IPO was not until July 25, 2018.  Defendants therefore only had, at most, less than a year and a half in which to sell stock.

1    Plaintiffs also do not discuss whether there was any waiting period after the IPO during which

2    Defendants were prevented from selling their stock.  Plaintiffs have also not provided any

3    information about what portion of their total holdings Messrs. Sridhar and Furr sold in December

4    2019 and January 2020.  Without more information, the Court does not find that these stocks sales

5    are sufficient, on their own, to establish scienter.

6          **Corporate Scienter.**  Plaintiffs contend that Bloom had its own financial incentives to

7    inflate the share price in order to cover its debts.  *See* SAC at ¶¶ 451–53.  The Ninth Circuit has

8    held that the theory of corporate or collective scienter is available, at most, in narrow

9    circumstances in which the challenged statements are "so dramatically false . . . [as] to create an

10   inference of scienter that at least some corporate officials knew of falsity upon publication." *In re*

11   *NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (rejecting corporate scienter

12   allegations) (quotation omitted).  Plaintiffs do not meet this standard.  And in the complaint,

13   Plaintiffs state only that Bloom is liable for the actions of Messrs. Sridhar, Furr and all other

14   employees under principles of *respondeat superior*.  *See* SAC at ¶¶ 478–79.  Because the Court

15   finds that Plaintiffs have not alleged scienter as to Messrs. Sridhar and Furr, Plaintiffs have also

16   not established scienter as to Bloom.

17                                    *        *        *

18         Even when Plaintiffs' allegations are considered in their entirety, the Court finds that the

19   inference of scienter is weak, and certainly not as strong as the inference that Defendants had a

20   non-fraudulent intent.  *See Tellabs*, 551 U.S. at 310 ("To determine whether the plaintiff has

21   alleged facts giving rise to the requisite 'strong inference,' a court must consider plausible,

22   nonculpable explanations for the defendant's conduct, as well as inferences favoring the

23   plaintiff.").  The Court therefore **GRANTS** the motion to dismiss on this basis.

24         ii.    **Loss Causation**

25         Lastly, Defendants contend that Plaintiffs have failed to allege loss causation regarding

26   fuel cell life.  "[T]o satisfy the loss causation requirement, the plaintiff must show that the

27   revelation of that misrepresentation or omission was a substantial factor in causing a decline in the

28   security's price, thus creating an actual economic loss for the plaintiff." *Nuveen Mun. High*

*Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013) (quoting *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425–26 (3d Cir. 2007)). This "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.'" *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 264 (2014)). However, this is not the only way to meet the pleading burden. Instead, "loss causation is simply a variant of proximate cause," and "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* at 1210.

Because the Court has found that Plaintiffs have not alleged scienter, the Court need not reach this issue. Nevertheless, to streamline the amendment process and any subsequent motion to dismiss, the Court addresses the parties' arguments. Defendants contend that the Hindenburg report did not constitute a corrective disclosure because it is based on publicly available information. *See* Dkt. No. 127 at 22–23. Plaintiffs allege that the falsity of Bloom's statements about fuel cell life was revealed to investors on September 17, 2019, when the Hindenburg authors issued their report concluding that Bloom's fuel cell life was less than three years. *See* SAC at ¶ 486. Defendants point out, however, that the Hindenburg report explicitly states that "all information [in the report] has been obtained from public sources." *See* Hindenburg Report at 59. Specifically, much of the Hindenburg report appears based on public utility data from California and New York. This Court has previously explained that "'the mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure.'" *In re Nektar Therapeutics*, No. 18-CV-06607-HSG, 2020 WL 3962004, at *18 (N.D. Cal. July 13, 2020) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)). "'If every analyst or short-seller's opinion based on already-public information could form the basis for a corrective disclosure, then every investor who suffers a loss in the financial markets could sue under § 10(b) using an analyst' s negative analysis of public filings as a corrective disclosure. That cannot be—nor is it—the law.'" *Id.* (quoting *Meyer*, 710 F.3d at 1199). The Court therefore **GRANTS** the motion on this basis.

33

Nevertheless, the Court notes that that the Ninth Circuit has at least considered the possibility that some materials may still constitute corrective disclosures if they "provid[e] additional or more authoritative [] information that deflated the stock price." *See In re Apollo Grp., Inc. Sec. Litig.*, No. 08-16971, 2010 WL 5927988, at *1 (9th Cir. June 23, 2010).[7]  Still, at least as currently alleged, Plaintiffs do not explain why the Hindenburg authors had the necessary background or expertise to interpret or aggregate the public utility data in a manner that added something to the factual record such that their report could still be considered a corrective disclosure under *Apollo*.

## IV.  CONCLUSION

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** the motions to dismiss.

- The Court **GRANTS IN PART** the Section 11 Defendants' motion to dismiss, Dkt. No. 130, **WITH LEAVE TO AMEND** as to Plaintiffs' claims based on accounting errors, fuel cell life, emissions, and internal controls.  The Court otherwise **DENIES** the motion.
- The Court **GRANTS** PwC's motion to dismiss, Dkt. No. 127, **WITH LEAVE TO AMEND**.
- The Court **GRANTS** the Section 10(b) Defendants' motion to dismiss, Dkt. No. 129, **WITH LEAVE TO AMEND**.

Any amended complaint must be filed within twenty-one (21) days of the date of this order.

When preparing an amended complaint, Plaintiffs are further ordered to prepare a statement-by-statement chart of the information required by 15 U.S.C. § 78u-4(b)(1) and (2) that specifically identifies: (A) each statement or action alleged to have been false or misleading, (B) the reasons the statement or action was false, misleading, or deceptive when made, and (C) if an allegation regarding the statement or omission is made on information and belief, all facts on

---

[7] As an unpublished Ninth Circuit decision, *In re Apollo* is not precedent, but may be considered for its persuasive value. *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

United States District Court
Northern District of California

1 which the belief is formed.  The chart should clearly identify which statements or omissions are

2 attributable to which defendants, and include a detailed statement of the facts giving rise to a

3 strong inference that each defendant acted with the required state of mind.  Plaintiffs should also

4 summarize their allegations regarding what each defendant knew with regard to the statement or

5 omission, and when they knew it.  Such a chart should be included within any amended complaint

6 or attached to any amended complaint.  For guidance on the format for such a chart, the Court

7 directs Plaintiffs to review *In re NVIDIA Corp. Sec. Litig.*, 18-cv-07669-HSG, Dkt. No. 149-2.

8       The Court further **SETS** a telephonic case management conference on October 26, 2021, at

9 2:00 p.m.  The parties should be prepared to discuss how to move this case forward efficiently.

10 All counsel shall use the following dial-in information to access the call:

11       Dial-In:  888-808-6929;

12       Passcode:  6064255

13 For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all

14 possible, parties shall use landlines.  The joint case management statement is due October 19,

15 2021.

16       **IT IS SO ORDERED.**

17 Dated: 9/29/2021

18

19 HAYWOOD S. GILLIAM, JR.
United States District Judge

20

21

22

23

24

25

26

27

28